UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| SERVICE LAMP CORPORATION PROFIT SHARING PLAN, individually, and on behalf of all other persons and entities similarly situated, | Case No. |
| | COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| Plaintiff, | |
| | **JURY TRIAL DEMANDED** |
| v. | |
| | **CLASS ACTION** |
| CARNIVAL CORPORATION, ARNOLD W. DONALD, AND DAVID BERNSTEIN, | |
| Defendants. | |

Plaintiff Service Lamp Corporation Profit Sharing Plan ("Plaintiff"), makes the following allegations based upon the investigation of Plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Carnival Corporation ("Carnival" or the "Company"), reports and advisories issued by securities analysts, press releases, investor presentations and other public statements by the Company as well as news and media reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action brought on behalf of all those who purchased or otherwise acquired Carnival common stock and securities between January 28, 2020 and May 1, 2020, inclusive ("the "Class Period"), seeking to pursue remedies against Carnival and certain of its officers under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Carnival bills itself as the world's largest leisure travel company and the largest cruise company, carrying nearly 45 percent of global cruise guests.  The Company has operations in North America, Australia, Europe and Asia, operating a portfolio of global, regional and national cruise brands that sell tailored cruise products, services and vacation experiences on 104 cruise ships to destinations around the world.

3.      This action alleges that Carnival and several officers of the Company made a series of false and misleading statements and concealed material information relating to the Company's adherence to its health and safety protocols in the wake of the COVID-19 pandemic, Carnival's role in facilitating the transmission of the virus, and the Company's violations of port-of-call regulations.  As a result of these false and misleading statements and omissions made throughout the Class Period, Carnival common stock and securities traded at inflated prices.

4.      On January 28, 2020, the first day of the Class Period, Carnival filed with the SEC its annual report on Form 10-K for the fiscal year ending November 30, 2019 ("2019 10-K"). That same day, the Company announced in a press release the resignation of Debra Kelly-Ennis, who resigned from her position as a director of the Company and Carnival plc, including her role as a member of their Health, Environmental, Safety and Security ("HESS") committees, effective January 27, 2020, which resignation enabled Kelly-Ennis to step out from under her obligation as a director to sign the 2019 Form 10-K.

5.      The following week, by February 5, 3,700 passengers and crew were quarantined about the Diamond Princess, a Gem-class ship operated by Princess Cruises, a cruise line owned by Carnival. Then on February 20, the Grand Princess, the first of the Grand-class cruise ships, docked in San Francisco and at least one known COVID infected person disembarked. That COVID infected individual had reportedly been seen by the ship doctor, exhibiting symptoms for

at least six days while on board the Grand Princess. By March 4, 2020 there was a COVID related fatality on board the Grand Princess, and seven (7) Company ships accounted for 49 of the 70 cruise ship fatalities.

6.       On April 16, 2020, when the Company still had at sea two (2) of its cruise ships, *Bloomberg Businessweek* published an article titled "Carnival Executives Knew They Had a Virus Problem, But Kept the Party Going," which revealed that Carnival may have failed to adequately protect passengers from COVID-19 on a series of cruise voyages and indeed continued to operate new cruise departures despite knowledge of the proliferation of COVID-19. On this news, the Company's share price fell $0.53 per share from a prior close of $12.38 per share to close at $11.85 per share on April 16, 2020.

7.       Then, on May 1, 2020, *The Wall Street Journal* published an article titled "Cruise Ships Set Sail Knowing the Deadly Risk to Passengers and Crew," which detailed how cruise ships, including Carnival ships, facilitated the spread of COVID-19 and provided new facts about early warning signs Carnival and its cruise lines possessed and the Company's related COVID-19 disclosure failures.  The article also noted that testimony from an investigation in Australia revealed that Carnival and its cruise lines may have misled shore officials by concealing those exhibiting COVID-19 symptoms before docking.  On the same day, it was revealed that the Chair of the House Committee on Transportation and Infrastructure and Chair of the House Subcommittee on Coast Guard and Maritime Transportation had initiated a records request regarding the response of Carnival to Covid-19 or other infectious disease outbreaks aboard cruise ships.  On this news, the Company's share price fell $1.97 per share from a prior close of $15.90 per share to close at $13.93 per share on May 1, 2020, further damaging Carnival investors.

8.      Throughout the Class Period, Defendants made materially false and/or misleading statements, and/or failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors that: (1) the Company's medics were reporting increasing events of COVID-19 illness on the Company's ships; (2) Carnival was violating port of call regulations by concealing the amount and severity of COVID-19 infections on board its ships; (3) in responding to the outbreak of COVID-19, Carnival failed to follow the Company's own health and safety protocols developed in the wake of other communicable disease outbreaks; (4) by continuing to operate, Carnival ships were responsible for continuing to spread COVID-19 at various ports throughout the world; and (5) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

11.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because many of the acts, practices and transactions that constitute the violations of law complained of herein, including the dissemination to the public of untrue statements of material fact, occurred in whole or in substantial part in this District.

12.     In connection with the acts and conduct alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications

## PARTIES

13.     Plaintiff Service Lamp Corporation Profit Sharing Plan purchased the publicly-traded common stock of Carnival during the Class Period, as set forth in the accompanying Certification, incorporated by reference herein, and was damaged thereby.

14.     Defendant Carnival is incorporated in the Republic of Panama with its headquarters in Miami, Florida.  The Company's stock is listed on the New York Stock Exchange (the "NYSE") under the ticker symbol "CCL."

15.     Defendant Arnold W. Donald was, at all times relevant, the president and chief executive officer ("CEO") of Carnival.

16.     Defendant David Bernstein was, at all times relevant, chief financial officer ("CFO") of Carnival.

17.     Defendants Donald and Bernstein are referred to as the "Individual Defendants." The Individual Defendants and Carnival are referred to collectively as the "Defendants."

18.     During the Class Period, the Individual Defendants, as senior executive officers of Carnival, were privy to confidential and proprietary information concerning Carnival, its operations, finances, financial condition, and present and future business prospects. The Individual Defendants also had access to material-adverse, non-public information concerning Carnival, as discussed herein.

19.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as

senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act, and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of Carnival's business and public statements.

20.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Carnival's SEC filings, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein.

21.     As senior executive officers and as controlling persons of a publicly-traded company whose common stock is registered with the SEC, traded on the NYSE, and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Carnival's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## FRAUDULENT SCHEME AND COURSE OF CONDUCT

22.     Defendants are liable for: (a) making false and misleading statements; or (b) failing to disclose and concealing adverse facts known to them about Carnival.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Carnival common stock was a success, as it: (a) deceived the investing public regarding Carnival's prospects and business; (b) artificially inflated the prices of Carnival common stock; and (c) caused Plaintiff and other members of the Class to purchase Carnival common stock at inflated prices.

## SUBSTANTIVE ALLEGATIONS

### Background

23.     Carnival describes itself as "the world's largest leisure travel company and among the most profitable and financially strong in the cruise and vacation industries."  Carnival touts that it is the "largest cruise company, carrying nearly 45 percent of global cruise guests, and a leading provider of vacations to all major cruise destinations throughout the world."  The Company operates all over the world, with operations in North America, Australia, Europe and Asia.

24.     Carnival operates a "portfolio of leading global, regional and national cruise brands that sell tailored cruise products, services and vacation experiences on 104 cruise ships to the world's most desirable destinations."  These cruise brands include Carnival Cruise Line, Princess Cruises, Holland America Line, Seabourn, Costa and Cunard, among others.

25.     Carnival has recognized that safety and comfort of its guests and crew and protecting the environment are paramount to the success of its business.  To that end, the Company's board has a Health, Environment, Safety, Security and Sustainability ("HESS") Committee, which is tasked with assisting the board in fulfilling its responsibility to supervise and monitor Carnival's health, environment, safety, security and sustainability related policies,

programs and initiatives at sea and ashore and compliance with related legal and regulatory requirements.

26.     On December 31, 2019, the Wuhan Municipal Health Commission, China, reported a cluster of pneumonia cases in Wuhan, Hubei Province, and a novel coronavirus was eventually identified ("COVID-19").  Since it was first identified, COVID-19 has spread throughout the world, resulting in an ongoing pandemic.  As of May 17, 2020, over 4.71 million cases have been reported across 188 countries and territories, resulting in over 315,000 deaths.

**Defendants' False and Misleading Statements Issued During the Class Period**

27.     On January 28, 2020, Carnival filed with the SEC its Annual Report on Form 10-K for its fiscal year ended November 30, 2019.  In its Form 10-K, the Company represented to investors that it was committed to ensuring a safe experience for the Company's guests and that Carnival was fully complying with all legal and statutory requirements related to health and safety throughout its business.  For example, the 10-K provided:

> Our commitments to the safety and comfort of our guests and crew and protecting the environment are paramount to the success of our business. We are committed to operating a safe and reliable fleet and protecting the health, safety and security of our guests, employees and all others working on our behalf. We continue to focus on further enhancing the safety measures onboard all of our ships. We are dedicated to fully complying with, or exceeding, all legal and statutory requirements related to health, environment, safety, security and sustainability throughout our business.
>
> *        *        *
>
> As members of the Cruise Lines International Association ("CLIA"), we helped to develop and have implemented policies that are intended to enhance shipboard safety and environmental protection throughout the cruise industry.

28.     Carnival also stated, among other things, that it provides "regular health, environmental, safety and security support, training, guidance and information to guests, employees and others working on our behalf," that it had developed and implemented "effective

and verifiable management systems to fulfill our health, environmental, safety, security and sustainability commitments," and that it reports and investigates "health, environmental, safety and security incidents and take[s] appropriate action to prevent recurrence."

29.     In the Form 10-K, Carnival also touted its ethics and compliance culture, noting that in August 2019 the Company had enhanced its compliance framework and significantly increased the resources it devoted to its compliance function "by creating an ethics and compliance program, as well as an ethics and compliance program strategic plan."  Led by a chief ethics and compliance officer, Carnival stated that its program involves compliance risk management, improved compliance training programs for its employees, thorough investigations and remedial actions relating to health, environmental and safety incidents and efforts to strengthen its corporate culture.

30.     Further, Carnival stated that, in 2015, it developed a set of "2020 sustainability goals reinforcing our commitment to the environment, our guests, our employees and the communities in which we operate."  One of the goals, aimed at "enhancing the health, safety and security of [Carnival's] guests and crew members," was Carnival's intention to "[c]ontinue to build on [its] commitment to protect the health, safety and security of guests, employees and all others working on [its] behalf and ensuring sustainable business practices across [its] brands and business partners."

31.     On January 28, 2020, Carnival also issued a press release titled "Resignation Of Director And New Board Committee Appointments," which stated in relevant part:

> Carnival Corporation & plc (NYSE/LSE: CCL; NYSE: CUK) announce that on January 27, 2020, Debra Kelly-Ennis resigned from her position as a Director of Carnival Corporation and Carnival plc, including her role as a member of their Health, Environmental, Safety and Security ("HESS") Committees, effective that same day.  The Boards thank Debra for her years of dedication and service.

9

32.     On January 30, 2020, the Company issued a press release titled "Carnival Corporation & plc Statement on Costa Cruises Ship in Italy," which stated in relevant part:

> Carnival Corporation & plc and the company's Italian brand Costa Cruises have confirmed that Italian health officials diagnosed a passenger on board a ship docked in Civitavecchia, north of Rome, Italy with the common flu. The ship will resume its Mediterranean program on Friday.
>
> Guests who should have disembarked today can either disembark or remain on board overnight, at their discretion. All guests scheduled to embark today will be accommodated in hotels near the port and embark on Friday.

33.     On February 12, 2020, the Company issued a press release titled "Carnival Corporation & plc Update On Financial Impact Of Coronavirus," which stated in relevant part:

> Carnival Corporation & plc is closely monitoring the evolving situation with respect to Coronavirus.  ***The safety of guests and employees, compliance and protecting the environment are top priorities for the company. The company's medical experts are coordinating closely with the U.S. Centers for Disease Control and Prevention and the World Health Organization to implement enhanced screening, prevention and control measures for its guests, crew and ships.***  The company's global team is working tirelessly to support guests impacted by voyage disruptions during this unprecedented time.  (Emphasis added.)

34.     On March 12, 2020 the Company announced "a voluntary and temporary pause" of the Global Ship Operations for Princess Cruises.

35.     On March 13, the Company announced a pause in operations of Carnival Cruise Line, stating in a press release:

> we have implemented higher and higher levels of screening, monitoring and sanitation protocols to protect the health and safety of our guests, crew and the communities we serve. While Carnival has not had a diagnosed case linked to our operation we realize this situation is bigger than the cruise industry and we will continue to do our part to support public officials to manage and contain this unprecedented public health challenge.

36.     That same day, the Company announced a pause in the operations of Seabourn, billed as the world's finest ultra-luxury travel experience, in a press release quoting Seaborn President Rick Meadows, as follows: "[W]e have the health and safety of all who travel with us as

10

a top priority.  Our pause should also reassure the hundreds of destinations we visit each year that we want to be responsible in our operations as we bring travelers into their communities each time we visit."

37.    Also on March 13, the Company issued a press release announcing a pause in its other operations, in which Defendant Donald is quoted as saying: "Through serving our many guests who still wanted to travel, ***we've stood with all the people in the port communities here in the U.S., and in the other places we sail,*** who are dependent on us for their livelihood. And today we stand with the nation as we together seek to mitigate the spread." (Emphasis added.)  Defendant Arnold repeated this statement in a press release issued by the Company on March 16, 2020, disclosing additional paused operations.

38.    On March 19, 2020, the Company issued a press release titled "Carnival Corporation Extends Offer to Governments and Health Authorities to Consider Cruise Ships as Temporary Hospitals," which stated in relevant part:

> Carnival Corporation & plc, the world's largest leisure travel company, today announced that select cruise ships from the company's global cruise line brands, including Carnival Cruise Line, Holland America Line, Princess Cruises and P&O Cruises Australia, will be made available to communities for use as temporary hospitals to help address the escalating impacts of the COVID-19 pandemic on healthcare systems around the world.
>
> With the continued spread of COVID-19 expected to exert added pressure on land-based healthcare facilities, including a possible shortage of hospital beds, ***Carnival Corporation and its brands are calling on governments and health authorities to consider using cruise ships as temporary healthcare facilities to treat non-COVID-19 patients***, freeing up additional space and expanding capacity in land-based hospitals to treat cases of COVID-19. As part of the offer, interested parties will be asked to cover only the essential costs of the ship's operations while in port.
>
> Governments or health authorities with interest can contact Monica Puello by email at MPuello@Carnival.com or by phone at (305) 406-8656.
>
> If needed, cruise ships are capable of being quickly provisioned to serve as hospitals with up to 1,000 hospital rooms that can treat patients suffering from less critical,

non-COVID-19 conditions. These temporary cruise ship hospital rooms can be quickly converted to install and connect remote patient monitoring devices over the ship's high-speed network – providing cardiac, respiratory, oxygen saturation and video monitoring capabilities. The rooms also have bathroom facilities, private balconies with access to sun and fresh air, as well as isolation capabilities, as needed.

Additionally, cruise ships being used as temporary hospital facilities to treat non-COVID-19 patients would have the ability to provide up to seven intensive care units (ICUs) in the ship's medical center equipped with central cardiac monitoring, ventilators and other key medical devices and capabilities. Similar to land-based health facilities, cruise ships can also house multiple medical functions in disparate locations by using different decks on the ship to separate each required medical area.

The temporary hospital cruise ships would be berthed at a pier near the community in need and operated by the ship's crew, with all maritime operations, food and beverage, and cleaning services provided by crew members on the ship. Medical services would be provided by the government entity or hospital responsible for fighting the spread of COVID-19 within that community.

39.     Throughout the Class Period, Defendants made materially false and/or misleading statements, and/or failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors that: (1) the Company's medics had  reported increasing events of COVID-19 illness on the Company's ships; (2) Carnival had violated port of call regulations by concealing the amount and severity of COVID-19 infections on board its ships; (3) in responding to the outbreak of COVID-19, Carnival failed to follow the Company's own health and safety protocols developed in the wake of other communicable disease outbreaks; (4) by continuing to operate, Carnival ships were responsible for continuing to spread COVID-19 at various ports throughout the world; and (5) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

**The Truth Begins To Emerge**

40.     On April 16, 2020, when the Company still had at sea two (2) of its cruise ships,

*Bloomberg Businessweek* published an article titled "Carnival Executives Knew They Had a Virus

Problem, But Kept the Party Going."  In that article, it was revealed that Carnival may have failed

to adequately protect passengers from COVID-19 on a series of cruise voyages, and indeed

continued to operate new cruise departures despite its knowledge that the threat posed by COVID-

19 had materialized on its ships and was likely to proliferate further.  The article stated, in part:

> Carnival's ships have become a floating testament to the viciousness of the new
> coronavirus and raised questions about corporate negligence and fleet safety.
> President and Chief Executive Officer Arnold Donald says his company's response
> was reasonable under the circumstances. "This is a generational global event—it's
> unprecedented," he says. "Nothing's perfect, OK? They will say, 'Wow, these
> things Carnival did great. These things, 20/20 hindsight, they could've done
> better.'"

> Donald says that if his company failed to prepare for the pandemic, it failed in
> the same way that many national and local governments failed, and should be
> judged accordingly. "Each ship is a mini-city," he says, and Carnival's response
> shouldn't be condemned before "analyzing what New York did to deal with the
> crisis, what the vice president's task force did, what the Italians, Chinese, South
> Koreans, and Japanese did. We're a small part of the real story. We're being pulled
> along by it."

> In the view of the CDC, however, Carnival helped fuel the crisis. "Maybe that
> excuse flies after the *Diamond Princess*, or maybe after the *Grand Princess*," says
> Cindy Friedman, the experienced epidemiologist who leads the CDC's cruise ship
> task force. "I have a hard time believing they're just a victim of happenstance."
> While it would have been tough to get everyone aboard the ships back to their home
> ports without infecting more people, Friedman says several of the plagued Carnival
> ships didn't even begin their voyages until well after the company knew it was risky
> to do so. She says its actions created a "huge strain" on the country. "Nobody should
> be going on cruise ships during this pandemic, full stop," she says.

> Donald and his team say they're making every effort to protect and treat their
> remaining passengers. The company has attempted to dock its fleet until the
> pandemic subsides. All but about 3,200 passengers and crew are back on shore.

> Carnival's future is less clear. Australian police have launched a criminal probe
> into whether the company's Princess Cruises subsidiary misled authorities about an

outbreak aboard a ship docked in Sydney, and its Costa Cruises subsidiary is facing multiple passenger lawsuits regarding its Covid-19 response.

41.    The *Bloomberg Businessweek* article also detailed Carnival's failure to take timely action after being apprised of COVID-19 threats to its fleet and passengers.  Specifically, the article stated:

> At 11:12 p.m. Japan Standard Time on Feb. 1, more than a month before the outbreak on the *Grand Princess*, the *Diamond Princess* was skimming around Asia on a multiweek cruise. One of its sanitation vendors, Wallem Group, emailed an alert to the vessel's chief administrative officer and a guest services inbox. A Wallem representative said a passenger was being treated for Covid-19 in Hong Kong. "Would kindly inform the ship related parties and do the necessary disinfection," the alert read. Unfortunately, and somewhat inexplicably, according to Roger Frizzell, Carnival's chief communications officer, nobody was monitoring those inboxes. He first says the messages hadn't been read for "at least days," then later emails that, actually, an employee had read them much sooner.

> In Carnival's latest version of the timeline, which it revised repeatedly during various interviews over the past several weeks, Nancy Chung, a Hong Kong-based director for the Princess line, learned of the positive test a few hours later, after seeing a report from Now News TV about a hospitalized coronavirus patient who was understood to have traveled to Hong Kong on a cruise. Chung texted an executive in California, who requested she connect Hong Kong health officials with Tarling, the company's chief medical officer, according to screenshots of the messages viewed by *Bloomberg Businessweek*. The company says these messages show it acted promptly. But Carnival didn't tell passengers they might have been exposed to the virus until the evening of Feb. 3, about 43 hours after the initial alert from Wallem was sent.

> There are other inconsistencies that suggest Carnival wasn't entirely on the ball. The Hong Kong health department put out a press release announcing the Covid-19 case late on Feb. 1, and at 11:33 a.m. on Feb. 2, Tarling sent an email to Hong Kong health authorities with the subject line "Confirmed Coronavirus Case" that included the passenger's name, age, and ward location at Princess Margaret Hospital. But Carnival says this was a mistake. "The subject line should've had 'question mark, question mark, question mark,' because he was asking if it's confirmed," says Frizzell, the Carnival spokesman, adding that Tarling didn't get official confirmation until 6:44 p.m. on Feb. 2. Tarling says he didn't see the previous day's press release. A spokesman for the Hong Kong health department notes that in addition to the press release, it immediately informed "the shipping agent in Hong Kong of the cruise concerned."

Another 24 hours elapsed before Captain Gennaro Arma informed passengers and crew on the *Diamond Princess* of the Covid-19 case. In his announcement, at 6:33 p.m. on Feb. 3, he tried to project calm as the ship cruised toward Yokohama, Japan. The guest hadn't reported feeling ill during his time on board, Arma said over the loudspeaker, but passengers should avoid close contact with anyone suffering respiratory illness, wash their hands for 20 seconds, and seek treatment from the ship's nurses if they had fever, chills, or a cough. "Rest assured, there will be no charge for this service," he said. Upon arrival in Yokohama that evening, Japanese health officials started medical screenings. Arma added: "The situation is under control, and therefore there are no reasons for concerns."

*     *     *

Even after Carnival became aware of the potential coronavirus case, passengers say staff tried to keep the fun going. Guests continued eating and drinking at buffets and bars, hanging out in saunas, and attending shows, including an operatic performance called *Bravo*. Carnival distributed itineraries (known as "Princess Patter") guiding guests to trivia contests and other group activities on Feb. 3. "They were encouraging us to mingle," says Gay Courter, who, after getting her temperature taken by a Japanese official the next day, went for a walk on deck and saw tables of as many as 30 people playing mahjong. A Carnival spokesman says the staff discontinued "most" scheduled activities on Feb. 4, though Japanese officials didn't institute a shipwide quarantine requiring passengers to stay in their cabins until Feb. 5.

42.     Notably, the April 16 *Bloomberg Businessweek* article also intimated that Carnival executives, including Defendant Donald, knew about the scale of the COVID-19 outbreak before the Company filed its Form 10-K on January 28, 2020, and indeed knew of the magnitude of the issue much earlier than most others:

There were other early warnings: [John] Padgett, [Carnival's chief experience and innovation officer], says that in January—after he'd communicated with a manufacturer in Wuhan, the origin of the pandemic, about making batteries for the digital badge system—the leadership, including Arnold Donald, all knew about the scale of the coronavirus outbreak. Padgett says he became aware of the problem's magnitude on Jan. 25—he remembers the exact date because it was the day before Kobe Bryant died. "The biggest thing about that—it's a learning I don't think I'll ever forget, and we shared it with Arnold when we were talking—is that we actually had insight into the global situation much earlier than most," Padgett says. Carnival canceled cruises set to embark from mainland Chinese ports, but these measures don't appear to have altered anything for ships making midcruise stops around Hong Kong or other parts of Asia.

43.     On this news, the Company's share price fell $0.53 per share from a prior close of $12.38 per share to close at $11.85 per share on April 16, 2020.

44.     Then, on May 1, 2020, *The Wall Street Journal* published an article titled "Cruise Ships Set Sail Knowing the Deadly Risk to Passengers and Crew." That article detailed how cruise ships, particularly Carnival ships, facilitated the spread of COVID-19, and provided new facts on early warning signs Carnival and its affiliated cruise lines possessed and the Company's disclosure failures. Further, the article also noted that The House Committee on Transportation and Infrastructure had requested documents from Carnival related "to Covid-19 or other infectious disease outbreaks aboard cruise ships" and that testimony from a separate investigation in Australia revealed that Carnival and its affiliated cruise lines may have misled shore officials by concealing those exhibiting COVID-19 symptoms before docking. The article stated, in pertinent part:

> Early in March, the world's cruise-ship operators had ample evidence to believe their fleet of luxury liners were incubators for the new coronavirus.
>
> Yet they continued to fill cruise ships with passengers, endangering those aboard and helping spread Covid-19 to the U.S. and around the globe, a Wall Street Journal investigation found.
>
> All told, the Journal found that the cruise industry launched voyages on more than 100 ships on or after March 4-the day of the first confirmed Covid-19 death of a passenger from a cruise stopping in the U.S., a marker of the pandemic's long reach.
>
> The U.S. Centers for Disease Control and Prevention has so far determined that 17 of the vessels, which were on international voyages and had entered at least one U.S. port, carried people who tested positive for Covid-19 within two weeks of disembarking.
>
> The virus passed among ship crews and travelers, finding easy passage to ports of call as well as the hometowns of those aboard, according to interviews with passengers and relatives, epidemiologists, ship employees and port and health officials in more than 20 countries.
>
> Cruise companies allowed passengers to travel home without telling them about fellow travelers who fell ill with symptoms of Covid-19 or tested positive for the coronavirus disease, or those who were sent to hospitals.
>
> Government officials in Australia, New Zealand, Canada, Dominican Republic, Trinidad and Tobago, as well as communities in Iowa, Ohio, California, Minnesota,

Florida, Hawaii and Puerto Rico, traced either their first Covid-19 cases or an acceleration of local infections to cruise-ship travelers.

By March 13, the CDC had linked cruise passengers to 17% of reported Covid-19 cases in the U.S. at the time.

The U.S. Coast Guard said it was investigating whether two cruise ships owned by Carnival Corp. violated federal law by failing to alert health authorities about sick travelers disembarking in San Francisco and Puerto Rico, the Journal found. A criminal investigation and a separate government-ordered probe are under way in Australia about similar suspicions regarding a third Carnival-owned cruise ship. The company said it didn't believe it broke any laws.

\*     \*     \*

The House Committee on Transportation and Infrastructure, signaling its intention to exercise its oversight role, sent letters Friday to Carnival, the CDC and the Coast Guard requesting copies of all memos, emails and other communications that pertained to Covid-19 or other infectious disease outbreaks aboard cruise ships.

Australia began a probe that could lead to criminal charges against Carnival or its staff regarding the March 8 voyage of the Ruby Princess around New Zealand. Authorities are trying to determine whether Carnival, or its Princess Cruises subsidiary, knew or should have known about potential Covid-19 cases before allowing some 2,700 passengers to disembark in Sydney.

In public hearings that began April 22, the ship's senior physician, Ilse Von Watzdorf, was asked why she didn't update the ship's medical log books to show that some ill people aboard the ship had been swabbed for possible Covid-19. "I did not have enough hours, I think" to update records, she testified.

Dr. Von Watzdorf said she wasn't sure why ship officers told shore officials it had no crew displaying possible Covid-19 symptoms before docking in Sydney. She also said the cruise company didn't brief her on the Diamond Princess Covid-19 outbreak, which she followed on social media.

Princess Cruises said in a written statement that "it would be inappropriate for us to comment" on matters under official inquiry.

\*     \*     \*

Carnival learned on March 2 that a passenger aboard a Feb. 11 voyage from San Francisco to Mexico on the Grand Princess had tested positive for Covid-19 after returning home to Placer County, Calif.

The man had disembarked on Feb. 21 in San Francisco, a day after visiting the ship's medical center with what Carnival's Chief Medical Officer Grant Tarling said at a March 7 news conference was a "six- to seven-day history of symptoms of an acute respiratory illness."

The Coast Guard is now investigating whether Carnival violated a federal law that requires ships approaching U.S. ports to report outbreaks of illness to the Coast Guard and, in certain cases, to the CDC. The rules are specific, defining a fever as a temperature of 100.4 degrees Fahrenheit or higher, as well as anyone who reports feeling feverish.

Lt. Cmdr. Matthew Kroll said Coast Guard officials only "indirectly received information regarding ill passengers and crew" on the Grand Princess. Mr. Frizzell, the Carnival spokesman, said the company "fully disclosed all of our illnesses to officials, as required."

On March 4, the man from Placer County died.

Twelve days after passengers disembarked, Carnival informed them they may have been exposed to the virus.

Vicki Eschelbach left the Grand Princess when it returned to San Francisco from Mexico on Feb. 21 and traveled home to Santa Rosa, Calif. She spent the next several days going to stores and attending church.

Ms. Eschelbach got the March 4 email from Princess Cruises saying she might have been exposed. "I was freaking out. Like, where am I spreading all these germs?" she said. She had no symptoms and didn't get tested.

That same day, Grand Princess passengers in the middle of the vessel's subsequent cruise to Hawaii received a letter saying the CDC was investigating "a small cluster of Covid-19" cases in Northern California that were connected to the ship's previous voyage to Mexico.

Some travelers and crew had stayed aboard the Grand Princess after the Mexico cruise for the Hawaii voyage, joining hundreds of new passengers who climbed aboard on Feb. 21. Among those on the Hawaii cruise, five people have died and 131 have tested positive, the U.S. Department of Health and Human Services said. County officials in California have so far traced five Covid-19 cases to the Mexico cruise, including two deaths.

*       *       *

The Costa Luminosa, owned by Carnival's Costa Cruises, set sail on March 5 from Fort Lauderdale to Puerto Rico and other stops in the Caribbean before heading back to Europe.

18

Shortly after the ship docked in San Juan three days later, an Italian couple were taken to Ashford Presbyterian Community Hospital. The woman had flu-like symptoms and difficulty breathing, said Dr. Rafael Gonzalez, the hospital's medical director.

While doctors treated the woman, hundreds of passengers left the ship to wander Old San Juan, swelled with people in town for a salsa festival.

"Everyone was allowed ashore. No problem," said Fabian de la Fuente, a passenger from Victoria, British Columbia. He said his entire family of five later tested positive for Covid-19.

The Costa Luminosa should have disclosed any contagious illnesses before the couple were admitted to the hospital, Dr. Gonzalez said. The staff was led to believe the Italian woman had pneumonia, he said.

When emergency-room staff asked if anybody else was sick on the ship, the ship's medical staff denied it, Dr. Gonzalez said. He later learned several crewmen were in quarantine for symptoms of Covid-19 at the time, he said.

"That's not right," the doctor said later in an interview. "That's just not right."

Any company that fails to properly notify the CDC of a serious outbreak of shipboard illness ahead of pulling into port can draw penalties as high as $200,000 for each violation. If a death is involved, the potential penalty can reach $500,000 for each case.

Ricardo Castrodad, a Coast Guard spokesman in San Juan, said maritime authorities weren't told of illnesses aboard the Costa Luminosa, or that passengers had been hospitalized, until after the ship left San Juan harbor on March 8 for Antigua. The Coast Guard is investigating, he said.

Carnival said in a written statement to the Journal that a ship physician suggested testing the woman for Covid-19 after she arrived at the hospital. Notifying the Coast Guard after the fact "was completely acceptable," the company said, because it was a medical emergency.

45.     As noted in *The Wall Street Journal* article, also on May 1, 2020, the Chair of the

House Committee on Transportation and Infrastructure Peter DeFazio and Chair of the House

Subcommittee on Coast Guard and Maritime Transportation Sean Patrick Maloney initiated a

records request regarding the response of Carnival, and its nine affiliated cruise lines, to the

coronavirus pandemic.   In the letter to Defendant Donald, DeFazio and Maloney expressed concerns Carnival was failing to appropriately acknowledge public health concerns in its public-facing materials, writing:

> While cruises are often viewed as a care-free escape from reality where passengers can dine, dance, relax, and mingle, we would hope that the reality of the COVID-19 pandemic will place a renewed emphasis on public health and passenger safety, but frankly that has not been seen up to this point. In fact, it seems as though Carnival Corporation and its portfolio of nine cruise lines, which represents 109 cruise ships, is still trying to sell this cruise line fantasy and ignoring the public health threat posed by coronavirus to potential future passengers and crew.

46.      On this news, the Company's share price fell $1.97 per share from a prior close of $15.90 per share to close at $13.93 per share on May 1, 2020.

**SCIENTER**

47.      During the Class Period, the Defendants had both the motive and the opportunity to commit fraud.   Defendants also had actual knowledge of the misleading nature of their statements, or acted with reckless disregard for the true information known to them at the time they made those statements.   In so doing, Defendants engaged in a course of conduct that operated as a fraud on Class Period purchasers of Carnival common stock.

**LOSS CAUSATION/ECONOMIC LOSS**

48.      During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Carnival common stock.   Later, when the market became aware of Defendants' prior misrepresentations, the price of Carnival common stock fell sharply, as the prior artificial inflation came out of the trading price of Carnival.   As a result of their purchases of Carnival common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## NO SAFE HARBOR

49.     Carnival's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

50.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Carnival who knew that the Carnival was false and was not accompanied by meaningfully cautionary language.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET

51.     Plaintiff is entitled to a presumption of reliance under *Affiliated Ute v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are primarily predicated upon omissions of material fact Defendants were under a duty to disclose or were required to disclose so as not to make their statements false and misleading.

52.     Plaintiff is alternatively permitted to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

        a.      Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

        b.      the omissions and misrepresentations were material;

c.      the Company's stock traded in an efficient market;

d.      the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

e.      Plaintiff and other members of the Class purchased Carnival common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

53.     At all relevant times, the markets for Carnival common stock were efficient for the following reasons, among others:

a.      as a regulated issuer, Carnival filed periodic public reports with the SEC;

b.      Carnival regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; and

c.      Carnival common stock was actively traded in an efficient market, namely the NYSE, under the ticker symbol "CCL."

**CLASS ACTION ALLEGATIONS**

54.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class.  Excluded from the Class are Defendants, directors, and officers of the Company, and their families and affiliates.

55.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to

the parties and the Court.  As of January 16, 2020, Carnival had 527,679,851 shares of common stock outstanding, owned by thousands of persons.

56.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

      a.      whether Defendants violated the Exchange Act;

      b.      whether Defendants omitted and/or misrepresented material facts;

      c.      whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

      d.      whether Defendants knew or recklessly disregarded that their statements were false and misleading;

      e.      whether the prices of Carnival common stock were artificially inflated; and

      f.       the extent of damage sustained by Class members and the appropriate measure of damages.

57.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

58.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests that conflict with those of the Class.

59.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I
### For Violation of Section 10(b) of the Exchange
### Act and Rule 10b-5 Against All Defendants

60.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

61.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew, or recklessly disregarded, were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Defendants made the false or misleading statements alleged herein intentionally and/or recklessly.

62.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

a.     employed devices, schemes, and artifices to defraud;

b.     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

c.     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Carnival common stock during the Class Period.

63.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Carnival common stock.  Plaintiff and the Class would not have purchased Carnival common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

24

64.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Carnival common stock during the Class Period.

**COUNT II**
**For Violation of § 20(a) of the Exchange Act**
**Against the Individual Defendants**

65.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

66.     The Individual Defendants acted as controlling persons of Carnival within the meaning of Section 20(a) of the Exchange Act.  By virtue of their power to control public statements about Carnival, the Individual Defendants had the power and authority to control Carnival and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23;

B.     Awarding Plaintiff and the members of the Class damages and interest;

C.     Awarding Plaintiff reasonable costs, including attorneys' and experts' fees; and

D.     Awarding such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  May 27, 2020

**SHEPHERD, FINKELMAN, MILLER**
**& SHAH, LLP**

By:___/s/ Jayne A. Goldstein_____
    Jayne A. Goldstein
    1625 N. Commerce Pkwy, Suite 320
    Fort Lauderdale, FL 33326
    (866) 849-7545
    Fax: (866) 300-7367
    jgoldstein@sfmslaw.com

*Local Counsel for Plaintiff*

**BARRACK, RODOS & BACINE**
Daniel E. Bacine
Jeffrey A. Barrack
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
(215) 963-0600
Fax: (215) 963-0838
dbacine@barrack.com
jbarrack@barrack.com

        and

**POMERANTZ LLP**
James M. LoPiano
600 Third Avenue
New York, NY  10016
(212) 661-1100
Fax: (917) 463-1044
jlopiano@pomlaw.com

*Counsel for Plaintiff and the*
*[Proposed] Class*

26