**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| SERVICE LAMP CORPORATION PROFIT SHARING PLAN, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:20-cv-22202-KMM |
| | Judge K. Michael Moore |
| Plaintiff, | |
| | CLASS ACTION |
| vs. | |
| CARNIVAL CORPORATION, ARNOLD W. DONALD, and DAVID BERNSTEIN, | ORAL ARGUMENT REQUESTED |
| Defendants. | |
| JOHN P. ELMENSDORP, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:20-cv-22319-KMM |
| | Judge K. Michael Moore |
| Plaintiff, | |
| v. | |
| CARNIVAL CORPORATION, CARNIVAL PLC, ARNOLD W. DONALD, DAVID BERNSTEIN, and MICKY ARISON, | |
| Defendants. | |
| ABRAHAM ATACHBARIAN, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:20-cv-23011-RNS |
| | Judge Robert N. Scola |
| Plaintiff, | |
| v. | |
| CARNIVAL CORPORATION, CARNIVAL PLC, ARNOLD W. DONALD, DAVID BERNSTEIN, and MICKY ARISON, | |
| Defendants. | |

80 SW 8TH STREET, SUITE 1999, MIAMI FL 33130   T: (305) 374 0440   WWW.MARKMIGDAL.COM

**ROY AND JOAN MCCARROLL'S MEMORANDUM OF LAW
IN FURTHER SUPPORT OF THEIR MOTION FOR CONSOLIDATION,
APPOINTMENT AS LEAD PLAINTIFF, AND APPROVAL OF SELECTION
OF LEAD COUNSEL, AND IN OPPOSITION TO COMPETING MOTIONS**

Lead Plaintiff movants Roy and Joan McCarroll (the "McCarrolls") respectfully submit this memorandum of law in further support of their motion for consolidation of the related actions,[1] appointment as lead plaintiffs, and approval of their selection of counsel, and in opposition to the competing lead plaintiff motions.[2]

**PRELIMINARY STATEMENT**

Under the PSLRA, the presumptive lead plaintiff is the movant with the largest financial interest who satisfies Rule 23's typicality and adequacy standards. For the reasons set forth herein, the McCarrolls respectfully submit that they are the presumptive lead plaintiffs here. Only "proof" of their inadequacy can rebut the "strong presumption" in favor of appointing the McCarrolls – no such proof exists here. Accordingly, the McCarrolls should be appointed Lead Plaintiffs for the Class in these Actions.

---

[1] Atachbarian, who filed one of the three complaints in these related actions (the "Actions"), is the only party to oppose consolidation here, but his opposition lacks foundation and should be rejected because separate actions are not necessary for different securities. *See In re Valeant Pharm. Intl., Inc. Sec. Litig.*, No. CV 15-7658 (MAS) (LHG), 2018 WL 5849466, at *8 (D.N.J. Nov. 7, 2018) (consolidating a separately filed action for options traders). Moreover, as Defendants note in their support of the motion to consolidate, the Actions all: (i) assert claims under Rule 10b-5 and Section 10(b) and 20(a) of the Securities Exchange Act of 1934 against Carnival and certain executives; (ii) allege that the same set of public statements by Defendants were materially misleading for the same reasons; and (iii) cite the same April 16, 2020 *Bloomberg* report and May 1, 2020 *Wall Street Journal* article as alleged corrective disclosures. *See* ECF No. 27 at 2. Thus, consolidation is warranted here.

[2] Competing motions were filed by: (i) New England Carpenters Pension Fund, New England Carpenters Guaranteed Annuity Fund, Massachusetts Laborers' Pension Fund, and Massachusetts Laborers' Annuity Fund (collectively, the "Funds"); (ii) LiUNA Pension Fund of Central and Eastern Canada ("LiUNA"); (iii) Stephen Harris; (iv) Joseph Fuscaldo; and (v) Stuart Roy Rosenblatt. As of the date of this filing, movants LiUNA, Stuart Roy Rosenblatt, and Stephen Harris have filed notices of non-opposition to the competing motions or withdrawal. ECF No. 26; 28; and 29. Otherwise undefined terms have the definitions set forth in the McCarrolls' opening brief.

Only one remaining movant, the Funds, asserts a larger financial interest than the McCarrolls, but the Funds' motion is undermined by Rule 23 impediments.  Indeed, the Funds have a debilitating conflict with members of the Class because they sold out their Carnival stock on March 18, 2020 – before four of the seven alleged disclosures in these Actions, including the key April 16, 2020 partial disclosure and the key May 1, 2020 final disclosure that are at the very heart of these Actions and are distinct from the earlier partial disclosures alleged.  Whereas the pre-April 16 partial disclosures revealed that Carnival passengers from three different ships had fallen ill or died as a result of COVID, the April 16, 2020 partial disclosure revealed for the first time in detail how Carnival actually *downplayed* the effects of COVID on the Company's ships. The May 1, 2020 final corrective disclosure continued to build on this news by revealing additional detail about how Carnival downplayed the impact of COVID.

The Funds have no incentive to prove that any post-March 18, 2020 corrective disclosure – including the pivotal April 16 and May 1 disclosures – revealed new information to the market about the alleged fraud because they sustained no harm from those disclosures.  In light of the foregoing, the Funds suffer from a clear conflict of interest with Class members who sustained damages from those very important disclosures.  Courts have found lead plaintiff movants atypical and inadequate in analogous circumstances.[3]  *See infra* at 5-7.

---

[3] It is also noteworthy that the pre-April 16, 2020 disclosures were not alleged in the initial complaint in these Actions – they were first added by counsel for the Funds in the second filed complaint.  *Compare Service Lamp Corporation Profit Sharing Plan v. Carnival Corp.*, No. 1:20-cv-22202-KMM ECF No. 1 ("*Service Lamp*")at ¶¶40-46; *with Elmensdorp v. Carnival Corp.*, No. 1:20-cv-22319 ECF No. 1 ("*Elmensdorp*") at ¶¶58-98.  There is no question that the broadest case possible is in the best interest of the Class at this stage.  *Miller v. Dyadic Int'l., Inc.*, No. 07-80948-CIV, 2008 WL 2465286, at *4 (S.D. Fla. Apr. 18, 2008) ("the longest, most inclusive class period is appropriate at this stage in the litigation because "it encompasses more potential class members.'").  However, for purposes of appointing a lead plaintiff, the Court should also consider whether counsel for the Funds have merely placed their own interests above the Class's to afford their clients an opportunity to seek a leadership appointment when their clients otherwise would have had none.  *Maliarov v. Eros Int'l. PLC*, No. 15-CV-8956 (AJN), 2016 WL 1367246, at *4 (S.D.N.Y. Apr. 5, 2016) (refusing to appoint a lead plaintiff movant

Relatedly, the Funds liquidated all of their Carnival stock *before* many of Carnival's alleged statements. Thus, the Funds are subject to a unique defense that they have no standing to allege such later statements were misleading because they owned no Carnival stock at the time those statements were made. Courts have rejected lead plaintiff movants under similar circumstances. *See infra* at 11.

The McCarrolls, in contrast, suffer from none of the issues afflicting the Funds. In fact, the McCarrolls suffered losses in connection with *every* alleged corrective disclosure because they bought before the first alleged corrective disclosure on February 3, 2020 and held 20,550 shares of Carnival stock through the end of the Class Period. Accordingly, they have every incentive to vigorously represent the interests of all Class members. The McCarrolls are also not subject to a unique defense that they lack standing to litigate alleged post-March 18, 2020 misstatements (including any such statements added in an amended complaint) because they bought Carnival shares during the Class Period and held 20,550 of them through May 1, 2020, the last day of the current operative Class Period.

Prior to the filing of this opposition, counsel for the McCarrolls contacted counsel for the Funds and expressed the concerns raised herein to see if the Funds would be willing to work cooperatively with the McCarrolls to ensure that the Class is fully protected. The Funds, however, were not interested.

---

*( … continued)*
that filed a complaint with a new partial disclosure which was the only disclosure that the movant had standing to pursue.) This is relevant to the Rule 23 inquiry and whether the Court's appointment here will act as a fiduciary for the Class or themselves. It is well established that the PSLRA eschews lawyer-driven litigation. *Topping v. Deloitte Touche Tohmatsu CPA*, 95 F. Supp. 3d 607, 615 (S.D.N.Y. 2015). Relatedly, there is simply no need for the multiple law firms the Funds seek to have the Court approve as co-lead counsel while leaving a swath of Class members unprotected by the conflict of interest afflicting the Funds.

Accordingly, the McCarrolls respectfully request that the Court deny the competing motions, appoint them as Lead Plaintiffs, and approve their selection of Lead Counsel. Alternatively, the McCarrolls respectfully request that the Court appoint them as Co-Lead Plaintiffs and their counsel as Co-Lead Counsel with the Funds to protect the interests of Class members who lost money after March 18, 2020.

**ARGUMENT**

I. **THE COURT SHOULD APPOINT THE MCCARROLLS AS LEAD PLAINTIFFS**

A. **The McCarrolls Are the Presumptive Lead Plaintiffs Because They Have the Largest Financial Interest of Movants Who Satisfy Rule 23**

Under the PSLRA, the presumptive lead plaintiff is the movant who suffered the largest financial interest and satisfies Fed. R. Civ. P.23. *See* 15 U.S.C. § 78u-4(a)(l); *see also* 15 U.S.C. § 78u-4(a)(3)(B) (setting forth procedure for selecting lead plaintiff); *see also Luczak v. Nat'l Beverage Corp.*, No. 0:18-cv-61631-KMM, 2018 WL 9847842, at *1 (S.D. Fla. Oct. 12, 2018). The McCarrolls sustained over $660,000 in losses and have the largest financial interest of all competing movants except the Funds, which, for the reasons articulated herein, have not met Rule 23's typicality and adequacy requirements.

The McCarrolls' substantial financial interest ensures that they will prosecute the Actions diligently on behalf of the Class. *Peters v. Jinkosolar Holding Co.*, No. 11 CIV. 7133 (JPO), 2012 WL 946875, at *4 (S.D.N.Y. Mar. 19, 2012) ("[t]he theory of these provisions was that if an investor with a large financial stake in the litigation was made lead plaintiff, such a plaintiff ... would be motivated to act like a 'real' client, carefully choosing counsel and monitoring counsel's performance to make sure that adequate representation was delivered at a reasonable price").

**B. The McCarrolls Satisfy the PSLRA's Rule 23 Requirements**

The McCarrolls also readily meet Rule 23's typicality and adequacy standards. The McCarrolls' claims are typical of those of other Class members because, like other Class members, they purchased Carnival securities during the Class Period at prices artificially inflated by Defendants' alleged misrepresentations and omissions and, unlike the Funds, held 20,550 Carnival shares through the end of the Class Period.

The McCarrolls also meet Rule 23's adequacy requirements. The McCarrolls are a married couple residing in Alabama with over 20 years of investing experience. They have also retained experienced counsel. ECF No. 25 at 11-13. Unlike the Funds, they suffer from no conflict of interest with any Class members because they suffered losses on all alleged corrective disclosures – including the pivotal April 16, 2020 and May 1, 2020 disclosures – and can allege claims for any and all statements throughout the Class Period. Thus, the McCarrolls are more than adequate to serve as lead plaintiffs – they are the perfect choice here.

**II.  COMPETING MOVANTS CAN OFFER NO PROOF THAT THE MCCARROLLS DO NOT SATISFY RULE 23**

To rebut the McCarrolls' presumptive lead plaintiff status, competing movants must offer "proof" that the McCarrolls do not satisfy Rule 23. *See* 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). Competing movants can offer no such proof. As discussed above, the McCarrolls handily meet the typicality and adequacy requirements.

**III.  THE COURT SHOULD NOT APPOINT THE FUNDS AS LEAD PLAINTIFFS BECAUSE THEY SUFFER FROM FATAL RULE 23 DEFICIENCIES**

Lead plaintiff movants must satisfy the typicality and adequacy provisions of Fed. R. Civ. P. 23 before serving as lead plaintiffs. *See* 15 U.S.C. § 78u-4. This Court has noted that the typicality requirement of Fed. R. Civ. P. 23(a)(3) is satisfied where the named representative's claims have the "same essential characteristics as the claims of the class at large." *Luczak*, 2018

5

WL 9847842, at *2 (citing *Prado-Steinman ex rel. Prado v. Bush,* 221 F.3d 1266, 1279 (11th Cir. 2000)).  In assessing adequacy, the court considers "(1) whether any substantial conflicts of interest exist between the [presumptive lead plaintiff] and the class; and (2) whether the [presumptive lead plaintiff] will adequately prosecute the action." *MAZ Partners LP v. First Choice Healthcare Solutions, Inc*., No. 6:19-CV-619-Orl-40LRH, 2019 WL 2648550, at *3 (M.D. Fla. June 12, 2019).  As discussed below, the Funds are neither typical of Class members nor adequate to represent them.

### A. Liquidating Before Key Corrective Disclosures – Particularly When They Are Critical to the Case and Significantly Different Than Earlier Ones – Renders The Funds Atypical and Inadequate Under Rule 23

Courts have found lead plaintiff movants who sell all their shares before the end of the Class Period atypical and inadequate under Rule 23.  For example, in *Constr. Workers Pension Tr. Fund v. Navistar Int'l Corp*., No. 13 C 2111, 2013 WL 3934243, at *4-5 (N.D. Ill. July 30, 2013), lead plaintiff movant Retirement Funds lost over $5 million but sold all of its shares after the first partial disclosure and before the final two disclosures.  The court held that the Retirement Funds should not be appointed as lead plaintiff because they suffered no harm from the two final disclosures.  *Id.* at *5 (because the Retirement Funds sold all of its Navistar Stock before the July 2012 Disclosure or the August 2012 disclosures they have "no incentive to fairly and adequately protect the interests of the class as to the later disclosures.")

Here, unlike the Funds, the McCarrolls have "shown that [they] alleg[e] significant losses resulting from all…relevant disclosures…and [have] a great incentive to vigorously litigate all material issues in this case."  *Id; see also Doshi v. Cable*, No. CV 2:17-025 (WOB-CJS), 2017 WL 5178673, at *4 (E.D. Ky. Nov. 7, 2017) (appointing individual investor with a smaller loss over an institutional movant who sold all of its shares after the first corrective disclosure); *In re Snap Inc. Sec. Litig.*, No. 2:17-CV-03679-SVW-AGR, 2019 WL 2223800, (C.D. Cal. Apr. 1,

6

2019) (rejecting proposed lead plaintiff who sold before final corrective disclosure because it raised unique defense which could be to "detriment of the putative class"); *In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig*., No. MDL 08-MD-1961, 2008 WL 11363375, at \*4 (D. Md. Aug. 27, 2008) (rejecting lead plaintiff movant group where two of four members sold before a corrective disclosure because there may be a "conflict between [that group's] claims and those asserted on behalf of [at least some members of] the class" and that the later stock drop was likely to be a "major focus" of the case).   In particular, the key April 16, 2020 partial corrective disclosure and the key May 1, 2020 final corrective disclosure – from which the Funds suffered no harm – will be a "major focus" of this case.  *See id*. at \*4.

In re BP, PLC Securities Litig.*, 758 F. Supp. 2d 428, 438 (S.D. Tex. 2010) is also instructive.   In *BP*, the court held that pension fund movants who "focus[ed] a good deal of attention on a fraud allegedly committed *after* April 20, 2010" was not suitable to serve as lead plaintiff for the entire class because, *inter alia*, "absent class members could be prejudiced by [these movants'] manner of drafting a consolidated complaint, defending motions to dismiss, and conducting discovery."  *See also id*. (it is "particularly important at this early stage of the case to avoid prejudicing the claims of absent class members through the appointment of a lead plaintiff who cannot fully and fairly represent them");[4] *Firefighters Pension and Relief Fund of City of New Orleans v. Bulmahn*, Civ. A. No. 13-3935, 2013 WL 6388583, at \*2 (E.D. La. Dec. 6, 2013) (creating a subclass after citing BP's concern over "[t]he stark difference between the two groups'…distinct theories of the case [which could] create a significant risk of conflict and prejudice to class members if they are not separated").

---

[4] The court in BP appointed individual plaintiffs as lead plaintiff for a subclass.  *See id.*  A subclass is not necessary here because, unlike the individual subclass plaintiffs in BP, the McCarrolls suffered substantial losses in connection with all corrective disclosures.

**B. The Singular April 16, 2020 and May 1, 2020 Revelations Were Very Different From the Earlier Ones – and Unlike the Funds, the McCarrolls Actually Suffered Losses in Connection With These Disclosures**

The April 16, 2020 and May 1, 2020 disclosures are different in kind, not degree, from the previous partial disclosures. The five partial disclosures before April 16, 2020 slowly revealed that passengers and employees on various Carnival ships had fallen ill with COVID:

On February 3, 2020, *Bloomberg News* reported that the Carnival ship, Diamond Princess, and its 2,666 passengers and 1,045 crew were quarantined in Japan after a Hong Kong man who had sailed on the Diamond Princess from January 20-25, 2020 was confirmed to have been infected by COVID. *Atachbarian v. Carnival Corporation*, No. 1:20-cv-23011-RNS ECF No. 1 ("*Atachbarian*") ¶25; *Elmensdorp* ¶¶13-14, 58. Carnival stock fell after this disclosure. *Elmensdorp* ¶60.

On March 4, 2020, the Company announced that the CDC was investigating a cluster of COVID cases connected with the Company's Grand Princess ship, located temporarily within or near the Port of San Francisco, California. *Atachbarian* ¶32; *Elmensdorp* ¶64. Carnival stock fell after this disclosure. *Elmensdorp* ¶68.

On March 8, 2020, *The New York Times* reported that the Diamond Princess quarantine failed, at least in part, because the Company had, among other things: (1) ignored an email from a port representative notifying the Company that one of its Diamond Princess passengers had tested positive for COVID; and (2) incorrectly assumed that the risk was minimal. *Elmensdorp* ¶70. Carnival stock fell after this disclosure. *Id*. at ¶71.

On March 27, 2020, the Company revealed the extent of a COVID outbreak on yet another Carnival-owned cruise ship (the MS Zaandam), with four passengers dead, two confirmed cases of COVID onboard, and more than 100 people reporting flu-like symptoms. *Id*. at ¶73. Carnival stock fell again after this disclosure. *Id*. at ¶74.

On April 1, 2020, in a prospectus supplement, Carnival reiterated the COVID problems on numerous ships and, among other things, reported that Carnival would be providing cash refunds that "could have a material adverse effect on our liquidity and capital resources." *Atachbarian* ¶45. Carnival also announced that day that it would seek to raise less than half the amount it originally sought in the offering. *Id*. at ¶46. Carnival stock fell after these disclosures. *Id*. at ¶47.

The detailed April 16, 2020 *Bloomberg* article, in contrast, disclosed significant facts about Carnival's "efforts to downplay the seriousness of the virus." *Elmensdorp* ¶22. The *Bloomberg* article revealed that "when the Company still had at sea two (2) of its cruise ships, Bloomberg Businessweek published an article titled 'Carnival Executives Knew They Had a

Virus Problem, But Kept the Party Going.'"   *Service Lamp* ¶40; *Atachbarian* ¶49; *Elmensdorp* ¶¶75, 89.   Demonstrating the significance of the *Bloomberg* article, all the complaints reported on it at great length.   *Elmensdorp* ¶¶22-23; 75-86; *Service Lamp* ¶¶40-42; *Atachbarian* ¶49.   Carnival stock fell after the April 16, 2020 revelations.   *Elmensdorp* ¶23.

Indeed, *Service Lamp* alleges that the truth ***only began to be disclosed*** with the April 16, 2020 revelation.   *See id*. at ¶40 ("The Truth Begins To Emerge…On April 16, 2020, when the Company still had at sea two (2) of its cruise ships, Bloomberg Businessweek published an article titled "Carnival Executives Knew They Had a Virus Problem, But Kept the Party Going").  This further demonstrates that the April 16, 2020 is significantly different from the earlier disclosures.  And, as noted above, the majority of the pre-April 16 disclosures were only added later by counsel for the Funds.

The remaining disclosure on May 1, 2020 revealed more about the alleged fraud, building on the April 16, 2020 *Bloomberg* article.  On May 1, 2020, *The Wall Street Journal* published an article titled "Cruise Ships Set Sail Knowing the Deadly Risk to Passengers and Crew," which detailed how cruise ships, including Carnival ships, facilitated the spread of COVID and provided new facts about early warning signs Carnival and its cruise lines possessed and the Company's related COVID disclosure failures."   *Service Lamp* ¶7.   On the same day, it was revealed that the Chair of the House Committee on Transportation and Infrastructure and Chair of the House Subcommittee on Coast Guard and Maritime Transportation had initiated a records request regarding the response of Carnival to COVID or other infectious disease outbreaks aboard cruise ships.   *Id*.   *See also Atachbarian* ¶50-54; *Elmensdorp* ¶24.   *See also Elmensdorp* ¶89 ("[c]iting extensive public reporting—***particularly the April 16, 2020 Bloomberg Businessweek article***, which the letter called "quite disturbing"—the Congressional Letter stated

that "it seems as though Carnival Corporation . . . is still trying to sell this cruise line fantasy and ignoring the public health threat posed by coronavirus to potential future passengers and crew"). Carnival stock again fell after the May 1, 2020 disclosures. *See, e.g., Elmensdorp* ¶25.

Unlike the Funds who had already liquidated their Carnival stock approximately one month prior to these key disclosures, the McCarrolls suffered substantial losses in connection with the April 16, 2020 and May 1, 2020 disclosures. Indeed, the McCarrolls' first Class Period purchase was on January 8, 2020 – well before the first alleged corrective disclosure, which was on February 3, 2020. *See supra* at 4. And the McCarrolls held 20,550 shares of Carnival stock through the end of the Class Period. *See* ECF 25-1. Thus, the McCarrolls were substantially injured by post-March 18, 2020 disclosures – including the critical and quite different April 16, 2020 and May 1, 2020 revelations – because they held Carnival shares at those times. In contrast, the Funds sold all their Carnival shares as of March 18, 2020. *See* ECF 23-4. ***The Funds, thus, liquidated after less than half – three of seven – of the disclosures, including these distinctly important ones***. *See infra* at 10-11.[5] Accordingly, the Funds have no incentive to prove that the four later disclosures – including the central April 16, 2020 and May 1, 2020 disclosures – revealed part of the fraud to the market. This is fatal to their lead plaintiff motion because it renders them atypical of, and inadequate to represent, all Class members.

## C. Unlike the Funds, the McCarrolls Are Not Subject to a Unique Defense that They Lack Standing to Allege Post-March 18, 2020 Misstatements

Courts have found that lead plaintiff movants are subject to a unique defense where they do not have standing to allege claims based on statements made when they held no shares of the subject stock that they had bought during the Class Period. *Grodko v. Cent. European Distribution Corp.*, No. CIV.A. 12-5530 JBS, 2012 WL 6595931, at *8 (D.N.J. Dec. 17, 2012)

---

[5] The Funds liquidated before the March 27, 2020, April 1, 2020, April 16, 2020 and May 1, 2020 disclosures.

10

(rejecting lead plaintiffs  who liquidated after partial disclosure because they were subject to a "unique defense regarding whether they can establish loss causation from the events that form the core of this action"); *Maliarov*, 2016 WL 1367246 at *4 (movant subject to unique defenses that rendered him incapable of adequately representing the class because he would be completely barred from a recovery if no earlier disclosure date is established).  Indeed, in the seminal *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 728 (1975), the Supreme Court observed that Section 10(b) of the Securities Exchange Act prohibits certain "manipulative or deceptive" conduct "in connection with the purchase or sale of any security."  Here, the Funds cannot allege claims based on post-March 18, 2020 statements because they cannot allege they purchased or sold Carnival stock in connection with such statements.  The Funds' Carnival transactions were over by March 18, 2020.

Here, the McCarrolls held 20,550 shares of their Class Period Carnival purchases through the end of the Class Period.  Thus, unlike the Funds, they are not subject to a unique defense as to whether they can allege misstatements after March 18, 2020.   For example, *Service Lamp* alleges that on March 19, 2020, Carnival represented in a press release that it "and its brands are calling on governments and health authorities to consider using cruise ships as temporary healthcare facilities to treat non-COVID-19 patients" – downplaying Carnival's own emergency with COVID.  *Service Lamp* ¶38.  *Atachbarian* contains allegations about Carnival's April 1, 2020 stock offering, including a preliminary prospectus on March 31, 2020 and a final one dated April 1, 2020.  *Atachbarian* at ¶45.  These offering documents – both of which discuss COVID at length – will undoubtedly be included in the future operative amended complaint.  Carnival

11

also made many other public statements about COVID between March 18, 2020 and May 1, 2020 (the end of the current class period).[6]

## IV.  ALL OTHER COMPETING MOTIONS SHOULD BE DENIED

As demonstrated above, the McCarrolls have the largest financial interest of qualified movants, they have made a *prima facie* showing of their typicality and adequacy, and there is no proof to rebut their showing of typicality and adequacy.  Accordingly, the Court should appoint the McCarrolls as Lead Plaintiffs and deny all competing motions.[7]

## V.  ALTERNATIVELY, THE MCCARROLLS SHOULD BE APPOINTED AS CO-LEAD PLAINTIFFS

Even if the Court is not fully convinced that the Funds suffer from debilitating Rule 23 impediments, and it should be, at the very least the McCarrolls respectfully submit that they should be appointed as Co-Lead Plaintiffs with the Funds to provide critical insurance for Class members who bought Carnival stock after March 18, 2020 or held Carnival stock through the end of the Class Period.  *See, e.g., BP*, 758 F. Supp. 2d at 442 (appointing subclass to guard interests of class members whose losses were substantially in a different part of the class period).

Courts have recognized the benefits of such diverse leadership – particularly that of mixing institutional investors like the Funds and individual investors like the McCarrolls.[8]

---

[6] *See, e.g.*, March 31, 2020 Form 10-K, two March 31, 2020 Form 8-Ks, April 2, 2020 Form 8-K, April 3, 2020 Form 10-Q, April 6, 2020 form 8-K, April 8, 2020 Form 8-K.

[7] The McCarrolls reserve the right to further address the typicality or adequacy of other competing movants should they oppose the McCarrolls' motion.

[8] *See, e.g., Sokolow v. LJM Funds Mgmt. Ltd.*, No. 1:18-cv-01039, 2018 WL 3141814, at *5 (N.D. Ill. June 26, 2018) ("Indeed, other courts have recognized that more diverse groups can better serve the interests of class members in securities class actions") (citing *City of Sterling Heights Gen. Emp. Ret. Sys. v. Hospira, Inc.*, No. 11 C 8332, 2012 WL 1339678, at *8 (N.D. Ill. Apr. 18, 2012);  *Weisz v. Calpine Corp.*, No. 4:02-CV-1200, 2002 WL 32818827, at *8 (N.D. Cal. Aug. 19, 2002) ("The Court finds that appointing both an institutional and an individual investor to serve as co-lead plaintiffs will ensure that all class members will adequately be represented in the prosecution of this action."); *Laborers Local 1298 Pension Fund v. Campbell Soup Co.*, No. Civ. A. 00-152 (JEI), 2000 WL 486956, at *3 (D.N.J. Apr. 24, 2000) (appointing two competing movants as co-lead plaintiffs in view of the desirability of having both

**CONCLUSION**

For the foregoing reasons and those given in their opening motion, the McCarrolls respectfully request that the Court issue an Order: (i) consolidating the above-captioned actions; (ii) appointing the McCarrolls as Lead Plaintiff for the Class; (iii) approving the McCarrolls' selection of Bernstein Liebhard as Lead Counsel for the Class and MM&H as Liaison Counsel to the Class; or, alternatively, appointing the McCarrolls as Co-Lead Plaintiffs and Bernstein Liebhard as Co-Lead Counsel for the Class.

DATED:  August 10, 2020

Respectfully submitted,

**MARK MIGDAL & HAYDEN**
80 S.W. 8th Street, Suite 1999
Miami, Florida 33130
Telephone: (305) 374-0440

By: *s/ Etan Mark*
    Etan Mark, Esq.
    Florida Bar No. 720852
    etan@markmigdal.com
    Daniel S. Maland, Esq.
    Florida Bar No. 114932
    daniel@markmigdal.com
    eservice@markmigdal.com

*Proposed Liaison Counsel for the Class*

---

*( ... continued)*
institutional investors and individual investors as lead plaintiffs "since each may bring a unique perspective to the litigation")).

**BERNSTEIN LIEBHARD LLP**
Stanley D. Bernstein, Esq.
Laurence J. Hasson, Esq.
Joseph R. Seidman
Matthew E. Guarnero, Esq.
10 East 40th Street
New York, NY 10016
Telephone: (212) 779-1414
Facsimile: (212) 779-3218
bernstein@bernlieb.com
lhasson@bernlieb.com
seidman@bernlieb.com
mguarnero@bernlieb.com

*Counsel for Lead Plaintiff Movants Roy and Joan McCarroll and Proposed Lead Counsel for the Class*

14

## CERTIFICATE OF SERVICE

I hereby certify that on August 10, 2020, a true and accurate copy of the above document was electronically filed with the Clerk of the Court by using the CM/ECF system which will send Notice of Electronic Filing to all counsel of record.

/s/ Etan Mark
Etan Mark, Esq.