**UNITED STATED DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

|  |  |
|---|---|
| IN RE CARNIVAL CORP. SECURITIES LITIGATION | Case No. 1:20-cv-22202-KMM <br><br> <u>CLASS ACTION</u> |
| ABRAHAM ATACHBARIAN, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> CARNIVAL CORPORATION, CARNIVAL PLC, ARNOLD W. DONALD, DAVID BERNSTEIN, and MICKY ARISON, <br><br> Defendants. | Case No. 1:20-cv-23011-KMM <br><br> <u>CLASS ACTION</u> |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF ABRAHAM ATACHBARIAN
FOR APPOINTMENTAS LEAD PLAINTIFF AND APPROVAL OF LEAD
COUNSEL OF AN OPTIONS CLASS OR SUBCLASS**

.

**TABLE OF CONTENTS**

TABLE OF CONTENTS..................................................................................................I

TABLE OF AUTHORITIES .........................................................................................II

PRELIMINARY STATEMENT ..................................................................... 1

PROCEDURAL HISTORY ............................................................................ 2

STATEMENT OF FACTS ............................................................................. 5

ARGUMENT ................................................................................................ 10

      I.      ATACHBARIAN SHOULD BE APPOINTED AS LEAD PLAINTIFF OF THE OPTIONS CLASS  OR SUBCLASS.................................................. 10

      A.    Atachbarian is Willing to Serve as a Class Representative .......................... 15

      B.    Atachbarian Has the "Largest Financial Interest" in the Action.................. 15

      C.    Atachbarian Otherwise Satisfies the Requirements of Rule 23 .................... 17

II.   LEAD PLAINTIFF'S SELECTION OF COUNSEL SHOULD BE APPROVED 19

CONCLUSION........................................................................................... 20

**TABLE OF AUTHORITIES**

**CASES**

*Basile v. Valeant Pharmaceutical Int'l Inc., et al.*,
No. 8:14-cv-02004-DOC-KESx (C.D. Cal. Mar. 15, 2017) ........................................... 17

*Blue Chip Stamps v. Manor Drug Stores*,
421 U.S. 723 (1975) ................................................................................................. 13

*Brustein v. Lampert*,
04-61159-CIV-LENARD/KLEIN, 2005 U.S. Dist. LEXIS 51106  (S.D. Fla.  2005) ..... 17

*Chill v. Green Tree Financial Corp.*,
181 F.R.D. 398 (D. Minn. 1998) ................................................................................ 16

*Hevisi v. Citigroup Inc.*,
366 F. 3d 70 (2nd Cir. 2004) ..................................................................................... 12

*In re Allergan, Inc. Proxy Violation Derivatives Litig.*,
Case No. 2:17-cv-04776 ............................................................................................. 14

*In re American Realty Capital Properties, Inc. Litig.*,
No. 1:15-mc-000040-AKH (S.D.N.Y. June 16, 2019) ................................................. 16

*In re Bank of Am. Corp. Sec., Derivative, & ERISA Litigation*,
No. 09 MDL 2058 (DC), 2010 U.S. Dist. LEXIS 37799 (S.D.N.Y. Apr. 9, 2010) ......... 14

*In re Molson Coors Brewing Co. Sec. Litig.*,
233 F.R.D. 147  (D. Del. 2005) ................................................................................. 19

*In re Oxford Health Plans, Inc. Sec. Litig.*,
182 F.R.D. 42  (S.D.N.Y. 1998) ................................................................................ 17

*In re Oxford Health Plans, Inc. Sec. Litig.*,
191 F.R.D. 369 (S.D.N.Y. 2000) ............................................................................... 13

*In re Valeant Pharms. Int'l., Ince. Secs. Litig.*,
15-cv-7658 (MAS)(LHG), 2018 U.S. Dist. LEXIS 191439  (D.N.J. Nov. 7, 2018) ........ 14

*Johnson v. J.C. Penny Co.*,
No. 6:1-cv-722, 2015 U.S. Dist. LEXIS 185879 (E.D. Texas June 10, 2015) ................. 14

*Kabak v. Becton, Dickinson & Co.*,
2020 WL 3056281 (D.N.J. June 9, 2020) ................................................................... 14

*Miller v. Dyadic Int'l, Inc.*,
 07-cv-80948, 2007 U.S. Dist. LEXIS 96099 (S.D. Fla. Dec. 14, 2007) .......................... 16

*Mulvaney v. GEO Group, Inc.*,
 16-cv-81494- MIDDLEBROOKS, 2016 U.S. Dist. LEXIS 193402 (S.D. Fla. 2016) ..... 19

*Nghiem Tran v. Erba Diagnostics, Inc.*,
 15-cv-24440 COOKE/TORRES, 2016 U.S. Dist. LEXIS 186864 (S.D. Fla. 2016) ........ 17

*Piven v. Sykes Enters. Inc.*,
 137 F. Supp. 2d 1295  (M.D. Fla. 2000) ...................................................................... 16, 18

*Prado-Steinman ex rel. Prado v. Bush*,
 22 F.3d 1266 (11th Cir. 2000) ........................................................................................ 18

*Thorpe v. Walter Inv. Mgmt., Corp.*,
 1:14-cv-20880-UU, 2016 U.S. Dist. LEXIS 33637 (S.D. Fla. Mar. 16, 2016) ................ 17

*Weinberg v. Atlas Air Worldwide Holdings, Inc.*,
 216 F.R.D. 248 (S.D.N.Y. 2003) .................................................................................... 18

## STATUTES

15 U.S.C. § 78u-4(a)(2)(A) .............................................................................................................. 5

15 U.S.C. § 78u-4(a)(3), Section 21D(a)(3) ..................................................................................... 1

15 U.S.C. § 78u-4(a)(3)(A)(i) ........................................................................................................ 11

15 U.S.C. § 78u-4(a)(3)(B)(i) & (ii) .............................................................................................. 11

15 U.S.C. § 78u-4(a)(3)(B)(iii) ...................................................................................................... 15

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I) ............................................................................................... 4, 11

15 U.S.C. § 78u4(a)(3)(B)(iii)(I)(bb) ............................................................................................. 16

15 U.S.C. § 78u-4(a)(3)(B)(v) ........................................................................................................ 19

15 U.S.C. §78u-4(a)(3)(B)(iii)(II)(aa) ........................................................................................... 19

## RULES

Fed. R. Civ. P. 23 .................................................................................................................. passim

## PRELIMINARY STATEMENT

Movant Abraham Atachbarian ("Movant" or "Atachbarian") respectfully submits this Memorandum of Law, pursuant to Section 21D(a)(3) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u-4(a)(3) (the "Exchange Act", as amended by the Private Securities Litigation Reform Act of 1995 (the "PSLRA")), for an Order: (1) appointing Movant as Lead Plaintiff on behalf of a class or subclass consisting of all persons other than Defendants (defined below) who sold put contracts and purchased call option contracts for the common shares of Carnival Corporation (NYSE: CLL)("Carnival" or "CCL") that were publicly traded on the New York Stock Exchange ("NYSE") during the (the "Options Class Period")[1] and who were damaged thereby (the "Options Class"), (2) approving proposed Lead Plaintiff's selection of Stull, Stull & Brody ("SSB") as Lead Counsel for the Options Class or subclass, and (3) consolidating the Atachbarian Action with the Consolidated Action.[2]  Atachbarian was a seller of CCL puts and a purchaser of CCL calls during the Options Class Period, and continued to hold shares of CCL through the end of the Class Period.[3]

---

[1] Atachbarian's damages remain the same even under the longer class period pled in the *Elmensdorp* complaint (defined below).  *See* 20-cv-22319-KMM, ECF 1 at ¶1 (pleading a class period consisting only of common stock purchasers or American Depository Share ("ADR") purchasers from September 26, 2019 to April 30, 2020.

[2] By order dated July 6, 2020, this Court consolidated the actions *Service Lamp Corp. Profit Sharing Plan v. Carnival Corp.*, No. 1:20-cv-22202 ("Service Lamp"), and *Elmensdorp v. Carnival Corp.*, No. 1:20-cv-22319 ("Elmensdorp").

[3] On July 27, 2020, motions to appoint lead plaintiff (*see e.g.*, ECF 17, 23 and 25) and motions to consolidate the Atachbarian Action with the Consolidated Action were filed in the Consolidated Action.  *See e.g.*, ECF 18, 20 and 21.

## PROCEDURAL HISTORY

As Atachbarian argued in his briefing submitted during the lead plaintiff process in the Service Lamp Action, his current motion, made pursuant to a separate PSLRA Notice disseminated on July 23, 2020, on behalf of options purchasers and put sellers, was necessitated by the fact that none of the prior lead plaintiff movants sought to represent options purchasers and more significantly, put sellers.[4]  Since that lead plaintiff process, all movants other than the New England Carpenters Pension and Guaranteed Annuity Funds and the Massachusetts Laborers' Pension and Annuity Fund (the "New England Pension Funds"), have withdrawn, making the New England Funds the presumptive lead plaintiff for common share and ADR purchasers.  The New England Funds have not come forward with any proposal to protect the options purchases and put sellers.  As further discussed below, they have done nothing but wrongly asserted that the definition of "securities" and the term "those who otherwise acquired securities" as used in respective notices disseminated during the lead plaintiff process includes put sellers.[5]  They have also argued that options purchasers do not need separate representation.[6]  Notably, the *Elmensdorp* complaint, filed by one of counsel representing the New England Funds, and seeking lead counsel appointment, asserted claims only on behalf of common share

---

[4] *See* Plaintiff Abraham Atachbarian's Memorandum of Law in Opposition to Consolidation ("Opp. to Consolidation") and Plaintiff Abraham Atachbarian's Memorandum of Law in Further Support of His Opposition to Consolidation ("Further Opp. to Consolidation"), ECF 30 and 33.

[5] Memorandum of Law in Further Support of the Motion of the New England Carpenters [] for Consolidation of Related Actions, and in Opposition to Competing Motions. (New England Further Opp"), ECF 32 at 11-12; 10.

[6] Reply Memorandum of Law in Further Support of the Motion of the New England Carpenters [] for Appointment as Lead Plaintiff and in Opposition to Competing Motions ("New England Reply"), ECF 34 at 12.

purchasers and ADR purchasers, explicitly eliminating from the action options purchasers and put sellers --demonstrating precisely why a separate class for options purchaser and in particular, put sellers, should be appointed here.[7]

To briefly reiterate the relevant procedural history here, Service Lamp Corporation Profit Sharing Plan ("Service Lamp") was the first plaintiff to file a complaint against CCL requiring a PSLRA notice. *Id*. It did not represent options purchasers, and most particularly did not seek to represent any sellers of CCL securities much less put sellers, in its complaint[8] or PSLRA notice (the "Service Lamp Notice").[9]

One of the New England Funds' counsel filed the *Elmensdorp* complaint on June 3, 2020. As stated above, that complaint sought only to bring claims on behalf of common purchasers and ADR purchasers.  The PSLRA Notice disseminated in connection with that filing, similarly stated only that it was brought on behalf of common share purchasers and ADR purchasers. ECF 23-7.

Given that neither of the two cases filed sought to represent options purchasers, and that both effectively excluded put sellers, such as Atachbarian, he filed his own action, disseminated notice and opposed consolidation of the *Atachbarian* Action with the *Service Lamp* and *Elmensdorp* Actions until the Court is able to conclude the lead plaintiff process in this Action.

---

[7] *Service Lamp Corporation Profit Sharing Plan v. Carnival Corporation, et al.*, 1:20-cv-22202 (the "Service Lamp Complaint") (ECF No. 1).

[8] In its complaint, Service Lamp asserts claims on behalf of an alleged class of all those who purchased or otherwise acquired Carnival common stock and securities between January 28, 2020 and May 1, 2020, inclusive ("the "Class Period"), seeking to pursue remedies against Carnival and certain of its officers under the Securities Exchange Act of 1934 (the "Exchange Act")  (ECF No. 1 at ¶1).

[9] *See* Declaration of Howard T. Longman (the "Longman Decl.") at Exhibit A, (the Service Lamp PSLRA Notice).

*See* Opp to Consolidation at pages 3-5 (setting forth the relevant procedural history).[10]  See

Longman Decl., Ex. B (Atachbarian PSLRA Notice).

During the period of July 27, 2020 to August 17, 2020, a lead plaintiff process was

undertaken, with the New England Funds as the last movant remaining, and therefore the

presumptive lead for at least those who acquired common shares and ADRS during the extended

class period asserted in the Elmensdorp complaint.

Atachbarian now moves to be appointed as lead of a class or subclass of options

purchasers and most particularly put sellers, and to have his chosen counsel, SSB, appointed as

lead counsel of that class or subclass.  He also seeks to have his action consolidated with the

Consolidated Action such that either two classes or at least an options purchaser and put seller

subclass is asserted.

The PSLRA directs the Court to appoint the movant for lead plaintiff that possesses the

largest financial interest in the outcome of the action and that satisfies the requirements of Fed.

R. Civ. P. 23. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).  At this juncture, Atachbarian believes that his

financial losses of about $91,737.00 incurred in connection with his sales of put options and

purchases of call options on CCL shares represents the largest financial interest in the relief

sought in this action by the Options Class.  Thus, Atachbarian should be appointed lead plaintiff

of the Options Class.  *See* Longman Decl., Ex. C. (Loss Calculation).

In addition to his significant financial interest in the cause of action asserted on behalf of

the Options Class, Atachbarian also meets the applicable requirements of Rule 23 because his

claims are typical of absent class members and because he will fairly and adequately represent

---

[10] The *Atachbarian* Action was transferred to this Court on August 20, 2020, and the Court
accepted the matter on August 21, 2020.  20-cv-23011, ECF 24.

the interests of the Options Class.  By filing his signed certification ("Certification"), Atachbarian has also satisfied the requirements of the PSLRA, 15 U.S.C. § 78u-4(a)(2)(A). *See* Longman Decl., Ex. D. To fulfill his responsibilities as Lead Plaintiff and vigorously prosecute this action on behalf of the Class, Atachbarian has selected the highly respected law firm of SSB as Lead Counsel. SSB is a nationally recognized securities class action firm and, in its long history, has recovered over two billion dollars on behalf of defrauded investors.

Accordingly, based on Atachbarian's significant financial interest, as well as his commitment to overseeing this litigation on behalf of the Options Class, Atachbarian respectfully requests that the Court enter an order appointing him as Lead Plaintiff and approving his selection of Lead Counsel of the Options Class.

## STATEMENT OF FACTS

As of January 27, 2020, the beginning of the Options Class Period, Carnival was the world's largest cruise company, carrying nearly 45 percent of global cruise guests with operations in North America, Australia, Europe and Asia, and 104 cruise ships. Carnival purportedly recognized that safety and comfort of its guests and crew are paramount to the success of its business and that its highest responsibilities and top priorities are to operate safely.[11] The Atachbarian Complaint alleges Defendants made repeated public statements assuring the public that its policies and procedures, despite COVID-19, the risks to its passengers and crews and business were low.

---

[11] *See* Atachbarian v. Carnival Corporation et al, 1:20-cv-23011-RNS (Atachbarian Complaint) at ¶19.  Citations to "Compl." refer to paragraphs of the Atachbarian Complaint.

5

On January 27, 2020, Carnival stated that "Although the [COVID-19] risks to our guests, crew and business around the world is very low, we are closely monitoring the situation." Compl. ¶19.

On January 28, 2020, Carnival made several statements regarding the safety of its cruise ships stated in its Form 10K for its fiscal year ended November 30, 2019 (the "2019 Form 10K"), including:

> Our commitments to the safety and comfort of our guests and crew and protecting the environment are paramount to the success of our business. We are committed to operating a safe and reliable fleet and protecting the health, safety and security of our guests, employees and all others working on our behalf. We continue to focus on further enhancing the safety measures onboard all of our ships. We are dedicated to fully complying with, or exceeding, all legal and statutory requirements related to health, environment, safety, security and sustainability throughout our business.

> Compl. ¶21.

The 2019 Form 10K represented that Carnival continued to build on its commitment to protect the health, safety and security of guests, employees and that Carnival has:

> implemented and continue to enhance policies and procedures that demonstrate our commitment to the safety of our guests and crew. These policies and procedures include the following: [. . .] Identifying and standardizing best practice policies and procedures in health, environment, safety and security disciplines across the entire organization including on all our ships.

> Compl. ¶21.

Unbeknownst to Atachbarian and other members of the Options Class, Carnival's statements regarding its alleged safety practices and policies were misleading because those safety practices and policies were either not followed or were woefully inadequate to protect the Carnival's passengers, crew or business from COVID-19.  Carnival misleadingly downplayed COVID-19 to "keep the party going" on its cruise ships.  The risks to Carnival's passengers,

6

crew and business were not low.  In fact, the risks to Carnival's passengers and crew were imminent and potentially fatal. Similarly, the risks to Carnival's business were so severe the Company's viability was at stake.  Compl. ¶¶23-24.

The Complaint alleges that on February 3, 2020, the Carnival ship, Diamond Princess, and its 2,666 passengers and 1,045 crew were quarantined in Japan after a Hong Kong man who had sailed on the Diamond Princess from January 20-25, 2020 was confirmed to have been infected by COVID-19. Compl. ¶25.  The next day, Carnival confirmed that 10 people on the Diamond Princess tested positive for Coronavirus Compl. ¶28   On February 6, 2020, Carnival stated that 41 people on the still quarantined Diamond Princess tested positive for Coronavirus. Compl. ¶29.

On February 12, 2020, Carnival reiterated public statements regarding its safety measures claiming that Carnival [] is closely monitoring the evolving situation with respect to Coronavirus and that the safety of guests and employees, compliance and protecting the environment are top priorities for the company.  Compl. ¶30.

On March 5, 2020, Carnival reported that COVID-19 test samples from 45 of 3,533 people on board the Grand Princess were taken for processing. The following day Carnival revealed that 21 of the 45 people tested positive for COVID-19, two passengers and nineteen crew members.  Ultimately, Carnival's Grand Princess had at least 103 COVID-19 cases and two deaths.  Compl. ¶33.

Despite the dangers of COVID-19 spread and what should have been obvious to Carnival—that its policies and procedures were wholly inadequate, on March 7, 2020, the Carnival ship, MS Zaandam departed from Buenos Aires, Argentina slated to conclude its voyage on March 21 in San Antonio, Chile. Compl. ¶33.  People aboard the Zaandam, mostly

7

crew members, began falling ill with flu like symptoms.  A week later, the cruise itinerary was canceled. The cruise continued at sea without a destination.  By March 22, passengers were confined to their rooms.  Compl. ¶33.

Carnival's MS Rotterdam with its 600 crew members was purportedly dispatched to deliver crucial medical supplies to the Zaandam. Compl. ¶33.  While enroute to the Zaandam, the Rotterdam crew were told that instead of merely delivering medical supplies, the Rotterdam would be picking up healthy Zaandam passengers to prevent the as of-then-undiagnosed sickness from spreading.  Compl. ¶34.  In truth, Carnival took "healthy crew members from all over the world" and dropped them "in the middle of the virus."  The Rotterdam crew members felt tricked.  Compl. ¶35.  Hence, contrary to its public statements, the safety of the Carnival crew members was not a "top priority."

On March 13, 2020, Carnival announced the pausing of its operations immediately across its fleet of ships based in North America and but would resume them on April 10. All Carnival ships then at sea would continue their voyages and return to their homeports as scheduled. Compl. ¶37.  Three days later, Carnival announced a voluntary and temporary pause of its fleet cruise operations by its continental Europe and North American brands. Subsequently, Carnival announced a "temporary" pause of its global fleet cruise operations across all brands.

On March 19, 2020, 2,700 passengers aboard Carnival's Ruby Princess were allowed to freely disembark in Sydney, Australia despite passengers on board showing signs of respiratory illnesses, and some being transported to hospital with COVID-19 like symptoms. At least 662 people linked to that Ruby Princess cruise were diagnosed with COVID-19, and eleven persons died. A criminal investigation of Carnival by Australian authorities stemming from Carnival's representations to local authorities prior to docking that COVID-19 was not an issue on the ship.

Carnival partially disclosed the risks posed to its business stemming from its "keep the party going" safety policies and practices in the wake of COVID-19 in its April 1, 2020 Issuer Free Writing Prospectus when the Company priced its offering of 62,500,000 shares of common stock at $8.00 per share raising a mere $485 million after underwriter's discounts, down sharply from the $1.25 billion the Carnival indicated it sought to raise.  Compl. ¶44.

On April 1, 2020, the price of CCL stock closed at $8.80 per share, down 34% from the March 31, 2020 closing price of $13.31 per share. At the end of trading on April 2, 2020, the market price of Carnival stock (CCL:NYSE) closed at $7.97 per share, down 9% from the previous trading day.  Compl. ¶47.

The full impact of Carnival's policies was finally revealed on May 1, 2020, when The Wall Street Journal published an article headlined "Cruise Ships Set Sail Knowing the Deadly Risk to Passengers and Crew" that, among other things, detailed Carnival's conduct to conceal COVID-19 risks to passengers, crew members and public officials, such as:

(a)   failing to take precautions, such as taking people's temperature, to minimize risks that COVID-19 infected persons would be permitted to board Carnival ships;

(b)   failing to timely notify passengers and crew of COVID-19 cases on Carnival ships;

(c)   failing to timely notify passengers and crew that they may have been exposed to COVID-19 on Carnival ships;

(d)   failing to notify government officials about sick passengers and crew aboard Carnival ships before docking;

(e)   failing to notify Carnival passengers and crew who unknowingly may have been exposed to COVID-19 passage to ports of call around the world; and

9

(f)     failing to notify Carnival passengers and crew who unknowingly may have been exposed to COVID-19 to travel home at the conclusion of a voyage.

Compl. ¶50.

The decline of the price of Carnival common shares adversely impacted the price of put and call options thus causing Plaintiff Atachbarian and other similarly situated Option Class members to incur substantial out of pocket damages.  Compl. ¶48.

The decline in the financial health of Carnival continues. On June 18, 2020, Carnival reported a record $4.4 billion in quarterly losses, as the COVID-19 pandemic crippled the world's biggest cruise operator and forced it to take major write-downs on the disposal of now redundant ships. Carnival said it had $7.6 billion available at the end of May 2020 but was burning $650 million a month as it awaits regulatory approvals for the resumption of some lines in the hope that customers will come back later this year.

On June 22, 2020, Carnival advised guests and travel agents that it has extended its operational pause in North America through September 30, 2020. On June 24, 2020, the credit rating agency Standard & Poors lowered Carnival's debt rating to junk status.

## ARGUMENT

**I.     ATACHBARIAN SHOULD BE APPOINTED AS LEAD PLAINTIFF OF THE OPTIONS CLASS OR SUBCLASS**

Atachbarian should be appointed Lead Plaintiff of the Options Class or subclass, and his action should be consolidated with the Consolidated Action. To his knowledge, he has the largest financial interest and is the only action asserting claims on behalf of an Options Class or subclass and otherwise satisfies the requirements of Rule 23.  In fact, the presumptive lead, the New

England Funds, has no options much less was a seller of put options.[12] The PSLRA directs courts to consider motions to serve as lead plaintiff filed by class members in response to a published notice of a class action and to do so by the later of (i) 90 days after the date of publication, or (ii) as soon as practicable after the Court decides any pending motion to consolidate. See 15 U.S.C. § 78u-4(a)(3)(B)(i) & (ii). According to the PSLRA, such motion must be made within 60 days of the publication of such notice and such notice is to be published within 20 days of filing a complaint. 15 U.S.C. § 78u-4(a)(3)(A)(i).

Further, under 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I), the Court is directed to consider all motions that meet the above requirements by plaintiffs or purported class members to appoint lead plaintiff filed in response to any such PSLRA notice. Specifically, the Court "shall" appoint "the presumptively most adequate plaintiff" to serve as lead plaintiff and shall presume that plaintiff is the person or group of persons, that:

> (aa) has either filed the complaint or made a motion in response to a notice . . .;
>
> (bb) in the determination of the Court, has the largest financial interest in the relief sought by the class; and
>
> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.
>
> 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).

As set forth below, Atachbarian readily satisfies all three of these criteria, and thus is entitled to the presumption that he is the most adequate plaintiff to lead the Options Class  Once Atachbarian is appointed as lead of the Options Class, the Atachbarian Action should be consolidated with the Consolidated Action such that Atachbarian is effectively a co-lead, or lead

---

[12] New England Carpenters Pension Fund LIFO Loss in Carnival Corp, ("New England Loss Calculation"), ECF 23-4.

of a subclass of Options traders, along with the presumptive lead of the common shareholder class, but representing the unique interests of the Options traders and in particular put sellers.

Movant Atachbarian is the most adequate plaintiff to represent this discrete class whose claims are unique from and may potentially conflict with claims asserted by purchasers of CCL stock. The Atachbarian complaint alleges that Carnival's operations have ceased. Compl. ¶57. It has been forced to sell numerous ships to lower operating costs and raise cash. Compl. ¶56. Its plan to raise equity capital during the Options Class period fell well short of intentions. Compl. ¶44. Liquidity was flagged as at risk given its monthly cash burn relative to available cash. Compl. ¶¶46, 56. Carnival's credit rating was cut to junk status. Compl. ¶58. Limited resources to compensate Carnival shareholders' claims as well as claims by sellers and purchasers of options could easily lead to conflicts between the classes requiring the appointment of a separate lead for the options purchasers and particularly the put sellers.

The New England Funds argued during the Service Lamp lead process, that appointing Atachbarian as lead of a subclass would somehow fragment the leadership of the case and that there is no support for appointing separate leadership for options purchasers or put sellers. *See, e.g.*, New England Reply (ECF 34) at 8-10. The cases that Atachbarian cited in his prior filings are very much on point and demonstrate that in this instance, separate representation is necessary. *See* Opp to Consolidation (ECF 30) at 5-13. *See also* Further Opp. to Consolidation (ECF 33) at 3-7. In the New England Reply, the New England Funds rely heavily on dicta in the Second Circuit decision, *Hevisi v. Citigroup Inc.*, 366 F. 3d 70, 82 (2nd Cir. 2004), which states

that a lead plaintiff need not have standing to assert every claim. *Id*. at 9.[13]  While that may be true in some instances, it is not true where specific securities were eliminated from the class and the notice that the lead seeks to represent, as here.  It is also untrue where there is a conflict between the class that the presumptive lead seeks to represent and other securities.

The issue here is that neither of the notices that were disseminated nor the complaints that were filed included a specific security in the class—put sellers.  *See* Opp. to Consolidation at 4 and Further Opp. to Consolidation at 2.[14] In each of the cases cited by Atachbarian and addressed in the New England Reply at page 10 note 9, the court required a second notice where the claims of specific securities purchasers were not included in the original notice, as the New England Funds recognize. *See* Opp. to Consolidation at 6-7. Contrary to New England's arguments, Atachbarian does not seek to carve out a niche from the Consolidated Action.  Rather, he asserts claims that were never brought and alleges an Options Class or subclass that was excluded from the Consolidated Action and thus one that the presumptive lead does not seek to represent or protect.

The New England Funds further argued that courts have rejected the claims of options traders for separate leadership.  New England Reply at 9, and note 6-7.  The New England Funds vastly overstate their position.  Court have repeatedly appointed a separate class of options purchasers, and put sellers, particularly because non-options purchasers have a tendency to cut

---

[13] In fact, *Hevesi* cites directly to *In re Oxford Health Plans, Inc. Sec. Litig.*, 191 F.R.D. 369, 380-81 (S.D.N.Y. 2000) where Chief Judge Brieant  appointed three distinct groups as lead plaintiffs. *Id*. at 83.

[14] Notably, in their reply, the New England Funds do not deny that neither the Exchange Act nor *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975) stands for the proposition that the acquisition of securities includes those who sold put options.   Instead, the New England Funds resort to citing Investopia. New England Reply at 10 n. 8.

out options purchasers from the action. *See* Opp. to Consolidation. at 11-13.   The New England

Fund's attempts to distinguish the cases cited by Atachbarian are unavailing. *See* New England

Reply at 9 note 7.[15]  Even those courts that have not appointed a separate lead for options

purchasers have noted that those securities have distinctive claims and issues of proof, and have

admonished any presumptive lead to take steps to protect the options purchaser's interest or, in

some cases, face removal as lead.  *See, e.g.*, *Johnson v. J.C. Penny Co.*, No. 6:1-cv-722, 2015

U.S. Dist. LEXIS 185879 (E.D. Texas June 10, 2015); *In re Bank of Am. Corp. Sec., Derivative,*

*& ERISA Litigation*, No. 09 MDL 2058 (DC), 2010 U.S. Dist. LEXIS 37799 (S.D.N.Y. Apr. 9,

2010), *Hedick v. Kraft Heinz Co.*, Case No. 10-cv-1339, 2019 U.S Dist. LEXIS 174315 (n.d. Ill.

Oct. 8, 2019).  Such protections include asserting claims on options purchasers' behalves, and

appointing as a named plaintiff, the lead options movant,--a commitment that the New England

---

[15] For instance, New England discusses *Kabak v. Becton, Dickinson & Co.*, 2020 WL 3056281, at
*3 (D.N.J. June 9, 2020), but there was no indication that the options investor seeking to be
appointed lead sold put options, as here, or that they ever raised the issue of whether put sellers
were properly informed by the relevant PSLRA notice, much less whether they were properly
represented by those who purchased securities.  Although in *In re Valeant Pharms. Int'l., Ince.*
*Secs. Litig.*, 15-cv-7658 (MAS)(LHG), 2018 U.S. Dist. LEXIS 191439, at *18-19 (D.N.J. Nov.
7, 2018) the Court did not appoint a separate lead plaintiff for an options class, on a motion filed
more than two years after initial appointment of lead plaintiff, it specifically stated that sellers of
put options were not encompassed by the alleged class of purchasers of Valeant equity securities.
Moreover, the lead plaintiff in *Valeant*, unlike the presumptive lead plaintiff here, transacted in
options during the class period and had an incentive to bring and pursue claims on behalf of
options traders. Id. at *21. Here none of the funds moving as part of the New England motion for
lead plaintiff motion has any options trades.  In *In re Allergan, Inc. Proxy Violation Derivatives*
*Litig.*, Case No. 2:17-cv-04776 has no applicability here on the grounds that damages for the
insider trading claims there were capped is faulty because as explained above, Carnival's
liquidity is under stress, it cannot operate due to the continuing COVID-19 crisis, and its
financial condition continues to decline.  Carnival's limited resources may well impact any
settlement or judgment for which differing interests of equity purchases versus put sellers will
compete. The appointment of separate lead representation for an options class in *Wallerstein* by
Judge Lucy Koh of the N.D. CA. is significant precedent, even though part of a stipulated agreed
on a lead plaintiff motion.

Funds have not made here.  *See, e.g.*, *Hedick*, at 31-32. Moreover, *Hedick* does not address one of

the primary issues present here-a deficient PSLRA notice for a certain class of investors.  Although

the Court there found that the options investors did not rebut the PSLRA presumption that the two

institutions with over $24 million in combined losses were the most adequate lead plaintiffs, the

Court allowed the case to go forward with two institutions as co-lead plaintiffs only on the condition

that the separate interests of options investors be closely monitored and protected during the

litigation.  *Id.* at *32

Given the specific circumstances in this case, separate representation for options

purchasers and in particular, put sellers is necessary.

### A.  Atachbarian is Willing to Serve as a Class Representative

On July 23, 2020, Atachbarian caused the Atachbarian PSLRA Notice to be published

over Business Wire pursuant to Section 21D(a)(3)(A)(i) of the PSLRA. Longman Decl., Ex. A.

The Atachbarian PSLRA Notice announced that an action had been filed against Defendants and

advised sellers and purchasers of options contracts for Carnival stock that they had until

September 21, 2020 to file a motion to be appointed as lead plaintiff. *Id*. Atachbarian is filing the

instant motion pursuant to the Atachbarian PSLRA Notice and has attached a Certification

attesting that he is willing to serve as a representative for the Options Class and to provide

testimony at deposition and trial, if necessary. *See id.*, Ex. D. Accordingly, Movant satisfies the

first requirement to serve as Lead Plaintiff of the proposed Options Class.

### B.  Atachbarian Has the "Largest Financial Interest" in the Action

The PSLRA requires a court to adopt a presumption that "the most adequate plaintiff . . .

is the person or group of persons that . . . has the largest financial interest in the relief sought by

the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii). To the best of his knowledge, Atachbarian has the

15

largest financial interest of any putative Options Class or subclass member seeking to serve as Lead Plaintiff of the Options Class or subclass. For claims arising under the Exchange Act, the "most adequate plaintiff" will be the plaintiff with the largest financial interest. In determining which movant has the largest financial interest, courts consider: (1) the number of securities sold or purchased during the class period; (2) the amount of the investment; and (3) the "alleged losses". *Miller v. Dyadic Int'l, Inc.*, 07-cv-80948, 2007 U.S. Dist. LEXIS 96099, at *5 (S.D. Fla. Dec. 14, 2007)("*Miller*"), citing *Piven v. Sykes Enters. Inc.*, 137 F. Supp. 2d 1295, 1302-03 (M.D. Fla. 2000). During the Class Period, Atachbarian, as a result of his sales of put option contracts and purchases of call option contracts incurred losses of $91,737.00. *See* Longman Decl., Ex. C. To the extent that Atachbarian possesses the largest financial interest in the outcome of this litigation asserting claims on behalf of sellers and purchasers of options, he is the presumptive "most adequate" plaintiff for the class or subclass. 15 U.S.C. § 78u4(a)(3)(B)(iii)(I)(bb). Thus, Atachbarian should be appointed lead plaintiff of an Options Class or, alternatively, separate Options sub-Class of persons who suffered losses in the purchases or sales of Carnival securities during the Class Period who were damaged thereby. *See Chill v. Green Tree Financial Corp.*, 181 F.R.D. 398 (D. Minn. 1998) (separate leadership appointed for a class of option traders); *In re Am. Italian Pasta Co. Sec. Litig.*, 05-cv-0725-CV-W-ODS, 2007 U.S. Dist. LEXIS 21365, at *24-25 (W.D. Mo. Mar. 26, 2007) (noting that a lead plaintiff who did not trade options cannot be lead on behalf of a class of options traders). *See also In re American Realty Capital Properties, Inc. Litig.*, No. 1:15-mc-000040-AKH (S.D.N.Y. June 16, 2019) (ECF No. 853) (Endorsed Letter Opinion noting on class certification that different considerations could come into play between options traders and other securities purchasers) (Longman Decl., Ex. E); *Basile v. Valeant Pharmaceutical Int'l Inc., et al.*, No.

16

8:14-cv-02004-DOC-KESx (C.D. Cal. Mar. 15, 2017)(ECF No. 318)(on motion for class certification, court required plaintiffs to give notice to derivative traders so that they would have the opportunity to intervene or bring their own claims) (Longman Decl., Ex. F).

### C. Atachbarian Otherwise Satisfies the Requirements of Rule 23

Section 21D(a)(3)(B)(iii)(I)(cc) of the PSLRA further provides that, in addition to possessing the largest financial interest in the outcome of the litigation, a lead plaintiff must "otherwise satisfy the requirements of Rule 23 of the Federal Rules of Civil Procedure." Rule 23(a) provides that a class action may proceed if the following four requirements are satisfied:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

In making its determination that a lead plaintiff satisfies the requirements of Rule 23, the Court need not raise its inquiry to the level required in ruling on a motion for class certification. Instead, a *prima facie* showing that the movant satisfies the requirements of Rule 23 is sufficient. *Brustein v. Lampert*, 04-61159-CIV-LENARD/KLEIN, 2005 U.S. Dist. LEXIS 51106, at *14 (S.D. Fla. June 15, 2005); *Nghiem Tran v. Erba Diagnostics, Inc.*, 15-cv-24440 COOKE/TORRES, 2016 U.S. Dist. LEXIS 186864, at *3 (S.D. Fla. Apr. 8, 2016).  Moreover, "typicality and adequacy of representation are the only provisions relevant to a determination of lead plaintiff under the PSLRA." *In re Oxford Health Plans, Inc. Sec. Litig.*, 182 F.R.D. 42, 49 (S.D.N.Y. 1998); *see also Thorpe v. Walter Inv. Mgmt., Corp.*, 1:14-cv-20880-UU, 2016 U.S. Dist. LEXIS 33637, at *18 (S.D. Fla. Mar. 16, 2016). Here, the Complaint sufficiently pleads Rule 23(a)(1) numerosity (Compl. ¶76) and Rule 23(a)(2) common questions (*id*. ¶79) in a manner common to all lead plaintiff candidates.

The typicality requirement of Fed. R. Civ. P. 23(a)(3) is satisfied where the named representative's claims have the "same essential characteristics as the claims of the class at large." *Prado-Steinman ex rel. Prado v. Bush*, 22 F.3d 1266, 1279 (11th Cir. 2000); *Piven v. Sykes Enters.*, 137 F. Supp. 2d 1295, 1306 (M.D. Fla. 2000) (same). Atachbarian's claims are typical of those of the Options Class or subclass. He alleges, as do all Options Class or subclass members, that Defendants violated the federal securities laws by deceiving the market concerning Carnival's safety policies and procedures, ability to weather the COVID-19 pandemic and financial prospects that resulted in the artificial inflation of the market prices of Carnival options contracts. Atachbarian, as did all members of the Options Class or subclass, sold or purchased or Carnival options contracts (and the underlying shares) at prices alleged to have been artificially inflated by Defendants' misrepresentations or omissions and was damaged upon the disclosure of the truth regarding those misrepresentations and/or omissions that drove down the price of its shares.  These shared claims, which are based on the same legal theory and arise from the same events and course of conduct as the Class's claims, satisfy the typicality requirement of Rule 23(a)(3).

The adequacy of representation requirement of Rule 23(a)(4) is satisfied where it is established that a representative party "will fairly and adequately protect the interests of the class."  The class representative must also have "sufficient interest in the outcome of the litigation to ensure vigorous advocacy." *Miller*, 2008 U.S. Dist. LEXIS at *19 (quoting *Weinberg v. Atlas Air Worldwide Holdings, Inc.*, 216 F.R.D. 248, 253 (S.D.N.Y. 2003)).

Atachbarian has submitted a signed Certification declaring his commitment to protect the Options Class or subclass. *See* Longman Decl., Ex. B. Further, there is no evidence of antagonism or conflict between Atachbarian's interests and the interests of the Options Class or

subclass. The significant losses incurred by Atachbarian demonstrate that he has a sufficient interest in the outcome of this litigation.  Moreover, Atachbarian has already vigorously pursued the interests of Options Class or subclass members by submitting briefing in the Service Lamp lead plaintiff process, requesting that the Court forego consolidating this Action with the Consolidated Action until a separate representative of the Options Class or subclass was appointed in order to protect the unique interests of Options Class or subclass members and in particular sellers of put options, who were not noticed in the Service Lamp lead plaintiff process. Atachbarian now seeks to be co-lead, or at least lead of a subclass of Options traders, and in particular, put sellers who were neither noticed in the Service Lamp lead plaintiff process, nor represented by the presumptive lead in the Consolidated Action, the New England Pension Funds, as further discussed below.

Finally, as set forth in greater detail below, Atachbarian has retained counsel highly experienced in vigorously and efficiently prosecuting securities class actions such as this Action and submits his choice to the Court for approval pursuant to 15 U.S.C. § 78u-4(a)(3)(B)(v).

## II.  LEAD PLAINTIFF'S SELECTION OF COUNSEL SHOULD BE APPROVED

The PSLRA vests authority in the lead plaintiff to select and retain lead counsel, subject to the approval of the Court. *See* 15 U.S.C. § 78u-4(a)(3)(B)(v). The Court should interfere with lead plaintiff's selection only when necessary "to protect the interests of the class." 15 U.S.C. §78u-4(a)(3)(B)(iii)(II)(aa); *see also Mulvaney v. GEO Group, Inc.*, 16-cv-81494-MIDDLEBROOKS, 2016 U.S. Dist. LEXIS 193402, at *8 (S.D. Fla. Nov. 18, 2016); *In re Molson Coors Brewing Co. Sec. Litig.*, 233 F.R.D. 147, 150 (D. Del. 2005) ("Once the lead plaintiff is chosen, that party is primarily responsible for selecting lead counsel.").

19

Here, Atachbarian has selected SSB as Lead Counsel for the Options Class or subclass. Over the many years that it has been representing investors, SSB, a premiere firm in the area of securities litigation based in New York, with an office in Beverly Hills, has earned a national reputation for the zealous representation of plaintiffs in complex litigations, including securities class actions. SSB has litigated hundreds of cases achieving an aggregate of more than two billion dollars in recoveries for aggrieved class members, as detailed in the firm's resume. *See* Longman Decl., Ex. F. As a result of their extensive experience in litigation involving issues similar to those raised in the instant action, Atachbarian's chosen counsel have the skill, knowledge, expertise, and experience that will enable them to prosecute this action effectively and expeditiously. Thus, the Court may be assured that the members of the Options Class will receive the best legal representation available.

## CONCLUSION

For the foregoing reasons, Atachbarian respectfully requests that the Court issue an Order: (1) appointing Movant Atachbarian as Lead Plaintiff for the Options Class or subclass; (2) approving his selection of Stull, Stull & Brody as Lead Counsel for the Options Class or subclass, and (3) consolidating the Atachbarian Action with the Consolidated Action.

Dated September 21, 2020

Respectfully submitted,

By:_____
Joshua H. Eggnatz, Esq.
JEggnatz@JusticeEarned.com
EGGNATZ PASCUCCI, P.A.
7450 Griffin Road, Suite 230
Davie, FL 33314
Tel: (954) 889-3359
Fax: (954) 889-5913

20

***Local Counsel for Movant Abraham Atachbarian***

Howard T. Longman (Pro Hac Vice)
hlongman@ssbny.com
STULL, STULL & BRODY
6 East 45th Street
New York, NY 10017
Tel: (212) 687-7230
Fax: (212) 490-2022

***Counsel for Movant Abraham Atachbarian and Proposed Lead Counsel for the Options Class***

Lynda J. Grant (Pro Hac Vice)
lgrant@grantfirm.com
THEGRANTLAWFIRM, PLLC
521 Fifth Avenue, 17th Floor
New York, NY 10175
Tel: (212) 292-4441
Fax: (212) 292-4442

***Counsel for Movant Abraham Atachbarian and the Proposed Options Class***

21

## CERTIFICATE OF SERVICE

I hereby certify that on September 21, 2020 a true and correct copy of the

foregoing was served via the Court's CM/ECF filing system on counsel of record in this action.

By:_____

Joshua H. Eggnatz, Esq.
JEggnatz@JusticeEarned.com
EGGNATZ PASCUCCI, P.A.
7450 Griffin Road, Suite 230
Davie, FL 33314
Tel: (954) 889-3359
Fax: (954) 889-5913

***Local Counsel for Movant Abraham
Atachbarian***

22