**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

|  |  |
|---|---|
| IN RE CARNIVAL CORP.<br>SECURITIES LITIGATION | Master File No. 1:20-cv-22202-KMM<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br><u>CLASS ACTION</u><br><br>DEMAND FOR JURY TRIAL<br><br>Hon. K. Michael Moore |

# TABLE OF CONTENTS

**Page(s)**

I.      INTRODUCTION ................................................................................................ 2

II.     JURISDICTION AND VENUE ....................................................................... 10

III.    PARTIES ............................................................................................................ 11

        A.      Lead Plaintiffs ........................................................................................ 11

        B.      Named Plaintiff ...................................................................................... 11

        C.      Defendants .............................................................................................. 11

IV.     DEFENDANTS' FRAUDULENT SCHEME .................................................. 13

        A.      Background On Carnival ........................................................................ 13

        B.      Throughout Its History, Carnival Has Touted Its Commitment To
                Ensuring Passengers' Safety And Security............................................ 17

        C.      Carnival's "HESS Policy" And Its Purported Actions To Assuage
                Concerns About Health and Safety Risks............................................... 23

        D.      As The Class Period Begins, Carnival Misleadingly Touts Its Purported
                HESS-Related Policies and Procedures And Its Enhanced Commitment to
                Health and Safety.................................................................................... 27

        E.      Carnival's Undisclosed Health And Safety Issues Led To The Company's
                Poor Response To The Coronavirus Outbreak ....................................... 32

V.      THE RELEVANT TRUTH EMERGES........................................................... 61

        A.      March 16, 2020: Carnival Announces That COVID-19 Will Cause It To
                Report A Loss In Fiscal Year 2020........................................................ 61

        B.      March 31, 2020: Carnival Attempts to Sell $1.25 Billion In Stock And
                $4.75 Billion In Debt Securities Due To The "Material Negative Impact"
                Of The Coronavirus Pandemic "On All Aspects Of Our Business".................... 68

VI.     POST-CLASS PERIOD EVENTS ................................................................... 72

VII.    SUMMARY OF SCIENTER ALLEGATIONS................................................ 78

        A.      Defendant Donald Admitted That He Was Intimately Involved In
                Carnival's Management of HESS Issues ................................................ 79

i

| | B. | Pursuant To Carnival's HESS Policy, The Company's Senior-Most Executives Were Responsible For Implementing Its Policies and Procedures Regarding Health and Safety ........................................... 79 |

| | C. | Defendant Donald Personally Received Information In January 2020 About The Scale Of The Coronavirus Outbreak In Wuhan, China .................... 81 |

| | D. | Carnival's Previous Experience With Viral Outbreaks Aboard Its Ships ........... 81 |

| | E. | Carnival Conducted Extensive Operations In And Around The Epicenter Of The Coronavirus Outbreak ................................................................. 82 |

| VIII. | | DEFENDANTS' FALSE AND MISLEADING STATEMENTS ................................. 83 |

| | A. | Statements From The Company's Website ............................................... 83 |

| | B. | Statements From The Beginning Of The Class Period To January 2020 ............. 86 |

| | C. | Statements From January 2020 To March 18, 2020 ................................... 87 |

| | D. | Statements From March 18, 2020 To March 24, 2020 ................................ 99 |

| IX. | | LOSS CAUSATION ............................................................................. 102 |

| X. | | PRESUMPTION OF RELIANCE ............................................................... 105 |

| XI. | | INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ................................ 106 |

| XII. | | CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT .............................. 107 |

| FIRST CLAIM FOR RELIEF ............................................................................. 107 |

| | | For Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Thereunder (Against All Defendants) ................................................ 107 |

| SECOND CLAIM FOR RELIEF ......................................................................... 108 |

| | | For Violation of Section 20(a) of the Exchange Act  (Against Defendant Donald) ....... 108 |

| XIII. | | CLASS ACTION ALLEGATIONS ............................................................. 109 |

| XIV. | | PRAYER FOR RELIEF ........................................................................ 110 |

| XV. | | JURY DEMAND ................................................................................ 111 |

Lead Plaintiffs the New England Carpenters Pension and Guaranteed Annuity Funds ("New England Carpenters") and the Massachusetts Laborers' Pension and Annuity Funds ("Massachusetts Laborers," and together with the New England Carpenters, "Lead Plaintiffs"), and additional Named Plaintiff Michael W. Slaunwhite ("Slaunwhite" and together with Lead Plaintiffs, "Plaintiffs"), by and through their counsel, bring this action individually and on behalf of all persons and entities who purchased or otherwise acquired between September 16, 2019 and March 31, 2019, inclusive (the "Class Period") the publicly traded common stock of Carnival Corporation ("Carnival Corp.") and/or the American Depositary Shares ("ADS") of Carnival plc ("Carnival plc," and together with Carnival Corp., "Carnival" or the "Company"); and/or all persons and entities who sold put options or purchased call options for the shares of Carnival common stock or ADSs during the Class Period.

Plaintiffs allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which Plaintiffs allege upon personal knowledge. Plaintiffs' information and belief is based upon Lead Counsel's investigation, which included the review and analysis of: (i) Carnival's regulatory filings with the U.S. Securities and Exchange Commission (the "SEC"); (ii) Carnival's press releases and public statements; (iii) analyst reports concerning Carnival; (iv) interviews with former employees of Carnival and other knowledgeable persons; (v) information obtained from governmental agencies and authorities based on requests for information, and (vi) additional public information regarding the Company and its industry. Lead Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.

1

## I.    INTRODUCTION

1.      This case is about Carnival's false and misleading statements and omissions concerning its commitment and practices to protect the health and safety of its passengers and crew members, and later, regarding the risks posed by and the impact of the COVID-19 pandemic on its business. From the start of the Class Period, Defendants Carnival and Arnold W. Donald (Carnival's Chief Executive Officer) made numerous proclamations about the Company's commitment to health and safety on board its ships, detailing the specific policies, personnel, and resources dedicated to those efforts. Later, they would repeatedly reassure investors and the public that COVID-19 posed little to no risk to passengers, crew members, or the Company's business. These representations were false and misleading and omitted material facts. Carnival's lack of any meaningful health and safety infrastructure was borne out in its disastrous response to the coronavirus pandemic.

2.      At the end of the Class Period, Carnival belatedly disclosed the risks posed by COVID-19—which were grossly exacerbated by the Company's insufficient health and safety infrastructure and long since realized—to its business and to the health and safety of Carnival's passengers and employees. The Company's disclosures at the end of the Class Period made clear that Carnival's health and safety policies and protocols were nowhere close to what Defendants had previously described to investors, and its response to the pandemic also made clear that such matters were far from a top priority for the Company's management. As the disparities between Carnival's statements regarding health and safety and the true, known (but previously undisclosed) business impact and risks posed by COVID-19 became known to investors, Carnival was forced to dramatically revise its risk disclosures, and its share price plummeted.

3.      Specifically, in two disclosures in March of 2020, Carnival revealed the true facts regarding the impact of its insufficient health and safety protocols, and the risks posed by COVID-

19 to its business. First, Defendants disclosed that Carnival would report a net loss and would revoke its earnings forecast for the balance of the fiscal year. Shortly thereafter, Carnival added to its disclosed risk factors the risks posed by COVID-19, which disclosure was underscored by the revelation that the Company would immediately seek to raise billions in cash to shore up its capital position. These disclosures revealed the impact of COVID-19 on Carnival's business, including to address the fallout associated with the outbreak of COVID-19 on multiple Carnival cruises in February and March 2020. The dual revelations—that Carnival did not impose adequate safeguards to protect the health and safety of its passengers and crew, and that these failures contributed to severely heightened risks to Carnival's business and financial wellbeing—forced the Company to seek billions of dollars of assistance from investors and to recognize in March 2020 that Carnival would report a loss for fiscal year 2020. These disclosures caused Carnival's stock price to decline dramatically, erasing over ***$27 billion in shareholder value***.

4.      As described in more detail below, Carnival is the world's largest cruise operator, carrying nearly half of the world's cruise passengers on voyages around the world on over 100 ships across nine cruise lines. Since its founding in the 1970s, Carnival has marketed itself as the "fun" cruise line, packing its vessels with restaurants, bars, nightclubs, theaters, and other amusement and entertainment options.

5.      Carnival also packs its ships with passengers—often many thousands at a time—who mingle in close quarters and are encouraged to take advantage of the ships' myriad amenities. Carnival cruise ships require hundreds or even thousands of employees to operate smoothly and seamlessly; these crew members live in cramped accommodations below the ships' decks.

6.      Although Carnival's ships are physically immense, a passenger or crew member on board one of the Company's vessels necessarily engages in prolonged, face-to-face contact with

hundreds, if not thousands, of other people for stretches of days or weeks. This type of human contact creates an environment in which infectious diseases can easily take hold and rapidly spread. As such, prior to and during the Class Period, Carnival was under pressure from all sides—passengers and crew, potential passengers and crew, international regulatory bodies, investors, and the general public—to ensure that its ships were clean, healthy, and safe. The risks posed by health incidents on its vessels were significant threats to the Company in the form of business interruptions, reputational harm, competitive pressure from other cruise lines, and legal liabilities. These risks all affected Carnival's bottom line and were closely watched by investors and securities analysts.

7.      Accordingly, Carnival has made its commitment to health, the environment, safety, security, and sustainability (designated by the Company as "HESS") a central pillar of both its public-facing operational priorities and its brand identity. Before the Class Period, Defendants Carnival and Donald claimed that Carnival was "fully committed to continuous improvement in health . . . safety, and security." Defendants also have touted that Carnival "[c]ontinued to implement a series of initiatives . . . [and] enhance our health and safety procedures" and was committed to "*[c]omplying with or exceeding all legal and statutory requirements related to health . . . safety, [and] security* . . . throughout our business activities."[1]

8.      Further to these purported goals, the Company formally adopted a "HESS Policy," which is overseen by Defendant Donald and Carnival's Board of Directors, and which states that Carnival is "committed to . . . protecting the health, safety and security of our passengers, guests, and all others working on our behalf thereby promoting an organization that always strives to be free of . . . illness . . . ." The HESS Policy reiterated Carnival's commitment to "*[c]omplying with*

---

[1] Unless otherwise noted, all emphasis in quotations is added.

*or exceeding all legal and statutory requirements related to health, environment, safety, security and sustainability throughout our business activities*," and "[a]ssigning health, environment, safety, security (HESS) and sustainability matters *the same priority as other critical business matters*." Critically, as described in more detail below, the HESS Policy also states that the "management" of Carnival will enact policies and procedures designed to implement the Policy.

9.     At the start of the Class Period, Defendants announced the creation of Carnival's Incident Analysis Group (the "IAG"), which is led by Sandra Rowlett, a career professional in the field of transportation safety. As described in more detail below, the Company tasked the IAG with making recommendations to enhance Carnival's HESS policies and procedures and developing programs to standardize training and investigation of the Company's HESS issues.

10.     In late January 2020, as the world began to react to the spread of the coronavirus with increasing urgency, Defendants consistently downplayed the threat that the virus posed not only to Carnival's passengers and crew, but also to its business. Defendants, for instance, stated on January 28, 2020, that, while the Company was monitoring the spread of the virus, "*the risks to our guests, crew, and business around the world is very low*." The following day, the Company failed to identify COVID-19 as a risk to its business in its Form 10-K filed with the SEC.

11.     At the same time that Carnival made these statements to the public, the Company and its CEO possessed firsthand, non-public information concerning the scope and severity of the coronavirus outbreak in China. As described in more detail below, in late January, John Padgett, Carnival's Chief Experience and Innovation Officer, was in contact with a Company vendor in Wuhan, China, the epicenter of the coronavirus outbreak. On January 25, 2020, this vendor notified Padgett of the seriousness of the virus and its spread around China, and Padgett directly relayed this information to Defendant Donald, who has admitted he personally took control of the

Company's response to the coronavirus. Former employees of Carnival have confirmed that, in early February 2020, the spread of the coronavirus in China already was affecting Carnival's operations, as the shutdown of plants and factories across China was preventing Carnival from obtaining equipment and materials. Defendants failed to disclose these developments—and the attendant financial risks to Carnival's business—to investors.

12.     Within days of Carnival's baseless announcement that "the risks to our guests, crew, and business around the world is *very low*," the first case of COVID-19 was confirmed *on board one of Carnival's cruise ships*—the Diamond Princess, which was carrying 2,666 passengers and 1,045 crew members. Despite this news, the Company continued to claim publicly, "*The safety, security and well-being of all guests and crew is our absolute priority*." The ship's captain assured guests, "*The situation is under control, and therefore there are no reasons for concerns*." Given Carnival's lack of sufficient policies, protocols, and procedures to adequately protect passengers' and employees' health, and in stark contrast to the Company's public statements, conditions aboard the Diamond Princess rapidly deteriorated. The ship was forced to remain docked off the coast of Japan for 27 days, as over 700 passengers and crew members contracted COVID-19. For the next two months, outbreaks of the coronavirus on board Carnival's cruise ships continued to occur, exacerbated by Carnival's lack of effective health and safety procedures and controls—in contravention of its stated commitment to protecting its passengers' and crew members' health and safety.

13.     The worldwide coronavirus pandemic illustrated that Carnival's HESS policies, Defendants' statements touting their commitment to their passengers' and crew members' health safety, and the Company's commitment to keeping its ships "free of . . . illness" were ultimately false. As the coronavirus spread throughout the world in the early months of 2020, unbeknownst

to investors, Carnival's policies, procedures, and infrastructure were insufficient, if existent at all. Rather than publicly acknowledging the risks posed by the coronavirus and that its policies, procedures, and protocols were insufficient to address them, Carnival publicly projected a "business as usual" narrative. Specifically, Carnival kept its ships full and on the water, continued to sell cruise tickets, and limited customers' access to refunds. All the while, Carnival's deficient health and safety protocols created all manner of problems on its ships, which ultimately proved to be virulent breeding grounds for the virus, causing severe illness and death among its passengers.

14.     Specifically, as described in more detail below, in contrast to the Company's publicly stated commitments and capabilities, Carnival's management failed to abide by its own and health authorities' guidance and standards to take the necessary precautions to protect its guests, staff, and business. For example, the Company's much-touted health and safety policies and procedures failed to prevent passengers from embarking on cruises on ships where infection already had been detected. On ships on which the coronavirus had been detected—including the Diamond Princess, the Grand Princess, the Ruby Princess, the Zaandam, the Coral Princess, and the Ecstasy—the Company: failed to inform passengers of their risk of contracting COVID-19; declined to cancel group activities or impose adequate social distancing measures; failed to impose proper measures to screen passengers for sickness or suspect travel history; failed to impose appropriate measures to sanitize the ships against infection; and failed to isolate or quarantine individuals showing symptoms or who had come into contact with those showing symptoms of COVID-19.

15.     Throughout, Defendants issued false or misleading statements and failed to disclose material information to investors regarding the Company's commitment to protecting the health

and safety of its passengers and crew, and the measures the Company was taking in the face of the spread of the virus to enhance that commitment. For instance, Defendants falsely claimed that, among other things:

- The Company was "coordinating closely with the U.S. Centers for Disease Control and Prevention and the World Health Organization to implement recommended screening, prevention and control measures for our ships."

- The Company was "dedicated to fully complying with, or exceeding, all legal and statutory requirements related to health, environment, safety, security and sustainability throughout our business."

- "The safety, security and well-being of all guests and crew is our absolute priority."

- "We have protocols, standards and practices for every possible issue you might imagine, including coronavirus."

- "[We have] enhanced our pre-boarding and onboard health protocols. . . . [W]e have implemented even more measures to prevent the spread of disease onboard."

- "Carnival has not had a diagnosed case [of COVID-19] linked to our operation."

16.      Defendant Donald was personally responsible for leading Carnival's coronavirus response. Despite his knowledge of the true facts, Donald also personally made false and misleading statements as part of a public relations campaign specifically designed to assure passengers and investors that cruising was safe and that Carnival's business was strong. For instance, Donald claimed in March 2020:

- "Our highest responsibility and our top priorities are compliance, environmental protection, and the health, safety and well-being of our guests."

- "No ship inherently has any virus or illness on it, it's obviously people, and so whatever happened on the ships originally came in from people coming on the ship . . . . [W]e have great protocols already. We've enhanced those protocols. . . . We have a long history of effectively managing and containing spreads of illness on the ships themselves."

- "There's no evidence whatsoever that community spread was dramatically enhanced by people going on cruise ships. . . . We have much more natural social distancing . . . ."

- "Cruise ships are not a source for coronavirus. We have hundreds of cruise ships out there, very few had cases on them . . . . [A] cruise ship is not a theater. It is not an arena. It's more like Central Park. There's lots of natural social distancing, the ships are large. People are not always gathered and clumped together."

17.     Despite Defendants' falsely optimistic outlook on Carnival's ability to contain the coronavirus and the potential effects of the virus on their business, the relevant truth began to emerge in mid-March. First, on March 16, 2020, Defendants disclosed publicly what they had known since late January: that COVID-19 would have a "material negative impact on [Carnival's] financial results and liquidity," and while the Company would be "unable to provide an earnings forecast," it "expect[ed] results of operations for the fiscal year ending November 30, 2020 to result in a net loss." The price of both Carnival common stock and Carnival ADSs declined by over 12% on this news.

18.     Then, on March 31, 2020, Defendants comprehensively revised the risk factors contained in the Company's Form 10-K. These new risk factors finally divulged the true and extremely serious risks that the coronavirus pandemic posed to Carnival's business as a result of Defendants' inability to implement adequate policies, procedures, and protocols to safeguard passengers' and employees' health and safety.

19.     The same day, Defendants announced that Carnival would seek to raise $6 billion in cash by conducting a public offering of $1.25 billion in Carnival common stock, and private offerings of $4.75 billion in debt securities. Defendants disclosed that the Company would be reducing capital expenditures and operating expenses and suspending dividend payments on and repurchases of Carnival stock. Despite Defendants' feigned optimism, their efforts to raise capital failed to meet their goals. Carnival disclosed the next day that the Company was pricing its public offering of 62,500,000 shares of common stock at $8.00 per share—which would result in Carnival raising just $485 million, far less than half of the amount it had set out to raise. On this news,

9

shares of Carnival common stock declined by 34%, and the price of Carnival ADSs declined by a similar amount.

20.     All told, Carnival's misstatements and omissions concerning its purported commitment to safeguarding its passengers' and crew members' health and safety—and its failure to disclose the known risks that the COVID-19 pandemic posed to its business—cost Carnival's shareholders over $27 billion in market capitalization. Throughout the Class Period, the price of Carnival common stock declined by over 73%, and the price of Carnival ADSs declined by over 74%, severely damaging Plaintiffs and the class of Carnival investors they seek to represent.

## II.    JURISDICTION AND VENUE

21.     The claims asserted herein arise under and pursuant to: Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

22.     This Court has jurisdiction over the claims asserted in this Complaint pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

23.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Carnival maintains its corporate headquarters in Miami, Florida, which is situated in this District, conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District.

24.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

### III.     PARTIES

#### A.     Lead Plaintiffs

25.     Lead Plaintiff New England Carpenters, based in Wilmington, Massachusetts, provides retirement benefits to carpenters throughout the New England region of the United States. As of December 31, 2019, New England Carpenters had total assets of over $5.5 billion. New England Carpenters purchased Carnival common stock during the Class Period, as reflected in its certification previously filed with this Court, and was damaged by Defendants' conduct as alleged in this Complaint. ECF No. 23-3.

26.     Lead Plaintiff Massachusetts Laborers, based in Burlington, Massachusetts, is a defined-benefit fund that provides retirement benefits to members of the Massachusetts Laborers' District Council of the Laborers International Union of North America. As of December 31, 2019, Massachusetts Laborers had total assets of approximately $3 billion. Massachusetts Laborers purchased Carnival common stock during the Class Period, as reflected in its certification previously filed with this Court, and was damaged by Defendants' conduct as alleged in this Complaint. ECF No. 23-3.

#### B.     Named Plaintiff

27.     Plaintiff Slaunwhite is an individual investor. As set forth in the certification attached to this Complaint as Exhibit A, Slaunwhite purchased or otherwise acquired Carnival common stock during the Class Period and was damaged by Defendants' conduct as alleged in this Complaint.

#### C.     Defendants

28.     Defendant Carnival Corp. operates the world's largest cruise company, carrying nearly forty-five percent of the world's cruise passengers through nine different business segments: Carnival Cruise Line; Princess Cruises; Holland America Line; Seabourn; P&O Cruises

(Australia); Costa Cruises; AIDA Cruises; P&O Cruises (UK); and Cunard. The Company boasts that it is "the leading provider of vacations to all major cruise destinations throughout the world." Incorporated in the Republic of Panama, the Company maintains its corporate headquarters at 3655 NW 87th Avenue, Miami, Florida, 33178. Carnival Corp.'s common stock is listed and trades on the New York Stock Exchange ("NYSE"), a presumptively efficient market, under the ticker symbol "CCL." As of March 25, 2020, the end of the Class Period, Carnival Corp. had over 527 million shares of stock outstanding, owned by at least thousands of investors.

29.     Defendant Carnival plc is incorporated in England and Wales, and maintains its principal executive offices at Carnival House, 100 Harbour Parade, Southampton, United Kingdom, SO15 1ST. Carnival plc's ADSs are listed and trade on the NYSE, a presumptively efficient market, under the ticker symbol "CUK." As of March 25, 2020, Carnival plc had over 182 million ordinary shares (each ordinary share is equivalent to one ADS) outstanding, owned by at least thousands of investors.

30.     In 1993, Defendants Carnival Corp. and Carnival plc formed a dual-listed company called Carnival, which operates as a single economic enterprise, with a single senior executive management team and identical Boards of Directors.

31.     Defendant Arnold W. Donald is and has been, at all relevant times, the president and CEO of Carnival since 2013, a Director of Carnival Corp. since 2001, and a Director of Carnival plc since 2003.

32.     Defendants Carnival Corp., Carnival plc, and Donald are referred to herein as "Defendants."

33.     During the Class Period, Defendant Donald, because of his positions within Carnival, regularly spoke in public, at investor conferences, and on earnings calls about the subject

matters in this Complaint, and/or other relevant subjects as discussed herein, and possessed the power and authority to control the contents of Carnival's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and investors. Defendant Donald was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of his positions and access to material non-public information available to him, Defendant Donald knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were materially false and/or misleading.

## IV.   DEFENDANTS' FRAUDULENT SCHEME

### A.   Background On Carnival

34.     A worldwide cruising company, Carnival was founded in 1972 by Ted Arison, the father of Carnival's current Chairman and former CEO, Mickey Arison. The Company began its corporate life by sailing just one ship, a converted Canadian ocean liner, the Mardi Gras, one-way from Miami to San Juan, Puerto Rico. Throughout the 1970s, the Company grew mainly by purchasing and retrofitting older ships. Carnival custom-built its own ship for the first time in the early 1980s, and continued to build increasingly large and extravagant ships—often weighing at least 100,000 tons and able to carry thousands of passengers.

35.     Today, Carnival operates the world's largest cruise company both by number of passengers carried and number of ships in its fleet. With nearly 13 million annual passengers, Carnival carries nearly forty-five percent of global cruise passengers through nine different business segments. The three largest global segments, Carnival Cruise Line, Princess Cruises, and Holland America, sail itineraries throughout the world with a collective fleet of fifty ships. Carnival's Seabourn segment is an ultra-luxury line sailing global itineraries with five ships. P&O

Cruises (Australia) services the Australian continent and surrounding areas with a fleet of three ships. Costa Cruises, AIDA Cruises, and P&O cruises service Italy, Germany, and the United Kingdom, respectively, with 26 ships. And the Cunard line sails a fleet of three ships throughout various itineraries, including the ultra-luxurious transatlantic sail on the Queen Mary 2. Given Carnival's worldwide reach, the Company describes itself as "the leading provider of vacations to all major cruise destinations throughout the world."

36.     Carnival's 104 ships can carry between approximately 1,200 and more than 6,500 guests at a time, with up to 2,000 crew members serving on the largest ships. Carnival's cruises range in length from two days to longer than two weeks for transatlantic itineraries; the Company has recently begun offering month-long cruises as well.

37.     The Company has a significant financial interest in crowding as many guests as it can onto each ship. One of the most important metrics in the cruising industry is the "guest-space ratio," which, as the foremost cruising trade association Cruising Lines International Association ("CLIA") explains, "effectively divides the total amount of ship space by the number of guests onboard to [measure] amount of space per person." Generally, luxury cruises have a lower guest-space ratio—in other words, less density—than standard lines. Whatever a ship's guest-space ratio, however, the more crowded a ship, the more money the cruise ship operators make. Because cruise ships are a high fixed-cost business—indeed, the Mardi Gras cost over $1 billion to build—cruise ship operators rely on a high volume of passengers to turn a profit. Moreover, because the majority of a cruise ship's profit margins come in the form of onboard purchases—such as food and alcohol sales, entertainment, shopping, and special events—rather than ticket sales, cruise ship operators routinely fill each ship to 105% or even 110% of its capacity by offering heavily discounted (or even free) cabins to generate maximum sales of onboard goods. Carnival is particularly successful

at executing this business model: its 17% profit margins are nearly double those of many comparably large hotel chains.

38.     Every Carnival cruise ship is a world unto itself, equipped with numerous attractions designed to encourage its passengers to congregate in confined spaces. For example, the current iteration of the Mardi Gras contains several distinct "fun zones," which "offer mini onboard excursions to different worlds and experiences." Guests can visit: the "French Quarter," a New Orleans-themed section with a bistro restaurant; the "Ultimate Playground" featuring a rollercoaster; "Summer Landing," which includes several restaurants and a pool-side bar; "Lido," which offers three additional restaurants and bars; or "La Piazza," a section devoted to Italian-themed restaurants and bars. In addition to eating and drinking, Carnival's ships are replete with entertainment options. On the Mardi Gras, guests can attend: a comedy club that holds nightly shows; a piano bar that, according to Carnival, "bring[s] guests in an intimate feel-good setting"; a jazz club; and other events held in the ship's several designated entertainment locations, such as the ship's central atrium, a "day-to-night entertainment complex." Some of Carnival's recently-added entertainment options include: the world's first at-sea IMAX movie theater; the SkyRide, a flying bicycle experience; and a fully operational at-sea brewery, all on board the Carnival Vista. As Defendant Donald summed it up, "Each ship is a mini-city."

39.     A cruise ship's crew lives and works in extremely close quarters for long periods of time. A notoriously difficult job, a typical cruise ship crew member works eleven hours a day, seven days per week, for as long as eight to ten months, with no days off. Crew members earn between $400 and $700 per month, or $1.62 to $2.27 per hour—a situation that is only possible because cruise ship operators such as Carnival incorporate outside of the United States and are not subject to U.S. labor laws. Given the sheer number of staff that each ship requires, crew members'

15

living quarters are far from luxurious. The typical crew member accommodation is below-deck, windowless, and shared with one to three roommates, with a bathroom shared either with roommates or communally. Crew members have reported not being able to spread their arms "without hitting something."

40.     In addition to the thousands of crew members on most cruise ships, cruise ship operators rely on a vast network of third parties that directly and indirectly support their operations. These individuals come into contact with cruise passengers in order to facilitate the smooth operation of every cruise. For example, the typical cruise guest flies to and from her destination, coming into contact with TSA agents, flight attendants, vendors, those transporting her to and from the airport, and of course other airline passengers. She then might stay in a hotel for a night or two before and after her cruise starts and ends, necessitating contact with the employees in the hotel and the hotel's other guests. When boarding the ship, a passenger is typically met by at least one greeter, who will accompany her to her room. And upon arriving in any port, she typically interacts with customs officers, luggage service vendors, bus drivers, tour operators, and the myriad other vendors that service the cruise industry. A cruise ship is not a vacuum; upon embarking on or disembarking from a cruise, passengers and crew members necessarily interact with scores of other individuals, all of whom are then at risk of contracting infectious diseases that might spread aboard the cruise ship.

41.     Despite the enormous size of many Carnival cruise ships, the hallmark of a Carnival cruise experience is prolonged, face-to-face contact with thousands of other people, often in small, enclosed spaces such as cabins, restaurants, bars, shops, spas, nightclubs, and theaters.

42.     Cruise ships—especially ones as large and as crowded as Carnival's—are particularly vulnerable to outbreaks of infectious diseases. This is because cruise ships are largely

populated by the elderly and those in close quarters. According to CLIA, the median age of cruise guests in 2018 was between 60 and 69 years old, with 19% of guests in this age range. Adding in those over the age of 70, the percentage rises to nearly 35%.

43.     Historically, the most common diseases to spread on cruise ships are norovirus and respiratory illnesses. Norovirus, which spreads through microscopic fecal particles and can be transmitted via infected individuals, surfaces, or food and water, causes gastrointestinal distress. Respiratory illnesses—most commonly influenza—also spread readily in cruise ship environments and typically cause fever, cough, and congestion. Legionnaires' disease, which occurs more commonly on cruise ships than in other environments, can cause severe pneumonia and even death. Finally, enterotoxigenic escherichia coli, a type of E. coli, is common on cruise ships. Transmitted by ice cubes or other contaminated water, it also causes gastrointestinal distress. Outbreaks of vaccine-preventable diseases such as chickenpox, measles, rubella, and meningococcal disease have also occurred on cruise ships.

44.     As a result of the physical constraints of a cruise ship, the advanced age and vulnerability of many cruise passengers, and the ease with which infectious diseases can break out and spread in a cruise environment, cruise ships, and Carnival's in particular, have gained a reputation for being "petri dishes" for illness. In light of this, and as described below, Carnival has gone to great lengths to ensure passengers, crew members, regulators, and investors that this reputation is unfounded.

## B.     Throughout Its History, Carnival Has Touted Its Commitment To Ensuring Passengers' Safety And Security

45.     Safety and security are integral to Carnival's brand identity. On a page of its website titled "Safety and Security," Carnival claims that the "safety and security of our guests is our top priority. Our excellent record of safe operation throughout Carnival's 40-plus year history, and the

comprehensive safety standards we continue to live up to every day, proves that commitment." Carnival touts that its purported safety measures are specifically designed to prevent disease outbreaks, stating for instance, that "the standard by which cruise ships are held for sanitation is the highest in the world." "Should an outbreak occur," the Company continues, "Carnival employs comprehensive cleaning and sanitizing efforts."

46.     Indeed, prior to the Class Period, Carnival routinely touted its commitment to health and safety. In its December 20, 2018 earnings call, for example, Defendant Donald claimed that Carnival was "fully committed to continuous improvement in health . . . safety, and security." The Company's January 28, 2019 Annual Report on Form 10-K listed "Health, Environment, Safety, Security and Sustainability" as the first of the Company's "four key pillars" and indicated that the Company's "commitment to the safety . . . of our guests and crew is paramount to the success of our business. We are committed to operating a safe and reliable fleet and protecting the health, safety and security of our guests, employees and all others working on our behalf." The Company similarly touted its commitment to "continuous improvement in health, environment, safety and security" during its April 16, 2019 shareholder meeting and in its April 19, 2019 Annual Report.

47.     Given their design, however—thousands of passengers and staff crowded into close quarters—cruise ships routinely experience outbreaks of viruses including noroviruses, which cause vomiting and diarrhea, and influenza and influenza-like illnesses ("ILI"), which cause fever, congestion, and fatigue, among other symptoms. While a person is "contagious," he can spread billions of viral particles. As such, once a viral outbreak occurs, it can be difficult to sufficiently clean a ship. For instance, one study documented an unidentified cruise ship in which, despite a full week of "aggressive sanitization" after a norovirus outbreak, 8% of the passengers on the ship's next outing became infected. The Centers for Disease Control and Prevention ("CDC"), a

federal agency under the Department of Health and Human Services, tracks such outbreaks and other health and safety issues associated with the cruise industry under its Vessel Sanitation Program ("VSP"). The VSP tracks outbreaks of norovirus and other communicable disease on cruises, but it relies on the cruise companies to self-report any outbreaks. The CDC has noted that the "close living quarters" on cruise ships can heighten the risk of viral transmission, and infected passengers can quickly infect other passengers and crew members.

48.    Indeed, in 2010, the World Health Organization ("WHO") designated viral outbreaks as a major public health challenge for the cruise industry, and in 2016, amid the recent outbreaks of Ebola and Middle East Respiratory Syndrome, or MERS, the WHO published extensive guidance on preventing and containing viral outbreaks on cruise ships in its "Handbook for management of public health events on board ships."

49.    For several years prior to the Class Period, the CDC has published best practices to advise cruise operators facing outbreaks of infectious diseases. As of the beginning of the Class Period—and before the outbreak of COVID-19—such guidance (the "CDC ILI Guidance") related to best practices for cruise ship operators to follow in the event of an outbreak of ILI. The CDC ILI Guidance is published because cruising "is characterized by the movement of large numbers of people in closed and semi-closed settings. Like other close-contact environments, these settings can facilitate the transmission of influenza viruses and other respiratory viruses from person to person . . . ."

50.    As such, the CDC ILI Guidance counsels cruise ship operators to take certain steps, including the following:

1. *Isolate*: "Passengers with ILI . . . should remain isolated in their cabins or quarters . . . until . . . 24 hours after resolution of fever . . . .";

2. *Distance*: "While temporarily in common areas, passengers and crew members with ILI should be encouraged to remain as far away from others as possible (at

least 6 feet), and either wear face masks or cover their mouths and noses with a tissue.";

3. *Sanitize*: If crew members must have contact with passengers and other crew members who have ILI, they should "[a]void touching [their] eyes, nose, and mouth" and "[w]ash [their] hands often with soap and water . . . ."; and

4. *Use PPE*: "Crew members . . . who may have contact with people with ILI should be instructed in the proper use, storage, and disposal of personal protective equipment (PPE) . . . . Use of N95 respirators or face masks . . . can be considered for cruise ship workers who cannot avoid close contact with people with ILI." Cruise ship operators should "ensure availability of conveniently located dispensers of alcohol-based hand sanitizer" and "carry a sufficient quantity of PPE, such as face masks, N95 respirators, and disposable gloves, for use in controlling the spread of influenza or other diseases."

51.     Critically, Carnival has admitted that it is bound by the CDC's and other regulators' guidelines concerning health and safety. For instance, Carnival stated on its website during the Class Period, "Our ships operate in full compliance with—and in many cases exceed—all U.S. and international safety regulations." In Carnival's June 2019 report on environmental, social, and governance issues, the Company stated: "In the U.S., we collaborate with the Centers for Disease Control and Prevention (CDC). . . . The CDC provides guidelines, reviews plans and conducts unannounced ship inspections. We continue to work with the CDC throughout a ship's life to maintain safe standards through regular inspections, crew training and guest education." Similarly, in its Form 10-K filed on January 28, 2020, Carnival reiterated its commitment to complying with the CDC's and other regulators' guidance. In that filing, Defendants stated:

We are committed to providing a healthy environment for all of our guests and crew. ***We collaborate with public health inspection programs throughout the world, such as the Centers for Disease Control and Prevention ("CDC") in the U.S. and the SHIPSAN Project in the EU to ensure that development of these programs leads to enhanced health and hygiene onboard our ships***. Through our collaborative efforts, ***we work with the authorities to develop and revise guidelines, review plans and conduct on-site inspections for all newbuilds and significant ship renovations***. In addition, we continue to maintain our ships by ***meeting, and often exceeding, applicable public health guidelines and requirements***, complying with inspections, reporting communicable illnesses and conducting regular crew training and guest education programs.

20

52.     Despite its purported commitment to operate in compliance with detailed guidance, Carnival has routinely failed to adequately contain outbreaks of ILI and other infectious diseases on its ships. For instance, in the three years leading up to the Class Period, Carnival reported to the CDC sixteen outbreaks of viral illnesses on its ships ranging from norovirus (a highly contagious, but typically not life-threatening, virus that causes vomiting and diarrhea) to E. coli (a bacteria that can cause infection and also result in vomiting and diarrhea). In 2019, *half* of the CDC-identified outbreaks of ILI aboard cruise ships occurred on Carnival-owned ships. In fact, in July 2019, the CDC gave Carnival's Fantasy ship one of the worst sanitation ratings in the Company's history—an "unsatisfactory" 77 out of 100 possible points. The CDC documented dozens of health and safety problems on board the ship, including a salad bar riddled with flies, shower hoses that discharged brown water, soiled cups, bowls, and utensils in food service areas, and inadequate or missing sneeze guards at food stations. Moreover, the CDC detailed several cases of acute gastroenteritis ("AGE") among employees that the ship handled improperly. For instance, the CDC noted that one employee who began experiencing AGE symptoms at 5:00 a.m. did not report to the medical center until 3:30 p.m. having worked for several hours while experiencing symptoms. This violated the CDC's requirement that crew members experiencing AGE symptoms "isolate in cabin or designated restricted area until symptom-free for a minimum of 24 hours . . . follow-up with and receive approval by designated medical personnel before returning crew to work [and] . . . document the date and time of last symptom and clearance to return to work." The CDC also noted that, in the case of another employee's bout of AGE, ship officials completed their interviews of the employee's contacts too quickly. This violated the CDC's requirement that, when a crew member experiences AGE, his "asymptomatic cabin mates

21

or immediate contacts" must "complete a verbal interview daily with medical or supervisory staff until 48 hours after the ill crew member's symptoms began."

53.     As a result, as described in more detail below, by the beginning of the Class Period, the Company undertook a concerted effort to increase its safety standards in response to years of infectious disease outbreaks and other health and safety violations.

54.     Beyond self-reporting disease outbreaks, though, the cruise industry lies in what some commentators have called "a regulatory black hole." Most cruise lines register their vessels under "flags of convenience," a term for the registration of a ship in a country that differs from the country of residence of the ship's owners. Ships are typically registered in Caribbean countries, whose enforcement powers are often practically limited—some countries, such as the Bahamas, have just one person in charge of inspecting ships that dock there. Other countries may intentionally decline to closely scrutinize the cruise industry, which provides them with a major source of revenue. The International Maritime Organization, the international organization that crafts rules and guidance governing shipping, including cruising, has no enforcement power. And the U.S. government has had limited success in regulating the industry because the ships are not incorporated here and thus largely do not operate under American laws. As such, Carnival and its competitors in the industry police themselves, making their self-imposed health and safety policies all the more essential to keeping passengers and staff protected from illness, injury, and death.

55.     Nevertheless, Carnival has been embroiled in environmental and safety scandals that have tarnished its reputation for maintaining stringent health, safety, and sustainability practices. For instance, in 2012, the Costa Concordia ran aground off the coast of Tuscany, Italy, killing 32 people; its captain fled the ship and was later charged with manslaughter. In 2013, the Company was fined after one of its ships dumped over 66,000 gallons of pool water into a national

park. The same year, Carnival's Triumph caught fire and stranded its passengers with inadequate sewage systems and air conditioning, turning a four-day cruise into a debacle with passengers in fetid conditions fearing for their lives. The voyage earned the dubious distinction of having been nicknamed the "poop cruise." In 2015, Carnival was fined for violating air pollution laws. And in 2017, the Company pleaded guilty to felony criminal charges and was fined $40 million for illegally and systematically releasing oil into the ocean and covering up the practice. Judge Patricia A. Seitz of the Southern District of Florida placed the Company under the supervision of a federal monitor for this conduct, but in 2019, the Company was charged and fined again for violating the terms of its probation.

### C. Carnival's "HESS Policy" And Its Purported Actions To Assuage Concerns About Health and Safety Risks

56.     Following these scandals, Carnival has made repeated efforts to shore up its safety and security protocols. Carnival has a Health, Environmental, Safety & Security Committee (the "HESS Committee") of its Board of Directors, which exists to assist the Company with, and keep the Board apprised of, the Company's efforts to self-regulate. Specifically, the HESS Committee was created to "assist the boards in fulfilling their responsibility to supervise and monitor [the Company's] health, environmental, safety and security policies, programs, [and] initiatives at sea and onshore, and compliance with related legal and regulatory requirements." The HESS Committee is comprised of at least three independent directors and meets at least four times annually. The HESS Committee reports to the Board, on which Defendant Donald sits. During Defendant Donald's tenure as a member of Carnival's Board—prior to his appointment as Carnival's CEO in 2013—Donald was a member of the HESS Committee.

57.     Among the HESS Committee's responsibilities is reviewing and recommending "appropriate policies for the Companies relative to . . . the health, safety and security of employees,

contractors, customers and the public" and overseeing "the Companies' monitoring and enforcement of these policies and the related procedures and practices." The HESS Committee is governed by the Company's HESS Policy, the current version of which is dated October 18, 2017, signed by Defendant Donald, and has been published on the Company's website at all times relevant to this action. In the HESS Policy, Carnival touts that its "management ensures that the commitments and objectives stated in our HESS Policy are clearly understood by everyone in the organization and articulated on a regular basis. Senior management reviews the HESS Policy at least annually."

58.     The first line of the HESS Policy indicates that Carnival is "committed to . . . [p]rotecting the health, safety and security of our passengers, guests, and all others working on our behalf thereby promoting an organization that always strives to be free of . . . illness . . . ." It touts that the Company is committed to "[c]omplying with or exceeding all legal and statutory requirements related to health, environment, safety, security and sustainability throughout our business activities," and that "[a]ssigning health, environment, safety, security (HESS) and sustainability matters the same priority as other critical business matters." Finally, the Company indicates in its policy that it will "[p]romote industry best practices and publicly report to and maintain open dialogue and cooperation with key stakeholders on HESS . . . matters."

59.     The HESS Policy also specifically states that the "management" of Carnival will enact specific policies and procedures designed to implement the Policy, including that Company's executives "will":

- ***Ensure compliance with this Policy*** within each of Carnival's Corporate and Operating Line organizations.

- ***Identify managers who are responsible for HESS*** and sustainability performance and ***ensure that there are clear lines of accountability***.

- ***Develop, implement and monitor effective and verifiable management systems*** to realize our HESS and sustainability commitments.

- ***Support a proactive framework of risk mitigation*** in the areas of HESS aimed at preventing, monitoring and responding to threats.

- ***Identify, document, assess and conduct periodic reviews of the principal HESS and sustainability risks affecting our business and implement practical measures to manage the identified risks effectively***.

- Provide HESS and sustainability support, training, advice, and information, as appropriate, to passengers, guests, employees, and others working on behalf of the Company.

- ***Promptly report and properly investigate all HESS incidents*** and take appropriate action to prevent recurrence.

- Establish and act upon goals and objectives to improve our HESS and sustainability performance.

- ***Promote industry best practices*** and publicly report to and maintain open dialogue and cooperation with key stakeholders on HESS and sustainability matters.

- ***Conduct a Corporate senior management review of this Policy at least annually***.

60.     These specific principles and implementation tasks presented to investors what appeared to be a robust management infrastructure and commitment to health and safety issues.

61.     More recently, on June 18, 2019, Carnival filed its 2018 report on environmental, social, and governance issues, "Sustainability from Ship to Shore." Carnival's purported commitment to health and safety was the centerpiece of this report. In it, Defendants stated that "[h]ealth . . . safety, and security (HESS) issues are paramount to our business." Defendants further touted that they "continue to build on our commitment to protect the health, safety and security of all our guests, employees and all others working on our behalf" and to that end the Company "[c]ontinued to implement a series of initiatives . . . [and] enhance our health and safety procedures" and was committed to "[c]omplying with or exceeding all legal and statutory requirements related to health . . . safety, [and] security . . . throughout our business activities."

25

Moreover, the Company claimed that it performed regular, internal HESS audits and that "[u]pper management and the Boards of Directors are regularly advised on corporate risk management issues and on the status of compliance with our [HESS] policies and procedures." In short, the Company, touted, "We do not underestimate the importance of ensuring the safety of our 12 million guests . . . ."

62.     In August 2019, Carnival hired Peter Anderson to fill the newly-created position of Chief Ethics and Compliance Officer. A former federal prosecutor, Anderson also worked on the federal monitorship of Volkswagen following its "clean diesel" emissions scandal. Carnival appointed Anderson as a member of the executive leadership team, reporting directly to Defendant Donald. He was tasked with "driv[ing] a culture of compliance and integrity that ensures adherence to legal and statutory requirements and the highest ethical principles." Defendant Donald connected Anderson's hiring to the Company's commitment to safety: "Our commitment is to excellence in safety . . . and overall compliance while delivering joyful vacations and great shareholder returns. Pete understands what it takes to help build a corporate compliance effort that is effective, and will help us to pursue compliance-related goals through pragmatic solutions that achieve measurable results . . . ." In the press release announcing his appointment, Anderson himself stated, "This new team underscores our commitment to ethics, compliance, the environment and health, safety and security . . . . We are in the process of developing a world-class, enduring culture of compliance among every one of our 150,000 employees. Compliance and ethics is at the heart of everything we do."

63.     As the outbreak of COVID-19 would eventually demonstrate, however, Carnival's purported policies and protocols concerning, and its *actual* commitment to, health and safety were far different than its public statements. The Company's response to the pandemic made clear that

neither the CDC's and other regulators' guidance, Carnival's own internal protocols, nor the Company's empty proclamations of the importance of health and safety were implemented or followed in any meaningful way. Instead, Defendants' unfailing breakdowns in this department—and its prioritization of profit over safety—led to its misstating the impact that COVID-19 would have on passengers, crew, and Carnival's financial health during the Class Period. This ultimately caused the Company's desperate efforts to raise capital at the end of March 2020.

### D. As The Class Period Begins, Carnival Misleadingly Touts Its Purported HESS-Related Policies and Procedures And Its Enhanced Commitment to Health and Safety

64. The Class Period begins on September 16, 2019, when—in response to several years of infectious disease outbreaks on board its ships, as well as other well-publicized HESS incidents—Carnival disclosed significant enhancements to its purported health and safety protocols. Specifically, the Company announced the creation of the IAG, a new, independent team that was focused on investigating and analyzing so-called "HESS issues." The Company described that the IAG would make recommendations to enhance Carnival's HESS policies, procedures, and training; recommend corrective action and preventative plans; and share lessons to prevent recurrence of issues. Further, the IAG would study issues that extend beyond single events to more broadly enhance health and safety procedures and develop programs to standardize training and investigation of issues across the Company.

65. To lead the IAG, Carnival appointed Sandra Rowlett, a career professional in transportation management and safety. Rowlett had worked for three decades at the National Transportation Safety Board overseeing aviation accident and railroad, pipeline, and hazardous materials investigations. Rowlett reported directly to Peter Anderson, and was tasked with "leading efforts to deploy new global investigation procedures, develop an investigator training and certification program, and standardize a company-wide, root-cause analysis system to aid in

continuous operational improvement." Showcasing the worldwide reach of the IAG, Rowlett's team members would report to her from across the globe, including from Miami and Orlando, Florida, Santa Clarita, California, Hamburg, Germany, Southampton, United Kingdom, Genoa, Italy, and Sydney, Australia.

66.     The Company represented that development of the IAG and Rowlett's appointment constituted a significant enhancement to Carnival's commitment to—and infrastructure to service—health and safety issues undertaken in response to the outbreaks of infectious disease and other HESS incidents the Company faced in prior years. The Company touted these steps in its communications with investors and the public. In the press release announcing the creation of the IAG, Anderson stated, "With over 100 ships sailing to more than 700 ports around the world, ***it's imperative that we are thorough and diligent when it comes to the health, safety and security of our guests and crew***, and protecting the environments and destinations where we operate, which are ***top priorities for all of us***."

67.     These statements augmented the Company's then-existing HESS Policy, which, as discussed above, made numerous representations and commitments concerning how Carnival would protect its customers and crew.

68.     In addition to the HESS Policy, as of the start of the Class Period, Carnival prominently positioned on its website statements related to its commitment to maintaining the health and safety of its passengers and crew. For instance, as of September 2019, Carnival's website stated, "The safety and security of our guests is our top priority. Our excellent record of safe operation throughout Carnival's 40-plus year history, and the comprehensive safety standards we continue to live up to every day, proves that commitment. Our ships operate in full compliance

with—and in many cases exceed—all U.S. and international safety regulations." This statement remained on Carnival's website throughout the Class Period.

69.     On September 26, 2019, when Carnival announced its financial results for the third quarter of 2019, the Company further touted its capabilities regarding health and safety, invoking the hiring of Peter Anderson. During the conference call that day, Defendant Donald said:

> On the leadership front, we are excited to announce that Peter Anderson has joined us as Head of Ethics and Compliance. ***That's a new role that is bringing together functions and people that were previously distributed across the corporation and complementing that with new talents, roles and processes to help take us to best-in-class and broad-based compliance***. Peter, whose background is a former federal prosecutor along with a wide breadth of experience, including as a court-appointed monitor ***will report directly to me***.

70.     Defendants' statements touting their commitment to their passengers' and crew members' safety were untrue, and created the misleading impression for investors that Carnival had proper protocols in place to prevent or control—and to minimize the financial impact of—infectious disease outbreaks on its cruise ships. The spread of COVID-19 throughout the world confirmed that such policies and controls did not exist. Further, as Carnival's ships proved to be a particularly virulent breeding ground for the virus, causing severe illness and death among its passengers, the Company not only downplayed the risk to its passengers and crew, and continued to sail, but paid lip service to its purported commitment to health and safety in order to bolster its bottom line. The true financial impact of Carnival's misrepresentations became critically apparent to investors as the Company was forced to materially augment its risk factors to address the impact of the COVID-19 outbreaks on its ships, reputation and financial outlook, and to seek to raise over $9 billion in cash during March of 2020.

71.     As news reporting later revealed, in early 2020, when a true public health emergency—a highly contagious virus spreading rapidly around the world—struck, Carnival's failed response demonstrated that it had no effective health and safety-related infrastructure to

implement and was not, in fact, committed to protecting the health and safety of its guests or crew, and that its statements to investors touting these protocols were false and misleading.

72.     The truth about the Company's systemic health and safety-related deficiencies—and their disastrous impact on the Company's financial condition—was not revealed until the end of the Class Period, but those failures existed at least since September 2019, if not before. Specifically, contrary to their public statements, Carnival lacked proper policies, procedures, controls, or processes to prevent cruise ships from embarking on new voyages after it learned that passengers and crew were exposed to COVID-19. The Company also lacked proper health and safety policies and procedures to prevent passengers from embarking on cruises on ships where infection had already been detected. ¶¶87, 134-37. Indeed, aboard the Diamond Princess, a ship on which infected passengers had sailed, the Company ignored information from third parties regarding infections on the ship, and waited days to inform passengers of their risk, to cancel group activities at which viruses could spread, and finally to quarantine passengers in their cabins. ¶¶98-103. Further, Carnival did not request that public health officials who boarded the ship to screen passengers to comply with medical guidelines: officials left potentially exposed passengers onboard the ship during testing rather than taking them ashore as recommended. ¶109. Even once the Diamond Princess was quarantined, Carnival failed to abide by protocols regarding distancing, sanitization, and use of personal protective equipment. Crew members often wore the same pair of gloves to deliver food to dozens of cabins at a time, stood door-to-door and face-to-face with passengers while delivering food, served passengers food on china, and collected dirty dishes and used linens without full protective gear. ¶110. Carnival also failed to undertake contact tracing for the first infected passenger who left the Diamond Princess (¶112), limiting his "close contacts" to

his traveling party—not the hundreds, if not thousands, of other passengers and crew members with whom he may have come into contact while on board the Carnival ship.

73.     In addition to lacking its own health and safety protocols that would have protected passengers and crew members as the coronavirus took hold, Carnival similarly failed to follow existing internal and CDC protocols, notwithstanding its public statements to the contrary. For instance, Carnival did not take boarding passengers' temperatures, as the Company announced it would (¶¶91, 162); did not institute enhanced cleaning protocols, or instituted new protocols too slowly to be effective (¶¶108, 162); allowed potentially infected passengers off the ship into crowded tourist destinations (¶¶87, 90-91, 144, 159); kept infected passengers and crew on board the ship instead of releasing them into safe quarantine facilities on land (¶¶113, 137); misrepresented the possibility of infection to local health officials (¶146); and did not communicate clearly the risks to passengers and crew aboard the ships (¶¶101-02, 111, 114-17, 145).

74.     As described in more detail below, Carnival's response to outbreaks of the coronavirus on its ships cannot be reconciled with its statements regarding the health and safety measures it had implemented and to which it was committed. The failings associated with the coronavirus outbreaks on Carnival's ships were not the result of an internal change in Company policy, infrastructure, or commitment that occurred in January, February, or March 2020. Rather, Carnival's failures reflected a lack of effectively functioning health and safety protocols, procedures, and operational capabilities that existed at the beginning of the Class Period. Carnival's inadequate and reckless response to the coronavirus outbreak ultimately revealed its statements about the paramount importance of protecting the health and safety of its passengers and crew to be false, and forced the Company to disclose the harsh impact of these failures as it starkly revised its risk factors and sought billions of dollars in cash.

31

### E.     Carnival's Undisclosed Health And Safety Issues Led To The Company's Poor Response To The Coronavirus Outbreak

75.     A coronavirus is a type of virus that is common in animals and sometimes evolves to infect humans. Named for their round shape covered in pointed structures resembling a corona, or crown, coronaviruses were first identified in humans in the 1960s. Coronaviruses circulate regularly and often cause mild illness, such as the common cold, in humans. Some coronaviruses, however, can cause more severe respiratory illnesses. For instance, earlier in the twenty-first century, two coronaviruses caused outbreaks of serious respiratory disease: MERS-CoV, which causes MERS, and SARS-CoV, which causes severe acute respiratory syndrome, or SARS. Most recently, a newly-identified coronavirus, SARS-CoV-2, was discovered in Wuhan, China in late 2019. This coronavirus causes a disease called COVID-19, which, as is now well known, has spread throughout the world, becoming a global pandemic.

76.     COVID-19 first came to the public's attention on December 31, 2019, when Chinese public health officials reported a cluster of cases of acute respiratory illness in Wuhan, China. Information on the coronavirus spread rapidly thereafter. On January 7, 2020, officials confirmed that a novel coronavirus, SARS-CoV-2, was the cause of the disease cluster. On January 11, 2020, China reported its first death associated with COVID-19. On January 16, 2020, the first COVID-19 cases outside of China were identified, when the WHO confirmed a case of COVID-19 in a Japanese citizen. On January 21, 2020, the CDC identified a patient in Washington state as the first case of COVID-19 in the United States. The CDC indicated that "[w]hile [COVID-19 was] originally thought to be spreading from animal-to-person, there are growing indications that . . . person-to-person spread is happening" as evidenced by infections among health care workers. On January 29, 2020, the United Arab Emirates reported the first cases of COVID-19 in the WHO's Eastern Mediterranean Region. On the same day, the WHO held the first meeting of the

Pandemic Supply Chain Network to create a market allowing for WHO and private sector partners to efficiently source and distribute COVID-19-related supplies.

77.     The global press covered COVID-19 with escalating alarm. On January 27, 2020, *The Wall Street Journal* reported that "[h]undreds of Americans were preparing to fly out of Wuhan . . . as fears grew at the epicenter of China's health crisis," noting that the State Department planned to evacuate roughly 1,000 Americans. *The New York Times* on January 28, 2020 noted that cases of COVID-19 had "jumped . . . overnight," that the death toll had risen beyond 130 people, that the "race" for a vaccine had begun, and that there was increasing evidence of human-to-human transmission of the virus.

78.     In the face of this emerging threat, Carnival assured investors that health and safety were critically important to its success and that it took those obligations seriously. In a January 28, 2020 *South Florida Business Journal* article, Carnival falsely and brazenly maintained that "***[a]lthough the risks to our guests, crew, and business around the world is very low***, we are closely monitoring the situation." Carnival was at least reckless in making such a baseless statement.

79.     Similarly, in its January 28, 2020 Annual Report on Form 10-K, Carnival continued to assure its investors that it was "dedicated to fully complying with, or exceeding, all legal and statutory requirements related to health, environment, safety, security, and sustainability throughout our business," a verbatim recitation of its purported commitment to health and safety that the Company made before the Class Period despite the emerging threat of COVID-19. The Company further touted that its dedication was evidenced by the facts that it provides "regular health, environmental, safety and security support, training, guidance and information" to guests and employees and that it developed and implemented "effective and verifiable management

systems to fulfill our health, environmental, [and] safety . . . commitments." Notably, Carnival's Form 10-K omitted any mention whatsoever of the Company's plans to contain any potential outbreaks of the coronavirus on board its ships, and critically, the broad risks to the Company's financial health that a global pandemic posed.

80.     Unknown to investors, at the time Carnival made these statements, it was in a unique position to understand the gravity of COVID-19 even before the WHO and United States government sounded the alarm. On January 25, 2020—days before Carnival filed its Form 10-K and Annual Report—a Company vendor based in Wuhan, China alerted John Padgett, Carnival's Chief Experience and Innovation Officer to the scale and severity of COVID-19. Padgett recalled the exact day he learned the information even months later because it was the day before the death of Kobe Bryant. Aware of the magnitude of COVID-19, Padgett confirmed that he "***shared [the information] with [Defendant] Donald when we were talking . . . . [W]e actually had insight into the global situation much earlier than most***."

81.     A former employee of Carnival, FE1, who worked as a project manager in Carnival's Manufacturing, Fulfillment, and Logistics division from February to May 2020, confirmed that Carnival had early access to information about the effects of the coronavirus on Carnival's business.[2] FE1 was hired by Carnival to work out of the Company's Innovation Center in Doral, Florida on building a wristband that would allow cruise passengers to use a single device to access their cabins, make purchases, and track family members. FE1 was an indirect report to Padgett, one step removed from him in the organization. FE1's responsibilities included

---

[2] Former employees of Carnival are identified in this Complaint by number ("FE1," "FE2," etc.). For ease of readability, the Complaint uses the pronoun "he" and the possessive "his" in connection with Former Employees. This convention is not meant to identify the actual gender of the Former Employee described.

coordinating with Carnival's manufacturers and vendors in Asia to procure sensors, readers, screens, and chips for the wristbands and to transport them to Carnival's ports of call for installation. FE1 described that he dealt most frequently with a broker in Singapore, who in turn dealt with manufacturers in China, and he explained that, as plants and factories in China began shutting down due to the spread of COVID-19, he was forced to find other suppliers through his Singaporean broker. FE1's experience internally at Carnival showed not only that the spread of the coronavirus was already disrupting Carnival's operations when Defendants stated that the risk of the virus to Carnival's business was "very low," but also that, as John Padgett explained, "We actually had insight into the global situation much earlier than most."

82.     It is no surprise, then, that as Carnival was reassuring its guests and investors that COVID-19 posed a minimal threat to the Company, on January 28, 2020, Carnival canceled all of its cruises on its Costa line departing from Chinese ports between January 25 and February 4, 2020. Publicly, however, the Company attributed these cancelations to the fact that "China has implemented travel restrictions," forcing it to "suspend cruise operations from Chinese ports." Critically, Carnival's announcement omitted the highly material fact that, as Defendants knew, cruising was becoming increasingly dangerous. Instead, Carnival continued to tout the safety of its operations, the low risk to its passengers, and its commitment to health and safety to its passengers, despite knowing that domestic and international public health agencies were issuing increasingly urgent declarations of emergencies, and having unique, firsthand insight into the severity of COVID-19 in China.

83.     On January 30, 2020, the WHO declared that the novel coronavirus outbreak met the criteria for a Public Health Emergency of International Concern. The WHO disclosed that, as of January 30, China was reporting over 7,700 confirmed and over 12,000 suspected cases of the

coronavirus, as well as 170 deaths. Outside of China, the WHO reported 83 cases in 18 other countries, seven of whom had no history of travel in China. The United States had reported its first coronavirus case on January 21, 2020.

84.     On January 31, 2020, President Trump issued a proclamation noting that, because the U.S. was now seeing confirmed cases of COVID-19, the government was "restrict[ing] and suspend[ing] the entry into the United States . . . of all aliens who were physically present within the People's Republic of China, excluding the Special Administrative Regions of Hong Kong and Macau, during the 14-day period preceding their entry or attempted entry into the United States."

85.     The same day, Defendants issued a statement downplaying the risk of coronavirus on Carnival ships and maintaining the façade that sailing on Carnival's ships was safe. Specifically, in a press release issued in response to the news of the WHO's declaration that the coronavirus was now a global public health emergency, Carnival stated:

> Although **the risk to our guests and crew is low,** we are closely monitoring the evolving situation with respect to Coronavirus. Our medical experts are coordinating closely with the U.S. Centers for Disease Control and Prevention (CDC) and the World Health Organization (WHO) to **implement enhanced screening, prevention and control measures for our ships, guests and crew.**

86.     Despite Defendants' contention that the risk to Carnival's passengers, staff, and business was "very low," the coronavirus quickly began to appear on Carnival's ships. On Saturday, February 1, 2020, Carnival learned that a passenger who had traveled aboard Carnival's Diamond Princess, which was carrying 2,666 passengers and 1,045 crew members, had tested positive for COVID-19 at a hospital in Hong Kong. The passenger in question previously boarded the Diamond Princess in Yokohama, Japan, on January 20 and disembarked in Hong Kong on January 25, at which point the ship continued its round-trip journey back to Yokohama. The remaining passengers on the ship were due to disembark in Yokohama on February 4, 2020, but Carnival announced that it was holding the ship off the coast of Yokohama for 24 hours.

87.     Later reporting confirmed that, despite the fact that, by the time the Diamond Princess embarked on its voyage on January 20, cases of COVID-19 had been confirmed throughout Asia and in the United States, ship officials took no boarding precautions other than to ask passengers if they were experiencing flu symptoms or a fever. Two days later, on January 22, 2020, when the Diamond Princess docked at Kagoshima, Japan, ship officials encouraged passengers to disembark to explore the city, but took no additional precautions when passengers reboarded. The same day, the first Diamond Princess passenger began to exhibit COVID-19 symptoms.

88.     On January 23, 2020, a second passenger began to exhibit symptoms—the same day that the Chinese government took the unprecedented step of closing off the entire city of Wuhan, which has a population of 11 million people.

89.     On January 24, 2020, hundreds of passengers on board the Diamond Princess participated in a champagne waterfall. By the time the Diamond Princess had docked in Hong Kong on January 25, Hong Kong had raised its coronavirus response level to "emergency" and had cancelled large-scale events such as its Spring Festival, Lantern Festival, and marathon, and had shuttered most of its stores. Ship officials evidently told passengers who were disembarking the Diamond Princess that Hong Kong was quiet due to the Chinese New Year. Again, when passengers reboarded the ship after exploring Hong Kong, no additional precautions were taken to screen them for COVID-19 symptoms or exposure.

90.     The Diamond Princess continued cruising throughout Asia. At stops in ports in Vietnam and Taiwan throughout the last week of January, guests were encouraged to disembark, explore the cities, mingle with locals, and travel on public transportation—without the benefit of any guidance or recommendations from Carnival on safety precautions for avoiding infection.

When passengers expressed concern that locals in Taipei, Taiwan were wearing masks, ship officials told them not to worry and that the locals were wearing masks by choice.

91.     By February 1, 2020, the day that the former Diamond Princess passenger tested positive for COVID-19 in Hong Kong, the remaining Diamond Princess passengers were encouraged to disembark to explore the Japanese city of Naha, Okinawa. While Japanese port officials checked passengers' temperatures when they left the ship, Carnival took no additional precautions and imposed no additional screening measures when passengers reboarded. The next day, Carnival crew members—particularly its food service employees—began exhibiting symptoms of COVID-19.

92.     Nevertheless, Carnival attempted to soothe the public's fears, stating on February 4, 2020, "***The safety, security and well-being of all guests and crew is our absolute priority***. The review of the arriving guests and crew, by Japanese health authorities, is standard practice after a guest tested positive for coronavirus and ***we are working closely with the local authorities to provide detailed records to facilitate their review***."

93.     That Carnival touted its commitment to health and safety despite failing to implement any health precautions on the Diamond Princess was even more egregious because, as the Diamond Princess was sailing, health authorities governing the maritime industry around the world were issuing health advisories regarding COVID-19 and recommending that ships enact specific measures to combat the virus.

94.     For instance, on January 24, 2020, the United States Coast Guard published a Marine Safety Information Bulletin entitled "Novel Coronavirus Precautions" (the "Coast Guard COVID-19 Guidance"). The Coast Guard COVID-19 Guidance noted that the COVID-19 outbreak "began in early December 2019" and "continues to expand in scope and magnitude,"

with "more cases in China and beyond its borders expected." The Coast Guard COVID-19 Guidance further cautioned that "[p]erson-to-person spread is occurring" and "[p]reliminary information suggests that older adults, and people with underlying health conditions, may be at increased risk for severe disease from this virus." As such, those passengers who "feel sick with fever, cough, or [have] difficulty breathing . . . should seek medical care right away" and "[w]ash hands often with soap and water for at least 20 seconds."

95.     The same day, the United States Department of Transportation's Maritime Administration published a bulletin about COVID-19 entitled "2020-002A Global-Novel-Coronavirus Outbreak" (the "DOT COVID-19 Guidance"). The DOT COVID-19 Guidance noted that COVID-19 was "a rapidly changing situation" causing "ports [to] tak[e] actions including health screenings of seafarers for [COVID-19]." The DOT COVID-19 Guidance further directed readers to the CDC's general guidance on COVID-19, noting that the agency had issued a travel warning to avoid nonessential travel to Wuhan, China and that the U.S. Department of State had issued a similar travel advisory.

96.     On January 27, 2020, the European Commission's Directorate-General for Health and Food Safety published guidance regarding cruise ship travel in light of COVID-19 (the "EU COVID-19 Guidance"). The EU COVID-19 Guidance indicated that travel companies, before boarding passengers, "should" relay the following information about COVID-19 to them: "symptoms, hygiene rules (hand washing, coughing and sneezing etiquette, disposal of dirty tissues, social distancing, elimination of handshaking events, etc.), special considerations for high-risk groups, what to do in case of relevant symptoms, and the potential for an outbreak on board." The EU COVID-19 Guidance further recommended that crew arriving on board from affected areas be educated about COVID-19 and monitored by health staff for fourteen days after leaving

39

any affected area for symptoms. The EU COVID-19 Guidance specifically noted that "[c]ruise ships visiting affected areas should provide information to passengers and crew . . . for international travel and trade in relation to the outbreak," including information about sanitation, when to seek medical care, and recommendations regarding the visitation of "live markets." In addition, "[a]dequate medical supplies and equipment should be available on board to respond to an outbreak" including "[a]dequate supplies of PPE . . . including gloves . . . [and] surgical masks." If a case of COVID-19 was detected on board, the EU COVID-19 Guidance provided lengthy recommendations for managing cases, such as isolating the passenger in an isolation room, notifying the "competent authorit[y] of the next port of call," recommendations for contact tracing, and specific recommendations regarding disembarkation procedures. Once passengers disembarked, the EU COVID-19 Guidance indicated that "a high level of cleaning and disinfection measures should be maintained on board" because COVID-19 "may survive in the environment for several days."

97.    In a post-Class Period article, *Bloomberg Businessweek* reported that, despite Carnival's soothing statements, and contrary to the several health advisories issued while the Diamond Princess was sailing, Carnival utterly failed to take reasonable precautions to protect passengers and crew members from the clear, known threat of coronavirus on board the Diamond Princess. Carnival's inability to contain the coronavirus outbreak that was rapidly spreading throughout the Diamond Princess reflected a clear failure in the Company's compliance with HESS protocols and external guidance regarding the spread of infectious disease.

98.    First, lapses in communication between ship officials, Carnival's corporate personnel, third party vendors, and local health officials dramatically slowed Carnival's ability to react to the first confirmed case of COVID-19 among its passengers and to enact adequate safety

protocols. According to *Bloomberg Businessweek*'s post-Class Period reporting, around 11 p.m., Japan time, on February 1, 2020, one of Carnival's sanitation vendors, Wallem Group, emailed an alert to the Diamond Princess's Chief Administrative Officer and a guest services email address notifying the vessel that one of its former passengers was being treated for COVID-19 at a hospital in Hong Kong. Wallem Group wrote, "Would kindly inform the ship related parties and do the necessary disinfection." Reporting has varied as to whether, as Carnival's Chief Communications Officer Roger Frizzell claimed, no one was monitoring these two email inboxes, or in fact, an employee read the messages in real time but took no immediate action.

99.     Carnival also has claimed that Nancy Chung, a Hong Kong-based director for the Princess line, learned of the former passenger's February 1, 2020 positive test and hospitalization only after seeing a TV news report on the evening of February 1 about a hospitalized coronavirus patient who had traveled to Hong Kong on a cruise. Chung texted a Carnival executive in California, who requested that she notify Hong Kong health officials to put them in touch with Dr. Grant Tarling, Carnival's Chief Medical Officer. Late on February 1, 2020, both Carnival and Hong Kong health officials had confirmed knowledge of the COVID-19 case, but officials aboard the Diamond Princess had still failed to notify passengers on the ship that a former passenger had tested positive for the virus.

100.    Lapses in communication were coupled with a stunning lack of urgency among high-ranking Carnival officials—including its Chief Medical Officer and Chief Communications Officer—to confirm the passenger's COVID-19 diagnosis and to take further action aboard the Diamond Princess. Around 11:30 a.m. on February 2, 2020, Dr. Tarling sent an email to Hong Kong's health authorities with the subject line "Confirmed Coronavirus Case," and included the passenger's name, age, and ward location at the Princess Margaret Hospital in Hong Kong.

41

Evidently, Tarling was attempting to verify that the passenger hospitalized at Princess Margaret was the same individual who had been aboard the Diamond Princess, but his email was not clearly phrased as a question. Tarling also claims not to have seen Carnival's February 1, 2020 press release announcing the former passenger's positive coronavirus test. Carnival's spokesperson Frizzell shifted the blame to the Hong Kong health authorities, claiming that the Hong Kong officials failed to react to Tarling's message until close to 7:00 p.m. that night. A spokesperson for the Hong Kong health department claimed, conversely, that the department immediately informed the shipping agent in Hong Kong of the name of the cruise on which the coronavirus patient had been a passenger.

101.    Officials on board the Diamond Princess mirrored the lack of urgency among Carnival's officials. The ship officials' complacency in the face of a rapidly growing threat confirms that, in sharp contrast to its public statements, Carnival did not have proper policies, procedures, protocols, or controls in place to prevent or contain the spread of infectious disease on its ships. For example, the Diamond Princess's Captain, Gennaro Arma, waited **24 hours** after learning the news of the confirmed coronavirus case before notifying the remaining passengers aboard the ship about the potential infection on board. This delay put passengers at further risk of infection, and ship officials' secrecy clearly violated Carnival's HESS directive to "maintain open dialogue and cooperation with key stakeholders on HESS . . . matters."

102.    According to *Bloomberg Businessweek*'s post-Class Period reporting, Captain Arma casually announced at 6:30 p.m. on February 3 that the passenger who tested positive had not felt ill during his time on board, but he counseled passengers to avoid close contact with anyone who was experiencing symptoms of respiratory illness, to wash their hands regularly for twenty seconds, and to seek treatment from the ship's nurses if they experience a fever, chills, or cough.

He assured passengers that there would be no charge for any medical service they sought, and he stated, "***The situation is under control, and therefore there are no reasons for concerns***." When the ship arrived in Yokohama, Japan later in the evening of February 3, Japanese health officials began screening the Diamond Princess's patients for coronavirus.

103.    Despite being under clear guidance to impose distancing and isolation measures, and to provide adequate personal protective equipment when a case of ILI was discovered on board, passengers were not given masks or other PPE when Carnival learned of the confirmed coronavirus case (or, ideally, even earlier)—a clear failure of protocol. Moreover, Diamond Princess staff did not take measures to distance guests from one another, discontinuing only some scheduled activities on February 4. Most critically, Carnival did not institute a full, ship-wide quarantine aboard the Diamond Princess—which would have required all passengers to remain in their cabins—until February 5.

104.    Critically, Defendant Donald has subsequently admitted that he was aware of the situation aboard the Diamond Princess before February 5, and ***he personally took control of the response efforts on that day***. As reflected in an April 2020 article, Donald told *Bloomberg Businessweek*, "We have a nice chain of command. As it became a bigger issue, I'm dialing into the situation updates."

105.    Contrary to its public statements and supposed policies for dealing with "HESS Issues," Carnival was unable to properly respond to the reality of a confirmed COVID-19 case on the Diamond Princess, and the situation aboard that vessel deteriorated further. By February 6, 2020, more than 20 people on the Diamond Princess had tested positive for the coronavirus. Ten initial cases were confirmed after authorities in Japan began screening passengers on February 3; the following day, ten more passengers received positive test results. Finally, after twenty positive

43

tests, ***Carnival confined the rest of the ship's more than 2,600 passengers to their cabins for two weeks***. By February 8, 2020, testing had identified 69 cases of coronavirus on board the Diamond Princess. Ultimately, as *Bloomberg* reported on May 21, 2020, ***712 people on the Diamond Princess tested positive for the coronavirus; forty of those passengers were eventually admitted to intensive care, and twelve died***.

106.    These statistics put Carnival's lack of internal health and safety protocols designed to prevent or contain the outbreak of infectious diseases on its ships, and its failure to abide by the protocols imposed upon the Company by the CDC and other regulators, into stark terms. Specifically, the rapid spread of COVID-19 aboard the Diamond Princess makes clear that, despite Defendants' public statements regarding Carnival's commitment to the health and safety of passengers and crews, and reassurances just days before that COVID-19 posed a very low risk, after learning of the first confirmed case of the illness, Carnival did not isolate those passengers and crew members who may have come into contact with the infected former passenger or his party, did not impose adequate distancing measures in common areas of the vessel where the virus could easily spread, failed to impose enhanced sanitization measures until days later, and critically, did not offer adequate personal protective equipment to either employees or guests.

107.    The complacency, secrecy, and lack of urgency with which Carnival's officials both aboard the Diamond Princess and managing the situation from Company headquarters approached the first confirmed case of COVID-19 stood in stark contrast to the tenets of Carnival's HESS Policy requiring the Company to assign HESS matters "the same priority as other critical business matters," and to "[p]romote industry best practices and publicly report to and maintain open dialogue and cooperation with key stakeholders" on HESS matters. The sheer number of infections ultimately discovered on board the Diamond Princess also belied Defendants' prior statements that

44

the protection of their passengers and crew are the Company's "top priority" and that the risk of contracting COVID-19 aboard a Carnival cruise ship was "very low."

108.    The Diamond Princess's lack of response to knowledge of a confirmed COVID-19 case illustrates the absence of any plan, compliance, and infrastructure around HESS issues. The disaster aboard the Diamond Princess evidences Carnival's lack of compliance with CDC guidelines and its failure to protect the health and safety of its passengers and crew, despite its public assurances otherwise. For example, *The New York Times* described that, after the former Diamond Princess passenger's positive case was confirmed, Carnival officials failed to abide the direction of Hong Kong health officials, who recommended immediate action, including "thorough environmental cleansing and disinfection of the cruise," which the Company ignored. While Carnival claimed it had enhanced cleaning procedures as early as February 3, those procedures were low-level and minimal at best.

109.    Moreover, even though Carnival explicitly knew that the coronavirus was present on the Diamond Princess by February 1, the Company did not ask the Japanese authorities—who boarded the ship on February 3 to screen passengers—to comply with its medical guidelines.

110.    In addition, despite Carnival's assurances that the situation aboard the Diamond Princess was under control, *The New York Times*'s reporting on the Diamond Princess's attempted quarantine reflected further lapses in Carnival's compliance with its HESS protocols and external regulatory guidance. The *Times* reported that, once the ship was quarantined, crew members often wore the same pair of gloves to deliver food to dozens of cabins at a time, and they stood face-to-face with passengers while delivering food, a potential source of infection for both passengers and staff members. Early in the quarantine, crew members served passengers' food on china, a potential mode of transmission, but even after switching to paper and plastic food service items,

crew members still opened cabin doors to pass meals to passengers rather than leave the food outside passenger cabins for passengers to retrieve. Crew members also collected dirty dishes and used linens without full protective gear.

111.    The *Times* noted that, while Captain Arma claimed that the crew had increased the number of hand sanitizers, rotated buffet utensils more frequently, and stepped up cleaning, passengers noticed few ship-wide changes after Arma's announcement about the infected passenger, further evidencing the Company's failure to abide by its own HESS policies and procedures, and the unambiguous tenets of the CDC's guidelines for ILI. Passengers described that crew members cautiously and quietly advised passengers to take certain precautionary measures, like avoiding touching the ship's handrails or keeping their pencils after trivia games (which were still ongoing). Nevertheless, as *Bloomberg Businessweek* later reported, despite having news of a potential infection on board the Diamond Princess, the Company "tried to keep the fun going." As late as February 3, guests continued eating and drinking in large groups at the ship's buffets and bars, lounging in the ship's saunas, attending shows and trivia contests, and participating in other group activities.

112.    Carnival also did not undertake appropriate contact tracing after learning that a passenger who was on board the Diamond Princess became infected. Contact tracing involves identifying and questioning every person with whom the infected individual had been in contact, and infectious disease experts believe that this process should begin immediately after identification of a positive case. Individuals who have been in close contact with the infected person should then themselves be isolated. Carnival intended to leave the contact tracing process to Japanese officials once the Diamond Princess docked in Yokohama; until that time, Carnival officials considered only the infected passenger's traveling party to be his close contacts. The

WHO, by contrast, considers close contacts to be dining companions, or anyone else who had face-to-face contact with the infected person. On a cruise ship, this definition of close contacts could cover hundreds or thousands of passengers and crew members. Instead, no restrictions were placed on the Diamond Princess's passengers until 11:00 p.m. on February 3, when the ship docked in Yokohama and Japanese health officials boarded.

113.    Given Carnival's failure to abide any policies, protocols, and controls—including its own HESS protocols—to prevent or contain the spread of infectious disease on its cruise ships, public health experts were far from surprised at the outcome aboard the Diamond Princess. According to the *Times*, despite the Japanese officials' order that the first 273 passengers who were tested remain in their rooms while awaiting test results, those passengers, in fact, moved about the ship and continued to eat at the buffets. Furthermore, after the first batch of positive test results was confirmed on February 5, Carnival decided to remove the passengers who tested positive from the ship but to keep everyone else on board, isolated in their cabins. Public health experts disagree with this approach, explaining that Carnival should have, instead, arranged for all passengers to be taken into safe quarantine in Japan—and no one should have remained on the ship, where the virus inevitably continued to spread.

114.    In sharp contrast to the Company's professed commitment to the health and safety of its passengers, Carnival's attitude toward the burgeoning crisis remained shockingly cavalier. Former employees of Carnival have described that, even after the catastrophe aboard the Diamond Princess, Carnival encouraged its sales staff to continue selling cruises in order to maximize profits in the face of a clear danger to its passengers and crew. FE2, who worked as a cruise vacation sales planner for Carnival's Princess line from 2018 to 2020, explained that as soon as the case on board the Diamond Princess was discovered, as many as 80% of his customers were asking for a refund.

Nevertheless, even after that, Princess's sales agents were pushed to increase sales. FE2 stated that, because customers always paid for some portion of their cruise upon booking, Carnival stood to make money with every sale made even if the cruise were to take place months or years in the future. As such, Carnival continued to push sales employees to make sales after the CDC issued its no-sail order in mid-March; he was encouraged to keep pushing sales until he was laid off from Princess on May 14, 2020.

115.   According to FE2, as news broke that the virus was spreading rapidly in Italy, Princess rerouted some of its Italian voyages, but did not cancel them. Customers inquired with FE2 and his colleagues about whether their cruises would be porting in areas of Italy where the virus was prevalent, but Princess told employees to assure customers that the virus was not in the port areas, and any virus hot spots were "several miles away, so they should be fine."

116.   FE2 explained that when passengers inquired with him and other sales employees about what precautionary measures Princess was taking to protect passengers from the coronavirus aboard its ships, employees were instructed to be vague—to tell guests that the Company was taking action, but not to provide specific details. FE2 stated that sales staff was instructed to inform passengers that heightened screening procedures might make boarding times longer; that Princess ships would be taking passengers' temperatures; and that passengers who had traveled to COVID-19 hot spots would not be allowed to board their ships. But if a passenger asked FE2 for more detailed information—such as what Princess was doing to increase sanitization—he could not provide them with specifics.

117.   FE2 also explained that, despite Carnival's purported focus on pleasing its customers, the Company erected roadblocks that prevented customers from simply canceling their cruises and obtaining a refund—even in the face of danger on board their ships. For instance, FE2

was instructed to keep customers on board their cruises first and foremost, but if customers wanted to cancel, sales staff were told to offer them incentives, such as a double cruise in the future, to keep them on the hook if they did not cancel. Sales staff were also instructed to tell cancelling customers that, due to administrative issues, their refunds would take an increasingly long time to process. Prior to the pandemic, FE2 noted that Carnival typically processed refunds in about three or four days. After passengers began to cancel their cruises due to fears of the coronavirus, FE2 recalled telling passengers, initially, that their refunds would take two weeks to process, which turned into thirty days, sixty days, and ninety days. He described that the Company constantly developed new excuses for why it could not process refunds quickly, frustrating sales staff—who were required to stick to the script the Company had provided—and customers, who felt they were not receiving suitable customer service. FE2 described that he received instructions from his supervisors to provide customers with adequate customer service, but not the level of service that would eventually lead to a refund. Regarding refunds, his supervisors' attitude was, "Why would you even ask? We're a sales team. Our job is to sell."

118.    Just days after the first coronavirus cases were identified on board the Diamond Princess, Carnival continued to behave as though the problem was limited to that one ship. However, throughout the first week of February, Carnival's MS Westerdam was sailing for over a week looking for a port of disembarkation. Because the Westerdam had set sail from Hong Kong on February 1, which was by then seeing a rise in cases of coronavirus—an extremely reckless decision by Carnival in the first instance—the other Asian ports at which the Westerdam was supposed to dock, including Thailand, Taiwan, Japan, the Philippines, and Guam, turned the ship away over fears of infections on board. As a result, the Westerdam was stranded at sea and forced to sail for another full week before it was permitted to dock in Sihanoukville, Cambodia on

February 13, 2020. Despite the fact that the ship had set off from Hong Kong, a virus hot spot, two weeks earlier, its passengers quickly disembarked with no additional precautionary measures, and notably, no plans for quarantining. Most alarming, by the time the Westerdam arrived in Cambodia, twenty passengers were showing suspicious symptoms. The saga of the Westerdam provided further evidence of the deep chasm that existed between Carnival's operations and its public statements regarding its purported policies to ensure the safety of its passengers and employees.

119.   On February 12, 2020, as the Westerdam was sailing around Asia in search of a port, Carnival continued its campaign to falsely assure investors and the public that cruising on its ships was still safe. The Company issued a press release stating:

> Carnival Corporation & plc is closely monitoring the evolving situation with respect to Coronavirus. ***The safety of guests and employees, compliance and protecting the environment are top priorities for the company***. The company's medical experts are coordinating closely with the U.S. Centers for Disease Control and Prevention and the World Health Organization to implement enhanced screening, prevention and control measures for its guests, crew and ships. The company's global team is working tirelessly to support guests impacted by voyage disruptions during this unprecedented time.

120.   The same day, February 12, 2020, the CDC published its Interim Guidance for Ships on Managing 2019 Novel Coronavirus (the "CDC COVID-19 Guidance"[3]), a comprehensive set of best practices for cruise companies to follow "to help prevent, detect, and medically manage suspected [COVID-19] infections" as the disease was understood at the time. The CDC COVID-19 Guidance noted that "cruise ships . . . involve[] the movement of large numbers of people in closed and semi-closed settings. Like other close-contact environments, ships may facilitate

---

[3] The CDC COVID-19 Guidance has been updated periodically as the CDC has gained a more developed understanding of COVID-19 throughout 2020. This Complaint, however, summarizes the information that was published by the CDC, and available to Defendants, on February 12, 2020.

transmission of respiratory viruses from person to person through exposure to respiratory droplets or contact with contaminated surfaces."

121.    *First*, the CDC COVID-19 Guidance recommended that cruise ship operators identify and isolate potentially infected passengers. The CDC COVID-19 Guidance noted that symptoms of COVID-19 "may include fever, cough, and shortness of breath." The CDC COVID-19 Guidance further noted that symptoms of COVID-19 could present with "little-to-no symptoms" but also could result in "severe illness and death," and with an "incubation period [that] is believed to be 2-14 days," the CDC recommended taking "a cautious approach" to patients that may be infected with COVID-19. The CDC recommended that, when a passenger was suspected of having COVID-19, cruise ship operators should:

1.  Ask patients to wear a face mask "as soon as they are identified";

2.  Evaluate patients in "a private room with the door closed, ideally an airborne infection isolation room . . . ."; and

3.  Staff entering the room or interacting with the patient should use the CDC's recommended precautions related to airborne illnesses, such as wearing goggles or a face shield.

122.    *Second*, the CDC COVID-19 Guidance recommended that cruise ship operators manage the care of sick or passengers once it was confirmed that the passenger was infected with COVID-19. Specifically, the CDC COVID-19 Guidance indicated that cruise ship operators should:

1.  Deny boarding of passengers or crew suspected of having COVID-19 not only "based on signs and symptoms" but also based on the passenger's "travel history in China or other known exposure . . . .";

2.  Isolate passengers and crew in their cabins or quarters "with the door closed until symptoms are improved" and specifically noted that "[d]iscontinuing isolation precautions is made on a case-by-case basis, in consultation with CDC."; and

3. Ideally, any necessary medical follow-up should occur in the isolated passenger's cabin, and the cruise ship operator should "[c]oordinate visits to the onboard medical center in advance, if needed" and have "the sick person wear a facemask before leaving their cabin."

123.   *Third*, the CDC COVID-19 Guidance recommended that cruise ship operators impose stringent COVID-19 symptom, temperature, and potential exposure checks for all passengers and crew members upon boarding the ships. Specifically, the Guidance stated:

Before boarding, conduct verbal or written screening in appropriate languages and in a private environment to determine whether persons have had signs or symptoms of COVID-19 or a known exposure to a person with COVID-19 within the past 14 days. In addition, temperature checks should be used to identify any person with a temperature of 100.4°F or greater. Deny boarding of a crew member or non-crew member who is suspected of having COVID-19 because they have symptoms, a temperature of 100.4°F or greater, or have had known exposure to a person with COVID 19 within the previous 14 days. Because the virus that causes COVID-19 can spread from persons without symptoms, ship operators should consider having embarking crew quarantine for 14 days immediately before or upon boarding the ship to prevent introduction of the virus on board.

124.   *Finally*, the CDC COVID-19 Guidance recommended that cruise ship operators take the following steps with respect to their crews:

1. When interacting with passengers or other crew members that have a fever or acute respiratory illness, ask the person to wear a face mask, maintain six feet of distance from the person, keep interactions "as brief as possible," avoid touching one's eyes, nose, and mouth;

2. Instruct crew members on the proper use, storage, and disposal of personal protective equipment ("PPE"), as the "[w]rong use or handling of PPE can increase the spread of disease";

3. Wear impermeable, disposable gloves if crew members need to have direct contact with sick people or potentially contaminated surfaces; and

4. For workers who cannot avoid close contact with people who have symptoms of COVID-19, wear N-95 respirators or face masks.

125.   By February 15, 2020, however, a passenger who had been aboard the MS Westerdam—and who traveled from Cambodia to Malaysia after the ship docked—tested positive for the coronavirus, raising concerns that infected passengers from the Westerdam were now

dispersing across Asia. In response to this news, Carnival's spokesperson Roger Frizzell falsely claimed on February 18, 2020, "*We have protocols, standards and practices for every possible issue you might imagine, including coronavirus*."

126.    Notably, Defendant Donald was heavily involved in the response to the coronavirus outbreak on board Carnival's ships. On February 18, 2020, *The New York Times* reported that, over the prior days, Donald visited the Princess headquarters in California and Holland America's offices in Seattle to participate in crisis-response meetings during which company officials held conference calls with colleagues in Japan and Cambodia. As described above, Defendant Donald has also admitted that, as early as February 5, he personally took control of the Company's response to the outbreak aboard the Diamond Princess.

127.    On February 24, 2020, Carnival announced the cancellation of all of its cruises on all of its cruise lines to mainland China through mid-March 2020. This included four ships run by Costa Cruises, and three additional ships from Princess and Seabourn, which had already been rerouted to other countries. Diamond Princess cruises to mainland China were suspended through mid-April. Defendants again downplayed this development as merely due to the spread of COVID-19 and increasing restrictions related to China alone, not to the clear danger posed by cruising in the midst of a rapidly spreading pandemic.

128.    Two days later, on February 26, 2020, Carnival issued its Schedule 14A Proxy Statement, which omitted any mention whatsoever of the coronavirus and the risks that it posed to Carnival's shareholders. Instead, Defendants reiterated their misleading statements relating to Carnival's health and safety protocols and claimed that health, security, and safety remained the Company's "highest responsibilities" and "top priorities." For instance, Defendants stated that Carnival's most important "[h]ealth, safety, and security goal" was to "[c]ontinue to build on our

commitment to protect the health, safety and security of guests, employees and all others working on our behalf."

129.    Also in the Proxy Statement, Defendants touted the critical role that the HESS Committees of the Board of Directors play in assuring that Carnival cruises comply with all relevant health and safety guidelines and directives. Defendants stated:

> The HESS Committees review and recommend policies relative to the protection of the environment and the health, safety and security of employees, contractors, guests and the public. The HESS Committees also supervise and monitor health, environmental, safety, security and sustainability policies and programs and review with management significant risks or exposures and actions required to minimize such risks. . . . Our HESS Committees are responsible for oversight of risk associated with the health, environment, safety and security of employees, contractors, guests and the public.

130.    Defendants further described the role of the HESS Committees, and in particular, the involvement of Carnival's highest-ranking executives on the Committees:

> **The HESS Committees and our management team review all significant risks or exposures and associated mitigating actions.** Each of the Group Chief Executive Officers, each brands' President, the Chief Maritime Officer and senior maritime representatives attend the meetings of the HESS Committees. In addition, Carnival Corporation & plc's HESS Policy describes our commitments to: protecting the health, safety and security of our passengers, guests, employees and all others working on our behalf, thereby promoting an organization that strives to be free of injuries, illness and loss; . . . complying with or exceeding all legal and statutory requirements related to health, environment, safety, security and sustainability throughout our business activities; and assigning health, environment, safety, security and sustainability matters the same priority as other critical business matters.

131.    Critically, the February 26 Proxy Statement made no mention whatsoever of the coronavirus pandemic, the risks it posed to Defendants' business, and the effects that it was already beginning to have on Carnival's business and financial health.

132.    The next day, Defendants filed Carnival's 2019 Annual Report, which included a short section titled "Fiscal Year 2020 Coronavirus Risk," and which stated:

In response to the ongoing coronavirus outbreak, China has implemented travel restrictions. As a result, we have suspended cruise operations from Chinese ports between January 25th and February 4th, canceling nine cruises. We also expect that travel restrictions will result in cancellations from Chinese fly-cruise guests booked on cruises embarking in ports outside China. We estimate that this will impact our financial performance by $0.03 to $0.04 per share. If the travel restrictions in China continue until the end of February, we estimate that this will further impact our financial performance by an additional $0.05 to $0.06 per share. Five percent of our capacity was scheduled to be deployed in China in fiscal year 2020. If these travel restrictions continue for an extended period of time, they could have a material impact on our financial performance.

133.    The 2019 Annual Report failed to disclose, however, that in addition to the short-term risk to Carnival's business posed by limited cancellations of cruises from certain geographic areas, Carnival's lack of a comprehensive plan to contain outbreaks of the coronavirus on its ships posed a severe long-term risk to the Company's business. Further, Defendants' risk factors included in the 2019 Annual Report failed to disclose that the Company had been in possession of information from Wuhan, China for over a month—which John Padgett had reported to Defendant Donald—concerning the severity, scale, and scope of the outbreak in China, which should have triggered the risk factors that the Company did not make until March 31, 2020.

134.    Shortly after issuing these statements, on March 4, 2020, Carnival told passengers aboard its Grand Princess ship that the CDC was investigating a cluster of coronavirus cases in Northern California—including the death of one man—that was linked to the Company's previous Grand Princess cruise. The man who died on March 4 had disembarked from the Grand Princess in San Francisco after exhibiting what Dr. Tarling described as a "six- to seven-day history of symptoms of an acute respiratory illness." The cruise on which the man had been a passenger sailed roundtrip from San Francisco and Mexico between February 11 and February 21, 2020; docked in San Francisco; and then embarked from San Francisco en route to Hawaii with 62 of the same passengers on board. On March 4, the ship was ordered to return to San Francisco. Later reporting confirmed that, prior to boarding the Grand Princess on February 11, 2020, passengers

were merely asked to sign a form stating that they were not sick; passengers were questioned no further about their travel history or potential exposure to the coronavirus, and none was examined. None of the 62 passengers and crew who transitioned from the first Grand Princess voyage to the second—and were obviously exposed to the coronavirus on the first leg of the cruise—were examined in any capacity until March 5, 2020.

135.   Carnival's March 4 health advisory from Dr. Tarling instructed passengers who had sailed on the previous Grand Princess voyage to remain in their cabins and wait to be cleared by medical staff. The health advisory also noted, "We are closely recording and monitoring all persons who have reported to the medical center with cold and flu symptoms during the voyage. As a precaution, we are also conducting additional enhanced environmental disinfection onboard in addition to our regular stringent cleaning and sanitation protocols."

136.   Three hours later, Carnival released another health advisory announcing that the Company was collaborating with the CDC and California authorities to take proactive measures aboard the Grand Princess. Critically, the update stated, "***While there are no confirmed cases of COVID-19 currently on board, the CDC has identified groups of guests and crew who will be tested before arrival into San Francisco***." The group identified for testing was "fewer than 100 guests and crew," and included "all in-transit guests (guests who sailed the previous Mexico voyage and remained on board for the current Hawaii voyage), those guests and crew who have experienced influenza-like illness symptoms on this voyage, and guests currently under care for respiratory illness." Unsurprisingly, given Carnival's non-compliance with applicable CDC guidelines and its lack of effective internal policies, 21 passengers aboard the Grand Princess would test positive for COVID-19 by March 6, 2020.

137.    On March 7, 2020, Carnival provided further updates on the situation aboard the Grand Princess. Specifically, the Company told passengers that as a result of the confirmed cases of COVID-19 aboard the Grand Princess, the ship was being held at sea approximately 50 miles off the coast of San Francisco. News outlets reported during the course of the Grand Princess's ordeal that Carnival's decision to keep passengers and crew members on board the ship was reckless. Despite the fact that the Diamond Princess's experience off the coast of Japan—after more than 700 passengers and crew members ultimately tested positive for the coronavirus—was deemed a public health failure, Carnival recklessly made the same decision again. Specifically, public health experts explained that recirculated air from a cruise ship's ventilation system, plus the close quarters and communal settings, make passengers and crew vulnerable to infectious diseases like the coronavirus. In addition, cruise ship air conditioning systems are not designed to filter out particles as small as the coronavirus, allowing the disease to rapidly circulate to other cabins. As such, experts agree that the ship should have been disembarked as quickly as possible and all passengers should have been quarantined at safe facilities on shore.

138.    Despite the ordeals aboard the Grand Princess, the Diamond Princess, and others— not to mention the rapid spread of the coronavirus around the entire world—Carnival continued to allow ships to set sail. On March 5, 2020, Carnival's Coral Princess embarked from San Antonio, Chile on a 14-day cruise with over 1,000 passengers on board. According to passengers who sailed on the cruise, Carnival took no safety precautions prior to passengers' boarding or at the time of their boarding to ensure that they were not suffering from symptoms of COVID-19 or had any suspicious travel history. Carnival's lack of infrastructure to screen passengers (setting aside its decision to allow the Coral Princess to sail in the first place) was shocking, considering the Coral

Princess set sail the same day that public health officials announced that 21 confirmed cases of COVID-19 were discovered aboard Carnival's Grand Princess.

139.    While the Grand Princess was floating off the coast of San Francisco with the virus rapidly spreading on board, on March 8, 2020, the U.S. State Department and the CDC issued guidance stating, "***U.S. citizens, particularly travelers with underlying health conditions, should not travel by cruise ship. CDC notes increased risk of infection of COVID-19 in a cruise ship environment***."

140.    The very next day, March 9, 2020, Carnival's Ecstasy, which can carry over 2,000 passengers, set sail from Jacksonville, Florida for a four-day cruise around the Bahamas. Passengers reported after the Class Period that Carnival personnel had not conducted pre-boarding screening or evaluation to determine whether the cruise's passengers were experiencing symptoms consistent with COVID-19. This clearly violated the CDC COVID-19 Guidance directing cruise ship operators to, prior to boarding, "conduct verbal or written screening . . . to determine whether persons have had signs or symptoms of COVID-19 or a known exposure to a person with COVID-19 within the past 14 days." This also flouted Carnival's own statements regarding its response to the coronavirus outbreak, including its February 18, 2020 claim, "***We have protocols, standards and practices for every possible issue you might imagine, including coronavirus***." Moreover, on board the Ecstasy: passengers were encouraged to mingle with other passengers; to eat and drink at the ship's buffets and bars alongside other passengers; to engage in group activities and to attend performances with the ships' other passengers. At least one passenger who sailed aboard the Ecstasy contracted COVID-19 and later died.

141.    Carnival's decision to let the Ecstasy and the Coral Princess sail—with no precautions taken to screen passengers, no modifications imposed to accommodate social

distancing guidelines, and no adequate sanitization of the ship, and despite Carnival's contemporaneous experiences with outbreaks aboard its ships—flew in the face of the CDC's COVID-19 Guidance explaining the danger that cruising poses in a rapidly expanding pandemic. The CDC stated, "[C]ruise ships . . . involve[] the movement of large numbers of people in closed and semi-closed settings. Like other close-contact environments, ships may facilitate transmission of respiratory viruses from person to person through exposure to respiratory droplets or contact with contaminated surfaces."

142.     On March 13, 2020, a full five days after the CDC warned Americans against traveling by cruise ship—and with knowledge of COVID-19 cases on board its ships and rapidly spreading—Carnival finally announced that it was "pausing operations immediately across its fleet of ships based in North America and will resume them on Friday, April 10." Defendants further falsely stated, "*[W]e have implemented higher and higher levels of screening, monitoring and sanitation protocols to protect the health and safety of our guests, crew and the communities we serve*."

143.     Defendants also falsely and misleadingly claimed that "*Carnival has not had a diagnosed case linked to our operation*." In addition to the ordeals aboard the Diamond Princess and the Grand Princess described above, passengers aboard two of Carnival's Costa ships had, by March 13, also tested positive for COVID-19, including a married couple who disembarked from Carnival's Costa Luminosa in Puerto Rico on March 8 and a passenger on a previous cruise who disembarked in the Cayman Islands on February 29 and later died. In fact, on March 13, 2020, the Governor of Puerto Rico confirmed that the island's first two coronavirus cases were the couple who had disembarked the Costa Luminosa on March 8 and tested positive for COVID-19.

144.     *The Wall Street Journal* later reported that Carnival's approach to dealing with illnesses on board the Costa Luminosa was particularly problematic, putting passengers, crew, and the citizens of Puerto Rico at severe risk. The Costa Luminosa set sail on March 5, 2020 from Fort Lauderdale, intending to make stops in Puerto Rico and other Caribbean islands before sailing back to Europe. After the ship docked in San Juan, Puerto Rico on March 8, an Italian woman was taken to a local hospital for flu-like symptoms and difficulty breathing. While she was being treated, hundreds of her fellow passengers disembarked from the Luminosa for an excursion in Old San Juan, which was particularly crowded due to a local salsa festival. A Canadian passenger told the *Journal*, "Everyone was allowed ashore. No problem." That passenger's entire family of five later tested positive for COVID-19.

145.     *The Wall Street Journal* also later published text messages between a passenger who traveled on board the Costa Luminosa and his son, which demonstrated Carnival's reckless attitude towards its passengers' health and safety. On March 13, the passenger, who was sick himself, texted his son, "Other people are sick here. . . . They won't tell us anything." The passenger died two weeks later.

146.     Worse yet, the Company failed to disclose to the Puerto Rican hospital that the woman may have been suffering from a contagious illness; hospital staff reported that they were led to believe she had pneumonia. When emergency room staff asked Carnival personnel whether anyone else was sick on board the ship, the Luminosa's staff said no. The medical director of the Puerto Rican hospital later learned that several crew members were, at the time of Carnival's denial, in fact quarantining on board the ship for symptoms of COVID-19. A spokesperson for the Coast Guard in San Juan told the *Journal* that maritime authorities were not notified of any

illnesses aboard the Costa Luminosa—including hospitalizations—until after the ship left San Juan harbor on March 8.

147. On March 12, 2020, unbeknownst to investors, Carnival's Princess subsidiary internally announced changes to its incident command organization to address "the ongoing challenges related to COVID-19 in [the] Princess fleet." On March 14, 2020, the CDC issued a no-sail order, effectively shutting down the cruise industry, including all of Carnival's operations. The order stated, "The CDC Director has reason to believe that cruise ship travel may continue to introduce, transmit, or spread COVID-19. As such, the CDC Director issued a No Sail Order for cruise ships effective March 14, 2020 . . . for the next thirty (30) days."

148. The same day, Carnival belatedly decided to prohibit passengers from disembarking at the cruise's scheduled ports of call and to cut short the Coral Princess's voyage and dock in Buenos Aires, Argentina. Nevertheless, the Company imposed no additional protective measures on board the ship and, according to passengers, life aboard the cruise continued as usual.

## V. THE RELEVANT TRUTH EMERGES

### A. March 16, 2020: Carnival Announces That COVID-19 Will Cause It To Report A Loss In Fiscal Year 2020

149. On March 16, 2020, Carnival issued a Form 8-K disclosing that Carnival had notified its lenders under a revolving credit agreement (the "Facility Agreement") that it intended to borrow approximately $3 billion "in order to increase its cash position and preserve financial flexibility . . . ."

150. Then, after the market closed on March 16, 2020, Carnival filed with the SEC an amendment to its Form 8-K issued earlier that day. Specifically, Carnival's Form 8-K/A stated that the Company could no longer provide an earnings forecast and that it expected the fiscal year to end in a net loss:

Significant events affecting travel, including COVID-19, typically have an impact on booking patterns, with the full extent of the impact generally determined by the length of time the event influences travel decisions. The Corporation believes the ongoing effects of COVID-19 on its operations and global bookings will have a material negative impact on its financial results and liquidity. The Corporation is taking additional actions to improve its liquidity, including capital expenditure and expense reductions, and pursuing additional financing. Given the uncertainly of the situation, the Corporation is currently unable to provide an earnings forecast, however we expect results of operations for the fiscal year ending November 30, 2020 to result in a net loss.

151.    Carnival's disclosure that COVID-19 had negatively impacted demand for cruises and that it would be unable to provide an earnings forecast and expected a net loss for the fiscal year ending November 30, 2020 began to reveal to investors the true long-term financial impact of the Company's ineffective health and safety protocols and infrastructure designed to prevent or control the outbreak of infectious illnesses on its ships. More fundamentally, Carnival's disclosures began to reveal its systemic inability to keep its passengers and crew safe and that Defendants' prior statements grossly understated the known, but previously undisclosed, impact of coronavirus on Carnival's operations, financial outlook, brand, and reputation.

152.    In response to this news, shares of Carnival common stock declined by over 12%, from a closing price of $14.57 on March 16, 2020 to close at $12.71 on March 17, 2020. Carnival ADSs similarly declined by over 12%, from a closing price of $12.91 on March 16, 2020 to close at $11.33 on March 17, 2020. Market commentators clearly linked Carnival's precipitous stock decline to its March 16 disclosures. Both *The Wall Street Journal* and *Barron's* noted that Carnival's disclosure—that it would generate a loss in 2020, against the prior forecast of a $3 billion profit—drove down the Company's share price.

153.    Following this disclosure, and despite the severe decline in stock price described above, Defendants continued to misrepresent the effectiveness of their health and safety protocols in response to the COVID-19 outbreak. Defendant Donald gave interviews that touted Carnival's

response to the coronavirus outbreak and recklessly attempted to convince Americans that cruising on Carnival's ships was safe.

154.    For instance, on March 18, 2020, Donald appeared for an interview on CNN and stated:

> *[N]umber one, our highest responsibility and our top priorities are compliance, environmental protection, and the health, safety, and well-being of our guests…*
>
> *[N]o ship inherently has any virus or illness on it, it's obviously people and so whatever happened on the ships originally came in from people coming on the ship and so what we've done is we have great protocols already. We've enhanced those protocols*, we're working very closely with the Centers for Disease Control and with the World Health Organization and other global medical experts to make certain. *We have a long history of effectively managing and containing spreads of illnesses on the ships themselves*, we've been set up for that, we have medical facilities on the ships who identify early, we pre-screen before people come on the ships, and then we can show the facts on the actual number of cases of confirmed COVID, and *there's no evidence whatsoever that community spread was dramatically enhanced by people going on cruise ships*.
>
> In fact, if you think about a cruise ship, just for a second, if you think about a cruise ship and you compare it to other forms of travel, we do temperature screenings, we do medical records, you don't do that when you go to a movie theater or get on a train or you're in an airport terminal or subway terminal. *We have much more natural social distancing, often people who haven't cruised think of cruises as these congested places. You know that there's much more space and social distancing than naturally happens on a cruise*.

155.    Simultaneously with Donald's television appearances touting the "great" and "enhanced" protocols on board Carnival's cruise ships, those Carnival ships that remained at sea lacked any health and safety measures to prevent or contain the coronavirus. On March 17, 2020, ship officials took the temperatures of the Coral Princess's passengers but imposed no other protective measures. Two days later, when the ship landed at Buenos Aires, passengers reported that ship officials provided conflicting instructions as to whether passengers could disembark and travel home. The same day, the Coral Princess departed Buenos Aires for Fort Lauderdale, Florida

after the Argentine government issued an order stating that any ships currently in port would be forced to remain there indefinitely.

156.    The senior physician on board the Coral Princess echoed Defendant Donald's disturbingly cavalier and false statements. On March 20, 2020, the cruise doctor issued a letter to the Coral Princess's 1,020 passengers and 878 crew members claiming, "***Rest assured that, relatively speaking, the Coral Princess is probably one of the safest places in the world to be at this time***." Over the next several days, the Coral Princess unsuccessfully attempted to port and disembark passengers at Montevideo, Uruguay and Rio de Janeiro, Brazil. Ultimately, by early April 2020, at least twelve passengers on board the Coral Princess were infected, three of whom eventually died.

157.    On March 22, 2020, Defendant Donald sat for an interview with Axios on HBO during which he made similar claims. He stated,

> ***If you look at the actual number of cases, you know cruise ships are not a source for coronavirus. We have hundreds of cruise ships out there, very few had cases on them.*** The one that had the most cases was very early on when no one understood hardly anything.

> But ***a cruise ship is not a theater. It is not an arena. It's more like Central Park. There's lots of natural social distancing, the ships are large. People are not always gathered and clumped together***.

> We identify, people get sick, there's a medical clinic onboard, we isolate, OK, and so in effect, you control the spread, whereas when you're in a restaurant or you're in a public library, in a school, that does not happen. So all I'm suggesting is ***a cruise ship is not a riskier environment, people perceive it that way, but the reality is it's not***.

158.    Donald's statement, however, stood in sharp contrast to what public health experts understood and the principles undergirding the CDC's ILI Guidance, among other things. Indeed, a member of the CDC's cruise ship task force later explained that, in fact, infection rates demonstrated that the virus spreads much more rapidly on cruise ships than in a supermarket or a

subway, particularly because cruises are often populated with people who are at greater-than-average risk for the disease, and they are in close contact with other individuals for long periods of time. For example, more than two-thirds of the passengers aboard Carnival's MS Zaandam were older than 65. Moreover, as described above, crew members on cruise ships are at increased risk for infectious disease because they often sleep in bunk beds, eat in mess halls, and share bathrooms.

159.    The facts bear this out. On March 19, 2020, Carnival allowed 2,700 passengers on board the Company's Ruby Princess to freely disembark in Sydney, Australia, despite the fact that several passengers were showing symptoms of respiratory illness, and some were hospitalized with COVID-19 symptoms. Upon the Ruby Princess's arrival in Sydney, a spokesperson for the Company stated, "Our onboard medical team was rigorous in its treatment of some guests who reported flu-like symptoms, and these guests were isolated. The ship reported these cases to [New South Wales] Health, which in turn requested swabs to be provided following the ship's arrival in Sydney, some of which subsequently tested positive for COVID-19." However, emails allegedly sent from a member of the Ruby Princess's crew to a Miami-based cruise industry blogger on or around March 29, 2020 identified a more dire situation. The crew member described, "1050+ very scared crew members are literally imprisoned on board with no real concrete info or plan. The crew is sick and getting sicker." In a second message, the crew member wrote, "No idea how many actually have Covid but MANY have symptoms including lack of taste & smell." Indeed, ship officers told New South Wales health authorities that 104 passengers and crew had acute respiratory infections, including 36 who visited the ship's clinic with influenza-like illnesses—however, the ship did not notify other passengers on board that they too may have been exposed or infected.

160.     Australia's New South Wales police commissioner ultimately launched a criminal investigation into the Company's conduct and transparency regarding the Ruby Princess in April 2020—particularly the Company's repeated representations that COVID-19 was not an issue aboard the ship. Ultimately, at least 662 people connected to the Ruby Princess were diagnosed with COVID-19, and eleven of those people died.

161.     Similarly, on March 22, 2020, Carnival identified a potential outbreak of the coronavirus on board Holland America's MS Zaandam ship, which was carrying 1,243 guests and 586 crew and had embarked from Buenos Aires on March 7, 2020. Thirteen guests and 29 crew members were reporting flu-like symptoms, and all guests were instructed to remain isolated in their rooms. Two days later, Holland America deployed another ship, the Rotterdam, to rendezvous with the Zaandam to provide it with supplies, staff, and COVID-19 testing kits. By March 27, 2020, the Company reported that 53 guests and 85 crew members were reporting flu-like symptoms, that two individuals had tested positive for COVID-19, and that certain healthy passengers would be transferred to the Rotterdam for further isolation. The same day, the Company determined that four guests aboard the Zaandam had died.

162.     Carnival's response to the outbreak aboard the Zaandam further confirms that, contrary to its public statements, the Company lacked proper health and safety protocols and controls necessary to protect its passengers and crew. For example, on February 28, 2020, Dr. Tarling recorded a message, which was posted on Princess's website the next day, informing passengers that the ships would take all boarding guests' temperatures, give out hand sanitizer, and closely check guests' passports for any suspicious recent travel. Yet, half a dozen passengers who sailed on the Zaandam in March subsequently told *The Wall Street Journal* that none of those extra precautions were evident on board the ship. Despite Dr. Tarling's claim that the Company

was enacting "enhanced boarding procedures," shockingly, one passenger told the *Journal*, "No temperature, nothing." And despite Dr. Tarling's claim in the video that the Company was undertaking "enhanced sanitization response protocols," this same passenger reported that he did not notice crew members taking any additional cleaning measures until two weeks later—halfway through the month-long cruise and close to a month after Dr. Tarling announced Carnival's updated protocols for sanitizing the ships. Once the potential coronavirus outbreak was reported on the Zaandam and passengers were instructed to isolate in their cabins, passengers said that some crew members did not wear masks or gloves to deliver food to passengers' cabins until after a local boat delivered a shipment of protective equipment. In other words, Carnival's ships were not adequately stocked with gear to begin with.

163. Despite all evidence to the contrary, Defendants continued to promote the Company's commitment to health and safety and to tout its ability to safeguard passengers and employees from illness. For instance, as of March 24, 2020, Carnival's website featured a page prominently titled, "Carnival's Commitment to Guest and Crew Health." The page stated

> Carnival Cruise Line's highest responsibilities include the health and safety of our guests and crew. Coronavirus is a fluid situation and we continue to work closely with public health experts and [CLIA] to monitor, screen, and implement best practices to protect the health of our guests and crew as it relates to COVID-19 (coronavirus). Our monitoring, screening, and operational protocols are designed to be flexible so that we can effectively adapt to changes as they occur.

164. On March 30, 2020, the Company announced that the Coral Princess, which had, by then, been searching in vain for a port for over a week, would be arriving in Barbados to stock up on supplies, and the Company reassured passengers, crew, and the public, "***There remains no known risk of COVID-19 on board***." Nevertheless, the same day, officials on board the Coral Princess told passengers that illness was spreading aboard the ship. On March 31, 2020, as the Coral Princess again attempted unsuccessfully to disembark passengers at Bridgetown, Barbados,

67

the Company reported, "The medical center onboard the Coral Princess has reported a higher-than-normal number of people presenting influenza-like symptoms." The public statement noted further that many passengers "have tested positive for regular influenza, however, given the concern surrounding COVID-19 (coronavirus), and out of an abundance of caution, guests have been asked to self-isolate in their staterooms and all meals will now be delivered by room service. Crew will remain in their staterooms when not working." Passengers on board the ship simply received this news via an announcement over the ship's loudspeaker: "All passengers please return to your cabins." In other words, Carnival did not impose a ship-wide quarantine on board the Coral Princess—despite close to two months of outbreaks on Carnival cruise ships, hundreds of confirmed coronavirus cases, and many deaths—until 16 days after the ship set sail.

**B.     March 31, 2020: Carnival Attempts to Sell $1.25 Billion In Stock And $4.75 Billion In Debt Securities Due To The "Material Negative Impact" Of The Coronavirus Pandemic "On All Aspects Of Our Business"**

165.    The relevant truth continued to emerge on March 31, 2020, when filed with the SEC a Preliminary Prospectus Supplement to Prospectus dated March 9, 2018 on Form 424(B)(5) seeking to commence an underwritten public offering of $1.25 billion in shares of Carnival common stock. Defendants disclosed that the Company intended to grant the underwriters a purchase option of up to $187.5 million in additional shares.

166.    The Company also disclosed that it had commenced private offerings to eligible purchasers of $3 billion of first priority senior secured notes due 2023 and $1.75 billion of senior convertible notes due 2023 (or up to $2.0125 billion aggregate principal amount if the initial purchasers exercised in full their option to purchase additional convertible notes).

167.    In one of two Forms 8-K filed the same day, Defendants disclosed that, in addition to pursuing the new avenues of financing described above, the Company would be "taking additional actions to improve our liquidity," including reducing capital expenditures and operating

expenses, suspending dividend payments on Carnival stock, and suspending the repurchase of Carnival stock.

168.    In the second Form 8-K, Defendants "update[d] the risk factors of the Company previously disclosed in periodic reports filed with the SEC, including its 2019 Form 10-K" to include a new "risk factor."

169.    Carnival updated its Risk Factors to specifically address COVID-19 because "[t]he spread of COVID-19 and the recent developments surrounding the global pandemic are having material negative impacts on all aspects of our business." Specifically, Carnival noted that "[t]o date we have incurred, and expect to continue to incur significant costs as we bring currently ongoing cruises to a conclusion" and "[w]e will continue to incur COVID-19 related costs as we sanitize our ships and implement additional hygiene-related protocol [sic] to our ships."

170.    Carnival further confirmed that "[d]ue to the outbreak of COVID-19 on some of our ships, and the resulting illness and loss of life in certain instances, we have been the subject of negative publicity which could have a long term impact on the appeal of our brands, which would diminish demand for vacations on our vessels," stating that "[w]e cannot predict how long the negative impact of recent media attention on our brands will last, or the level of investment that will be required to address the concerns of potential travelers through marketing and pricing actions."

171.    Carnival likewise explained that it had "received and expect[ed] to continue to receive lawsuits from passengers aboard the Grand Princess voyage in February 2020," as well as "additional lawsuits stemming from COVID-19," and while it could not "predict the quantum or outcome of any such proceedings and the impact that they will have on our financial results . . .

any such impact may be material." The Company concluded that the foregoing may require it to raise additional capital.

172.    These costs—both those incurred and those the Company expected to incur—due to the spread of COVID-19 aboard multiple Carnival cruise ships resulting from the Company's failure to implement policies, procedures, processes, or controls to prevent or control the outbreak of infectious diseases including ILI and, as relevant here, COVID-19, required the Company to raise additional capital, by conducting an offering of the Company's common stock at a price more than 25% the then-current trading price, and to cancel its dividend and share repurchase program.

173.    The next day, April 1, 2020, Defendants filed another Supplement to its March 9, 2018 Prospectus, in which they disclosed that the Company was pricing its offering of 62,500,000 shares of common stock at $8.00 per share. This pricing would result in Carnival's raising a mere $485 million, after the underwriters' discounts, a far cry from the $1.25 billion that Defendants initially hoped to raise. The April 1, 2020 Prospectus Supplement stated, "The spread of novel coronavirus (COVID-19) and the recent developments surrounding the global pandemic are having material negative impacts on all aspects of our business." The filing also announced an update to Carnival's cancellation policies to "permit cruisers to cancel certain upcoming cruises and elect to receive refunds in cash or future cruise credits." Defendants disclosed, "The volume and pace of cash refunds could have a material adverse effect on our liquidity and capital resources."

174.    Following this disclosure, on April 1, 2020, S&P Global Ratings downgraded Carnival's issuer credit rating from BBB to BBB- "to reflect its expectation that the cruise ship operator will likely generate minimal, if any, EBITDA in 2020 as a result of sailing suspensions due to the coronavirus outbreak."

175.    The price of Carnival stock plummeted on this news. Shares of Carnival common stock declined by 33.2% from a price of $13.17 at the close of trading on March 31, 2020 to $8.80 at the close of trading on April 1, with another 9% decline by the end of the trading day on April 2, to close at $7.97. The price of Carnival ADSs declined similarly steeply, by 31.%, falling from a closing price of $11.93 on March 31 to close at $8.16 on April 1, to close finally at $7.50 by the end of the trading day on April 2, 2020.

176.    The disclosures on March 31, 2020 and April 1, 2020 revealed the true financial harm that its dearth of health and safety protocols had inflicted upon its business. More specifically, Carnival's disclosures revealed that its systemic failure to implement the health and safety policies, procedures and resources it said it had in place was wreaking havoc on the Company's financial condition, thereby necessitating it to urgently raise capital. Moreover, the lack of demand for Carnival's shares confirmed the market's belated understanding that Carnival was incapable of protecting its passengers and crew from coronavirus outbreaks on its ships.

177.    While analysts were initially optimistic about the possibility that Carnival's March 31 and April 1 announcements would significantly improve the Company's liquidity while operations were indefinitely stalled, the market ultimately took a bleaker outlook on the developments. In an April 2, 2020 note, William Blair's analyst wrote, "We are lowering our estimates on Carnival to reflect an upsizing of the company's notes offering to $4 billion (from $3 billion previously) alongside an 11.5% interest rate (higher than we had projected). . . . The common stock offering was decreased to about $500 million from $1.25 billion, pricing at $8 per share. Given the upsizing in debt and lower stock offering, we are lowering our 2020 estimate to a loss of $0.78." On April 3, 2020, Bank of America's analyst wrote that it was "retain[ing] our

Neutral rating" and noted that while Carnival's "new liquidity should give capacity to the group to find its requirements until the end of the year . . . . this comes at a high cost."

178.    From the first day of the Class Period to the last day of the Class Period, after investors learned the truth about Carnival's false statements, the price of Carnival's common stock declined by more than 73%, and the price of Carnival's ADSs had declined by more than 74%, wiping out approximately $27 billion in shareholder value.

## VI.    POST-CLASS PERIOD EVENTS

179.    Following the end of the Class Period, Defendants' failure to implement policies and procedures designed to protect passengers' and crew members' health and safety continued to prove not only financially disastrous for the Company, but also fatal. On April 2, 2020, as the Coral Princess remained docked off the coast of Barbados, the Company announced that it sent thirteen coronavirus test samples to Barbadian authorities "in response to a reported small cluster of cases of respiratory illness and in an abundance of caution." Seven passengers and five crew members tested positive for COVID-19. The next day, two passengers died. After U.S. Coast Guard officials turned the Coral Princess away from the port of Fort Lauderdale because of the "unacceptable risk of medical emergency due to the inherent and high probability of transmission of COVID-19 aboard," the ship finally docked in Miami. In Miami, a total of fourteen passengers were transported to hospitals around Florida in serious or critical condition, and another passenger ultimately died. On April 6, 2020, the Coral Princess began fully disembarking the ship's remaining passengers.

180.    Emails obtained from the CDC in response to Freedom of Information Act requests evidence the agency's frustration with Carnival's lack of plans, policies, or infrastructure to ensure the safe and efficient disembarkation and repatriation of passengers and crew members from ships on which infections had been discovered. For example, on April 4, 2020, Cindy Friedman, the

physician leading the CDC's COVID-19 Cruise Ship Task Force, sent an email to Carnival's Chief Maritime Office Admiral William Burke, Dr. Tarling, and other CDC, U.S. Coast Guard, and Florida health department officials explaining that, "[g]iven the rapidity with which . . . passengers are developing symptoms," the CDC recommended that the Company "find charter or other private transport to get these individuals to their final destination and home as quickly as possible so they can quarantine at home for 14 days and so that local health authorities at their final destination can be made aware." Dr. Friedman requested that Carnival provide the agency with a "detailed itinerary for each person leaving the ship. That itinerary needs to include nationality and final destination for each person leaving the ship." Dr. Friedman noted that "the last version of your plan" demonstrated that the Company was planning to add individuals who had been on board either the Zaandam or the Rotterdam to flights containing passengers from the Coral Princess— this was "concerning" to the CDC because the agency had a "separate agreement for the Zaandam and Rotterdam disembarkation."

181.   Dr. Friedman sent a follow-up email to Admiral Burke three hours later clarifying that Coral Princess passengers must also be "transported to their homes for a 14-day quarantine by either private vehicle or charter flight(s) to their final destination."

182.   Approximately twenty minutes later, Admiral Burke replied to Dr. Friedman's email—and included additional recipients to the email, including Defendant Donald—stating, "I understand this to be your concurrence to fly our charters tomorrow."

183.   Dr. Friedman responded several hours later noting that her earlier email was not, in fact, evidence of her concurrence, and voicing her frustration that Carnival had yet to provide the information the CDC was seeking. She wrote:

Admiral

73

My concurrence doesn't come piecemeal in a sequence of disjointed emails. CDC is asking for a single written out coherent plan submitted to the entire Unified Command with appropriate time for each agency to review, ask clarifying questions and to clear. The discussions via email are only meant as a courtesy to assist. I would like to close this email dialog for this evening please. This discussion can resume on the calls set for tomorrow through the Unified Command.

184.     Despite the outbreaks of COVID-19 that continued to emerge on Carnival's ships, the tensions between the Company and the government agencies leading the American response to the pandemic, and the scores of passengers and crew members still stuck at sea, Defendants continued their public relations campaign to assure the public not only that cruising on Carnival cruise ships was safe, but also that Carnival's cruise ships were not to blame for the rapid spread of the coronavirus throughout the world in the spring of 2020. For instance, during an April 15, 2020 interview with CNBC, Defendant Donald argued that "very few" of Carnival's ships were affected, and that passengers aboard cruise ships "are at far less risk in a cruise environment than other environments." He added, "We have really high standards on cruise ships in dealing with any kind of health risk. You don't go to many places where you have medical records, where there is temperature scanning, there's lots of deep cleaning going on often and all the time." Similarly, on an April 16, 2020 call with the media, Defendant Donald stated, "Cruise ships are not the cause of the virus, nor are they the reason for the spread in society. It's not a dramatic impact compared to how the community spread occurred around the world."

185.     Despite Donald's attempt to deflect blame, cruise ships clearly played a critical role in the spread of the disease around the world. Government officials in Australia, New Zealand, Canada, Dominican Republic, Trinidad and Tobago, and in American communities in Iowa, Ohio, California, Minnesota, Florida, Hawaii, and Puerto Rico, traced either their first COVID-19 cases or an acceleration of local infections to cruise-ship travelers. In the United States, by March 13, health officials with the CDC had linked cruise passengers to 17% of the country's COVID-19

caseload. *The Wall Street Journal*'s reporting has since confirmed that seven ships owned by Carnival accounted for 49 of the roughly 70 deaths of passengers and crew with COVID-19 on vessels that began voyages or boarded new passengers in the first two weeks of March. The Ruby Princess alone accounted for a huge portion of Australia's entire COVID-19 outbreak. Australian authorities traced 973 COVID-19 cases and 28 deaths, more than a quarter of the country's total fatalities, to the Ruby Princess, including community transmissions. Health authorities on Australia's island state of Tasmania concluded that returning Ruby Princess passengers likely triggered a hospital outbreak and 114 local COVID-19 cases on the island. New Zealand's health officials also attributed 22 of that country's cases to the Ruby Princess.

186.    Indeed, the *Miami Herald*'s comprehensive study of the spread of the coronavirus on cruise ships later confirmed that Carnival's ships accounted for, by far, the largest numbers of total known cases and total known deaths among both passengers and crew members in the entire industry. The *Herald* documented the reports of coronavirus cases among individuals who tested positive for COVID-19 within fourteen days of disembarking from an ocean cruise, and it described its analysis as "conservative." As of early October 2020, the *Herald* reported that Carnival's vessels accounted for 2,409 known cases—1,389 among passengers and 846 among crew members—and 80 known deaths—56 among passengers, and twelve among crew members. These numbers far exceed even the second-most affected cruise operator, Royal Caribbean, which saw 762 known cases (261 passengers and 493 crew members) and sixteen known deaths (six passengers and ten crew members).

187.    On April 9, 2020, the CDC renewed its no-sail order for an additional 100 days, or until the expiration of the Secretary of Health and Human Service's declaration that COVID-19

constitutes a public health emergency. This news would keep Carnival's ships on dry land for longer than the Company's previously announced pause in operations.

188.     Then, on April 16, 2020, *Bloomberg Businessweek* published the article, "Socially Distance This: Carnival Executives Knew They Had a Virus Problem but They Kept The Party Going." The article exposed Carnival's utter failure to contain the coronavirus on its ships and, in particular, Defendants' knowledge of the Company's failure to live up to its statements to investors that the Company's highest priority was protecting the health and safety of passengers and crew. For example, the *Bloomberg* article first revealed that John Padgett, Carnival's Chief Experience and Innovation Officer, had heard from a vendor in Wuhan as early as January 25, 2020 about "the scale of the coronavirus outbreak." What's more, Padgett explained that he shared this news with Defendant Donald, noting "we actually had insight into the global situation much earlier than most."

189.     On April 24, 2020, Carnival's Cunard line announced that it was further extending its pause in operations, cancelling all sailings of its Queen Mary 2 and Queen Victoria ships through July 31, 2020, and cancelling the entire Alaska season of its Queen Elizabeth ship and all departures through September 8, 2020.

190.     The same day, the *Miami Herald* reported that, during a hearing before U.S. District Judge Patricia Seitz related to the Company's environmental crimes case, described above (¶55), the Company told the Court that 100 of its passengers and 72,000 of its crew members remained stuck at sea. Shockingly, the Company reported these figures nearly a month after entirely suspending its operations.

191.     Similarly, on May 1, 2020, *The Wall Street Journal* published its story on Carnival's misconduct, "Cruise Ships Set Sail Knowing the Deadly Risk to Passengers and Crew."

The *Journal*'s reporting placed blame squarely on Carnival for contributing to the spread of the coronavirus pandemic across the world. Specifically, the *Journal* reported that the U.S. Coast Guard was investigating whether two Carnival cruise ships violated federal law by failing to alert authorities that sick passengers had disembarked from ships in San Francisco and Puerto Rico. Further, the *Journal* found that seven ships owned by Carnival accounted for 49 of the roughly 70 deaths of passengers and crew members from COVID-19 on vessels that began voyages or boarded new passengers in the first two weeks of March.

192.    Also on May 1, 2020, the United States House of Representatives began to take action. Specifically, the Chair of the House Committee on Transportation and Infrastructure Peter DeFazio and Chair of the House Subcommittee on Coast Guard and Maritime Transportation Sean Patrick Maloney initiated a records request to Carnival concerning its response to the coronavirus pandemic. In the letter to Defendant Donald, the Committee Chairs expressed concerns that Carnival failed to appropriately acknowledge public health concerns in its public-facing materials, writing:

> While cruises are often viewed as a care-free escape from reality where passengers can dine, dance, relax, and mingle, we would hope that the reality of the COVID-19 pandemic will place a renewed emphasis on public health and passenger safety, but frankly that has not been seen up to this point. In fact, it seems as though Carnival Corporation and its portfolio of nine cruise lines, which represents 109 cruise ships, is still trying to sell this cruise line fantasy and ignoring the public health threat posed by coronavirus to potential future passengers and crew.

193.    The Committee's letter to Carnival sought records including: copies of Carnival's fleet-wide Outbreak Prevention and Response Plans, including any coronavirus-specific prevention and/or response plans and any plans that will be implemented after the CDC's no-sail order is lifted; documents and communications from Carnival's Miami headquarters discussing, referring to, or referencing coronavirus among employees; documents and communications discussing, referring to, or referencing coronavirus among any ship's officer, medical or healthcare

related staff, or on board any Carnival ship; correspondence between any crew member, ship's officer, or medical or health care related staff, on any Carnival Corporation affiliated ship, with the CDC, the U.S. Department of Health and Human Services (HHS), the United States Coast Guard, the California Department of Public Health or the Florida Department of Health; and correspondence between any employee at Carnival's headquarters with any employee aboard any Carnival ship.

194. Finally, on May 4, 2020, Defendants announced that Carnival had cancelled additional cruises through August 31, 2020, but optimistically noted that eight ships from Miami, Port Canaveral, and Galveston "could potentially operate if it was determined that cruising can resume."

195. The CDC's no-sail order expired on October 31, 2020 and was replaced by a less restrictive "Conditional Sailing Order," under which the cruise industry was allowed to begin a phased approach to resuming operations. Less than two weeks later, the first cruise ship to embark on a journey since late-March 2020 was turned back to its port after a passenger tested positive for COVID-19.

## VII.   SUMMARY OF SCIENTER ALLEGATIONS

196. As alleged herein, numerous facts give rise to the strong inference that, throughout the Class Period, Defendants knew or recklessly disregarded the fact that their statements and omissions, as set forth in Section VIII, were materially false and misleading when made. The information in this section summarizes certain of the allegations—which are set forth more fully above—that detail the Defendants' scienter. All of these allegations must be considered holistically in evaluating Defendants' scienter. The cumulative knowledge of all members of Carnival's senior management team, including Defendant Donald, regarding the matters addressed herein is properly imputed to Carnival.

**A.      Defendant Donald Admitted That He Was Intimately Involved In Carnival's Management of HESS Issues**

197.     As specified by the Company's HESS Policy, which he personally signed, Defendant Donald has admitted that he was intimately involved in Carnival's response to the coronavirus outbreak. For instance, Defendant Donald has admitted that he was aware of the situation aboard the Diamond Princess before February 5, 2020 (the date when the Diamond Princess quarantined all of its passengers). He also stated that he personally took control of the response efforts on that day. As he told *Bloomberg Businessweek*, "We have a nice chain of command. As it became a bigger issue, I'm dialing into the situation updates." And on February 18, 2020, *The New York Times* reported that, over the prior days, Donald visited the Princess headquarters in California and Holland America's offices in Seattle to participate in crisis-response meetings where company officials held conference calls with colleagues in Japan and Cambodia.

198.     In addition, emails obtained from the CDC show that Defendant Donald received correspondence between the Company's high-ranking maritime and medical personnel and the CDC and other government agencies that were coordinating the American response to the pandemic, confirming his lead role in managing the coronavirus outbreak. Specifically, on April 5, 2020, Defendant Donald received an email from Dr. Cindy Friedman, the physician leading the CDC's COVID-19 Cruise Ship Task Force, in which Dr. Friedman voiced her frustration regarding Carnival's lack of a coherent plan to safely disembark and repatriate passengers and crew members from ships on which infections were spreading.

**B.      Pursuant To Carnival's HESS Policy, The Company's Senior-Most Executives Were Responsible For Implementing Its Policies and Procedures Regarding Health and Safety**

199.     As described above, the HESS Committee was established in 2006 in part to assist the Company with, and keep the Board apprised of, its efforts to self-regulate and to fulfill

Carnival's commitment to protecting the health and safety of its passengers and employees. Specifically, the HESS Committee was created to "assist the boards in fulfilling their responsibility to supervise and monitor [the Company's] health, environmental, safety and security policies, programs, [and] initiatives at sea and onshore, and compliance with related legal and regulatory requirements." The HESS Committee is comprised of at least three independent directors and meets at least four times annually. The HESS Committee reports to the Board, on which Defendant Donald sits. Prior to Defendant Donald's appointment as Carnival's CEO in 2013, he had been an active member of the HESS Committee since its founding in 2006.

200. Among the HESS Committee's responsibilities is reviewing and recommending "appropriate policies for the Companies relative to . . . the health, safety and security of employees, contractors, customers and the public" and overseeing "the Companies' monitoring and enforcement of these policies and the related procedures and practices." The HESS Committee is governed by the Company's HESS Policy. Carnival touts that its "management ensures that the commitments and objectives stated in our HESS Policy are clearly understood by everyone in the organization and articulated on a regular basis. Senior management reviews the HESS Policy at least annually." The first line of the HESS Policy indicates that Carnival is "committed to . . . protecting the health, safety and security of our passengers, guests, and all others working on our behalf thereby promoting an organization that always strives to be free of . . . illness . . . ." It further touts that the Company is committed to "[c]omplying with or exceeding all legal and statutory requirements related to health, environment, safety, security and sustainability throughout our business activities." The Company indicates in its policy that it will "[p]romote industry best practices and publicly report to and maintain open dialogue and cooperation with key stakeholders on HESS . . . matters."

201.    Most significantly, the Company has made clear that the members of the HESS Committee interact frequently with Company management and the rest of the Board of Directors. Specifically, the Company has written, "The Health, Environmental, Safety and Security (HESS) Committees are *briefed by management on the status, progress of and plans for HESS and sustainability-related matters*, as well as on HESS audit results." Further, the Company has admitted, "*Upper management and the Boards of Directors are regularly advised on* corporate risk management issues and *on the status of compliance with our health, environment, safety, security, and sustainability policies and procedures*."

### C.    Defendant Donald Personally Received Information In January 2020 About The Scale Of The Coronavirus Outbreak In Wuhan, China

202.    As described above, John Padgett, Carnival's Chief Experience Officer, has reported that he was in contact with one of Carnival's vendors, based in Wuhan, China, in late January 2020. During a conversation on January 25, 2020, this vendor alerted Padgett as to the scale and severity of COVID-19. Padgett recalled the exact day he learned the information even months later because it was the day before the death of Kobe Bryant. Critically, Padgett has stated that he "shared [the information] with [Defendant] Donald when we were talking . . . . [W]e actually had insight into the global situation much earlier than most." The fact that Defendant Donald received detailed information from a colleague—whose information had come directly from a source working at the epicenter of the coronavirus outbreak—about the severity of the pandemic as early as late-January supports the inference of Donald's scienter.

### D.    Carnival's Previous Experience With Viral Outbreaks Aboard Its Ships

203.    Carnival's considerable experience with outbreaks of infectious disease on board its cruise ships—and with reporting those outbreaks to the CDC—supports an inference of Defendants' scienter. As described above, in 2010, the WHO designated viral outbreaks as a major

public health challenge for the cruise industry and called on the major players in the industry, including Carnival, to enhance their procedures and protocols relating to preventing and containing viral outbreaks. And in 2016, in the midst of both the Ebola and MERS pandemics, the WHO published extensive guidance for preventing and containing viral outbreaks on cruise ships.

204.    Indeed, as described above, Carnival has frequently experienced outbreaks of norovirus and other ILIs on board its ships. Since 1994, Carnival's Princess line alone has experienced more than 50 outbreaks of norovirus and other infectious diseases. In the three years leading up to the Class Period, for instance, Carnival experienced sixteen outbreaks of diseases including norovirus and E. coli on its ships that were reported to the CDC. In 2019, half of the CDC-identified viral outbreaks in the industry occurred on Carnival-owned ships. Indeed, in January 2019, the CDC documented a norovirus outbreak on Carnival's Oasis of the Seas ship that infected 592 passengers and crew. This number of infections was more than the total number of passengers and crew infected with norovirus on cruise ships in all of 2018.

### E.    Carnival Conducted Extensive Operations In And Around The Epicenter Of The Coronavirus Outbreak

205.    In addition to receiving firsthand, real-time information from a vendor based in Wuhan, China about the scale and severity of the coronavirus outbreak, Carnival conducted extensive operations in Asia, including in areas around the epicenter of the coronavirus outbreak, which further supports Defendants' scienter. For instance, in 2018, Carnival released a document titled "Carnival Corporation: Industry Leader in China and Asia," in which it described itself as "the leading cruise operator in Asia." Carnival's Costa Asia line of cruises first brought cruising to China in 2006 and largely serves the pacific region. Carnival also formed a joint venture in 2015 that allowed it to "accelerate the development and growth of the overall cruise industry in China" by purchasing and operating ships to assist in developing a domestic cruise brand in the Chinese

market. In July 2017, Princess launched its Majestic Princess in Shanghai, the first cruise ship specifically designed and built for the Chinese market. And the Costa line launched two additional ships specifically for the Chinese market.

206. The Company also serves the rest of Asia, with extensive operations throughout the Pacific region. In 2019, Carnival launched a 24-day transpacific crossing, from Long Beach, California to Singapore, with stops in Guam, Vietnam, and Malaysia. The Company also offers cruises in and around Japan, Hong Kong, Bali, Thailand, Indonesia, Taiwan, and the Philippines.

207. Further, at the outset of the coronavirus pandemic, Carnival cancelled nine cruises leaving from Chinese ports between January 25 and February 4. However, Defendants publicly blamed these cancelations merely on China's implementation of travel restrictions—not on the quickly worsening pandemic, and not on the health risks that travel in and around China was already posing.

## VIII.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS

208. As summarized in detail below, throughout the Class Period, Defendants Carnival and Donald each made materially false and misleading statements and omissions concerning: (i) Carnival's commitment to protecting the health and safety of its passengers and crew; and (ii) the risk that COVID-19 posed to the Company's passengers, crew, operations, and overall financial wellbeing.

### A.    Statements From The Company's Website

209. Throughout the entire Class Period, the Company's website presented its Health, Environment, Safety, Security & Sustainability Policy & Governance (the "HESS Policy"). The HESS Policy stated:

> Carnival Corporation & plc's values are found in our Health, Environmental, Safety and Security Policy, which describes our commitments to:

1. ***Protecting the health, safety and security of our passengers, guests, employees*** and all others working on our behalf, thereby promoting an organization that always strives to be free of injuries, illness and loss.

2. Protecting the environment, including the marine environment in which our vessels sail and the communities in which we operate, striving to prevent adverse environmental consequences and using resources efficiently and sustainably.

3. ***Complying with or exceeding all legal and statutory requirements related to health, environment, safety, security*** and sustainability throughout our business activities.

4. Assigning health, environment, safety, security (HESS) and sustainability matters ***the same priority as other critical business matters***.

210.   The HESS Policy further stated that the Company's "management" will enact specific policies and procedures designed to implement the Policy, including that Company's executives "will":

- Ensure compliance with this Policy within each of Carnival's Corporate and Operating Line organizations.

- Identify managers who are responsible for HESS and sustainability performance and ensure that there are clear lines of accountability.

- Develop, implement and monitor effective and verifiable management systems to realize our HESS and sustainability commitments.

- Support a proactive framework of risk mitigation in the areas of HESS aimed at preventing, monitoring and responding to threats.

- Identify, document, assess and conduct periodic reviews of the principal HESS and sustainability risks affecting our business and implement practical measures to manage the identified risks effectively.

- Provide HESS and sustainability support, training, advice, and information, as appropriate, to passengers, guests, employees, and others working on behalf of the Company.

- Promptly report and properly investigate all HESS incidents and take appropriate action to prevent recurrence.

- Establish and act upon goals and objectives to improve our HESS and sustainability performance.

- Promote industry best practices and publicly report to and maintain open dialogue and cooperation with key stakeholders on HESS and sustainability matters.

- Conduct a Corporate senior management review of this Policy at least annually.

211.    The statements in ¶¶209-10 above were materially false and misleading, and failed to disclose material information. Far from "[a]ssigning health, environment, safety, security (HESS) and sustainability matters the same priority as other critical business matters," the Company's statements created the misleading impression for investors that Carnival had proper protocols in place to prevent or control—and minimize the financial impact of—infectious disease outbreaks on its cruise ships. As would be ultimately revealed by the end of the Class Period, Carnival never had proper health and safety protocols in place to protect its passengers and crew, fulfill its public commitments with respect to health and safety, or mitigate the financial impact of an infectious disease outbreak. The Company lacked health and safety policies, procedures, and protocols to prevent passengers from embarking on cruises on ships that had already been found to be contaminated with viruses (¶¶133-37), lacked health and safety protocols necessary to promptly inform interested parties when an infection on a ship occurred (¶¶100-01, 143-44) and to communicate with health authorities and other third-parties (¶¶97, 145), and failed to abide by then-existing protocols regarding distancing, sanitization, and use of personal protective equipment when an outbreak did occur (¶¶102, 104, 109).

212.    As of the first day of the Class Period, and at all times thereafter, the Company, in a section of its website captioned "Safety and Security," stated the following:

> **The safety and security of our guests is our top priority**. Our excellent record of safe operation throughout Carnival's 40-plus year history, and the comprehensive safety standards we continue to live up to every day, proves that commitment. ***Our ships operate in full compliance with — and in many cases exceed — all U.S. and international safety regulations***.

213.    The statements in ¶212 above were materially false and misleading, and failed to disclose material information. Far from making the "safety and security of [its] guests" its "top priority," the Company's statements created the misleading impression for investors that Carnival had proper protocols in place to prevent or control—and minimize the financial impact of—infectious disease outbreaks on its cruise ships. In reality, as would be ultimately revealed by end of the Class Period, Carnival never had proper health and safety protocols in place to protect its passengers and crew and fulfill its public commitments with respect to health and safety for the same reasons as those stated in ¶211 above.

**B.      Statements From The Beginning Of The Class Period To January 2020**

214.    On September 16, 2019, the Company issued a press release announcing the creation of the Incident Analysis Group. In the press release, the Company's Chief Ethics and Compliance Officer, Peter Anderson stated, "With over 100 ships sailing to more than 700 ports around the world, ***it's imperative that we are thorough and diligent when it comes to the health, safety and security of our guests and crew***, and protecting the environments and destinations where we operate, which are ***top priorities for all of us***."

215.    The statements in ¶214 above were materially false and misleading, and failed to disclose material information. Far from being "thorough and diligent" with respect to issues of health and safety, the Company's statements created the misleading impression for investors that Carnival had proper protocols in place to prevent or control—and minimize the financial impact of—infectious disease outbreaks on its cruise ships. For the same reasons set forth ¶211, and despite representing that the creation of the Incident Analysis Group and the hiring of a former federal prosecutor as Head of Ethics and Compliance demonstrated the Company's purported commitment to health and safety, the Company, in reality, never had proper protocols in place to fulfill those commitments at any time during the Class Period.

216.    On September 26, 2019, Carnival held its third quarter earnings call for 2019 (the "Q3 2019 earnings call"). During the Q3 2019 earnings call, Defendant Donald stated:

> On the leadership front, we are excited to announce that Peter Anderson has joined us as Head of Ethics and Compliance. That's a new role that is bringing together functions and people that were previously distributed across the corporation and complementing that with new talents, roles and processes to help take us to best-in-class and broad-based compliance. Peter, whose background is a former federal prosecutor along with a wide breadth of experience, including as a court-appointed monitor will report directly to me.

217.    The statements in ¶216 above were materially false and misleading, and failed to disclose material information. Far from having, or being committed to having, "best-in-class and broad-based compliance" with respect to issues of health and safety, Defendant Donald's statements above (made on behalf of Carnival) created the misleading impression for investors that Carnival had proper protocols in place to prevent or control—and minimize the financial impact of—infectious disease outbreaks on its cruise ships. For the same reasons set forth in ¶211, and despite representing that the creation of the Incident Analysis Group and the hiring of a former federal prosecutor as Head of Ethics and Compliance demonstrated the Company's purported commitment to health and safety, the Company, in reality, never had proper protocols in place to fulfill those commitments at any time during the Class Period.

### C.    Statements From January 2020 To March 18, 2020

218.    On January 28, 2020, the *South Florida Business Journal* published an article entitled "Cruise stocks fall as Carnival, Royal Caribbean, Norwegian cancel trips due to Coronavirus outbreak." In the article, a Carnival representative stated that ***"[a]lthough the risks to our guests, crew, and business around the world is very low,*** we are closely monitoring the situation . . . . Our medical experts are *coordinating closely with the U.S. Centers for Disease Control and Prevention and the World Health Organization to implement recommended screening, prevention and control measures for our ships*."

87

219.     The statements in ¶218 above were materially false and misleading, and failed to disclose material information. Despite Defendants' public representation that the "risk" presented to Carnival's guests and crew was "low" and that the Company was implementing "recommended screening, prevention and control measures for [its] ships," the Company knew, but failed to disclose, that COVID-19 presented a grave risk to its passengers and crew, operations, and financial health, and the Company's statements created the misleading impression for investors that Carnival had proper protocols in place to prevent or control—and minimize the financial impact of—infectious disease outbreaks on its cruise ships. Just days before making these statements, Defendants received unique, non-public information regarding the scale and severity of COVID-19 due to its extensive operations in China generally and Wuhan specifically. John Padgett, Carnival's Chief Experience Officer who received this information, specifically indicated that he "shared [the information] with [Defendant] Donald and that the Company "actually had insight into the global situation much earlier than most."

220.     Moreover, by January 27, 2020, the U.S. Coast Guard COVID-19 Guidance, DOT COVID-19 Guidance, and EU COVID-19 Guidance were published, further sounding the alarm with respect to the risks of COVID-19 to the cruise and maritime industries, and corroborating the non-public information provided to Padgett regarding the specific risks presented to Carnival's passengers and crew, operations, and financial health, as a consequence of its failure to implement proper health and safety protocols to prevent the spread of infectious disease, including coronavirus. Finally, as discussed in ¶211, Carnival never had proper protocols in place to prevent or control—and minimize the financial impact of—infectious disease outbreaks on its cruise ships.

221.     On January 28, 2020, the Company published its Annual Report on Form 10-K (the "2019 10-K"). The 2019 10-K was signed by Defendant Donald. In the 2019 10-K, Carnival stated:

Our commitments to the safety and comfort of our guests and crew and protecting the environment are paramount to the success of our business. We are committed to operating a safe and reliable fleet and protecting the health, safety and security of our guests, employees and all others working on our behalf. We continue to focus on further enhancing the safety measures onboard all of our ships. ***We are dedicated to fully complying with, or exceeding, all legal and statutory requirements related to health, environment, safety, security and sustainability throughout our business.***

222.    In the 2019 10-K, Defendants further stated:

[Carnival provides] regular health, environmental, safety and security support, training, guidance and information to guests, employees and others working on our behalf . . . . [Carnival has developed and implemented] ***effective and verifiable management systems to fulfill our health, environmental, safety, security and sustainability commitments*** . . . . [the Company reports and investigates] health, environmental, safety and security incidents and ***take[s] appropriate action to prevent recurrence***.

223.    In the 2019 10-K, Defendants further stated:

We are committed to providing a healthy environment for all of our guests and crew. ***We collaborate with public health inspection programs throughout the world, such as the Centers for Disease Control and Prevention ("CDC") in the U.S. and the SHIPSAN Project in the EU to ensure that development of these programs leads to enhanced health and hygiene onboard our ships.*** Through our collaborative efforts, ***we work with the authorities to develop and revise guidelines, review plans and conduct on-site inspections for all newbuilds and significant ship renovations. In addition, we continue to maintain our ships by meeting, and often exceeding, applicable public health guidelines and requirements***, complying with inspections, reporting communicable illnesses and conducting regular crew training and guest education programs.

224.    The statements in ¶¶221-23 from the 2019 10-K, signed by Defendant Donald, above were materially false and misleading, and failed to disclose material information. Despite Defendants' public commitments to "fulfill [its] health . . . safety and security" obligations, its stated "dedicat[ion] to fully complying with, or exceeding, all legal and statutory requirements" in these areas and its claim that it was "collaborat[ing] with . . . the [CDC] . . . to ensure that [public health inspection] programs lead[] to enhanced health and hygiene onboard our ships," the growing COVID-19 crisis affecting the Company's ships demonstrated that Carnival never had proper

89

protocols in place to prevent or control—and minimize the financial impact of—infectious disease outbreaks on its cruise ships.

225.    The manner in which the Company handled the COVID-19 outbreak onboard the Diamond Princess demonstrated that effective health and safety protocols did not exist. For example, the Company: (i) only asked passengers if they were experiencing flu symptoms or fever prior to boarding the ship, even though the Company knew COVID-19 was spreading, *see* ¶86; (ii) recklessly allowed hundreds of passengers to participate in a champagne waterfall the day after a second passenger began exhibiting symptoms of COVID-19, even though this was contrary to its internal policies and the guidance provided by the CDC, *see* ¶88; (iii) did not quickly identify cases of COVID-19 onboard the Diamond Princess because of the lack of communication among ship officials, Carnival personnel, third party vendors, and local health officials, even though its own policy required it to "maintain open dialogue and cooperation with key stakeholders on HESS . . . matters," *see* ¶¶97-99; (iv) did not distribute masks or other PPE to passengers and crew, nor take measures to distance passengers and crew from one another, even though the CDC's longstanding ILI Guidance required otherwise; (v) ignored the direction of Hong Kong officials to "cleans[e] and disinfect[]" the ship, even though the Company knew COVID-19 was spreading, *see* ¶108; and (vi) continued to flout the CDC ILI Guidance regarding PPE and social distancing, even after the ship was placed under official quarantine. *See* ¶102.

226.    Despite the Company's statement that health and safety was its "top priority," and even after its conduct on the Diamond Princess described above, the Company continued to encourage its sales staff to sell cruises and erected roadblocks to customers attempting to cancel their cruises, evidencing the Company's commitment to profit, not safety. *See* ¶113. Finally, as discussed in ¶211, Carnival was not committed to the prevention of and never had proper protocols

in place to prevent, control, or minimize the financial impact of infectious disease outbreaks on its cruise ships.

227.    In the 2019 10-K, Defendants further stated that, "In response to the ongoing coronavirus outbreak, China has implemented travel restrictions. As a result, we have suspended cruise operations from Chinese ports between January 25th and February 4th, canceling nine cruises."

228.    The statements in ¶227 above were materially misleading, and failed to disclose material information. Despite Defendants' public representation that Carnival had suspended cruise operations in China due to the fact that "China ha[d] implemented travel restrictions," they knew, but failed to disclose, that COVID-19 presented a grave risk to its passengers and crew, operations, and financial health in China because, as discussed in ¶¶219-20 above, just days before making these statements, Defendants received unique, non-public information regarding the scale and severity of COVID-19 due to its extensive operations in China generally and Wuhan specifically from John Padgett, Carnival's Chief Experience Officer.

229.    The 2019 10-K also included a section entitled "Risk Factors," which includes a discussion of the most significant factors that make an investment in Carnival securities speculative or risky. In the 2019 10-K, Defendants identified the following risk, among others:

> ***World events impacting the ability or desire of people to travel may lead to a decline in demand for cruises***. We ***may*** be impacted by the public's concerns regarding the health, safety and security of travel, including government travel advisories and travel restrictions, political instability and civil unrest, and other general concerns. Additionally, we ***may*** be impacted by heightened regulations around customs and border control, travel bans to and from certain geographical areas, government policies increasing the difficulty of travel and limitations on issuing international travel visas. . . .

230.    The statement in ¶229 above, in addition to the "Risk Factor" section of the 2019 10-K, was materially false and misleading, and failed to disclose material information. Despite

Defendants representing that "[w]orld events impacting the ability or desire of people to travel may lead to a decline in demand for cruises," and that Carnival "may be impacted" by "the public's concerns regarding the health, safety and security of travel," Defendants knew, but failed to disclose, that COVID-19 already was a "world event" that was "impacting the ability or desire of people to travel" and presented a grave risk to its passengers and crew, operations, financial health, and reputation. Indeed, as discussed in ¶¶219-20 above, just days before making these statements, Defendants received unique, non-public information regarding the scale and severity of COVID-19 due to its extensive operations in China generally and Wuhan specifically from John Padgett, Carnival's Chief Experience Officer. Moreover, Defendants knew that, as discussed in ¶211 above, Carnival never had proper protocols in place to prevent, control, or minimize the financial impact and reputational harm associated with the failure to prevent or contain outbreaks of infectious disease on its cruise ships.

231.    The statement in ¶229 above, in addition to the "Risk Factor" section of the 2019 10-K, was further materially false and misleading because, despite their knowledge of the risks posed by COVID-19 described in the preceding paragraph, Defendants failed to disclose the most significant factors that made an investment in Carnival securities speculative or risky, which include, but are not limited to, the following: (i) the likely negative impact on Carnival's business and reputation as a result of current and ongoing COVID-19 outbreaks on its ships; (ii) the likely negative impact on Carnival's business and reputation, because Carnival's core passenger demographic is particularly vulnerable to the spread of infectious disease, including COVID-19, given their known relative age and health; (iii) the likely negative impact on Carnival's business and reputation due to the close quarters-design of its ships, the elevated risk of outbreaks of infectious diseases (and, particularly, ILI and respiratory ailments) on its ships, and the lack of

proper protocols to prevent or control outbreaks of infectious diseases on its ships; (iv) the likely

negative financial costs to Carnival's business to contain a COVID-19 outbreak, including

sanitizing the effected vessels, dealing with the fallout of passengers or crew contracting,

spreading, or dying from COVID-19, and complying with enhanced regulatory health and safety

requirements; and (v) that an outbreak of COVID-19 aboard any of Carnival's ships may expose

the Company to negative publicity which could impact its appeal to its passengers and crew and

diminish the Company's brand, leading to a loss of sales revenue and the need to implement costly

marketing and pricing actions to attract future passengers.

232.    On January 31, 2020, Carnival issued a statement in the press in response to the

WHO's declaration that COVID-19 constituted a global public health emergency. In the press

statement, Carnival stated:

> Although **the risk to our guests and crew is low**, we are closely monitoring the
> evolving situation with respect to Coronavirus. Our medical experts are
> coordinating closely with the U.S. Centers for Disease Control and Prevention
> (CDC) and the World Health Organization (WHO) to **implement enhanced
> screening, prevention and control measures for our ships, guests and crew**.

233.    The statements in ¶232 above were materially false and misleading, and failed to

disclose material information for the same reasons as those stated in ¶¶219-20 above. In fact, the

same day that Defendants falsely and misleadingly described the threat of COVID-19 as "very

low," the U.S. government suspended all travel from China due to the spread of COVID-19.

234.    On February 4, 2020, the Company issued a statement in the press, claiming, "The

**safety, security and well-being of all guests and crew is our absolute priority**. The review of the

arriving guests and crew, by Japanese health authorities, is standard practice after a guest tested

positive for coronavirus and we are working closely with the local authorities to provide detailed

records to facilitate their review."

235.    The statements in ¶234 above were materially false and misleading, and failed to

disclose material information. Despite Defendants touting their commitment to the health and

safety of their passengers and crew as their "absolute priority," the growing COVID-19 crisis

affecting the Company's ships demonstrated that Carnival never had proper protocols in place to

control—and minimize the financial impact of—infectious disease outbreaks on its cruise ships

for the same reasons as those described in ¶211 above. In addition, contrary to its professed concern

for the "safety, security and well-being of all guests and crew," Carnival allowed the MS

Westerdam to set sail from China, which Carnival knew was seeing a massive rise in cases of

coronavirus, on February 1, 2020.

236.    On February 12, 2020, the Company issued a press release in which it stated:

> Carnival Corporation & plc is closely monitoring the evolving situation with
> respect to Coronavirus. ***The safety of guests and employees, compliance and
> protecting the environment are top priorities for the company***. The company's
> medical experts are coordinating closely with the U.S. Centers for Disease Control
> and Prevention and the World Health Organization to implement ***enhanced
> screening, prevention and control measures*** for its guests, crew and ships. The
> company's global team is working tirelessly to support guests impacted by voyage
> disruptions during this unprecedented time.

237.    On February 18, 2020, after a passenger who had been aboard the MS Westerdam

tested positive for the coronavirus, *The New York Times* published an article entitled, "Cruise Giant

Carnival Works to Manage Deepening Coronavirus Crisis." In the article, in response to the news

regarding the MS Westerdam, Carnival's spokesperson Roger Frizzell stated, "***We have protocols,

standards and practices for every possible issue you might imagine, including coronavirus***."

238.    The statements in ¶¶236-37 above were materially false and misleading, and failed

to disclose material information. Despite Defendants touting their commitment to the health and

safety of their passengers and crew as their "top priorit[y]," the growing COVID-19 crisis affecting

the Company's ships demonstrated that Carnival never had proper protocols in place to prevent,

control, or minimize the financial impact of infectious disease outbreaks on its cruise ships for the same reasons as those described in ¶211 and ¶235 above. In addition to those failings on the Diamond Princess and MS Westerdam, the Company, on February 11, 2020, re-embarked 62 passengers and crew back onto the Grand Princess from a previous voyage just days earlier knowing that a prior-passenger was removed from this ship after exhibiting COVID-19 symptoms. This passenger subsequently tested positive for COVID-19 and died. Nevertheless, Carnival did not conduct even cursory medical examinations or require those 62 individuals to sign a form stating they were not experiencing any symptoms related to COVID-19 before permitting additional passengers to board this ship. These statements were further reckless because, by February 12, 2020, the CDC had published its CDC COVID-19 Guidance containing many "protocols" to combat COVID-19, none of which the Company implemented.

239.    On February 26, 2020, Carnival issued its Definitive Proxy Statement on Schedule 14A (the "February 2020 Proxy Statement"). In the February 2020 Proxy Statement, Defendants stated that health, security, and safety remained the Company's "**highest responsibilities**" and "**top priorities**." Defendants further stated that Carnival's most important "[h]ealth, safety, and security goal" was to "[c]ontinue to build on our commitment to protect the health, safety and security of guests, employees and all others working on our behalf."

240.    Also in the February 2020 Proxy Statement, the Company reiterated its commitment to health and safety:

> At Carnival Corporation & plc, *our highest responsibilities and our top priorities are to operate safely* . . . and *to be in compliance everywhere we operate in the world*. To that end, the Boards of Directors of Carnival Corporation & plc established Board-level Health, Environmental, Safety & Security (HESS) Committees comprised of four independent Directors. The principal function of the HESS Committees is to assist the Boards in fulfilling their responsibility to: supervise and monitor Carnival Corporation & plc's health, environmental, safety, security and sustainability-related policies, programs, initiatives at sea and ashore;

and *comply with related legal and regulatory requirements relating to health, environmental, safety, security and sustainability*.

241.    The statements in ¶¶239-40 above were materially false and misleading, and failed to disclose material information. Despite Defendants publicly touting that their "highest priorit[y]" was health and safety and committing to "comply[ing] with . . . legal and regulatory requirements relating to health . . . [and] safety," the growing COVID-19 crisis affecting the Company's ships confirms that Carnival never had proper protocols in place to prevent or control—and minimize the financial impact of—infectious disease outbreaks on its cruise ships for the same reasons as those described in ¶¶211, 235, and 238 above.

242.    The February 2020 Proxy Statement also described the role that the HESS Committees of the Board of Directors play in assuring that Carnival cruises comply with all relevant health and safety guidelines and directives. Defendants stated:

> The HESS Committees review and recommend policies relative to the protection of the environment and the health, safety and security of employees, contractors, guests and the public. The HESS Committees also supervise and monitor health, environmental, safety, security and sustainability policies and programs and review with management significant risks or exposures and actions required to minimize such risks. . . . Our HESS Committees are *responsible for oversight of risk associated with the health, environment, safety and security of employees, contractors, guests and the public*.

243.    Also in the February 2020 Proxy Statement, Defendants described the role of the HESS Committees and the involvement of Carnival's highest-ranking executives on the Committees:

> *The HESS Committees and our management team review all significant risks or exposures and associated mitigating actions. Each of the Group Chief Executive Officers, each brands' President, the Chief Maritime Officer and senior maritime representatives attend the meetings of the HESS Committees*. In addition, Carnival Corporation & plc's HESS Policy describes our commitments to: protecting the health, safety and security of our passengers, guests, employees and all others working on our behalf, thereby promoting an organization that strives to be free of injuries, illness and loss; . . . complying with or exceeding all legal and statutory requirements related to health, environment, safety, security and

96

sustainability throughout our business activities; and assigning health, environment, safety, security and sustainability matters the same priority as other critical business matters.

244.   The statements in ¶¶242-43 above were materially false and misleading, and failed to disclose material information. Defendants publicly touting that their board-level HESS Committee "supervise[d] and monitor[ed] health . . . [and] safety" issues at the Company, whose meetings were attended by each of Carnival's brands' "Chief Executive Officers" created the misleading impression for investors that Carnival had proper protocols in place to prevent or control—and minimize the financial impact of—infectious disease outbreaks on its cruise ships. However, in reality, Carnival never had proper protocols in place to prevent or control—and minimize the financial impact of—infectious disease outbreaks on its cruise ships for the same reasons as those described in ¶¶211, 235, and 238 above.

245.   On February 28, 2020, Dr. Grant Tarling, Carnival's Chief Medical Officer, recorded a video regarding the steps the Company was taking in response to COVID-19 to ensure the safety of its passengers and employees. The video was published on Holland America's website and publicly disseminated on platforms such as YouTube. In the video, in a section titled "Enhanced Boarding Procedures," Dr. Tarling stated:

> [We have] ***enhanced our pre-boarding and onboard health protocols***. Our advanced sanitation response protocols serve as our foundational basis and comprehensive practice, ***developed in conjunction with the U.S. CDC, and several other health authorities*** . . . . In light of the global spread of coronavirus or COVID-19, we are also taking extra precautions . . . . ***[A]ll guests will be required to go through thermal screening and/or be checked with non-contact thermometers in many of our embarkation ports to detect signs of fever***. Our crew members are also being screened and providing us a clean bill of health before they are permitted to embark the ship.

246.   In a section of the video entitled "Enhanced Onboard Preventive Measures," Dr. Tarling stated:

[G]iven the global spread of COVID-19, *we have implemented even more measures to prevent the spread of disease onboard*. These include the distribution of personal hand sanitizers to each guest onboard . . . . *We have enhanced sanitation protocols* for all staterooms and high-traffic public areas, with more frequent disinfection being applied. As part of our standard cleaning protocols, *we routinely use a disinfectant that kills coronaviruses within 30 seconds*.

247.   The statements in ¶¶245-46 above were materially false and misleading, and failed to disclose material information. Despite Defendants publicly touting that they had implemented "enhanced sanitation protocols" on the Zaandam, the growing COVID-19 crisis affecting the Company's ships demonstrated that Carnival never had proper protocols in place to prevent or control—and minimize the financial impact of—infectious disease outbreaks on its cruise ships for the same reasons as those described in ¶¶211, 235, and 238 above. In addition, the Company, in violation of the CDC COVID-19 Guidance, failed to take the following recommended measures: (i) implement temperature checks on the Zaandam; (ii) conduct any "enhanced" cleaning measures until two weeks after Defendants' statement; (iii) require crew members to wear masks or gloves to deliver food to passengers' cabins; and (iv) provide sufficient PPE for crew members to adequately protect themselves and passengers from COVID-19. *See* ¶161

248.   On March 13, 2020, the Company issued a press release (the "March 2020 Press Release") announcing that it was pausing service. In the press release, the Company stated, "[W]e have implemented *higher and higher levels of screening, monitoring and sanitation protocols* to protect the health and safety of our guests, crew and the communities we serve." Defendants further stated, "*Carnival has not had a diagnosed case linked to our operation*."

249.   The statements in ¶248 above were materially false and misleading, and failed to disclose material information. Despite Defendants publicly touting their "higher and higher levels of screening" and claiming that the Company "has not had a diagnosed case [of COVID-19] linked to our operation," the growing COVID-19 crisis affecting the Company's ships demonstrated that

Carnival never had proper protocols in place to prevent or control—and minimize the financial impact of—infectious disease outbreaks on its cruise ships for the same reasons as those described in ¶¶211, 235, 238, and 247 above. The Company clearly already had cases of COVID-19 "linked to" its ships, including, by the time Defendants made their statement, numerous cases on the Diamond Princess, Grand Princess, MS Westerdam, and Zaandam, rendering Defendants' statements blatantly false when made.

250.    Moreover, despite the Company's continued inability to contain COVID-19 outbreaks on its ships, it continued to allow its ships to set sail, all while misleading investors with its public statements touting its health and safety protocols and safe cruising operations. On March 5, 2020, Carnival's Coral Princess set sail with over 1,000 passengers on board while the Costa Luminosa set sail and allowed passengers to disembark in ports without concern for the effects of spreading illness abord the ship onto the mainland or allowing passengers to potentially acquire illness on the mainland and bring it back to the ship. On March 9, 2020, Carnival's Ecstasy set sail without any requirement that personnel conduct pre-boarding screening or evaluation to determine whether passengers were exhibiting symptoms, in clear violation of the CDC COVID-19 Guidance directing cruise ship operators to, prior to boarding, "conduct verbal or written screening . . . to determine whether persons have had signs or symptoms of COVID-19 or a known exposure to a person with COVID-19 within the past 14 days" and belying Carnival's claims that it had "protocols" in place to protect passengers and guests and deal with COVID-19. *See* ¶¶137, 139.

### D.    Statements From March 18, 2020 To March 24, 2020

251.    On March 18, 2020, Defendant Donald appeared for an interview on the CNN television program *Quest Means Business*. During the interview, Defendant Donald stated:

> ***[N]umber one, our highest responsibility and our top priorities are compliance, environmental protection, and the health, safety, and well-being of our guests…***

99

*[N]o ship inherently has any virus or illness on it, it's obviously people and so whatever happened on the ships originally came in from people coming on the ship and so what we've done is we have great protocols already. We've enhanced those protocols*, we're working very closely with the Centers for Disease Control and with the World Health Organization and other global medical experts to make certain. *We have a long history of effectively managing and containing spreads of illnesses on the ships themselves*, we've been set up for that, we have medical facilities on the ships who identify early, we pre-screen before people come on the ships, and then we can show the facts on the actual number of cases of confirmed COVID, and *there's no evidence whatsoever that community spread was dramatically enhanced by people going on cruise ships*.

In fact, if you think about a cruise ship, just for a second, if you think about a cruise ship and you compare it to other forms of travel, we do temperature screenings, we do medical records, you don't do that when you go to a movie theater or get on a train or you're in an airport terminal or subway terminal. *We have much more natural social distancing, often people who haven't cruised think of cruises as these congested places. You know that there's much more space and social distancing than naturally happens on a cruise*.

252.    On March 22, 2020, Defendant Donald appeared for an interview on the HBO television program *Axios on HBO*. During the interview, Defendant Donald stated:

*If you look at the actual number of cases, you know cruise ships are not a source for coronavirus. We have hundreds of cruise ships out there, very few had cases on them*. The one that had the most cases was very early on when no one understood hardly anything. . . .

But *a cruise ship is not a theater. It is not an arena. It's more like Central Park. There's lots of natural social distancing, the ships are large. People are not always gathered and clumped together*. . . .

We identify, people get sick, there's a medical clinic onboard, we isolate, OK, and so in effect, you control the spread, whereas when you're in a restaurant or you're in a public library, in a school, that does not happen. So all I'm suggesting is *a cruise ship is not a riskier environment, people perceive it that way, but the reality is it's not*.

253.    Defendant Donald's statements in ¶¶251-52 above were materially false and misleading, and failed to disclose material information. Far from "work[ing] closely with public health experts" and considering health and safety its "highest responsibilit[y]," Carnival's cruise ships, in fact, provided few opportunities for "natural social distancing" like "Central Park" and

COVID-19, unknown to investors at the time, presented a grave risk to the Company's passengers, crew, operations, and financial health, and the Company's statements created the misleading impression for investors that Carnival had proper protocols in place to prevent or control—and minimize the financial impact of—infectious disease outbreaks on its cruise ships for the same reasons as those described in described in ¶¶211, 235, 238, 247, and 249-50 above. In addition, contrary to Defendant Donald's statements that cruise ships have "lots of natural social distancing," on February 12, 2020, the CDC specifically warned that cruises ships presented a greater, not lesser, risk of spreading COVID-19. Indeed, The CDC COVID-19 Guidance noted that "cruise ships . . . involve[] the movement of large numbers of people in closed and semi-closed settings . . . [that] may facilitate transmission of respiratory viruses from person to person through exposure to respiratory droplets or contact with contaminated surfaces." Moreover, the extent of COVID-19 cases linked to the Company's ships belies Defendant Donald's statement that "cruise ships are not a source of coronavirus." Indeed, when Defendant Donald made this statement, Carnival had already experienced serious outbreaks on the Diamond Princess, Grand Princess, MS Westerdam, Zaandam, and others, *see* ¶¶104, 124, 137, 160, the CDC had issued a no-sail order specifically because of the danger posed by cruising, *see* ¶146, and, by March 13, 2020, health officials with the CDC had linked cruise passengers to 17% of the U.S.'s COVID-19 caseload, *see* ¶184.

254.    As of March 24, 2020, in a section of its website entitled "Carnival's Commitment to Guest and Crew Health," the Company stated:

> Carnival Cruise Line's **highest responsibilities include the health and safety of our guests and crew**. Coronavirus is a fluid situation, and we continue to work closely with public health experts and the Cruise Lines International Association (CLIA), **to monitor, screen and implement best practices to protect the health of our guests and crew as it relates to COVID-19 (coronavirus)**. Our monitoring,

screening and operational protocols are designed to be flexible so that we can effectively adapt to changes as they occur.

255.   The Company's statements in ¶254 above were materially false and misleading, and failed to disclose material information. Far from considering "the health and safety of [its] guests and crew" its "highest responsibilit[y]" and working with public health experts to "monitor, screen and implement best practices to protect" them, and the Company's statements created the misleading impression for investors that Carnival had proper protocols in place to prevent or control—and minimize the financial impact of—infectious disease outbreaks on its cruise ships. However, in reality, Carnival never had proper protocols in place to prevent or control—and minimize the financial impact of—infectious disease outbreaks on its cruise ships for the same reasons as those described in ¶¶211, 235, 238, 247, and 249-50 above.

## IX.   LOSS CAUSATION

256.   During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market. Defendants' scheme artificially inflated the price of Carnival stock and operated as a fraud and deceit on the Class. Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on March 16, 2020, and March 31, 2020, the price of Carnival's stock fell. As a result of their purchases of Carnival securities during the Class Period, Plaintiffs and other members of the Class suffered harm. Until the final disclosure, on March 31, 2020, each of Carnival's disclosures described below only partially revealed the truth, and Defendants accompanied each disclosure with additional false and misleading information that maintained the artificial inflation in the price of Carnival's stock. As such, the full amount of inflation was not removed until after the final disclosure on the last day of the Class Period.

257. Specifically, Defendants' materially false and misleading statements misrepresented Carnival's implementation of, and compliance with, health and safety protocols purportedly designed to keep passengers and crew safe from infectious disease, and concealed the true financial risk that a public health emergency such as COVID-19 posed to the Company's financial position. When Defendants' prior misrepresentations and fraudulent conduct were disclosed to investors, the price of Carnival securities fell significantly. As a result of the disclosure of the truth of Defendants' fraud, the price of Carnival common shares declined by over 73%, from a closing price of $48.92 per share on September 16, 2019, the first day of the Class Period, to a closing price of $13.17 per share on March 31, 2020, the last day of the Class Period. Similarly, the price of Carnival ADSs declined by over 74%, from a closing price of $47.06 per share on September 16, 2019, the first day of the Class Period, to a closing price of $11.93 per share on March 31, 2020, the last day of the Class Period.

258. The disclosures that each partially corrected the market price of Carnival's common stock and reduced the artificial inflation caused by Defendants' materially false and misleading statements are detailed below:

| Date | Corrective Event | Closing Stock Price (CCL) | Change from Previous Day's Close (CCL) | Closing Stock Price (CUK) | Change from Previous Day's Close (CUK) |
|---|---|---|---|---|---|
| March 16, 2020 | Carnival disclosed that COVID-19 will have a material negative impact on its financial results and liquidity, that it would report a loss for fiscal year 2020, and that it could not provide a forecast for the year's results. | $12.71 | -12.76% | $11.33 | -12.24% |

| Date | Corrective Event | Closing Stock Price (CCL) | Change from Previous Day's Close (CCL) | Closing Stock Price (CUK) | Change from Previous Day's Close (CUK) |
|---|---|---|---|---|---|
| March 31, 2020 | Carnival announced private offering of notes and public offering of stocks intended to raise $1.25 billion, but ultimately raised only $485 million, and amended its risk disclosures to explain the impact that COVID-19 was having on its business. | $8.80 | -33.18% | $8.16 | -31.6% |

259. On the date of each disclosure, no other adverse, company-specific information entered the market, and therefore the entirety of Carnival's stock price decline on the date of each corrective event is attributable to the disclosure of previously undisclosed material facts concerning Carnival's lack of compliance with its health and safety obligations and resultant inability to keep its passengers and crew safe from infectious disease.

260. It was entirely foreseeable to Defendants that their materially false and misleading statements and omissions regarding Carnival's compliance with its health and safety obligations and its ability to keep its passengers and crew safe from infectious disease would artificially inflate the price of Carnival's common stock. It was also foreseeable to Defendants that the revelation of the truth about Carnival's lack of compliance with its health and safety obligations and resultant inability to keep its passengers and crew safe from infectious disease would cause the price of the Company's securities to fall as the artificial inflation caused by Defendants' misstatements and omissions was removed. Thus, the stock price declines described above were directly and proximately caused by Defendants' materially false and misleading statements and omissions.

## X.      PRESUMPTION OF RELIANCE

261.    At all relevant times, the markets for Carnival Corp.'s common stock and Carnival plc's ADS, and call and put options of both, were efficient for the following reasons, among others:

(a)      Carnival Corp.'s common stock and Carnival plc's ADS met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b)      As a regulated issuer, Carnival filed periodic public reports with the SEC and NYSE;

(c)      Carnival regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)      Carnival was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

262.    As a result of the foregoing, the market for Carnival Corp.'s common stock and Carnival plc's ADS promptly digested current information regarding Carnival from all publicly available sources and reflected such information in the price of Carnival Corp.'s common stock and Carnival plc's ADS. Under these circumstances, all purchasers of Carnival stock within the defined Class during the Class Period suffered similar injury through their purchase of Carnival stock at artificially inflated prices, and the presumption of reliance applies. Carnival put and call

options similarly traded at prices based on the market for the underlying shares, and were thus also efficient.

263.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Carnival's lack of compliance with its health and safety obligations and resultant inability to keep its passengers and crew safe from infectious disease—information that Defendants were obligated to disclose— positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Carnival's compliance with its health and safety obligations and its ability to keep its passengers and crew safe from infectious disease, as set forth above, that requirement is satisfied here.

## XI.     INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

264.     Carnival's "Safe Harbor" warnings accompanying any forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

265.     Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading, and the statement was authorized and/or approved by an executive officer of Carnival who knew that the statement was false, and/or the statement omitted material adverse information whose disclosure was necessary to render the statement not misleading. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, because they were not stated to be such assumptions underlying or relating to any projection or statement of future economic

performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## XII.   CLAIMS BROUGHT PURSUANT TO THE EXCHANGE ACT

### FIRST CLAIM FOR RELIEF

**For Violation of Section 10(b) of the Exchange Act
and SEC Rule 10b-5 Thereunder
(Against All Defendants)**

266.    Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

267.    During the Class Period, Defendants Carnival Corp., Carnival plc, and Donald carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause economic harm to Plaintiffs and other members of the Class.

268.    Defendants Carnival Corp., Carnival plc, and Donald (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and/or (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

269.    Defendants Carnival Corp., Carnival plc, and Donald individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

270.     During the Class Period, Defendants Carnival Corp., Carnival plc, and Donald made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

271.     Defendants Carnival Corp., Carnival plc, and Donald had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or recklessly disregarded the true facts that were available to them. Defendants Carnival Corp., Carnival plc, and Donald engaged in this misconduct to conceal Carnival's true condition from the investing public and to support the artificially inflated prices of the Company's stock.

272.     Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they purchased Carnival stock and were harmed when the truth about Carnival negatively impacted the price of those securities. Plaintiffs and the Class would not have purchased Carnival stock at the prices they paid, or at all, had they been aware of the truth about Carnival.

273.     As a direct and proximate result of Defendants Carnival Corp., Carnival plc, and Donald's wrongful conduct, Plaintiffs and the other members of the Class suffered harm in connection with their respective purchases of the Company's stock during the Class Period.

274.     By virtue of the foregoing, Defendants Carnival Corp., Carnival plc, and Donald violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## SECOND CLAIM FOR RELIEF

### For Violation of Section 20(a) of the Exchange Act
### (Against Defendant Donald)

275.     Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

276.     Defendant Donald acted as a controlling person of Carnival within the meaning of Section 20(a) of the Exchange Act. By virtue of his high-level position, participation in, and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and his power to control public statements about Carnival, Defendant Donald had the power and ability to control the actions of Carnival and its employees. By reason of such conduct, Defendant Donald is liable pursuant to Section 20(a) of the Exchange Act.

## XIII.   CLASS ACTION ALLEGATIONS

277.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities who purchased or otherwise acquired the publicly traded common stock of Carnival Corporation; who purchased or otherwise acquired the American Depositary Shares of Carnival plc; and/or who sold put option contracts or purchased call options for the shares of Carnival common stock from September 16, 2019 through March 31, 2020 inclusive (the "Class Period"). Excluded from the Class are Defendants and their families, directors, and officers of Carnival Corp. and/or Carnival plc, and their families and affiliates.

278.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of the end of the Class Period, Carnival had approximately 527 million shares of stock outstanding, owned by at least hundreds or thousands of investors. As of the end of the Class Period, Carnival plc had over 182 million ADSs outstanding, owned by at least thousands of investors. The market for Carnival put and call options was similarly active, with thousands of contracts trading weekly over the Class Period, by at least hundreds of investors.

279.     Questions of law and fact common to the members of the Class, which predominate over questions which may affect individual Class members, include:

(a)     Whether Defendants violated the Exchange Act;

(b)     Whether Defendants misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(e)     Whether Defendants' misconduct impacted the price of Carnival securities that are a part of the defined Class;

(f)     Whether Defendants' misconduct caused the members of the Class to sustain harm; and

(g)     The extent of harm sustained by Class members and the appropriate measure of harm.

280.    Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained harm from Defendants' wrongful conduct.

281.    Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action securities litigation. Plaintiffs have no interests which conflict with those of the Class.

282.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XIV.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensation to Plaintiffs and other Class members against all Defendants, jointly and severally, for all harm sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

     D.     Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XV.   JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: December 15, 2020          Respectfully submitted,

*/s/ Zachary S. Bower*

ZACHARY S. BOWER
Florida Bar No. 17506
**CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.**
Security Building
117 NE 1st Avenue
Miami, Florida 33132-2125
zbower@carellabyrne.com
Tel.: (973) 994-1700
Fax: (973) 994-1744

*Liaison Counsel for Lead Plaintiff and
Liaison Counsel for the Class*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
James A. Harrod (*pro hac vice*)
Kate W. Aufses (*pro hac vice*)
Benjamin W. Horowitz (*pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Tel.: (212) 554-1400
Fax: (212) 554-1444
jim.harrod@blbglaw.com
kate.aufses@blbglaw.com
will.horowitz@blbglaw.com

*Counsel for Lead Plaintiff and
Lead Counsel for the Class*

**KESSLER TOPAZ METZLER**
    **& CHECK LLP**
Jennifer L. Joost (*pro hac vice* pending)
One Sansome Street, Suite 1850
San Francisco, California 94104
Tel.: (415) 400-3000
Fax: (415) 400-3001
jjoost@ktmc.com

Jamie M. McCall (*pro hac vice* pending)
Richard A. Russo, Jr. (*pro hac vice* pending)
280 King of Prussia Road
Radnor, Pennsylvania 19087
Tel.: (610) 667-7706
Fax: (610) 667-7056
jmccall@ktmc.com
rrusso@ktmc.com

*Counsel for Lead Plaintiff and*
*Lead Counsel for the Class*

**BERNSTEIN LIEBHARD LLP**
Laurence Hasson
10 East 40th Street
New York, New York 10016
Tel.: (212) 779-1414
Fax: (212) 779-3218
lhasson@bernlieb.com

*Additional Counsel for the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served by Electronic Filing generated by the CM/ECF, on this 15th day of December, 2020, which will provide notification of filing to all counsel of record.

By: */s/ Zachary S. Bower*
Zachary S. Bower

1