**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

IN RE CARNIVAL CORP.
SECURITIES LITIGATION

Case No. 1:20-cv-22202-KMM

**DEFENDANTS' MOTION TO DISMISS THE**
**AMENDED COMPLAINT AND**
**INCORPORATED MEMORANDUM OF LAW**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... iii

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND ...........................................................................................................................3

      A.     Carnival's Business.......................................................................................................3

      B.     Carnival's Public Statements Regarding COVID-19 ...............................................4

              1.     The Origins of COVID-19 and Carnival's Public Statements in
                     January 2020.......................................................................................................4

              2.     The *Diamond Princess* and Carnival's Public Statements in
                     February 2020.....................................................................................................5

              3.     The *Grand Princess* and Carnival's Public Statements in March
                     2020.....................................................................................................................6

              4.     Carnival Continues to Disclose the Financial Impact of the
                     Pandemic.............................................................................................................7

ARGUMENT .................................................................................................................................8

I.     The Complaint Fails to Allege Any Actionable Misrepresentations or Omissions.............9

      A.     The Complaint Fails to Allege that Defendants Failed to Warn of the Risks
             to Carnival's Business and Passengers of COVID-19 .............................................9

              1.     Defendants' Statements in January 2020.....................................................9

               2.     Defendants' Statements in February 2020.................................................13

               3.     Defendants' Statements in March 2020......................................................14

      B.     The Complaint Fails to Allege that Defendants' Statements Affirming
             Carnival's Compliance with Regulatory Requirements Were False or
             Misleading..............................................................................................................15

      C.     The Complaint Fails to Allege that Defendants' Statements Concerning
             Carnival's Commitment to Passenger Safety and Health Were False or
             Misleading..............................................................................................................20

      D.     Carnival Cruise Line's Statement that it "Had Not Had a Diagnosed Case
             Linked to Our Operation" is Not Alleged to Have Been False at the Time
             It was Made.............................................................................................................26

II.    The Complaint Fails to Allege Scienter.............................................................................27

      A.     The Complaint Fails to Allege Severe Recklessness with Respect to
             Defendants' Statements about the Risks of COVID-19 ........................................27

      B.     The Complaint Fails to Allege Severe Recklessness with Respect to
             Defendants' Statements About Carnival's Commitment to Regulatory
             Compliance and Passenger Health and Safety........................................................30

              1.     Regulatory Compliance ..............................................................................30

              2.     Commitment to Health and Safety..............................................................32

C.    Carnival's Actions Throughout the Class Period Are Inconsistent with
      Scienter ....................................................................................................34

III.    The Complaint Fails to Allege Loss Causation ...............................................37

IV.    If Plaintiffs' Claims Are Not Dismissed, the Class Period Should be Shortened.............39

CONCLUSION............................................................................................................40

**TABLE OF AUTHORITIES**

**Page(s)**

CASES

*Abecassis* v. *Eugene M. Cummings, P.C.*,
  2010 WL 9452252 (S.D. Fla. June 3, 2010) ............................................................9

*In re Altisource Portfolio Sols., S.A. Sec. Litig.*,
  2015 WL 12001262 (S.D. Fla. Sept. 4, 2015) .....................................................36

*Barrett* v. *PJT Partners Inc.*,
  2017 WL 3995606 (S.D.N.Y. Sept. 8, 2017).........................................................24

*In re Boston Tech., Inc. Sec. Litig.*,
  8 F. Supp. 2d 43 (D. Mass. 1998) ........................................................................30

*In re Braskem S.A. Sec. Litig.*,
  246 F. Supp. 3d 731 (S.D.N.Y. 2017).....................................................................24

*Brophy* v. *Jiangbo Pharms., Inc.*,
  781 F.3d 1296 (11th Cir. 2015) .............................................................................27

*Bryant* v. *Avado Brands, Inc.*,
  187 F.3d 1271 (11th Cir. 1999) ...............................................................................4

*Carvelli* v. *Ocwen Fin. Corp.*,
  934 F.3d 1307 (11th Cir. 2019) ...........................................................8, 10, 14, 20

*Chiarenza* v. *IBSG Int'l., Inc.*,
  2010 WL 3463304 (S.D. Fla. Sept. 2, 2010) ........................................................29

*City of Pontiac Policemen's & Firemen's Ret. Sys.*, v. *UBS AG*,
  752 F.3d 173 (2d Cir. 2014).................................................................................26

*Cutsforth* v. *Renschler*,
  235 F. Supp. 2d 1216 (M.D. Fla. 2002)................................................................35

*DeSouza* v. *Fed. Home Mortg. Corp.*,
  572 F. App'x 719 (11th Cir. 2014) ..........................................................................4

*Diehl* v. *Omega Protein Corp.*,
  339 F. Supp. 3d 153 (S.D.N.Y. 2018)...................................................................20

*Durham* v. *Whitney Info. Network, Inc.*,
  2009 WL 3783375 (M.D. Fla. Nov. 10, 2009) ......................................................32

*Fidel* v. *Rampell*,
  2005 WL 5587454 (S.D. Fla. Mar. 29, 2005)...........................................30, 31, 33

*FindWhat Inv. Grp.* v. *FindWhat.com*,
    658 F.3d 1282 (11th Cir. 2011) ......................................................33, 34

*In re Ford Motor Co. Sec. Litig.*,
    381 F.3d 563 (6th Cir. 2004) ...............................................................10

*Franklin* v. *Curry*,
    738 F.3d 1246 (11th Cir. 2013) ..............................................................3

*S.E.C.* v. *Gane*,
    2005 WL 90154 (S.D. Fla. Jan. 4, 2005) .............................................15

*Garfield* v. *NDC Health Corp.*,
    466 F.3d 1255 (11th Cir. 2006) ............................................................28

*Godinez* v. *Alere Inc.*,
    272 F. Supp. 3d 201 (D. Mass. 2017) ..................................................31

*In re Heartland Payment Sys., Inc. Sec. Litig.*,
    2009 WL 4798148 (D.N.J. Dec. 7, 2009) ............................................34

*Henningsen* v. *ADT Corp.*,
    161 F. Supp. 3d 1161 (S.D. Fla. 2015) ......................................... passim

*In re HomeBanc Corp. Sec. Litig.*,
    2010 WL 1524836 (N.D. Ga. Apr. 13, 2010) ......................................38

*Howard* v. *Arconic Inc.*,
    395 F. Supp. 3d 516 (W.D. Pa. 2019)..................................................26

*Hubbard* v. *BankAtlantic Bancorp, Inc.*,
    688 F.3d 713 (11th Cir. 2012) .......................................................10, 14

*Instituto de Prevision Militar* v. *Merrill Lynch & Co., Inc.*,
    2007 WL 2900318 (S.D. Fla. Sept. 28, 2007) .....................................37

*In re John Alden Fin. Corp. Sec. Litig.*,
    249 F. Supp. 2d 1273 (S.D. Fla. 2003) ...............................................10

*In re KLX, Inc. Sec. Litig.*,
    232 F. Supp. 3d 1269 (S.D. Fla. 2017) ....................................29, 35, 36

*Luczak* v. *Nat'l Beverage Corp.*,
    812 F. App'x 915 (11th Cir. 2020) ......................................................39

*Luo* v. *Sogou, Inc.*,
    465 F. Supp. 3d 393 (S.D.N.Y. 2020)..................................................19

iv

*McClain* v. *Iradimed Corp.*,
  111 F. Supp. 3d 1293 (S.D. Fla. 2015) ............................................................25, 40

*Menaldi* v. *Och-Ziff Cap. Mgmt. Grp LLC*,
  277 F. Supp. 3d 500 (S.D.N.Y. 2017) ..............................................................19, 24

*In re Merrill Lynch & Co. Rsch. Reps. Sec Litig.*,
  568 F. Supp. 2d 349 (S.D.N.Y. 2008) ....................................................................38

*Metro. Transp. Auth. Defined Benefit Pension Plan Master Tr.* v. *Welbilt, Inc.*,
  2020 WL 905591 (M.D. Fla. Feb. 6, 2020) ..............................................................32

*Meyer* v. *Greene*,
  710 F.3d 1189 (11th Cir. 2013) ...............................................................37, 38, 39

*In re Miva, Inc. Sec. Litig.*,
  2008 WL 681755 (M.D. Fla. Mar. 12, 2008) ............................................................40

*Mizzaro* v. *Home Depot, Inc.*,
  544 F.3d 1230, 1239-40 (11th Cir. 2008) ..................................................... passim

*Mogensen* v. *Body Cent. Corp.*,
  15 F. Supp. 3d 1191 (M.D. Fla. 2014) .............................................30, 31, 33, 34

*Nardy* v. *Chipotle Mex. Grill, Inc.*,
  2019 WL 3297467 (D. Colo. Mar 29, 2019) ..........................................................16

*In re NDCHealth Corp., Inc., Sec. Litig.*,
  2005 WL 6074918 (N.D. Ga. July 27, 2005) ..........................................................35

*Nguyen* v. *Endologix, Inc.*,
  962 F.3d 405 (9th Cir. 2020) .................................................................................36

*In re Ocwen Fin. Corp. Sec. Litig.*,
  2015 WL 12780960 (S.D. Fla. Sept. 4, 2015) ........................................................36

*Ong* v. *Chipotle Mex. Grill, Inc.*,
  294 F. Supp. 3d 199 (S.D.N.Y. 2018).............................................................23, 26

*Plumbers & Steamfitters Local 773 Pension Fund* v. *Danske Bank*,
  2020 WL 4937461 (S.D.N.Y. Aug. 24, 2020)...................................................20, 34

*In re PXRE Grp. Sec. Litig.*,
  600 F. Supp. 2d 510 (S.D.N.Y. 2009).....................................................................29

*Monroe Cnty. Emps.' Ret. System* v. *YPF Sociedad Anonima*,
  15 F. Supp. 3d 336 (S.D.N.Y. 2014).......................................................................26

*Retail Wholesale & Dept. Store Union Local 338 Ret. Fund* v. *Hewlett-Packard Co.*,
  845 F.3d 1268 (9th Cir. 2017) ................................................................24

*Rombach* v. *Chang*,
  355 F.3d 164 (2d Cir. 2004)..................................................................35

*In re Royal Caribbean Cruises Ltd. Sec. Litig.*,
  2013 WL 3295951 (S.D. Fla. Apr. 19, 2013) .......................................12

*Singh* v. *Cigna Corporation*,
  918 F.3d 57 (2d Cir. 2019)...............................................................19, 20

*In re Sunterra Corp. Sec. Litig.*,
  199 F. Supp. 2d 1308 (M.D. Fla. 2002) ...............................................36

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)........................................................................27, 28

*Waterford Twp. Gen. Emps. Ret. Sys.* v. *SunTrust Banks Inc.*,
  2010 WL 3368922 (N.D. Ga. Aug. 19, 2010) .......................................38

*Ziemba* v. *Cascade Int'l, Inc.*,
  256 F.3d 1194 (11th Cir. 2001) ...........................................................27

STATUTES

15 U.S.C. § 78u-4(b).....................................................................1, 9, 37

Securities Exchange Act Section 10(b)...........................................8, 26, 40

Securities Exchange Act Section 20(a)................................................8, 40

OTHER AUTHORITIES

Fed. R. Civ. P. 9(b) ....................................................................1, 8, 30

Fed. R. Civ. P. 12(b)(6).......................................................................1

SEC Rule 10b-5 ...................................................................................8

Pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b), upon the incorporated memorandum of law, the accompanying Declaration of Daniel S. Sinnreich dated January 18, 2021 and its exhibits, and all other papers herein, Defendants Carnival Corp., Carnival plc (collectively, "Carnival" or the "Company"), and Arnold Donald (together with Carnival, the "Defendants") hereby move this Court to dismiss the Consolidated Class Action Complaint (the "Complaint") filed on December 17, 2020 in its entirety and with prejudice.

## PRELIMINARY STATEMENT

On March 12 and 13, 2020, as the scope and severity of the global COVID-19 pandemic came into focus, Carnival took the unprecedented step of voluntarily and indefinitely suspending the Company's global cruising operations.  On March 14, 2020, the Centers for Disease Control and Prevention (the "CDC") issued a No Sail Order suspending all future voyages subject to U.S. jurisdiction.  In the wake of these announcements, and as the financial impact of the pandemic on the cruise industry became clear, Carnival's share price predictably declined.

Plaintiffs, investors in Carnival securities, seek to recover investment losses they suffered in March 2020.  They argue that Carnival's share price decline was driven not by the COVID-19 pandemic, nor the cessation of Carnival's global business, but instead by the Company's supposed "securities fraud."  Plaintiffs' theory is that Defendants somehow knew more than leading health experts and world governments about the scope and future course of COVID-19 and maliciously concealed this information between January and March 2020—all without any discernable motive.  These claims are plainly illogical, are not supported by a single well-pleaded fact in the 282-paragraph Complaint, and they should be dismissed with prejudice.

Plaintiffs' claims fail at the outset because, according to the very documents cited in the Complaint, Carnival consistently disclosed that COVID-19 was causing the Company to suspend

cruises and could have a material negative impact on the Company's business and financials.
Carnival disclosed this risk and estimated the per-share impact of COVID-19 as early as January
28, 2020—at a time when there were fewer than 100 reported cases of COVID-19 outside of
China.  Carnival again voluntarily disclosed this risk on February 12, 2020—at a time when the
WHO did not recommend cancellation of mass gatherings in part because "[n]ot enough is
known about . . . the intensity of human-to-human transmission."  Plaintiffs do not identify any
known risks that Carnival failed to disclose in early 2020.

Faced with these robust disclosures, Plaintiffs are forced to argue that Defendants misled
investors when they affirmed their commitment to regulatory compliance and the health and
safety of passengers and crew.  But these statements are not actionable, and in any event
Plaintiffs plead no facts demonstrating that they were false.  There are no well-pleaded facts
demonstrating that any Carnival ship failed to comply with a single government mandate, much
less that Carnival engaged in wanton fleet-wide noncompliance.  Plaintiffs also point to COVID-
19 outbreaks that occurred aboard certain Carnival ships as evidence of the Company's lack of
commitment to health and safety.  But Plaintiffs' own allegations demonstrate that Carnival
worked closely with leading health authorities to quickly respond to reported cases of the novel
virus, including by testing passengers, canceling on-ship activities, and imposing ship-wide
quarantines—all before such measures were required by any government agency.  And, as
numerous courts have recognized, the fact that a risk materializes does not mean that a company
is not committed to combating that risk.

Plaintiffs also fail to plead scienter.  To the extent the Complaint identifies isolated
incidents of ships failing to follow CDC guidelines or implement adequate safety protocols, there
are no allegations—not even conclusory ones—that any of this information was reported to

Carnival's senior management.  Carnival's actions throughout the class period—during which it repeatedly disclosed the risks COVID-19 posed to its financial performance, promptly disclosed confirmed COVID-19 cases aboard specific ships, and voluntarily suspended its global cruising operations prior to the CDC's No Sail Order—reflect transparency and good corporate governance and are fundamentally inconsistent with Plaintiffs' theory of fraudulent intent.

Finally, Plaintiffs fail to show that Carnival's allegedly fraudulent conduct caused their losses.  Even if Carnival had implemented more stringent safety protocols and done a better job responding to the pandemic, Plaintiffs still would have suffered losses when the global cruise industry ground to a halt in March 2020.

At most, Plaintiffs' allegations amount to a claim that Carnival, like the rest of the world, may have misjudged the risks and eventual impact of COVID-19 in early 2020.  But Defendants cannot be held to the impossibly high standard of failing to predict the unprecedented scope of this pandemic and disclose risks that were not known to leading world health experts, government authorities, or Defendants during that time.  It is all too easy to look back at the devastation caused by the pandemic over the past year and posit, in retrospect, that more could have been done to prevent its spread.  While such criticisms may have a role in debates over public policy, they are not the basis for a claim of federal securities fraud.  Accordingly, Plaintiffs' claims should be dismissed.

## BACKGROUND[1]

### A.    Carnival's Business

Carnival operates a portfolio of global, regional, and national cruise brands around the world, including Carnival Cruise Line, Princess Cruises, Holland America Line, P&O Cruises

---

[1]    Plaintiffs' well-pleaded allegations are treated as true for the purposes of this motion.  However, no presumption of truth is afforded to the Complaint's legal conclusions.  *See Franklin* v. *Curry*, 738 F.3d 1246,

(Australia), P&O Cruises (UK), Seabourn Cruise Line, Costa Cruises, AIDA Cruises, and Cunard Cruise Line.  During the class period, Carnival operated over 100 ships docking at over 700 ports around the world.  Ex. 1 at 11, 13-18.[2]  Carnival operates as a dual-listed company, made up of two public companies, Carnival Corporation and Carnival plc.  Carnival Corp. is incorporated in Panama and its shares are traded on the New York Stock Exchange.  Ex. 1 at 7, 28.  Carnival plc is incorporated in England and Wales and its shares are traded on the London Stock Exchange and its American Depository Shares are traded on the New York Stock Exchange.  *Id.*

**B.    Carnival's Public Statements Regarding COVID-19**

This case arises out of public statements Defendants allegedly made regarding the risks of, and Carnival's response to, COVID-19 between January and March 2020.  Plaintiffs allege that these statements were materially misleading and intended to defraud investors.

**1.    The Origins of COVID-19 and Carnival's Public Statements in January 2020**

Carnival filed its 2019 annual report on Form 10-K with the SEC on January 28, 2020 (the "10-K").  Compl. ¶ 46.  The 10-K specifically disclosed that the coronavirus had caused Carnival to "suspend[] cruise operations from Chinese ports between January 25th and February 4th, canceling nine cruises," estimated the per-share impact of the virus at the time, and warned that if travel restrictions continued in China it could "have a material impact on our financial performance."  Ex. 1 at 26.  The 10-K similarly warned investors that "guest and crew illnesses,"

---

1248 & n.1 (11th Cir. 2013).  Further, the Court may consider documents referenced in the Complaint and central to the Plaintiffs' claims.  *See DeSouza* v. *Fed. Home Mortg. Corp.*, 572 F. App'x 719, 721 (11th Cir. 2014).  The Court may also consider relevant documents filed with the SEC and other matters of public record.  *See Bryant* v. *Avado Brands, Inc.*, 187 F.3d 1271, 1280 (11th Cir. 1999).

[2]    References to "Ex. __" refer to exhibits to the attached Declaration of Daniel S. Sinnreich.  Page citations refer to the PDF pagination of exhibits, inclusive of exhibit cover page.

and the public's "concerns regarding the health, safety and security of travel, including government travel advisories and travel restrictions," could adversely affect its business.  Ex. 1 at 21.  On January 28, 2020, Carnival told members of the press that, "[a]lthough the risk to our guests, crew and business around the world [from COVID-19] is very low, we are closely monitoring the situation."  Compl. ¶ 78.

These disclosures were consistent with the limited information available in January.  On January 17, 2020, Dr. Nancy Messonnier, director of the CDC's National Center for Immunization and Respiratory Diseases, advised that while not much was known about the virus, "we believe the current risk from this virus to the general public is low."  Ex. 2 at 2.  On January 24, 2020, the U.S. Coast Guard explained that person-to-person spread was occurring but "it is unclear how easily the virus spreads between people."  Ex. 3 at 2; Compl. ¶ 94.  On January 30, 2020, the CDC explained that "no additional precautions are recommended at this time beyond the simple daily precautions that everyone should always take."  Ex. 4 at 3.  By that date, the WHO had confirmed only 83 total cases of COVID-19 outside China.  Compl. ¶ 83.

## 2. The *Diamond Princess* and Carnival's Public Statements in February 2020

On February 1, 2020, Carnival allegedly learned that a former passenger who had disembarked the *Diamond Princess* on January 25 had tested positive for COVID-19.  Compl. ¶¶ 98-99.  According to Plaintiffs, Carnival informed local authorities and everyone aboard the vessel about the diagnosis within 24 hours.  Compl. ¶¶ 100-01.  Over the next three days, in consultation with global medical authorities and the Japanese government, Carnival invited local health officials aboard to screen passengers for coronavirus, canceled several scheduled activities, advised passengers "to avoid close contact with anyone who was experiencing symptoms of respiratory illness, to wash their hands regularly for twenty seconds, and to seek

5

treatment from the ship's nurses if they experience a fever, chills, or cough," and imposed a *full, ship-wide quarantine*. *Id.* ¶¶ 100-03.

On February 12, 2020, Carnival disclosed in a press release that the Company believed that COVID-19 would have a "material impact on its financial results." Ex. 5 at 2.  In the same press release, Carnival stated that it was working with the CDC and the WHO to implement enhanced screening, prevention and control measures, and that it remained committed to the health and safety of its employees and guests.  *Id.*; Compl. ¶ 119.  On the same day as the press release, the CDC issued Interim Guidance for Ships on Managing 2019 Novel Coronavirus (the "Interim Guidance"), which provided "recommend[ations]" for handing COVID-19 cases but did not recommend that cruise ship operators cancel voyages, even if a current passenger tested positive for COVID-19.  Ex. 6.  Also on February 12, 2020, the WHO reiterated that it "did not recommend any specific health measures for travelers."  Ex. 7 at 8.  In guidance published on February 14, 2020, the WHO did not recommend cancellation of mass gatherings in part because "[n]ot enough is known about . . . the intensity of human-to-human transmission."  Ex. 8 at 3.  The U.S. Department of State would not warn of the danger of COVID-19 on cruise ships until March 8, 2020.  Ex. 9 at 2.

### 3.     The *Grand Princess* and Carnival's Public Statements in March 2020

On March 4, 2020, Carnival learned that certain passengers who had traveled on a prior voyage of the *Grand Princess* and disembarked in San Francisco more than a week earlier had tested positive for COVID-19.  Compl. ¶ 134.  According to Plaintiffs, on the same day Carnival learned this information, it ordered the *Grand Princess* to cancel its current trip to Hawaii and return to San Francisco, and instructed all 62 passengers and crew who had also traveled on the prior voyage to isolate in their cabins.  *Id.* ¶¶ 134-36.  Pursuant to orders from state and local

authorities, as well as President Trump, passengers were not allowed to disembark until the following week.  Ex. 10 at 3, 10; Ex. 11 at 4-5; Ex. 12 at 2-3.

On March 12 and 13, 2020, Carnival's brands announced voluntary and temporary pauses of their cruising operations.  Exs. 13-15; Compl. ¶ 142.  On March 14, 2020, the CDC issued a No Sail Order, identifying the particular danger COVID-19 posed on cruise ships and suspending all future voyages subject to U.S. jurisdiction.  Ex. 16.

The No Sail Order noted the limited magnitude and geographic scope of the pandemic in mid-March 2020, as there had been only 132,000 cases globally, 1,620 cases in the United States, and 41 known deaths in the United States at that point.  *Id.* at 3.

### 4.      Carnival Continues to Disclose the Financial Impact of the Pandemic

As the COVID-19 pandemic continued to evolve, Carnival issued additional disclosures updating investors about the impact that COVID-19 and related travel restrictions were having on its finances and operations.  In a March 16, 2020 SEC filing, Carnival disclosed its belief that COVID-19 "will have a material negative impact on its financial results and liquidity" and that the Company expected a net loss for the fiscal year.  Compl. ¶ 150; Ex. 17 at 4.  On March 19, 2020, Carnival issued a press release previewing its financial results for the first quarter of 2020, which included a net loss of $781 million for the quarter, and reiterating that Company's belief that "the ongoing effects of COVID-19 on its operations and global bookings will have a material negative impact on its financial results and liquidity."  Ex. 18 at 4.  In two SEC filings on March 31, 2020, Carnival disclosed substantially similar information in connection with Carnival's public and private offering of new shares; Carnival also added new COVID-19-specific information to its risk disclosures.  Compl. ¶¶ 167-71.

As discussed in more detail below, the disclosures seized on by Plaintiffs were made in a fast-changing environment, in which regulators and experts, including the WHO, the CDC, and

the U.S. Executive Branch were disseminating inconsistent recommendations and instructions about the threat posed by the virus and the best preventative measures.  By April it became clear that the impact of the pandemic on both U.S. and international tourism would be far more severe and far longer-lasting than any expert or government had predicted.  As a result, the lives and health of international travelers exposed to COVID-19, including cruise passengers, have been tragically impacted.  And Carnival's business and common stock price have been severely adversely affected.

*   *   *

The Complaint asserts claims against all Defendants under Section 10(b) of the Exchange Act and Rule 10b-5 based on the alleged misrepresentations described below, and a control person claim against Donald under Section 20(a) of the Exchange Act.  Compl. ¶¶ 266-76.

## ARGUMENT

To state a claim under Section 10(b) and Rule 10b-5, Plaintiffs must allege, with respect to each Defendant: (1) a material misstatement or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  *Carvelli* v. *Ocwen Fin. Corp.*, 934 F.3d 1307, 1317 (11th Cir. 2019).  Plaintiffs are also subject to a "triple-layered pleading standard," consisting of not only the "federal notice-pleading requirements, . . . but also the heightened pleading standards found in Federal Rule of Civil Procedure 9(b) and the special fraud pleading requirements imposed by the Private Securities Litigation Reform Act."  *Id.* at 1317-18.

To comply with Rule 9(b), Plaintiffs must "allege specifically (1) which statements or omissions were made in which documents or oral representations; (2) when, where, and by whom the statements were made (or in the case of omissions, not made); (3) the content of the statements or omissions and how they were misleading; and (4) what the defendant received as a

result of the fraud." *Id.* at 1318.  Under the PSLRA, falsity allegations must not only "specify each statement alleged to have been misleading" but also "the reason or reasons why the statement is misleading."  15 U.S.C. §78u-4(b)(1).  The PSLRA also requires, with respect to each act or omission alleged, that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. §78u-4(b)(2).  The Complaint fails to satisfy these stringent requirements.

## I.      The Complaint Fails to Allege Any Actionable Misrepresentations or Omissions

The Complaint relies on the fundamentally flawed theory of fraud by hindsight, criticizing Carnival for failing to anticipate the course and impact of a novel pandemic on its ships.  *See Abecassis* v. *Eugene M. Cummings, P.C.*, 2010 WL 9452252, at *7 (S.D. Fla. June 3, 2010) ("[s]peculation and fraud by hindsight is no basis for a fraud claim").  The Complaint lacks any particularized facts showing that Defendants concealed known risks, or misled investors about its commitments to compliance and health and safety, during the class period.

### A.      The Complaint Fails to Allege that Defendants Failed to Warn of the Risks to Carnival's Business and Passengers of COVID-19

#### 1.      Defendants' Statements in January 2020

Plaintiffs allege that Carnival's annual report for the fiscal year ending November 30, 2019, issued on January 28, 2020, was misleading because it failed to disclose the likely impact of COVID-19 on the Company's business and passengers.  Compl. ¶ 231.  Plaintiffs also allege that Carnival misled investors about the severity of COVID-19 and the threat it posed to cruise ships when the Company purportedly told the press on January 28 and 31, 2020, that the risks of COVID-19 to its guests, crew, and global business were "low."  *Id.* ¶¶ 78, 85, 218, 219, 232.  Neither allegation withstands scrutiny.

9

Plaintiffs' claims about the 10-K fail because, as Plaintiffs themselves acknowledge, the 10-K specifically warned that the coronavirus had forced the Company to suspend cruise operations in China and that "[i]f these travel restrictions continue for an extended period of time, they could have a material impact on our financial performance." Ex. 1 at 26; Compl. ¶ 132.[3]  Plaintiffs do not identify any additional information that Defendants should have included in this risk disclosure; nor could they, given how little was known about the virus at that time.  *See infra* at 13, 25.  Plaintiffs also ignore warnings in the 10-K that Carnival's business could be adversely affected by guest and crew illness and by the public's concerns regarding the health, safety, and security of travel, and that Carnival had experienced health and safety incidents in the past and "may experience similar or other incidents in the future." Ex. 1 at 21. Despite Plaintiffs' argument that the 10-K "omitted any mention" of the risks COVID-19 posed to the Company's "financial health," Compl. ¶ 79, the 10-K clearly disclosed the very risk that Plaintiffs allege materialized, extinguishing their claim.  *See Hubbard* v. *BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 729-30 (11th Cir. 2012) (finding there could be no claim when plaintiffs' alleged loses were due to "market forces that [defendant] had warned of").

Plaintiffs also plead no facts to suggest that Carnival did not reasonably believe that the risk to Carnival's guests and crew "around the world" was "low" in late January 2020. Predictions made in good faith based on what is knowable at the time cannot be the basis of securities fraud just because they are later proven to be inaccurate.  *In re John Alden Fin. Corp. Sec. Litig.*, 249 F. Supp. 2d 1273, 1277 (S.D. Fla. 2003) ("The fact that in hindsight the projection turned out to be wrong does not mean that it lacked a reasonable basis when made.").[4]

---

[3]    Plaintiffs allege that this language appeared in Carnival's annual report filed on February 27, 2020.  *See* Compl. ¶ 132.  Plaintiffs are wrong.  Carnival filed its annual report on *January 28, 2020.*  Ex. 1; *see* Compl. ¶ 227.

[4]    *See also Carvelli*, 934 F.3d at 1323 (affirming dismissal of claims where plaintiffs failed to allege that the defendant did not believe its statements of opinion about its competitive strengths or improved results); *In re*

Moreover, the assessment that the global risk of COVID-19 was "low" at the time was consistent with contemporaneous public statements from leading health authorities.  On January 17, 2020, the director of the CDC's National Center for Immunization and Respiratory Diseases advised that "the current risk from this virus to the general public is low."  Ex. 2 at 2.  On January 30, 2020, the CDC described the "risk to the American public" as "low."  Ex. 4 at 2.  Even in *late February*, the WHO still reported that the "risk of infection is low" for individuals who had not come in close contact with an infected person or recently traveled to an area where COVID-19 was spreading.  Ex. 19 at 8; *see also infra* at 13, 25.

The pandemic was also believed to be geographically contained at the time these statements were made.  As of January 30, 2020, there were only *83 confirmed cases* of the virus and *no confirmed deaths* outside of mainland China.  *See* Compl. ¶ 83.  The very statements referenced in the Complaint confirm this point.  In his January 31, 2020 proclamation, President Trump noted that only around "200 people have died from the virus, all in China," and only restricted travel of non-citizens coming from mainland China.  Ex. 20 at 2; Compl. ¶ 84.  Likewise, both the U.S. Coast Guard and Department of Transportation bulletins cited by Plaintiffs identified COVID-19 as being geographically limited to specific regions of China and noted that it was a "rapidly changing situation" and "unclear how easily th[e] virus spreads between people."  Exs. 3 & 21; Compl. ¶¶ 94-95; *see also* Ex. 23 at 7 (cited in Compl. ¶ 96) (January 27, 2020 guidance from the European Union describing the "current absence of adequate evidence for the novel Coronavirus transmission and communicability").  Plaintiffs do

---

*Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 571-72 (6th Cir. 2004) (statement that the "Ford Explorer is an extremely safe and thoroughly-engineered vehicle" not rendered misleading by later recall because Plaintiffs offered no basis to believe defendant did not believe the statements when made).

not identify a *single* known case of COVID-19 aboard any cruise ship, let alone a Carnival ship, in January 2020.

Notwithstanding the uncertainty and lack of consensus about the risks of COVID-19 in January 2020, Plaintiffs allege that Carnival "was in a unique position to understand the gravity of COVID-19 even before the WHO and United States government sounded the alarm." Compl. ¶ 80. The basis for this incredible allegation is a vague quotation taken from an April 16, 2020 *Bloomberg Businessweek* article, in which John Padgett, Carnival's Chief Experience and Innovation Officer, recalled gaining "insight" into the "global situation" on January 25, 2020, after discussing coronavirus with an unnamed battery manufacturer in Wuhan, China. Ex. 10 at 11-12. But Plaintiffs provide no details about what "insight" Padgett supposedly learned in January that leading health and government experts lacked. To the extent Padgett learned about the scale of the outbreak in Wuhan, Plaintiffs ignore the fact that Carnival canceled all cruising operations in China on the same date Padgett allegedly spoke to the battery manufacturer. Ex. 1 at 26; *see also infra* Section II.A.

Plaintiffs also reference a former Carnival employee—who began working *after* January 2020—who recalls the unremarkable fact that as manufacturing plants in China were affected by the virus, he was forced to look for other suppliers for Carnival's wristbands. Compl. ¶ 81. But this employee does not suggest that he was unable to secure *any* product, or that he shared his concerns with any supervisor, much less a senior executive. *See In re Royal Caribbean Cruises Ltd. Sec. Litig.*, 2013 WL 3295951, at *18 (S.D. Fla. Apr. 19, 2013) (rejecting confidential witness accounts where complaint failed to allege that they communicated their observations to senior management).

2.      **Defendants' Statements in February 2020**

As the situation evolved, Carnival promptly and accurately disclosed to the public information regarding the danger COVID-19 posed to its passengers and business.  On February 12, 2020, Carnival issued a press release which warned that the virus was "now resulting in the cancellation of voyages" from China and "other parts of Asia," and that "as a result of Coronavirus, the company believes the impact on its global bookings and cancelled voyages will have a material impact on its financial results."  Ex. 5 at 2; Compl. ¶ 119.  The Company also provided investors with its best per-share estimate of the negative impact of COVID-19.  Ex. 5.

Plaintiffs plead no facts showing that Carnival somehow knew that COVID-19 posed a greater risk than the Company disclosed on February 12, 2020 and fail to identify any additional risk disclosures that Carnival should have included in this press release.  Carnival could not have known at the time that it would later have to cancel its global cruising operations.  The contemporaneously released CDC Interim Guidance did not recommend that ship operators cancel voyages, even if a current passenger tested positive for COVID-19.  *See* Ex. 6.  And the CDC did not order the cancelation of future voyages until it issued a No Sail Order more than one month later, on March 14, 2020.  Ex. 16.  Similarly, the U.S. Department of State did not recommend that U.S. citizens even *reconsider* cruise ship travel *to or within Asia* until February 20, 2020, Ex. 22 at 2, and did not warn travelers of the dangers associated with COVID-19 on cruise ships generally until March 8, 2020.  Ex. 9 at 2.  And the WHO did not issue guidance for handling COVID-19 on cruise ships until February 24, 2020—and even then, the WHO did not recommend that operators cancel cruises.  *See* Ex. 24.  The Complaint does not plausibly allege that Carnival's management had better insight than these public health experts regarding the geographic extent and rapidity of the pandemic's spread.

3.     <u>**Defendants' Statements in March 2020**</u>

Plaintiffs allege that statements made by Donald and other Carnival employees in March 2020 were misleading because they misstated and concealed the risks COVID-19 posed to cruise ships.  Compl. ¶¶ 154-57; 251-53.  For example, Donald expressed his opinion in television interviews on March 18 and 22 that "a cruise ship is not a riskier environment" than other activities because it provides guests with "space and social distancing" and access to clinics.

Donald's opinions could not have misled investors because the cited interviews occurred *after* the market knew that Carnival had voluntarily suspended its global operations and the CDC had prohibited all further cruising operations.  *See infra* at 22.  Both interviews also aired *after* Carnival issued an SEC filing on March 16, 2020, which, *according to Plaintiffs*, "began to reveal to investors" the pandemic's impact on the Company's business operations and financials. Compl. ¶ 151.  Given the extensive public information about the risks of COVID-19 aboard cruise ships, including Defendants' own disclosures, Donald's statements could not have misled investors.  *See Hubbard*, 688 F.3d at 729-30.  The Complaint also contains *no facts* demonstrating that Donald did not believe his statements of opinion at the time they were made. *See Carvelli*, 934 F.3d at 1323.

Plaintiffs also argue that Defendants' statements in March were belied by "the extent of COVID-19 cases linked to the Company's ships."  Compl. ¶ 253.  But the Complaint identifies only six Carnival ships that had COVID-19 cases in March 2020, which is entirely consistent with Donald's statement that among Carnival's cruise ships, "very few had cases on them." Compl. ¶ 252.[5]

---

[5]     Plaintiffs also allege that by March 13, health officials at the CDC had "linked cruise passengers to 17% of the country's COVID-19 case load," but provide no source for that allegation.  Compl. ¶ 185.  The only CDC release from the time period that Plaintiffs *do* cite is the March 14, 2020 CDC No Sail Order, which does not support Plaintiffs' allegation about cruise passengers.

14

Plaintiffs also claim that Donald's statements in March were misleading because an unidentified member of the CDC's cruise ship task force "later explained" that the virus spreads more rapidly on a cruise ship than a supermarket or subway.  Compl. ¶ 158.  But neither this information, for which Plaintiffs cite no authority, nor later reporting between April and October 2020, Compl. ¶¶ 185-86, can render Defendants' statements about the risks of COVID-19 in *March* misleading.  *See S.E.C.* v. *Gane*, 2005 WL 90154, at *11 (S.D. Fla. Jan. 4, 2005) (an "inability to foresee the future does not constitute fraud") (quotation marks omitted).

### B.   The Complaint Fails to Allege that Defendants' Statements Affirming Carnival's Compliance with Regulatory Requirements Were False or Misleading

Plaintiffs allege that Defendants' routine statements throughout the class period affirming Carnival's commitment to complying with regulatory requirements were materially misleading because Carnival allegedly failed to adhere to certain regulatory guidelines in the early days of the pandemic.  *See, e.g.*, Compl. ¶¶ 51, 61-63, 154-55, 218-25, 240-41.  These allegations fail because Plaintiffs plead no specific facts demonstrating isolated incidents of regulatory noncompliance, much less the kind of systemic, fleet-wide noncompliance that could render Defendants' statements misleading.

As a threshold point, although the Complaint purports to identify several examples of regulations and guidelines, it fails to explain what, precisely, Carnival did to allegedly run afoul of most of these regulations and guidelines.  There are, for example, no allegations that Carnival actually failed to comply with the WHO "Handbook for management of public health events on board ships" (Compl. ¶ 48), the January 24, 2020 U.S. Coast Guard Bulletin (Compl. ¶ 94), the January 24, 2020 Department of Transportation Release (Compl. ¶ 95), the EU COVID-19 Guidance (Compl. ¶ 96), the January 31, 2020 proclamation by President Trump (Compl. ¶ 84), or the March 14 CDC No Sail Order (Compl. ¶ 147).

15

Several of Plaintiffs' other allegations of regulatory noncompliance are simply too vague or conclusory to support a fraud claim under the PSLRA.  For example, Plaintiffs allege that Carnival "ignored the direction of Hong Kong officials to 'cleanse and disinfect'" the *Diamond Princess* after learning that a former passenger had tested positive for COVID-19.  Compl. ¶¶ 108, 225.  But they fail to explain what Carnival allegedly had been ordered to do, and how Carnival failed to comply; Plaintiffs simply state without any explanation or elaboration that Carnival's cleaning procedures were "low-level and minimal at best."  Compl. ¶ 108; *see also* Compl. ¶ 155 (alleging that a Carnival ship ignored an unspecified Argentine "order" to remain in port "indefinitely").  Because "the Complaint does not identify the regulations or standards that [defendants] allegedly failed to comply with," Plaintiffs cannot allege that Carnival's statements regarding its commitment to compliance were misleading.  *See Nardy* v. *Chipotle Mex. Grill, Inc.*, 2019 WL 3297467, at *11 (D. Colo. Mar 29, 2019).

Plaintiffs allege that Defendants' handling of the COVID-19 outbreak aboard the *Diamond Princess* in early February 2020 "flout[ed]" the CDC's Guidance for Cruise Ships on Influenza-Like Illness Management (the "ILI Guidance"), which had been issued in 2016.  Compl. ¶ 225.  But the ILI Guidance, by its plain terms, was simply "guidance" that contained the CDC's "recommendations" and "requests" to help cruise ships prevent, diagnose, and treat ILI.  Ex. 25.  It applied only to cruise ships "originating from, or stopping in, the United States," *id.* at 2, and therefore did not apply to the *Diamond Princess*.

In any event, Plaintiffs' do not identify any recommendations in the ILI Guidance that Carnival failed to follow.  Plaintiffs fault Carnival for taking too long to inform passengers that a former passenger—who disembarked a week earlier—had tested positive for coronavirus.  Compl. ¶¶ 98-99.  But the ILI Guidance does not recommend that operators inform customers

that a prior passenger was infected, *see* Ex. 25, and the *Diamond Princess* captain informed all passengers within one day of learning about the diagnosis, Compl. ¶ 101.  Plaintiffs allege that the fact that "passengers were not given masks or other PPE when Carnival learned of the confirmed coronavirus case" was "a clear failure of protocol."  Compl. ¶ 103.  But nowhere does the ILI Guidance recommend masks for *passengers*; it even states that face masks are "not generally recommended for cruise ship *crew members* for general work activities."  Ex. 25 at 5. Even as late as March 2020, both the WHO and the U.S. Surgeon General recommended *against* the use of masks except when caring for someone suspected of having COVID-19.  Exs. 26-27. Plaintiffs also argue that Carnival failed to isolate passengers and crew who may have come into contact with the infected passenger, failed to impose adequate distancing measures, and failed to impose enhanced sanitization measures.  Compl. ¶ 106.  But *none* of these measures are recommended for general use in the ILI Guidance.  *See* Ex. 25.  Although implementing these measures might seem sensible given what is known today, they were not obvious—much less mandated—during the first week of February 2020, when the CDC was recommending "no additional precautions . . . beyond the simple daily precautions that everyone should always take."  *See* Ex. 4 at 3.[6]

Plaintiffs also allege that Carnival's handling of an outbreak aboard the *Grand Princess* in early March 2020 reflected "Carnival's non-compliance with applicable CDC guidelines," but fail to specify any particular CDC guideline or offending conduct.  *See* Compl. ¶ 136.  Plaintiffs appear to fault Carnival for failing to "examine" certain passengers who traveled on the *Grand Princess*' prior voyage from Mexico to San Francisco, and then "re-embarked" for a subsequent

---

[6]    To the extent Plaintiffs fault Carnival for continuing to sell cruise tickets after the events aboard the *Diamond Princess*, Compl. ¶¶ 114-17, they do not suggest that this practice violated any rule or agency guidance.

trip from San Francisco to Hawaii.  *See* Compl. ¶¶ 134, 238.  But Plaintiffs provide no explanation for why Carnival should have examined those passengers when they "re-embarked" on February 11, 2020—at a time when no known cases of COVID-19 were linked to the vessel—and Plaintiffs cite no regulation that would have mandated such an examination. Plaintiffs also allege that Carnival's "decision" to keep passengers aboard the ship on March 7, 2020, after confirming cases on board, was "reckless."  Compl. ¶ 137.  This accusation is disingenuous; according to contemporaneous reporting and articles cited in the Complaint, the decision to require passengers to quarantine aboard the *Grand Princess* rather than on land was made by state and local authorities, as well as President Trump.  *E.g.*, Exs. 10-12.[7]

Finally, Plaintiffs allege that two vessels that launched in March 2020—the *Coral Princess* and the *Ecstasy*—failed to conduct pre-boarding "verbal or written screening" to assess passengers for potential COVID-19 exposure, a precaution purportedly recommended in the CDC's Interim Guidance.  Compl. ¶¶ 123, 138, 140-41.  Plaintiffs have their facts wrong; this recommendation did not appear in the Interim Guidance.  *See* Ex. 6.  Plaintiffs quote language from a version of the CDC's Guidance issued in ***July 2020***, long after these voyages were concluded.  *See* Ex. 28 at 3-4; Compl. ¶ 123.  Defendants cannot be faulted for failing to abide by regulatory guidance that did not exist.[8]

---

[7]   Plaintiffs' allegation is particularly puzzling given that Plaintiffs elsewhere fault Carnival for *allowing* passengers to disembark ships with confirmed or suspected COVID-19 cases.  Compl. ¶¶ 118, 144, 159.

[8]   The allegation that the *Ecstasy* and *Coral Princess* did not comply with the Interim Guidance because they sailed with "no modifications imposed to accommodate social distancing guidelines, and no adequate sanitization of the ship," Compl. ¶ 141, lacks *any support* in the Complaint and should be afforded no weight. The Complaint's similar allegations about the *Zaandam* should be afforded no weight because they appear to be based on the recollection of a handful of anonymous passengers on that ship who would have no knowledge of the ship's cleaning measures and PPE protocols.  Compl. ¶ 162; *infra* Section II.B.  In any event, because the *Zaandam* did not originate or stop in a U.S. port, it was not subject to the recommendations in the ILI or Interim Guidance.

Even assuming this conduct ran afoul of a regulatory requirement (or even a recommendation), it would not render Carnival's statements about commitment to regulatory compliance actionable.  In addition to its own health and safety policies, Carnival operated in over 700 ports around the world and is "subject to numerous international, national, state and local laws, regulations, treaties and other legal requirements" that "change regularly, sometimes on a daily basis."  *See* Ex. 1 at 21.  Both the ILI and the Interim Guidance recognize this tangled web of regulations and guidance, noting that "[a]s ships travel worldwide, ship management and medical staff need to be aware and respond to local jurisdictional requirements."  Exs. 6 & 25. No reasonable investor would have interpreted Carnival's comments as a *guarantee* that the Company would always comply with every one of the myriad of potentially applicable rules and regulations.  In any event, the securities laws do not require companies to disclose isolated acts of mismanagement.  *See Menaldi* v. *Och-Ziff Cap. Mgmt. Grp LLC*, 277 F. Supp. 3d 500, 512-13 (S.D.N.Y. 2017) (holding that company's disclosure about anti-corruption compliance programs was not rendered misleading by failure to disclosed bribes allegedly paid by employees).[9]

The Second Circuit's decision in *Singh* v. *Cigna Corporation*, 918 F.3d 57 (2d Cir. 2019) is instructive.  In *Singh*, plaintiffs alleged that defendants' statements regarding their commitment to compliance with all "applicable regulations" were materially misleading because a regulator later found that the company had committed several violations.  *Id.* at 630-61.  The appellate court affirmed dismissal of these claims because a reasonable investor would not have relied on general statements regarding regulatory compliance in making an investment decision.

---

[9]   *Henningsen* v. *ADT Corp.*, 161 F. Supp. 3d 1161, 1197 (S.D. Fla. 2015) ("[T]he law does not impose a duty to disclose every slip-up and misstep, however immaterial, within a touted sales program."), *aff'd sub nom.*, 660 F. App'x 850 (11th Cir. 2016); *Luo* v. *Sogou, Inc.*, 465 F. Supp. 3d 393, 413 (S.D.N.Y. 2020) ("[T]here is no free-standing obligation under United States law to disclose even criminal conduct that is uncharged—let alone insufficient regulatory compliance.").

*Id.* at 63.  The court emphasized that defendants' statements about compliance with applicable regulations were, much like Carnival's disclosure, "framed by acknowledgements of the complexity and numerosity of applicable regulations," which "suggests caution (rather than confidence) regarding the extent of [defendant's] compliance." *Id.* at 64.  The court rejected plaintiffs' "creative attempt to recast" the regulatory violations at issue as securities fraud and explained that "such generic statements [regarding compliance] do not invite reasonable reliance . . . and so cannot form the basis of a fraud case." *Id.* at 59-60.  Recently, the Eleventh Circuit found similar statements concerning a company's commitment to "devote substantial resources to . . . regulatory compliance and risk management efforts" were inactionable. *Carvelli*, 934 F.3d at 1320-22.[10]  The Court should reach the same conclusion here.[11]

### C.    The Complaint Fails to Allege that Defendants' Statements Concerning Carnival's Commitment to Passenger Safety and Health Were False or Misleading

Plaintiffs allege that Carnival's statements affirming the Company's "commitment to the safety of our guests and crew" were materially misleading because Carnival allegedly failed to establish appropriate health and safety protocols, which in turn contributed to COVID-19 infections aboard certain ships.  *See, e.g.*, Compl. ¶¶ 46, 74, 128, 214-17, 221-22, 234-47.  The Complaint does not identify what health and safety protocols Carnival had in place, nor explain

---

[10]    *See also Plumbers & Steamfitters Local 773 Pension Fund* v. *Danske Bank*, 2020 WL 4937461, at *7 (S.D.N.Y. Aug. 24, 2020) (finding defendant's statement that the company "conduct[s] business in accordance with the laws and regulations of the countries where we operate" was inactionable) (citing TAC ¶ 245); *Diehl* v. *Omega Protein Corp.*, 339 F. Supp. 3d 153, 162 (S.D.N.Y. 2018) (finding statement that defendant had "implemented a comprehensive compliance program" was not actionable "[r]egardless of whether [defendant] had properly implemented the compliance program" or whether that program was effective).

[11]    The allegations that two vessels failed to inform passengers that certain individuals had begun to experience flu-like symptoms, and that passengers without symptoms were permitted to disembark from those vessels, fail for the same reasons.  *See* Compl. ¶¶ 143-46, 159-60.  Plaintiffs do not identify what rule, if any, this alleged conduct violated; and even if they did, isolated acts of regulatory noncompliance do not amount to securities fraud.  *See Singh*, 918 F.3d at 63.

why they were inadequate or how Carnival failed to follow them.  Instead, Plaintiffs argue that

Carnival simply "lacked health and safety policies" and "*never* had proper health and safety

protocols in place to protect its passengers and crew."  Compl. ¶ 211 (emphasis added).  These

vague allegations are insufficient for several reasons.

The very documents cited in the Complaint demonstrate that Carnival did not "lack"

health and safety policies.  The Complaint admits that Carnival's Board of Directors maintains a

committee that oversees the Company's health, environment, safety, and security ("HESS")

protocols, subject to a publicly available HESS Policy.  Compl. ¶¶ 56-57.  The HESS Policy

tasks Carnival's management with taking certain actions to improve the Company's HESS

practices, such as performing "annual HESS audits," providing "HESS and sustainability

support, training, advice, and information" to "passengers, guests, [and] employees," and

maintaining "an Ethics & Compliance reporting hotline."  Ex. 29; Compl. ¶¶ 59-61.  Plaintiffs do

not allege that the HESS Committee failed to meet or follow through on its commitments.  The

Complaint also admits that the Company hired a former federal prosecutor in August 2019 to fill

the newly-created position of Chief Ethics and Compliance Officer, Compl. ¶ 62, and created an

Incident Analysis Group ("IAG") in September 2019 to review and recommend enhancements to

the Company's HESS Policies, Compl. ¶ 64.

The Complaint is also replete with examples of Carnival's conduct that reflect its

commitment to health and safety—often at the expense of its bottom line.  Plaintiffs allege that

as early as January 25, 2020, Carnival suspended its cruise operations in China, the only known

region with a significant number of COVID-19 cases at the time.  Compl. ¶ 227.  When the

*Diamond Princess* experienced an outbreak in early February 2020, Carnival's CEO "dial[ed]

into" the response and traveled to California and Washington to participate in crisis-response

meetings.  Compl. ¶ 197.  According to several disclosures cited by the Complaint, Carnival was "coordinating closely" with the CDC and WHO as early as January 2020 "to implement enhanced screening, prevention and control measures for [its] guests, crew and ships."  Compl. ¶¶ 85, 119, 136, 154.  Plaintiffs plead no facts showing that Carnival was *not* coordinating closely with these authorities.  To the contrary, the Complaint admits that Carnival personnel collaborated with "the CDC and other government agencies that were coordinating the American response to the pandemic," and cites an email exchange in which Carnival personnel and the CDC collaborated on a plan to disembark and repatriate passengers aboard certain Carnival ships.  Compl. ¶¶ 100, 180-83, 198.  And as the scope of the COVID-19 pandemic came into focus, Carnival *voluntarily* suspended its global operations to "mitigate the spread" of the virus—*prior* to the CDC's No Sail Order.  Compl. ¶ 142.  The CDC *praised* CLIA members, which includes all Carnival lines, for proactively suspending cruise ship operations, an action that demonstrated "commitment . . . to protecting the health and safety of both cruise ship passengers and the public at large."  *See* Ex. 16 at 6.  These allegations are simply inconsistent with the theory that Carnival lacked any health and safety protocols.

Notwithstanding these concessions, Plaintiffs allege that Carnival's lack of commitment to health and safety was evident from the widely-reported outbreaks that occurred aboard the *Diamond Princess* and *Grand Princess*.  Despite characterizing Carnival's response as sluggish, however, the Complaint makes clear that within a day of learning that a single former *Diamond Princess* passenger had tested positive for COVID-19, Carnival alerted the local authorities and the entire vessel of the diagnosis.  Compl. ¶¶ 98-101.  Over the next three days, in consultation with global health authorities, the vessel invited local health officials aboard to screen patients for coronavirus, counseled passengers to "to avoid close contact with anyone who was

experiencing symptoms of respiratory illness, to wash their hands regularly for twenty seconds, and to seek treatment from the ship's nurses if they experience a fever, chills, or cough," canceled several scheduled activities, and imposed a *full, ship-wide quarantine*. *Id.* ¶¶ 100-03. These actions were taken during the first week in February—at a time when the WHO did not recommend cancellation of mass gatherings in part because "[n]ot enough is known about . . . the intensity of human-to-human transmission." Ex. 8 at 3.

Plaintiffs' allegations about the *Grand Princess* are similarly unavailing. According to the Complaint, on the same day that Carnival learned that passengers who had disembarked more than a week earlier had tested positive for COVID-19, it returned the vessel to its originating port and instructed all passengers and crew who had traveled on the prior voyage with the infected passengers to isolate in their cabins. Compl. ¶¶ 134-36. Each of those individuals were then tested for coronavirus the following day. *Id.* These affirmative steps to limit the spread of COVID-19 were not even contemplated by the ILI or the Interim Guidance, and Plaintiffs fail to identify any additional precautions that public health authorities recommended at the time.

Plaintiffs also allege that certain other Carnival ships experienced COVID-19 cases and failed to implement better cleaning, distancing, and isolation protocols in February and March 2020. *See* Compl. ¶ 73. As discussed above, however, Plaintiffs do not allege that Carnival's conduct on any ship ran afoul of health- or safety-related government recommendations, much less regulations. *See supra* Section I.B. And the fact that certain ships experienced cases does not demonstrate Carnival's lack of commitment to health and safety because the mere fact that a risk materializes is not evidence that a company was not committed to preventing or combating that risk. *See Ong* v. *Chipotle Mex. Grill, Inc.*, 294 F. Supp. 3d 199, 232 (S.D.N.Y. 2018)

(finding that statements of "commit[ment]" to safety programs were not actionable simply because the company "failed to live up to its . . . safety standards").[12]

Carnival did not claim that its health and safety policies were guaranteed to be effective. To the contrary, Carnival disclosed that despite its commitment to safety, "our ships have been involved in accidents and other incidents in the past and we may experience similar or other incidents in the future." Ex. 1 at 21.  Courts have recognized that no compliance or safety program is guaranteed to be foolproof.  *See Retail Wholesale & Dept. Store Union Local 338 Ret. Fund* v. *Hewlett-Packard Co.*, 845 F.3d 1268, 1278 (9th Cir. 2017) (finding that the "promotion of ethical conduct . . . did not reasonably suggest that there would be no violations"); *Barrett* v. *PJT Partners Inc.*, 2017 WL 3995606, at *6 n.6 (S.D.N.Y. Sept. 8, 2017) (a statement that the company "prohibits certain conduct by employees is not a factual representation that those policies will always be followed by all employees or that they are 100% effective"). Plaintiffs would require that any company making this "type of milquetoast corporate-speak" disclosure regarding its safety or compliance program also disclose *any* failure of those plans. *Menaldi*, 277 F. Supp. 3d at 513.  That is plainly not the law.  *See In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 755-56 (S.D.N.Y. 2017) ( "[I]t simply cannot be that every time a violation of [a company's] code occurs, a company is liable under federal law for having chosen to adopt the code at all.") (quotation marks omitted).

---

[12]   These allegations are also inadequate because they are based on anonymous accounts of former passengers that were published in post-class period news reports, Compl. ¶¶ 97, 191, and Plaintiffs provide no explanation for how a handful of former customers on a few vessels would have insight into Carnival's fleet-wide health and safety practices.  *See Mizzaro* v. *Home Depot, Inc.*, 544 F.3d 1230, 1239-40 (11th Cir. 2008).  At most, these customers may have witnessed certain crew members on certain Carnival ships failing to implement what *Plaintiffs* now believe—with the basis of hindsight—would have been better safety procedures.  That is insufficient to allege that Carnival lacked health and safety policies entirely, that Carnival's policies were inadequate, or that Carnival failed to implement its policies.  *See Henningsen*, 161 F. Supp. 3d at 1195-96 (finding that an allegation from an internal confidential witness that defendants in isolated circumstances did not require background checks was insufficient to show that there was a company-wide policy to that effect).

To the extent Plaintiffs fault Defendants for not implementing more stringent health and safety protocols in early 2020—or for not canceling *all* Carnival cruises at that time—those allegations fail because the Complaint does not show that any of Carnival's statements or protocols were inconsistent with the medical consensus about the risk of the virus and best preventative practices at the time.  In early 2020, health officials largely advised travelers to follow standard safety precautions, but did not recommend mask usage, cancellation of international travel, cancellation of cruises, or cancellation of large gatherings.[13]  Even the Interim Guidance on which Plaintiffs rely notes that "routes of transmission have yet to be determined" and only advised isolating individuals with COVID-19 symptoms or those who had "high-risk exposures" to symptomatic individuals.  Ex. 6 at 3-4.  And the CDC did not recommend that people wear face coverings in public to slow the spread of COVID-19 until April 4, 2020—reversing its earlier position.  *See* Exs. 32-33.  The mere fact that health care experts and government officials later changed their advice concerning how to best protect people from COVID-19, or that, in hindsight, the risks were greater than Carnival, the WHO, and the CDC believed them to be is not a basis for a securities fraud claim.  *See McClain* v. *Iradimed Corp.*, 111 F. Supp. 3d 1293, 1303-04 (S.D. Fla. 2015) (Moore, J.) (finding that it was not a misleading omission to fail to disclose events that had not yet occurred).

Finally, even if Plaintiffs could identify any supposed shortcomings in Carnival's health and safety protocols (and they do not), Carnival's statements regarding its commitment to health

---

[13]  *E.g.*, Ex. 30 (January 29, 2020: WHO states that there is "no evidence" on masks' "usefulness to protect non-sick persons"); Ex. 31 (February 4, 2020: WHO chief calls on countries not to impose restrictions "that unnecessarily interfere with international travel and trade"); Ex. 6 (February 12, 2020: CDC provides interim guidance to ships handling COVID-19 stating that the use of masks is "not generally recommended for cruise ship crew members for general work activities"); Ex. 7 (February 12, 2020: WHO does "not recommend any specific health measures for travelers); Ex. 27 (March 1, 2020: WHO states "If you are healthy, you only need to wear a mask if you are taking care of a person with suspected #coronavirus infection"); *see supra* at 13.

and safety are not actionable under the securities laws.  Courts have repeatedly found that value-based statements affirming commitments to "product safety" are not actionable.  *Howard* v. *Arconic Inc.*, 395 F. Supp. 3d 516, 549 (W.D. Pa. 2019).[14]  This is because these statements merely "present[] a declaration of goals and aspirations for the Company," upon which no reasonable investor would rely.  *Howard*, 395 F. Supp. 3d at 549.  While Defendants take their commitments to passenger health and safety seriously, these statements cannot form the basis of a securities fraud suit.

>     **D.**      **Carnival Cruise Line's Statement that it "Had Not Had a Diagnosed Case Linked to Our Operation" is Not Alleged to Have Been False at the Time It was Made**

Plaintiffs allege that Carnival Cruise Line's statement on March 13, 2020 that "Carnival [Cruise Lines] has not had a diagnosed case linked to our operation" was false because Carnival had previously reported COVID-19 outbreaks aboard certain vessels.  Compl. ¶¶ 248-49.  Plaintiffs conflate Carnival, the parent company, with Carnival Cruise Line, the brand.  The statement quoted in the Complaint was issued by and about Carnival Cruise Line, which operates the "Carnival" branded ships.  Exs. 13-14.  The outbreaks identified in the Complaint occurred on ships operated by entirely different brands that did not issue the relevant statement.  Additionally, given how widely reported the COVID-19 cases aboard other ships were, *infra* at 39, no reasonable investor would have been misled by Carnival Cruise Line's statement, even if it had applied to all Carnival vessels.  *See Monroe Cnty. Emps.' Ret. System* v. *YPF Sociedad Anonima,* 15 F. Supp. 3d 336, 355-56 (S.D.N.Y. 2014) (dismissing Section 10(b) claims where "[m]any of [the] alleged omissions were either fully disclosed or matters of public knowledge").

---

[14]   *See, e.g.*, *City of Pontiac Policemen's & Firemen's Ret. Sys* v. *UBS AG*, 752 F.3d 173, 185 n.53 (2d Cir. 2014) (finding that general statements regarding "reputation, integrity, . . . compliance with ethical norms" and "risk management" to be inactionable); *Ong*, 294 F. Supp. 3d at 231-33 (finding inactionable statements that "food safety programs are also designed to ensure that [the Company] compl[ies] with applicable . . . guidelines").

## II.     The Complaint Fails to Allege Scienter

Liability for securities fraud requires a "showing of either an intent to deceive, manipulate, or defraud or severe recklessness." *Brophy* v. *Jiangbo Pharms., Inc.*, 781 F.3d 1296, 1302 (11th Cir. 2015) (internal quotation and citation omitted).  "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care [such that] . . . the defendant must have been aware of [the fraud]."  *Ziemba* v. *Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001).  Plaintiffs must not only identify facts contradicting defendants' public statements but must plead particular facts—such as "documentation, communication, or conversation"—showing that the contrary information was reported to or otherwise known by defendants.  *See Mizzaro*, 544 F.3d at 1250-51.  To survive dismissal, a complaint must allege facts sufficient to make the inference of scienter "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent."  *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).  The Complaint makes no such showing.

### A.     The Complaint Fails to Allege Severe Recklessness with Respect to Defendants' Statements about the Risks of COVID-19

The Complaint alleges no facts raising a strong inference that Defendants had actual, contemporaneous knowledge of material risks to the Company's operations and finances in early 2020 that they intentionally failed to disclose.[15]  As discussed *supra* Section I.A.1-2, announcements by public health authorities in January and February 2020 reflected their belief that the risks of COVID-19 at that time were limited.  *See, e.g.*, Exs. 2 & 4.  To the extent there

---

[15]   To evaluate whether the defendant corporations acted with scienter, the Court must "look to the state of mind of the individual corporate official or officials who made or issued the [challenged] statement."  *Mizzaro*, 544 F.3d at 1254 (quoting *Southland Secs. Corp.* v. *INSpire Ins. Sols., Inc.*, 365 F.3d 353, 366 (5th Cir. 2004)).

was any consensus among medical experts at the time, it was *not* to enact broad restrictions on international travel or cancel mass gatherings.  *See* Exs. 4, 7 & 31.  And the medical community believed at the time that certain preventative measures we take for granted today—such as wearing masks—would not prevent the spread of the virus.  *See* Exs. 26-27 & 30.

Plaintiffs plead no specific facts demonstrating that, despite this record, Carnival somehow knew about the unprecedented scope and impact of the pandemic in early 2020. Instead, the Complaint repeatedly references a statement allegedly made by John Padgett, Carnival's Chief Experience and Innovation Officer, suggesting that he learned from a Wuhan-based battery manufacturer about the "gravity," "magnitude," and "scale" of the COVID-19 pandemic on *January 25, 2020*—"even before the WHO and the United States government sounded the alarm."  Compl. ¶¶ 80, 202.  At most, these statements suggest that Padgett learned about the extent of the outbreak in Wuhan, China, on January 25.  But there is no allegation that Defendants ignored this purported information; to the contrary, Carnival suspended all cruising operations in China on that same date.  Compl. ¶ 82.  To the extent Plaintiffs allege Defendants somehow learned about the full, global scale of the pandemic on January 25, 2020—when there were fewer than 83 reported cases and no reported deaths outside China, *see* Compl. ¶ 83—the allegation is implausible and should be rejected.  *See Tellabs*, 551 U.S. at 314.

The allegation should also be rejected because it comes nowhere near meeting the particularity requirements of the PSLRA.  The Complaint provides *no detail* about what information or "insight" the battery manufacturer provided to Padgett, nor does it describe when the information was passed to Donald and what, exactly, Donald was told.  These allegations cannot support a strong inference of fraudulent intent.  *See Garfield* v. *NDC Health Corp.*, 466 F.3d 1255, 1265 (11th Cir. 2006) (concluding that allegations about a meeting involving senior

executives were insufficiently particularized where the complaint "failed to allege what was said at the meeting, to whom it was said, or in what context").

Plaintiffs also suggest that scienter can be inferred because Carnival "conducted extensive operations in Asia." Compl. ¶¶ 205-06. But the wholly innocuous facts that Carnival launched a cruise ship "designed and built for the Chinese market" in 2017 and "described itself as the leading cruise operator in Asia" in 2018, *id.*, do not raise a strong inference that the Company lied to investors about the risks of COVID-19 or its commitment to health and safety. If anything, the allegation that Carnival "cancelled nine cruises leaving from Chinese ports between January 25 and February 4," *id.* ¶ 207, suggests that Carnival followed travel restrictions and took affirmative steps to protect its passengers and crew.

Similarly, the fact that Carnival had previously experienced "outbreaks of infectious disease on board its cruise ships," Compl. ¶¶ 203-04—information that Plaintiffs *do not* allege Carnival made any attempt to conceal—does not suggest that that Company concealed information about COVID-19 outbreaks from investors. *See In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d 1269, 1282-83 (S.D. Fla. 2017) (finding that prior disclosure of related negative information contradicts an inference of scienter); *Chiarenza* v. *IBSG Int'l., Inc.*, 2010 WL 3463304, at *5 (S.D. Fla. Sept. 2, 2010) ("Knowledge of this past problem, on its own . . . is not enough to establish scienter.").[16] Finally, the mere fact that Carnival's early assessment of COVID-19 may have underestimated the ultimate impact of the virus does not support a strong inference of scienter.[17]

---

[16]   Plaintiffs similarly allege that in 2019 "half of the CDC-identified viral outbreaks in the industry occurred on Carnival-owned ships." Compl. ¶ 204. Not only does this allegation show nothing about Defendants' intent to deceive investors, it is also commensurate with Plaintiffs' allegation that Carnival carries "nearly half of the world's cruise passengers." Compl. ¶ 4.

[17]   *See In re PXRE Grp. Sec. Litig.*, 600 F. Supp. 2d 510, 548 (S.D.N.Y. 2009) (statements issued in response to "unprecedented and uncertain situation" were not evidence of scienter even though they ultimately proved

**B.** **The Complaint Fails to Allege Severe Recklessness with Respect to Defendants' Statements About Carnival's Commitment to Regulatory Compliance and Passenger Health and Safety**

        **1.** **Regulatory Compliance**

As explained above, there are no well-pleaded facts demonstrating that Carnival's conduct during the class period failed to adhere any governing rule or regulation. *See supra* Section I.B. But even if Plaintiffs did allege that certain Carnival vessels failed to comply with certain regulatory requirements, the Complaint lacks any particularized facts showing that *any* such incidents were communicated to Carnival's senior executives. The allegations concerning Carnival's purported regulatory non-compliance are drawn from newspaper articles published after the class period, which primarily sourced their information from cruise ship passengers and other anonymous sources. *E.g.*, Compl. ¶¶ 188, 191; Exs. 10 & 34. But there are no allegations—even conclusory ones—that any of these sources ever communicated any of their observations about Carnival's purported failures to Carnival's senior management. Plaintiffs' scienter allegations fail for this reason alone. *See Mizzaro*, 544 F.3d at 1253 (finding scienter allegations inadequate where complaint lacked particularized allegations that facts contradicting public statements were reported to senior management during the class period).[18]

Nor should the Court infer that Carnival's senior management *must have* known about specific regulatory infractions. Carnival operated over 100 vessels that cruise all over the globe;

---

incorrect); *In re Boston Tech., Inc. Sec. Litig.*, 8 F. Supp. 2d 43, 58 (D. Mass. 1998) (dismissing claim that "rests on an assumption that defendants must have known of the severity of their problems earlier because conditions became so bad later on," because "fraud by hindsight is insufficient under Rule 9(b)") (internal quotations and citations omitted).

[18]  *See also Mogensen* v. *Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1220 (M.D. Fla. 2014) (adequately pleading scienter requires particularized allegations such as "specific details of first-hand interactions with a defendant in which they advised him that existing facts contradicted his public disclosures"); *Fidel* v. *Rampell*, 2005 WL 5587454, at *7 (S.D. Fla. Mar. 29, 2005) (refusing to infer scienter when complaint failed to allege that defendants were directly told specific information that contradicted their public disclosures).

there is simply no basis for imputing knowledge of every imprudent or improper action by the captain and crew of every ship in the fleet to senior management in Miami. *See Godinez* v. *Alere Inc.*, 272 F. Supp. 3d 201, 220-21 (D. Mass. 2017) (finding that merely pointing to a "steady drumbeat of negative information" and alleged problems involving "far-flung operations all over the world and very different kinds of government regulatory problems facing different subsidiaries" was insufficient to demonstrate a strong inference of scienter).

Plaintiffs attempt to remedy this pleading deficiency by alleging that "Defendant Donald has admitted that he was intimately involved in Carnival's response to the coronavirus outbreak." Compl. ¶ 197.  Plaintiffs allege that Donald personally "took control" of the *Diamond Princess* situation on February 5, 2020, *id.* ¶ 104, and that he participated in "crisis-response meetings" at the Princess brand headquarters in mid-February, *id.* ¶ 126.  But Plaintiffs do not allege that Defendants failed to follow regulatory guidance or implement adequate safety measures aboard the *Diamond Princess* after February 5—to the contrary, Plaintiffs allege that the vessel implemented a full ship-wide quarantine on that date.  *Id.* ¶ 103.  Nor do Plaintiffs allege that Donald had contemporaneous knowledge of any specific regulatory failures or health and safety protocols.  Similarly, Plaintiffs do not allege who was at the "crisis-response meetings" or what was said at those meetings, much less that Donald learned specific facts that contradicted Defendants' public statements about the virus.  *See Mizzaro*, 544 F.3d at 1253; *Mogensen*, 15 F. Supp. 3d at 1220; *Fidel*, 2005 WL 5587454, at *7.

Moreover, despite Plaintiffs' characterization of these statements as an "admission," there is nothing nefarious about Carnival's CEO "dialing into the situation updates" about an unprecedented outbreak of a novel infectious disease.  Plaintiffs do not dispute that Defendants were coordinating with world health authorities to respond to the *Diamond Princess* outbreak;

31

Plaintiffs do not allege that Carnival failed to follow these authorities' guidance in response to the outbreak; and Plaintiffs do not allege that Defendants tried to cover up the *Diamond Princess* outbreak.  To the contrary, both the Company and the press reported events aboard the *Diamond Princess* as they unfolded.  *E.g.*, Exs. 35-36.  Plaintiffs' allegations describe a CEO engaged in responsible corporate governance, not securities fraud.  *See Metro. Transp. Auth. Defined Benefit Pension Plan Master Tr.* v. *Welbilt, Inc.*, 2020 WL 905591, at *5 (M.D. Fla. Feb. 6, 2020) (repeated disclosure of accounting errors over time is evidence that defendant was "pursuing the truth—not attempting to deceive investors").

Similarly, the allegation that Donald was copied on an email from the CDC on April 4, 2020, clarifying its request that Carnival submit a plan for repatriating passengers from certain vessels is not evidence that Donald acted with scienter.  *See* Compl. ¶¶ 180, 198.  The quoted email contains no suggestion of any wrongdoing by Carnival—to the contrary, it demonstrates that Carnival was coordinating with the CDC on its response to the pandemic.  And, in any event, the cited email post-dates the class period and cannot show Donald's knowledge of contrary facts during the class period.  *See Durham* v. *Whitney Info. Network, Inc.*, 2009 WL 3783375, at *19 (M.D. Fla. Nov. 10, 2009) (absent a link to knowledge or theory of fraud *during* the class period "any post class [period] developments are not relevant or indicative of scienter").

### 2.     <u>Commitment to Health and Safety</u>

As described above, Carnival's statements regarding its commitment to health and safety protocols were entirely in line with contemporaneous guidance from public health officials, undercutting any inference of scienter.  *See supra* Section I.C.  Plaintiffs once again rely on anonymously-sourced statements from news reports that post-date the class period to suggest that certain ships could have taken additional steps to protect passenger health and safety.  But as discussed above, Plaintiffs do not allege that *any* such incident was ever reported to Carnival's

senior management.  *See Mizzaro*, 544 F.3d at 1253; *Mogensen*, 15 F. Supp. 3d at 1220; *Fidel*, 2005 WL 5587454, at *7.[19]

Plaintiffs also allege that Defendants must have known about contrary facts alleged in the Complaint because Carnival's Board maintains a HESS Committee, which reviews and recommends policies relating to health and safety and is "briefed by management" on the status of HESS-related matters.  Compl. ¶¶ 199-201.  But the Complaint contains no allegations describing any meeting of the HESS Committee or what was discussed, much less a particular meeting at which Donald or any senior executive was in attendance and briefed on any of the allegedly contrary facts identified in the Complaint.  Plaintiffs' failure to "flesh out at least some of the details of the conversations [and] meetings" referenced in the Complaint fatally undermines their theory of scienter.  *Henningsen*, 161 F. Supp. 3d at 1200 (finding allegation that CEO would "always" attend meetings where attrition and competition were discussed insufficient to demonstrate scienter with respect to alleged misrepresentations regarding the effect of competition on customer attrition) (quotation omitted).[20]  Nor does the allegation that Carnival's Board oversaw the Company's health and safety protocols suggest that the Company and CEO must have acted with scienter.  "To impute knowledge of or extremely reckless disregard for the truth from the mere existence of an internal reporting system, and the mere active engagement of management, would allow almost any securities fraud case to proceed into

---

[19]   Plaintiffs also fail to provide any explanation for how the sources who provided these accounts to newspaper reporters—most of whom appear to have been passengers—could have known about Carnival's ship-wide (much less fleet-wide) protocols for treating sick passengers or otherwise responding to COVID-19 outbreaks. *See, e.g.*, Compl. ¶¶ 138, 140, 144, 145, 148, 162 (describing news reports attributed to passengers); Exs. 10 & 34.  The Court should afford these anonymous sources no weight because Plaintiffs fail to specify any bases for the sources' information, much less "unambiguously provide[] in a cognizable and detailed way the basis of the [source's] knowledge." *Mizzaro*, 544 F.3d at 1239-40.

[20]   *See also FindWhat Inv. Grp.* v. *FindWhat.com*, 658 F.3d 1282, 1304 (11th Cir. 2011) (refusing to infer scienter from allegations that internal concern over fraud problem was discussed at a meeting one of the individual defendants attended).

discovery.  These are precisely the types of vague allegations that the PSLRA was meant to curtail."  *Mogensen*, 15 F. Supp. 3d at 1220-21 (citations omitted).

Even if, with hindsight, Defendants might have done a better job of responding to the pandemic, that cannot support an inference of scienter.  *Plumbers & Steamfitters Local 773 Pension Fund* v. *Danske Bank*, 2020 WL 4937461, at *7 (S.D.N.Y. Aug. 24, 2020) (although "Plaintiffs allege that Defendants' responses [to the developing scandal] were sluggish, sluggishness does not give rise to a strong inference of scienter").[21]

## C.    Carnival's Actions Throughout the Class Period Are Inconsistent with Scienter

Because the "scienter analysis is comparative," courts must consider "alternative inferences that arise from the Complaint's allegations (and apparent omissions)."  *FindWhat Inv. Grp.*, 658 F.3d at 1303.  Here, the Complaint reflects Carnival's transparency with investors and omits any theory of Defendants' motive for committing the alleged fraud.  These allegations are logically inconsistent with scienter and render Plaintiffs' theory implausible.

Carnival disclosed the risks of COVID-19 and its projected impact on the Company's financial performance as early as *January 28, 2020*.  Ex. 1 at 26; Compl. ¶ 132.  Carnival again disclosed the risk that COVID-19 could have a material negative impact on the business in a press release issued on February 12, 2020—three weeks before the SEC's first informal guidance on the subject.  Exs. 5 & 37; Compl. ¶ 119.  Carnival's voluntary, affirmative disclosures of negative market developments strongly suggest that the Company did not intend to deceive the public about the impact of COVID-19.  *See Henningsen*, 161 F. Supp. 3d at 1204 ("Defendants'

---

[21]    *See also In re Heartland Payment Sys., Inc. Sec. Litig.*, 2009 WL 4798148, at *7 (D.N.J. Dec. 7, 2009) (scienter not adequately pleaded where defendants not alleged to know that company's "security systems were so deficient that it was false to say that [the company] 'places significant emphasis on maintaining a high level of security'").

repeated public cautionary statements and disclosures would make little sense if Defendants had a plan to deceive the public on these very issues.").[22]

Similarly, although Plaintiffs allege that COVID-19 outbreaks aboard certain vessels revealed the falsity of Carnival's statements regarding its commitment to health and safety, Plaintiffs do not allege that Carnival made any effort to conceal those outbreaks.  Carnival provided regular updates regarding the situations aboard the *Diamond Princess* and the *Grand Princess*, which were also the subject of major news coverage.  *See* Exs. 10 at 3; Ex. 11; Ex. 35-36; Ex. 38.  These contemporaneous disclosures also negate any inference that Defendants were trying to conceal contrary facts from investors.  *See In re KLX*, 232 F. Supp. 3d at 1283-84 (finding that "repeated disclosure of negative information" regarding the allegedly concealed information cuts against a finding of scienter).

The Company's decisions to cancel cruises during the class period also undermine any inference of scienter.  Plaintiffs concede that Carnival cancelled nine cruises leaving from Chinese ports in late January and early February 2020.  Compl. ¶ 207.  And, as discussed above, Carnival voluntarily announced its decision to halt all cruises worldwide *in advance* of the CDC's No Sail Order—a decision for which it was commended by the CDC.  This voluntary decision, which had an immediate and substantial negative impact on the Company's financials, weighs against a finding of scienter.  *In re NDCHealth Corp., Inc., Sec. Litig.*, 2005 WL 6074918, at *9 (N.D. Ga. July 27, 2005) (finding that immediate disclosure of information that would have a negative impact on the company "weighs against a finding of scienter").

---

[22] *See also Rombach* v. *Chang*, 355 F.3d 164, 176-77 (2d Cir. 2004) (finding that defendant's voluntarily disclosure of negative information in advance of its scheduled SEC filing undercut a finding of scienter); *Cutsforth* v. *Renschler*, 235 F. Supp. 2d 1216, 1260-61 (M.D. Fla. 2002) (finding that the prompt disclosure of negative information "is inconsistent with the contention that . . . the defendants were acting with scienter").

Plaintiffs' theory of scienter is also implausible because they fail to identify any motive for any Defendant to defraud investors in early 2020.  *See In re KLX*, 232 F. Supp. 3d at 1282 (finding that failure to allege "any personal motive" weighed against scienter).[23]  Plaintiffs have not alleged that *any* Carnival executives or directors sold *any* of their Carnival shares during the class period, "an omission that weighs against inferring scienter."  *Mizzaro*, 544 F.3d at 1253; *accord In re Altisource Portfolio Sols., S.A. Sec. Litig.*, 2015 WL 12001262, at *14 (S.D. Fla. Sept. 4, 2015).  To the contrary, Carnival plc actually *repurchased* more than 3 million of its own shares during the class period.  *See* Ex. 39 at 7; Compl. ¶ 19 (alleging that Carnival did not suspend repurchases of Carnival stock until March 31, 2020—the last day of the class period). This fact is wholly inconsistent with fraudulent intent because no Company would purchase its own shares at a price it knows to be inflated.  *See In re Ocwen Fin. Corp. Sec. Litig.*, 2015 WL 12780960, at *10 (S.D. Fla. Sept. 4, 2015); *Henningsen*, 161 F. Supp. 3d at 1204.

In essence, Plaintiffs are alleging that Carnival engaged in irrational and self-destructive behavior by continuing to operate cruises and make optimistic statements about its business, despite knowing that COVID-19 would inevitably cause passengers and crew to become sick or even die and its business to grind to a halt.  The implausibility of Plaintiffs' theory highlights the lack of any discernable motive and is fatal to their securities fraud claim.  *See Nguyen* v. *Endologix, Inc.*, 962 F.3d 405, 416-19 (9th Cir. 2020) (finding it more plausible that defendants modulated their public optimism over time regarding their clinical trials as more information became available than that they intentionally pursued a hopeless FDA approval process).

---

[23]   *See In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1337 (M.D. Fla. 2002) ("It is also significant that the Amended Complaint contains no allegations as to [defendant's] motive to commit or participate in fraud.").

III.    **The Complaint Fails to Allege Loss Causation**

Under the PSLRA, "the plaintiff shall have the burden of proving that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-4(b)(4).  To establish loss causation, plaintiffs "must prove not only that a fraudulent misrepresentation artificially inflated the security's value, but also that the fraud-induced inflation that was baked into the plaintiffs' purchase price was subsequently removed from the stock's price, thereby causing losses to the plaintiff."  *Meyer* v. *Greene*, 710 F.3d 1189, 1194-96 (11th Cir. 2013) (internal citation and quotations omitted).  "To establish loss causation, a plaintiff must show that the untruth was in some reasonably direct, or proximate, way responsible for his loss."  *Instituto de Prevision Militar* v. *Merrill Lynch & Co., Inc.*, 2007 WL 2900318, at *11 (S.D. Fla. Sept. 28, 2007) (Moore, J.). It is insufficient simply to allege a price decline following an announcement of negative information.  *Meyer*, 710 F.3d at 1195-97.

Plaintiffs point to three SEC filings as purported "corrective disclosures" that revealed the truth of Defendants' fraud: (i) a filing on March 16, 2020, disclosing that Carnival believed COVID-19 "will have a material negative impact on its financial results and liquidity" and that the Company expected a net loss for the fiscal year, Compl. ¶ 150, and (ii) two filings on March 31, 2020, that disclosed substantially similar information in connection with Carnival's public and private offerings of new shares, *id.* ¶¶ 165-71.  These filings do not satisfy Plaintiffs' burden for pleading loss causation.

*First*, Plaintiffs' loss causation allegations indulge in a fiction that it was Carnival's conduct aboard certain vessels that caused the Company's stock to drop.  But the obvious reason that the Company's stock dropped in March 2020 was the suspension of Carnival's global business.  Indeed, the alleged corrective disclosures specifically cite the fact that "the Corporation implemented a temporary pause of its global fleet cruise operations across all

37

brands" as a reason for its negative financial outlook.  Ex. 18 at 4; Ex. 40 at 10.  Similarly, the financial analysts cited in the Complaint stated that the damage to Carnival's business at the end of the class period was the "result of sailing suspensions due to the coronavirus outbreak." Compl. ¶ 174.  Even if Carnival had done a better job responding to the pandemic, the Company's stock still would have plummeted after it was forced to abruptly cancel its worldwide business operations in March 2020.  Plaintiffs' failure to "allege facts sufficient to apportion the losses between the [factors] that ultimately destroyed [their] investment" renders their loss causation allegations inadequate. *Waterford Twp. Gen. Emps. Ret. Sys.* v. *SunTrust Banks Inc.*, 2010 WL 3368922, at *4 (N.D. Ga. Aug. 19, 2010) (quotation and citation omitted).[24]

*Second*, these filings simply did not reveal the alleged falsity of the statements identified in the Complaint.  Plaintiffs' theory is that "Carnival's response to outbreaks of the coronavirus on its ships cannot be reconciled with its statements regarding the health and safety measures it had implemented and to which it was committed."  Compl. ¶ 74; *see id.* ¶¶ 211-55.  But the alleged corrective disclosures revealed only that COVID-19—and the associated "pause of [Carnival's] fleet operations across all brands"—would have a negative material impact on the Company's financials.  Ex. 18 at 4; Ex. 40 at 10.  Neither disclosure "revealed" anything about Carnival's actions aboard any vessel or commitment to health and safety, and thus neither caused the loss associated with the fraud alleged in the Complaint.  *See Meyer*, 710 F.3d at 1200 (finding that to constitute a corrective disclosure, a statement must reveal to the market the falsity of a prior misstatement).

---

[24]   *See also In re HomeBanc Corp. Sec. Litig.*, 2010 WL 1524836, at *21 (N.D. Ga. Apr. 13, 2010) (loss causation not pleaded where complaint "fails to make any allegations that would allow the Court to distinguish between any losses caused by the Defendants' alleged misrepresentations and the collapse of the [] industry as a whole"); *In re Merrill Lynch & Co. Rsch. Reps. Sec Litig.*, 568 F. Supp. 2d 349, 364 (S.D.N.Y. 2008) (failure to "assert facts that distinguish between the alleged fraud and the market-wide collapse" was fatal to the claim).

*Third*, even if the alleged corrective disclosures did reveal the falsity of Defendants' statements, neither disclosure could have caused investors' losses because the information "revealed" in the disclosures was already public.  To the extent the disclosures revealed information about COVID-19 outbreaks and deaths aboard certain vessels, that information had already been disclosed by Carnival and reported by the press as the outbreaks were discovered. *See, e.g.*, Exs. 10-12, 35-36 & 38.  And to the extent Plaintiffs argue that these filings revealed that COVID-19 would have a material negative impact on the Company's finances, that information was also already public.  Carnival disclosed in its 10-K on January 28, 2020, and again in a press release on February 12, 2020, that disruptions from the coronavirus could have a material negative impact on the Company's financials, and estimated the per-share negative impact of the virus.  *See* Ex. 1 at 26; Ex. 5 at 2.  Because the purported corrective disclosures merely confirmed negative information already known to the market, neither caused the loss alleged.  *See Luczak* v. *Nat'l Beverage Corp.*, 812 F. App'x 915, 926 (11th Cir. 2020) ("If a document discusses only information of which the market is already aware . . . it is simply insufficient to constitute a corrective disclosure.") (quotation omitted); *Meyer*, 710 F.3d at 1199 (stating that a report based on public information "standing alone, cannot reveal to the market the falsity of a company's prior factual representations") (quotation omitted).

## IV.  <u>If Plaintiffs' Claims Are Not Dismissed, the Class Period Should be Shortened</u>

The alleged class period begins on September 16, 2019, the date on which Carnival announced the creation of the IAG, a team "focused on investigating and analyzing so-called 'HESS issues.'"  Compl. ¶ 64.  But the Complaint provides no explanation for why the class period should begin on that date.  Plaintiffs do not allege that the IAG did or failed to do *anything*, or that the Company concealed anything from investors about the IAG.  The Complaint does not allege that Defendants engaged in *any* wrongful or deceptive conduct until January 28,

39

2020, when Carnival allegedly described the risk of coronavirus as "low" despite its supposed knowledge to the contrary.  *See* Compl. ¶¶ 78-79.  And the Complaint does not allege that Carnival deployed inadequate health and safety protocols until the *Diamond Princess* experienced an outbreak in February 2020.  *See* Compl. ¶ 86.

Plaintiffs make the wholly conclusory argument that "[t]he failings associated with the coronavirus outbreaks on Carnival's ships" reflected inadequate health and safety protocols "that existed at the beginning of the Class Period."  Compl. ¶ 74.  But there are no well-pleaded facts that support this allegation.  To the contrary, the section of the Complaint alleging supposed misstatements in 2019, *id.* ¶¶ 64-74, points exclusively to events occurring in 2020 for support, *id.* ¶¶ 72-73.  The Class Period should begin no earlier than the date on which Defendants are actually alleged to have misled investors—January 28, 2020.  *See In re Miva, Inc. Sec. Litig.*, 2008 WL 681755, at *2 (M.D. Fla. Mar. 12, 2008) (excising 17 months from the beginning of a class period because the alleged misstatements during that period "were not actionable").[25]

## CONCLUSION

The Court should dismiss the Complaint with prejudice.

---

[25]  The Section 20(a) claim should be dismissed because Plaintiffs fail to plead a predicate violation of Section 10(b).  *See McClain*, 111 F. Supp. 3d at 1307.

## **REQUEST FOR HEARING**

Pursuant to L. R. 7.1(b)(2), Defendants respectfully requests a hearing on the Motion. Defendants believe a hearing would be helpful given the complexity of the underlying issues, allegations, and factual timeline involved in this matter and will assist the Court in adjudicating the Motion.  Defendants estimate that sixty (60) minutes will be sufficient.

Dated: January 18, 2021
Miami, Florida

Respectfully submitted,

NELSON MULLINS BROAD AND
    CASSEL

*/s/ Mark F. Raymond*
Mark F. Raymond
Florida Bar No. 373397
Erin K. Kolmansberger
Florida Bar No. 94104
2 South Biscayne Blvd. 21st Floor
Miami, FL 33131
Tel: 305-373-9425
Fax: 305-995-6384
Email:  mark.raymond@nelsonmullins.com
        erin.kolmansberger@nelsonmullins.com

PAUL, WEISS, RIFKIND,
    WHARTON & GARRISON LLP
Theodore V. Wells Jr.
(*admitted pro hac vice*)
Richard A. Rosen
(*admitted pro hac vice*)
Daniel S. Sinnreich
(*admitted pro hac vice*)
1285 Avenue of the Americas
New York, New York  10019
Tel:  212-373-3000
Fax:   212-757-3990
Email:  twells@paulweiss.com
        rrosen@paulweiss.com
        dsinnreich@paulweiss.com

**Counsel for Defendants**

42

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that, on January 18, 2021, a copy of the foregoing **Defendants' Motion to Dismiss the Consolidated Class Action Complaint** was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

*/s/ Mark F. Raymond*
Mark F. Raymond
Florida Bar No. 373397
Erin K. Kolmansberger
Florida Bar No. 94104
2 South Biscayne Blvd. 21st Floor
Miami, FL 33131
Tel: (305) 373-9425
Fax: (305) 995-6384
E-mail:  mark.raymond@nelsonmullins.com
          erin.kolmansberger@nelsonmullins.com


*Attorney for Defendants*

43