**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:20-cv-22202-KMM

IN RE CARNIVAL CORP. SECURITIES
LITIGATION.
_______________________________________/

**ORDER**

THIS CAUSE came before the Court upon Defendants' Motion to Dismiss the Amended Complaint and Incorporated Memorandum of Law. ("Mot.") (ECF No. 61). Plaintiffs filed a Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Class Action Complaint. ("Resp.") (ECF No. 64). Defendants filed a Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss the Amended Complaint. ("Reply") (ECF No. 67). The Motion is now ripe for review.

## I. BACKGROUND[1]

This case arises under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Securities Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Consolidated Compl. ¶ 21. The Lead Plaintiffs in this consolidated class action lawsuit are the New England Carpenters Pension and Guaranteed Annuity Funds ("New England Carpenters") and the Massachusetts Laborers' Pension and Annuity Funds ("Massachusetts Laborers") (collectively, "Lead Plaintiffs"), both of which purchased Carnival common stock between September 16, 2019 and March 31, 2020 (the "Class

[1] The following background facts are taken from the Consolidated Class Action Complaint (Corrected) ("Consolidated Compl.") (ECF No. 52) and are accepted as true for purposes of ruling on this Motion to Dismiss. *Fernandez v. Tricam Indus., Inc.*, No. 09-22089-CIV-MOORE/SIMONTON, 2009 WL 10668267, at *1 (S.D. Fla. Oct. 21, 2009).

Period"). *Id.* ¶¶ 25–26. The Defendants are Carnival Corp., which operates the world's largest cruise company and whose common stock is listed and traded on the New York Stock Exchange ("NYSE"); Carnival plc, which together with Carnival Corp. "formed a dual-listed company called Carnival, which operates as a single economic enterprise, with a single senior executive management team and identical Board of Directors," and whose American Depositary Shares ("ADS") are listed and traded on the NYSE; and Arnold W. Donald, who is the president and chief executive officer ("CEO") of Carnival and a Director of both Carnival Corp. and Carnival plc (collectively, "Defendants" or "Carnival"). *Id.* ¶¶ 28–32.

"[P]rior to the Class Period, Carnival routinely touted its commitment to health and safety." *Id.* ¶ 46. During the Class Period, Carnival's website advertised that its ships "operate in full compliance with—and in many cases exceed—all U.S. and international safety regulations." *Id.* ¶ 51. Carnival's commitment to health and safety was also documented on its Form 10-K filed January 28, 2020 ("2019 10-K"), wherein it stated:

> We are committed to providing a healthy environment for all of our guests and crew. We collaborate with public health inspection programs throughout the world, such as the Centers for Disease Control and Prevention ("CDC") in the U.S. and the SHIPSAN Project in the EU to ensure that development of these programs leads to enhanced health and hygiene onboard our ships. Through our collaborate efforts, we work with the authorities to develop and revise guidelines, review plans and conduct on-site inspections for all newbuilds and significant ship renovations. In addition, we continue to maintain our ships by meeting, and often exceeding, appliable public health guidelines and requirements, complying with inspections, reporting communicable illnesses and conducting regular crew training and guest education programs.

*Id.* However, "[d]espite its purported commitment to operate in compliance with detailed guidance, Carnival has routinely failed to adequately contain outbreaks of [influenza-like illnesses ("ILI")] and other infectious diseases on its ships." *Id.* ¶ 52. Further, in the ten years leading up to the Class Period, "Carnival has been embroiled in environmental and safety scandals that have

tarnished its reputation for maintaining stringent health, safety, and sustainability practices." *Id.* ¶ 55. These scandals resulted in Carnival making "repeated efforts to shore up its safety and security protocols," including the formation of a Health, Environmental, Safety & Security Committee (the "HESS Committee"), which "is comprised of at least three independent directors and meets at least four times annually." *Id.* ¶ 56.

The HESS Committee is governed by Carnival's HESS Policy, which imposes several requirements upon Carnival's executives in furtherance of Carnival's commitment to "protecting the health, safety and security of [its] passengers, guests, and all others working on [its] behalf thereby promoting an organization that always strives to be free of . . . illness." *Id.* ¶¶ 58–59. "These specific principles and implementation tasks presented to investors what appeared to be a robust management infrastructure and commitment to health and safety issues." *Id.* ¶ 60. Carnival took other actions to publicly demonstrate its commitment to health and safety, such as filing a report on June 18, 2019 discussing its commitment to health and safety and creating a chief ethics and compliance officer position in August 2019. *Id.* ¶¶ 61–62. "As the outbreak of COVID-19 would actually demonstrate, however, Carnival's purported policies and protocols concerning, and its ***actual*** commitment to, health and safety were far different than its public statements." *Id.* ¶ 63.

At the start of the Class Period, on September 16, 2019, "Carnival disclosed significant enhancements to its purported health and safety protocols." *Id.* ¶ 64. One such enhancement was the creation of the Incident Analysis Group ("IAG"), which "would make recommendations to enhance Carnival's HESS policies, procedures, and training; recommend corrective action and preventative plans; and share lessons to prevent recurrence of issues." *Id.* Carnival appointed "a career professional in transportation management and safety" to lead the IAG. *Id.* ¶ 65. Carnival represented these efforts "constituted a significant enhancement to Carnival's commitment

to—and infrastructure to service—health and safety issues undertaken in response to the outbreaks of infectious disease and other HESS incidents [Carnival] faced in prior years." *Id.* ¶ 66. Defendants "further touted [Carnival's] capabilities regarding health and safety" during a conference call on September 26, 2019, when Carnival announced its financial results for the third quarter of 2019. *Id.* ¶ 69. "Defendants' statements touting their commitment to their passengers' and crew members' safety were untrue, and created the misleading impression for investors that Carnival had proper protocols in place to prevent or control—and to minimize the financial impact of—infectious disease outbreaks on its cruise ships." *Id.* ¶ 70. "The true financial impact of Carnival's misrepresentations became critically apparent to investors as [Carnival] was forced to materially augment its risk factors to address the impact of the COVID-19 outbreaks on its ships, reputation and financial outlook, and to seek to raise over $9 billion in cash during March of 2020." *Id.*

The COVID-19 pandemic revealed that Carnival "lacked proper policies, procedures, controls, or processes to prevent cruise ships from embarking on new voyages after it learned that passengers and crew were exposed to COVID-19" and "lacked proper health and safety policies and procedures to prevent passengers from embarking on cruises on ships where infection had already been detected." *Id.* ¶ 72. Additionally, Carnival "failed to follow existing internal and CDC protocols, notwithstanding its public statements to the contrary." *Id.* ¶ 73. "Carnival's inadequate and reckless response to the coronavirus outbreak ultimately revealed its statements about the paramount importance of protecting the health and safety of its passengers and crew to be false, and forced [Carnival] to disclose the harsh impact of these failures as it starkly revised its risk factors and sought billions of dollars in cash." *Id.* ¶ 74.

Carnival publicly downplayed the risk of COVID-19 in a January 2020 news article and continued to tout its dedication to health and safety in its 2019 10-K. *Id.* ¶¶ 78–79. However, just three days prior to filing its 2019 10-K and unknown to investors, Carnival "was in a unique position to understand the gravity of COVID-19 even before the [World Health Organization ("WHO")] and United States government sounded the alarm." *Id.* ¶ 80. Carnival was in such a unique position because one of Carnival's vendors—based in Wuhan, China—alerted Carnival's chief experience and innovation officer John Padgett ("Padgett") of "the scale and severity of COVID-19" and Padgett, in turn, shared that information with Defendant Donald. *Id.* Additionally, a former employee of Carnival "confirmed that Carnival had early access to information about the effects of the coronavirus on Carnival's business." *Id.* ¶ 81. Carnival continued to publicly downplay the risk of coronavirus on its ships in the days that followed. *Id.* ¶¶ 85, 92.

Thereafter, passengers and crewmembers would indeed become ill aboard Carnival's ships, with the first such illness reported being a former passenger of the *Diamond Princess* who disembarked on January 25, 2020 and tested positive in a hospital on February 1, 2020. *Id.* ¶ 86. Passengers aboard the *Diamond Princess* were not given masks or personal protective equipment ("PPE") after Carnival learned of the confirmed case. *Id.* ¶ 103. News outlets began publishing articles criticizing Carnival's actions, or lack thereof. *Id.* ¶¶ 97–98, 102, 105, 108, 110–111, 113. As ultimately reported by *Bloomberg Businessweek* on May 21, 2020, 712 people on the *Diamond Princess* tested positive for coronavirus; 40 of those passengers were eventually admitted to intensive care; and 12 died. *Id.* ¶ 105.

Meanwhile, "Carnival encouraged its sales staff to continue selling cruises in order to maximize profits in the face of a clear danger to its passengers and crew." *Id.* ¶ 114. When

customers inquired with Carnival about canceling their cruise tickets, "sales staff were told to offer them incentives, such as a double cruise in the future, to keep them on the hook if they did not cancel." *Id.* ¶ 117. "Sales staff were also instructed to tell cancelling customers that, due to administrative issues, their refunds would take an increasingly long time to process." *Id.*

On February 12, 2020, the CDC published its Interim Guidance for Ships on Managing 2019 Novel Coronavirus ("CDC COVID-19 Guidance"). *Id.* ¶ 118. The CDC COVID-19 Guidance included recommendations for treating passengers suspected of having COVID-19; managing passenger care when an infection was confirmed; imposing symptom, temperature, and potential exposure checks before passengers boarded ships; and crew management. *Id.*

On February 24, 2020, Carnival announced the cancellation of all its cruises to mainland China through mid-March 2020, and the suspension of its *Diamond Princess* cruises to mainland China through mid-April 2020, which Carnival downplayed as "merely due to the spread of COVID-19 and increasing restrictions related to China alone, not to the clear danger posed by cruising in the midst of a rapidly spreading pandemic." *Id.* ¶ 127.

On February 26, 2020, Carnival issued its Schedule 14A Proxy Statement, which omitted any reference to the risks of COVID-19 but continued to tout its commitments to health and safety. *Id.* ¶¶ 128–131. On February 27, 2020, Carnival filed its 2019 Annual Report, which included a short section discussing the risks of COVID-19 but did not disclose that Carnival's lack of a comprehensive plan to contain outbreaks of the coronavirus on its ships posed a severe long-term risk to the Company's business. *Id.* ¶¶ 132–133.

On March 4, 2020, "Carnival told passengers aboard its *Grand Princess* ship that the CDC was investigating a cluster of coronavirus cases in Northern California—including the death of one man—that was linked to the Company's previous *Grand Princess* cruise." *Id.* ¶ 134. "[P]rior

to boarding the *Grand Princess* on February 11, 2020, passengers were merely asked to sign a form stating that they were not sick; passengers were questioned no further about their travel history or potential exposure to the coronavirus, and none was examined." *Id.* "None of the 62 passengers and crew who transitioned from the first *Grand Princess* voyage to the second—and were obviously exposed to the coronavirus on the first leg of the cruise—were examined in any capacity until March 5, 2020." *Id.* Passengers who had sailed on the first *Grand Princess* voyage were instructed to remain in their cabins until they could be medically cleared, and Carnival advised its passengers that more cleaning and sanitation would be done. *Id.* ¶ 135. By March 6, 2020, 21 passengers aboard the *Grand Princess* would test positive for COVID-19. *Id.* ¶ 136. Then, Carnival decided to hold the ship at sea even though "experts agree that the ship should have been disembarked as quickly as possible and all passengers should have been quarantined at safe facilities on shore." *Id.* ¶ 137.

On May 5, 2020, Carnival's *Coral Princess* set sail, with Carnival taking "no safety precautions prior to passengers' boarding or at the time of their boarding to ensure that they were not suffering from symptoms of COVID-19 or had any suspicious travel history." *Id.* ¶ 138.

On March 8, 2020, the U.S. State Department and the CDC issued guidance stating "U.S. citizens, particularly travelers with underlying health conditions, should not travel by cruise ship. CDC notes increased risk of infection of COVID-19 in a cruise ship environment." *Id.* ¶ 139.

On March 9, 2020, Carnival's *Ecstasy* set sail, with passengers later reporting that "Carnival personnel had not conducted pre-boarding screening or evaluation to determine whether the cruise's passengers were experiencing symptoms consistent with COVID-19" in violation of CDC COVID-19 Guidance. *Id.* ¶ 140.

On March 13, 2020, Carnival announced that it was pausing its operations. *Id.* ¶ 143. On March 16, 2020, Carnival issued a Form 8-K "disclosing that Carnival had notified its lenders under a revolving credit agreement . . . that it intended to borrow approximately $3 billion 'in order to increase its cash position and preserve financial flexibility.'" *Id.* ¶ 150. After the market closed that same day, Carnival filed an amendment to its Form 8-K stating that it "could no longer provide an earnings forecast and that it expected the fiscal year to end in a net loss." *Id.*

"[S]hares of Carnival common stock declined by over 12%, from a closing price of $14.57 on March 16, 2020 to close at $12.71 on March 17, 2020. Carnival ADSs similarly declined by over 12%, from a closing price of $12.91 on March 16, 2020 to close at $11.33 on March 17, 2020. Market commentators clearly linked Carnival's precipitous stock decline to its March 16 disclosures." *Id.* ¶ 152. Yet, "Defendants continued to misrepresent the effectiveness of their health and safety protocols in response to the COVID-19 outbreak." *Id.* ¶ 153. Subsequent Carnival SEC filings and disclosures, coupled with further negative publicity, resulted in further significant stock decreases. *Id.* ¶¶ 165–177. "From the first day of the Class Period to the last day of the Class Period, after investors learned the truth about Carnival's false statements, the price of Carnival's common stock declined by more than 73%, and the price of Carnival's ADSs had declined by more than 74%, wiping out approximately $27 billion in shareholder value." *Id.* ¶ 178.

On December 17, 2020, Lead Plaintiffs filed the Consolidated Class Action Complaint [Corrected] alleging violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 thereunder (Count I); and Section 20(a) of the Exchange Act (Count II). *See generally* Consolidated Compl. Now, Defendants move to dismiss the Consolidated Complaint with prejudice for failure to state a claim. *See generally* Mot.

## II. LEGAL STANDARD

"To state a claim for securities fraud under Rule 10b-5, a plaintiff must allege the following elements: (1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the misrepresentation or omission and the loss, commonly called loss causation." *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1317 (11th Cir. 2019) (quoting *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236–37 (11th Cir. 2008)) (internal quotation marks omitted).

A claim of securities fraud is subject to a "triple-layered pleading standard." *Id.* "To survive a motion to dismiss, a securities-fraud claim brought under rule 10b-5 must satisfy not only the run-of-the-mill federal notice-pleading requirements, *see* Federal Rule of Civil Procedure 8(a)(2), but also the heightened pleading standards found in Federal Rule of Civil Procedure 9(b) and the special fraud pleading requirements imposed by the Private Securities Litigation Reform Act of 1995 [("PSLRA")], 15 U.S.C. § 78u-4." *Id.* at 1317–18.

The Eleventh Circuit has explained that Rule 9(b), in the securities fraud context, "requires a plaintiff to allege specifically (1) which statements or omissions were made in which documents or oral representations; (2) when, where, and by whom the statements were made (or, in the case of omissions, not made); (3) the content of the statements or omissions and how they were misleading; and (4) what the defendant received as a result of the fraud." *Id.* at 1318 (citing *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011)).

"The PSLRA—with some overlap—requires a complaint to 'specify each statement alleged to have been misleading' and the 'reason or reasons why the statement is misleading.'" *Id.* (quoting 15 U.S.C. § 78u-4(b)(1)(B)). The PSLRA "also requires, 'with respect to each act or

omission alleged,' that a complaint 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id.* (quoting § 78u-4(b)(2)(A)). The Eleventh Circuit has explained that the required state of mind "is an 'intent to defraud or severe recklessness on the part of the defendant.'" *Id.* (quoting *FindWhat*, 658 F.3d at 1299)). "[A] 'strong inference' is one that is 'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007)). "Although scienter may be inferred from an aggregate of factual allegations, it must be alleged with respect to each alleged violation of the statute." *Id.* (citing *FindWhat*, 658 F.3d at 1296).

## III. DISCUSSION

Defendants argue that the Consolidated Complaint should be dismissed because it (1) fails to allege any actionable misrepresentations or omissions, Mot. at 9–26; and (2) fails to allege scienter, *id.* at 27–36.[2] These arguments are addressed in turn below.

### A. Misrepresentations and/or Omissions

Defendants argue that the Consolidated Complaint "relies on the fundamentally flawed theory of fraud by hindsight, criticizing Carnival for failing to anticipate the course and impact of a novel pandemic on its ships." *Id.* at 9. Defendants argue that (1) the Consolidated Complaint fails to allege that Defendants failed to warn of the risks of COVID-19 to Carnival's business and passengers; (2) the Consolidated Complaint fails to allege that Defendants' statements affirming Carnival's compliance with regulatory requirements were false or misleading; (3) the Consolidated

[2] Defendants also challenge loss causation, Mot. at 37–39, and argue that if the Complaint is not dismissed, the Class Period should be shortened, *id.* at 37–39. Finding that the Complaint fails to allege actionable misrepresentations or omissions made with scienter, the Court does not reach these arguments.

Complaint fails to allege that Defendants' statements concerning Carnival's commitment to passenger health and safety were false or misleading; and (4) Carnival's statement that it "had not had a diagnosed case linked to [its] operation" is not alleged to have been false at the time it was made. *Id.* at 9–26. Lead Plaintiffs oppose each of Defendants' arguments. Resp. at 13–40.

"A misrepresentation or omission is material if, 'in the light of the facts existing at the time,' a 'reasonable investor, in the exercise of due care, would have been misled by it.'" *Carvelli*, 934 F.3d at 1317 (quoting *FindWhat*, 658 F.3d at 1305). "In other words, materiality depends on whether a 'substantial likelihood' exists that a 'reasonable investor' would have viewed a misrepresentation or omission as 'significantly alter[ing] the total mix of information made available.'" *Id.* (quoting *S.E.C. v. Morgan Keegan & Co.*, 678 F.3d 1233, 1245 (11th Cir. 2012) (per curiam)) (internal citation and quotation marks omitted). "The question of materiality is not subject to a bright-line test, but instead depends on the specific circumstances of each case, including the totality of information available to investors." *Id.* (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 30, 37–45 (2011)). "The materiality requirement aims to strike a balance between protecting investors and allowing companies to distribute information without perpetual fear of liability—in essence, to ensure that not every minor misstatement provides litigation fodder for disgruntled investors." *Id.*

1. Alleged False and Misleading Statements[3]

> Pre-Pandemic Statements on Carnival's Website: Corporation & plc's values are found in our Health, Environmental, Safety and Security Policy, which describes our commitments to: 1. **Protecting the health, safety and security of our passengers, guests, employees** and all others working on our behalf, thereby promoting an organization that always strives to be free of injuries, illness and loss. 2. Protecting the environment, including the marine environment in which our vessels sail and the communities in which we operate, striving to prevent adverse

[3] Bold text reflects Lead Plaintiffs' emphasis in the Consolidated Complaint.

environmental consequences and using resources efficiently and sustainably. 3. **Complying with or exceeding all legal and statutory requirements related to health, environment, safety, security** and sustainability throughout our business activities. 4. Assigning health, environment, safety, security (HESS) and sustainability matters **the same priority as other critical business matters**. . . . Management . . . will: Ensure compliance with this Policy within each of Carnival's Corporate and Operating Line organizations. Identify managers who are responsible for HESS and sustainability performance and ensure that there are clear lines of accountability. Develop, implement and monitor effective and verifiable management systems to realize our HESS and sustainability commitments. Support a proactive framework of risk mitigation in the areas of HESS aimed at preventing, monitoring and responding to threats. Identify, document, assess and conduct periodic reviews of the principal HESS and sustainability risks affecting our business and implement practical measures to manage the identified risks effectively. Provide HESS and sustainability support, training, advice, and information, as appropriate, to passengers, guests, employees, and others working on behalf of the Company. Promptly report and properly investigate all HESS incidents and take appropriate action to prevent recurrence. Establish and act upon goals and objectives to improve our HESS and sustainability performance. Promote industry best practices and publicly report to and maintain open dialogue and cooperation with key stakeholders on HESS and sustainability matters. Conduct a Corporate senior management review of this Policy at least annually. . . . **The safety and security of our guests is our top priority**. Our excellent record of safe operation throughout Carnival's 40-plus year history, and the comprehensive safety standards we continue to live up to every day, proves that commitment. **Our ships operate in full compliance with—and in many cases exceed—all U.S. and international safety regulations**.

Consolidated Compl. ¶¶ 209–210, 212.

<u>September 16, 2019 Press Release:</u> With over 100 ships sailing to more than 700 ports around thew world, **it's imperative that we are thorough and diligent when it comes to health, safety and security of our guests and crew**, and protecting the environments and destinations where we operate, which are **top priorities for all of us**.

*Id.* ¶ 214.

<u>September 26, 2019 Earnings Call:</u> On the leadership front, we are excited to announce that Peter Anderson has joined us as Head of Ethics and Compliance. That's a new role that is bringing together functions and people that were previously distributed across the corporation and complementing that with new talents, roles and processes to help take us to best-in-class and broad-based compliance. Peter, whose background is a former federal prosecutor along with a wide breadth of experience, including as a court-appointed monitor will report directly to me.

*Id.* ¶ 216.

January 28, 2020 Annual Report ("2019 10-K"): Our commitments to the safety and comfort of our guests and crew and protecting the environment are paramount to the success of our business. We are committed to operating a safe and reliable fleet and protecting the health, safety and security of our guests, employees and all others working on our behalf. We continue to focus on further enhancing the safety measures onboard all of our ships. **We are dedicated to fully complying with, or exceeding, all legal and statutory requirements related to health, environment, safety, security and sustainability throughout our business**. . . . [Carnival provides] regular health, environmental, safety and security support, training, guidance and information to guests, employees and others working on our behalf . . . . [Carnival has developed and implemented] **effective and verifiable management systems to fulfill our health, environmental, safety, security and sustainability commitments**. . . . [The Company reports and investigates] health, environmental, safety and security incidents and **take[s] appropriate action to prevent recurrence**. . . . We are committed to providing a healthy environment for all of our guests and crew. **We collaborate with public health inspection programs throughout the world, such as the [CDC] in the U.S. and the SHIPSAN Project in the EU to ensure that development of these programs leads to enhanced health and hygiene onboard our ships**. Through our collaborative efforts, **we work with the authorities to develop and revise guidelines, review plans and conduct on-site inspections for all newbuilds and significant ship renovations**. **In addition, we continue to maintain our ships by meeting, and often exceeding, applicable public health guidelines and requirements**, complying with inspections, reporting communicable illnesses and conducting regular crew training and guest education programs. . . . In response to the ongoing coronavirus outbreak, China has implemented travel restrictions. As a result, we have suspended cruise operations from Chinese ports between January 25th and February 4th, canceling nine cruises. . . . **World events impacting the ability or desire of people to travel may lead to a decline in demand for cruises**. We **may** be impacted by the public's concerns regarding the health, safety and security of travel, including government travel advisories and travel restrictions, political instability and civil unrest, and other general concerns. Additionally, we **may** be impacted by heightened regulations around customs and border control, travel bans to and from certain geographical areas, government policies increasing the difficulty of travel and limitations on issuing international travel visas.

*Id.* ¶¶ 221–223, 227, 229.

January 28, 2020 Press Statement: **Although the risks to our guests, crew, and business around the world is very low**, we are closely monitoring the situation . . . . Our medical experts are **coordinating closely with the [CDC] and**

**the [WHO] to implement recommended screening, prevention and control measures for our ships**.

*Id.* ¶ 218.

January 31, 2020 Press Statement: Although **the risk to our guests and crew is low**, we are closely monitoring the evolving situation with respect to Coronavirus. Our medical experts are coordinating closely with the [CDC] and the [WHO] to **implement enhanced screening, prevention and control measures for our ships, guests and crew**.

*Id.* ¶ 232.

February 4, 2020 Press Statement: The **safety, security, and well-being of all guests and crew is our absolute priority**. The review of the arriving guests and crew, by Japanese health authorities, is standard practice after a guest tested positive for coronavirus and we are working closely with the local authorities to provide detailed records to facilitate their review.

*Id.* ¶ 234.

February 12, 2020 Press Statement: Carnival Corporation & plc is closely monitoring the evolving situation with respect to Coronavirus. **The safety of guests and employees, compliance and protecting the environment are top priorities for the company**. The company's medical experts are coordinating closely with the [CDC] and the [WHO] to implement **enhanced screening, prevention and control measures** for its guests, crew and ships. The company's global team is working tirelessly to support guests impacted by voyage disruptions during this unprecedented time.

*Id.* ¶ 236.

February 18, 2020 Press Statement: **We have protocols, standards and practices for every possible issue you might imagine, including coronavirus**.

*Id.* ¶ 237.

February 26, 2020 Definitive Proxy Statement, 14A: [Carnival's most important] [h]ealth, safety, and security goal [was to] [c]ontinue to build on our commitment to protect the health, safety and security of guests, employees and all others working on our behalf. . . . At Carnival Corporation & plc, **our highest responsibilities and our top priorities are to operate safely** . . . and **to be in compliance everywhere we operate in the world**. To that end, the Boards of Directors of Carnival Corporation & plc established Board-level Health, Environmental, Safety & Security (HESS) Committees comprised of four independent Directors. The

principal function of the HESS Committees is to assist the Boards in fulfilling their responsibility to: supervise and monitor Carnival Corporation & plc's health, environmental, safety, security and sustainability-related policies, programs, initiatives at sea and ashore; and **comply with related legal and regulatory requirements relating to health, environmental, safety, security and sustainability**. . . . The HESS Committees review and recommend policies relative to the protection of the environment and the health, safety and security of employees, contractors, guests and the public. The HESS Committees also supervise and monitor health, environmental, safety, security and sustainability policies and programs and review with management significant risks or exposures and actions required to minimize such risks. . . . Our HESS Committees are **responsible for oversight of risk associated with the health, environment, safety and security of employees, contractors, guests and the public**. . . . **The HESS Committees and our management team review all significant risks or exposures and associated mitigation actions**. **Each of the Group Chief Executive Officers, each brands' President, the Chief Maritime Officer and senior maritime representatives attend the meetings of the HESS Committees**. In addition, Carnival Corporation & plc's HESS Policy describes our commitments to: protecting the health, safety and security of our passengers, guests, employees and all others working on our behalf, thereby promoting an organization that strives to be free of injuries, illness and loss; . . . complying with or exceeding all legal and statutory requirements related to health, environment, safety, security and sustainability throughout our business activities; and assigning health, environment, safety, security and sustainability matters the same priority as other critical business matters.

*Id.* ¶¶ 239–240, 242–243.

<u>February 28, 2020 Publicly Disseminated Video Featuring Chief Medical Officer:</u> [We have] **enhanced our pre-boarding and onboard health protocols**. Our advanced sanitation response protocols serve as our foundational basis and comprehensive practice, **developed in conjunction with the U.S. CDC, and several other health authorities** . . . . In light of the global spread of coronavirus or COVID-19, we are also taking extra precautions . . . . **[A]ll guests will be required to go through thermal screening and/or be checked with non-contact thermometers in many of our embarkation ports to detect signs of fever**. Our crew members are also being screened and providing us a clean bill of health before they are permitted to embark the ship. . . . [G]iven the global spread of COVID-19, **we have implemented even more measures to prevent the spread of disease onboard**. These include distribution of personal hand sanitizer to each guest onboard . . . . **We have enhanced sanitation protocols** for all staterooms and high-traffic public areas, with more frequent disinfection being applied. As part of our standard cleaning protocols, **we routinely use a disinfectant that kills coronavirus within 30 seconds**.

*Id.* ¶¶ 245–246.

March 13, 2020 Press Statement: [W]e have implemented **higher and higher levels of screening, monitoring and sanitation protocols** to protect the health and safety of our guests, crew and the communities we serve. . . . **Carnival has not had a diagnosed case linked to our operation**.

*Id.* ¶ 248.

March 18, 2020 Press Statement: **[N]umber one, our highest responsibility and our top priorities are compliance, environmental protection, and the health, safety, and well-being of our guests**. . . . **[N]o ship inherently has any virus or illness on it, it's obviously people and so whatever happened on the ships originally came in from people coming on the ship and so what we've done is we have great protocols already**. **We've enhanced those protocols**, we're working very closely with the [CDC] and the [WHO] and other global medical experts to make certain. **We have a long history of effectively managing and containing spreads of illnesses on the ships themselves**, we've been set up for that, we have medical facilities on the ships who identify early, we pre-screen before people come on the ships, and then we can show the facts on the actual number of cases of confirmed COVID, and **there's no evidence whatsoever that community spread was dramatically enhanced by people going on cruise ships**. . . . In fact, if you think about a cruise ship, just for a second, if you think about a cruise ship and you compare it to other forms of travel, we do temperature screenings, we do medical records, you don't do that when you go to a movie theater or get on a train or you're in an airport terminal or subway terminal. **We have much more natural social distancing, often people who haven't cruised think of cruises as these congested places**. **You know that there's much more space and social distancing than normally happens on a cruise**.

*Id.* ¶ 251.

March 22, 2020 Press Statement: **If you look at the actual number of cases, you know cruise ships are not a source for coronavirus**. **We have hundreds of cruise ships out there, very few had cases on them**. The one that had the most cases was very early on when no one understood hardly anything. . . . But **a cruise ship is not a theater**. **It is not an arena**. **It's more like Central Park**. **There's lots of natural social distancing, the ships are large**. **People are not always gathered and clumped together**. . . . We identify, people get sick, there's a medical clinic onboard, we isolate, OK, and so in effect, you control the spread, whereas when you're in a restaurant or you're in a public library, in a school, that does not happen. So all I'm suggesting is **a cruise ship is not a riskier environment, people perceive it that way, but the reality is it's not**.

*Id.* ¶ 252.

> March 24, 2020 Website Statement: Carnival Cruise Line's **highest responsibilities include the health and safety of our guests and crew**. Coronavirus is a fluid situation, and we continue to work closely with public health experts and the Cruise Lines International Association (CLIA), **to monitor, screen and implement best practices to protect the health of our guests and crew as it relates to COVID-19 (coronavirus)**. Our monitoring, screening and operational protocols are designed to be flexible so that we can effectively adapt to changes as they occur.

*Id.* ¶ 254.

2. Failure to Warn of the Risks of COVID-19

*a. January 2020 Statements*

Defendants argue that Lead Plaintiffs cannot show that Carnival's 2019 10-K and its January 2020 press statements were misleading to investors. Mot. at 9–12. Specifically, Defendants argue that Lead Plaintiffs acknowledge that the 2019 10-K "warned that the coronavirus had forced [Carnival] to suspend cruise operations in China and that 'if these travel restrictions continue for an extended period of time, they could have a material impact on [Carnival's] financial performance.'" *Id.* at 10 (quoting Ex. 1). Further, Defendants cite the 2019 10-K's warning that "Carnival's business could be adversely affected by guest and crew illness and by the public's concerns regarding the health, safety, and security of travel, and that Carnival had experienced health and safety incidents in the past and 'may experience similar or other incidents in the future.'" *Id.*

As to Carnival's statements related to the risk to Carnival's passengers and crewmembers being "low," Defendants argue that Lead Plaintiffs plead no facts to suggest that such statements were not based on a reasonable belief. *Id.* Further, Defendants argue that those statements were "consistent with contemporaneous public statements from leading health authorities." *Id.* at 11. In support, Defendants argue that "[o]n January 30, 2020, the CDC described the 'risk to the

American public' as 'low,' [and] [e]ven in *late February*, the WHO still reported that the 'risk of infection is low' for individuals who had not come in close contact with an affected person or recently traveled to an area where COVID-19 was spreading." *Id.*

Defendants argue that Lead Plaintiffs' reliance on Padgett having gained "insight" into the "global situation" on January 25, 2020 after discussing coronavirus with an unnamed battery manufacturer in Wuhan, China—in support of its assertion that Carnival "was in the unique position to understand the gravity of COVID-19 even before the WHO and United States government sounded the alarm"—is an "incredible allegation." *Id.* at 12. Defendants argue that Lead Plaintiffs fail to provide any detail as to what the "insight" might have been, and "[t]o the extent that Padgett learned about the scale of the outbreak in Wuhan, Plaintiffs ignore the fact that Carnival canceled all cruising operations in China on the same date Padgett allegedly spoke to the battery manufacturer." *Id.* Defendants also discredit Lead Plaintiffs' reference to a former Carnival employee "who recalls the unremarkable fact that as manufacturing plants in China were affected by the virus, he was forced to look for other suppliers for Carnival's wristbands." *Id.* at 12.

Lead Plaintiffs argue that "[a]t best, the information available to Defendants suggested that the COVID-19 risk to passengers and crew aboard Carnival's ships was unknown, which means that Defendants had no factual basis to state that the risk is 'low' or 'very low'"; "[a]t worst, Defendants understood the true risk that COVID-19 posed to its passengers and crew and knowingly misled investors by downplaying these risks in an effort to avoid material impacts on Carnival's business." Resp. at 19. Lead Plaintiffs argue for the first time in their Response that Defendants "failed to include a COVID-19 risk factor" in Carnival's 2019 10-K pursuant to

Regulation S-K, Item 105, and such a failure "is, by itself, sufficient to sustain a claim under Section 10(b)."[4] *Id.* at 19–20.

As an initial matter, the Court finds unpersuasive the argument that Carnival should have chosen a different course of action—based on a conversation with a battery manufacturer in Wuhan, China, the epicenter of a rapidly evolving pandemic—rather than basing its decisions on guidance and recommendations from public health officials, such as the CDC or the WHO. There is no allegation that this battery manufacturer had and shared medically or scientifically based knowledge regarding the spread of coronavirus such that Carnival had an obligation to forewarn its investors of potential risks that were then unknown. This vague assertion, at best, imputes upon Padgett and Carnival knowledge of the conditions in Wuhan, China, based on the battery manufacturer's personal observations. Further, the Court finds it insignificant that a Carnival employee had to rely on suppliers outside of China to procure supplies. Lead Plaintiffs fail to allege how that amounts to Carnival having any more insight as to the impact of COVID-19 than the average person, whether in the United States or abroad, could readily ascertain.

Accordingly, the Court does not find that, as pled, the January 2020 statements are materially false or misleading, particularly considering the COVID-19 specific warnings provided in Carnival's 2019 10-K. *See* Consolidated Compl. ¶¶ 227, 229 (alerting investors of suspended cruise operations from Chinese ports which resulted in the cancellation of nine cruises, and cautioning that "[w]orld events impacting the ability or desire of people to travel may lead to a

---

[4] The Consolidated Complaint contains no such claim. Accordingly, this argument is impermissibly raised, and the Court will not consider it for the purposes of the instant motion. *See Burgess v. Religious Tech. Ctr., Inc.*, 600 F. App'x 657, 665 (11th Cir. 2015) (per curiam) ("We repeatedly have held that plaintiffs cannot amend their complaint through a response to a motion to dismiss.").

decline in demand for cruises"); *see also Carvelli*, 934 F.3d at 1317 ("[M]ateriality depends on whether a 'substantial likelihood' exists that a 'reasonable investor' would have viewed a misrepresentation or omission as 'significantly alter[ing] the total mix' of information made available.") (quoting *S.E.C.*, 678 F.3d at 1245) (internal citation and quotation marks omitted).

*b. February 2020 Statements*

Defendants argue that Carnival's February 12, 2020 press release "warned that the virus was 'now resulting in the cancellation of voyages' from China and 'other parts of Asia,' and that 'as a result of Coronavirus, the company believes the impact on its global bookings and cancelled voyages will have a material impact on its financial results.'" Mot. at 13. Defendants do not directly address the February 4, 18, 26, and 28, 2020 statements, however Defendants argue that the following timeline of events show that Carnival could not have known in February 2020 "that it would later have to cancel its global cruising operations":

> The contemporaneously [(February 12, 2021)] released CDC Interim Guidance did not recommend that ship operators cancel voyages, even if a current passenger tested positive for COVID-19.
>
> [T]he CDC did not order the cancelation of future voyages until it issued a No Sail Order more than one month later, on March 14, 2020.
>
> [T]he U.S. Department of State did not recommend that U.S. citizens even reconsider cruise ship travel to or within Asia until February 20, 2020, . . . and did not warn travelers of the dangers associated with COVID-19 on cruise ships generally until March 8, 2020.
>
> [T]he WHO did not issue guidance for handling COVID-19 on cruise ships until February 24, 2020—and even then, the WHO did not recommend that operators cancel cruises.

*Id.* at 13, Exs. 6, 9, 16, 22, & 24.

Lead Plaintiffs argue that "Defendants continued to reassure investors regarding their response to and the impact of COVID-19" throughout February 2020, and Defendants' "statements

were false and misleading because Carnival's COVID-19-related risks were materially increasing in February 2020." Resp. at 21. Lead Plaintiffs cite to the known cases on the *Diamond Princess* in February 2020, and ports in Thailand, Taiwan, Japan, the Philippines, and Guam denying entry to the *Westerdam*. *Id.* Lead Plaintiffs argue that "Defendants' ongoing failure to comply with existing, let alone enhanced, CDC and internal protocols compounded these risks." *Id.* Specifically, Lead Plaintiffs argue that "Carnival allowed passengers to disembark and re-board the [*Diamond Princess*] and enjoy cruise amenities without limitation"; "Carnival did not provide *Diamond Princess* passengers with PPE or instructions to socially distance"; and "Carnival took virtually no precautions to protect *Grand Princess* passengers and crew." *Id.* at 21–22. Finally, Lead Plaintiffs argue that the Court cannot consider the extrinsic materials Defendants cite in support of their timeline, upon which they "improperly seek to exculpate themselves."[5]

Most of the February 2020 statements cited reflect Carnival's goals which cannot be objectively measured in the face of a rapidly evolving global pandemic such as coronavirus. For example, as it relates to Carnival's statements announcing the establishment of the HESS Committees—which were charged generally with supervising and monitoring health, environmental, safety, security, and sustainability initiatives—Lead Plaintiffs do not argue that those Committees *did not exist*; rather, Lead Plaintiffs infer that the Committees *were not effective* because Carnival would ultimately suffer financial loss as a result of the pandemic. Further, some

---

[5] Federal Rule of Evidence 201 provides that "[t]he court may judicially notice a fact that is not subject to reasonable dispute because . . . it can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201. Here, the Court finds it prudent to judicially notice guidance—specifically, guidance issued by the CDC, the WHO, and the U.S. State Department—that Lead Plaintiffs reference and include excerpts of in the Consolidated Complaint. *See, e.g.*, *McClain v. Iradimed Corp.*, 111 F. Supp. 3d 1293, 1299–30 & n.6 (S.D. Fla. 2015).

of the February 2020 statements discuss incomplete actions, ongoing initiatives, or aspirational goals, such as "[t]he company's medical experts are coordinating closely with the [CDC] and the [WHO] *to implement* enhanced screening, prevention and control measures for its guests, crew and ships" and "Carnival Corporation & plc's HESS Policy describes our commitments to: protecting the health, safety and security of our passengers, guests, employees and all others working on our behalf, *thereby promoting an organization that strives to be* free of injuries, illness and loss." *See* Consolidated Compl. ¶¶ 236, 243.

The most actionable statements as potentially false or misleading are those that relate to actions Carnival asserted it had already implemented or would begin implementing immediately. For instance, Carnival stated that it was requiring guests "to go through thermal screening and/or be checked with non-contact thermometers in *many* of [its] embarkation ports to detect signs of fever" and that Carnival had "implemented even more measures to prevent the spread of disease onboard [including] distribution of personal hand sanitizer to each guest onboard." *Id.* ¶¶ 245–246. Lead Plaintiffs do not argue that those actions were not taken; rather, they rely on the fact that such measures, even if they were taken, would not ultimately prove to be effective to combat the coronavirus. But that hindsight knowledge cannot be used to assert securities fraud. *See In re John Alden Fin. Corp. Sec. Litig.*, 249 F. Supp. 2d 1273, 1277 (S.D. Fla. 2003) ("The fact that in hindsight [a] projection turned out to be wrong does not mean that it lacked a reasonable basis when made.").

Lead Plaintiffs assert that Carnival, in violation of the CDC COVID-19 Guidance, failed to take the following recommended measures: (i) implement temperature checks on the *Zaandam*; (ii) conduct any 'enhanced' cleaning measures until two weeks after Defendants' statement; (iii) require crew members to wear masks or gloves to deliver food to passengers' cabins; and

(iv) provide sufficient PPE for crew members to adequately protect themselves and passengers from COVID-19. Consolidated Compl. ¶ 247. However, these assertions fail to show that Defendants' statements were false or misleading because (i) Defendants did not state that temperature checks would be conducted at *all* embarkation ports, but rather "*many*"; (ii) Lead Plaintiffs fail to show with any specificity that enhanced cleaning measures were not conducted; and, as it relates to (iii) and (iv), Defendants did not state that crew members would be required to wear masks or gloves, or that any PPE would be provided to them by Carnival, nor do Lead Plaintiffs show with any specificity that such broad, general measures were recommended by the CDC in February 2020.

Accordingly, the Court does not find that, as pled, the February 2020 statements are materially false or misleading.

*c. March 2020 Statements*

Defendants first argue that the statement made on March 13, 2020—that Carnival had not had a diagnosed coronavirus case linked to its operation—was not made by the parent company, Carnival, but rather by the brand, Carnival Cruise Lines, which operates the branded Carnival ships. Mot. at 26. Second, Defendants argue that "given how widely reported the COVID-19 cases aboard the ships were, . . . no reasonable investor would have been misled by Carnival Cruise Line's statement, even if it had applied to all Carnival vessels." *Id.* As to the statements made later in March, Defendants argue that "Donald's opinions could not have misled investors because the cited interviews [(March 18 and 22, 2020)] occurred *after* the market knew that Carnival had voluntarily suspended its global operations and the CDC had prohibited all further cruising operations." *Id.* at 14. Further, Defendants argue that "[b]oth interviews also aired *after* Carnival issued an SEC filing on March 16, 2020, which, *according to Plaintiffs*, 'began to reveal to

investors' the pandemic's impact on [Carnival's] business operations and financials." *Id.* Defendants argue that Lead Plaintiffs offer no facts to suggest that Donald did not believe the statements he made when he made them in March 2020, and Donald's statements of opinion could not have mislead investors "[g]iven the extensive public information about the risks of COVID-19 aboard cruise ships, including Defendants' own disclosures." *Id.*

Lead Plaintiffs argue that Defendant Donald's statements—which they dispute as reflecting his opinions—were materially false and misleading because of the numerous ship-related COVID-19 cases and deaths known of at the time the statements were made and "Carnival's failure to comply with pre-existing (and enhanced) health and safety standards, which exacerbated the COVID-19 outbreaks on Carnival's ships in February and March 2020." Resp. at 23. Specifically, Lead Plaintiffs discuss two Carnival ships that set sail in early March and argue that (1) "*Zaandam* passengers reported, contrary to Defendants' statements, no temperature checks and no noticeable extra cleaning measures until two weeks into the voyage"; (2) "despite high numbers of individuals with flu-like symptoms aboard the *Crown Princess*, . . . Carnival did not require passenger quarantine until 16 days into the voyage"; and (3) "even after the COVID-19 outbreak began on the *Zaandam*, crew members did not utilize adequate PPE." *Id.* Lead Plaintiffs argue that "Carnival's ships were not set up to provide 'natural social distancing,' given, among other things, its guest-space ratio designed to ensure its 17% profit margins." *Id.* Finally, Lead Plaintiffs cite to examples of passengers who would ultimately become sick with or die from coronavirus and argue that "[b]y March 13, CDC officials had linked 17% of the U.S.'s COVID-19 cases to cruise ships." *Id.* at 23–24.

The Court finds that the March 13, 2020 statement—specifically that "Carnival has not had a diagnosed case linked to [its] operation"—was not an opinion and was false. Defendants'

argument that the statement was not made by the parent company, Carnival, but rather by the brand, Carnival Cruise Lines, which operates the branded Carnival ships, is irrelevant as it is clearly connected to Carnival cruises generally. However, this statement was made on the *same day* that Carnival announced a voluntary suspension of voyages in response to the pandemic. *See* Mot. Exs. 13–14. The Court fails to see how that statement, or any of the statements made thereafter, could reasonably mislead investors at that stage of the pandemic. Further, Lead Plaintiffs do not reconcile the conflict between the later March 2020 statements—which generally assert that cruise ships are safe places to be as compared to other crowded venues like movie theaters—and Carnival's March 16, 2020 Form 8-K/A ("March 2020 SEC Filing") which stated:

> Significant events affecting travel, including COVID-19, typically have an impact on booking patterns, with the full extent of the impact generally determined by the length of time the event influences travel decisions. The Corporation believes the ongoing effects of COVID-19 on its operations and global bookings will have a material negative impact on its financial results and liquidity. The Corporation is taking additional actions to improve its liquidity, including capital expenditure and expense reductions, and pursuing additional financing. Given the uncertainty of the situation, the Corporation is currently unable to provide an earnings forecast, however we expect results of operations for the fiscal year ending November 30, 2020 to result in a net loss.

Consolidated Compl. ¶ 150.

Accordingly, the Court does not find that, as pled, the March 2020 statements are materially false or misleading.

3. Statements Affirming Compliance with Regulatory Requirements

Defendants argue that "Plaintiffs plead no specific facts demonstrating isolated incidents of regulatory noncompliance, much less the kind of systemic, fleet-wide noncompliance that could render Defendants' statements misleading." Mot. at 15. Defendants argue that the Consolidated Complaint "fails to explain what, precisely, Carnival did to run afoul of [various] regulations and

guidance," and the "allegations of regulatory noncompliance are simply too vague or conclusory to support a fraud claim under the PSLRA." *Id.* at 15–16. Where Lead Plaintiffs do make specific allegations, *e.g.*, that passengers were not given masks or other PPE after Carnival learned of a confirmed coronavirus case, or that Carnival failed to isolate passengers and crew who might have come into contact with the infected passenger, Defendants argue that no such measures were recommended in relevant guidance at the time. *Id.* at 16–17. Defendants acknowledge that such measures may seem sensible now, but argue that such measures "were not obvious—much less mandated—during the first week of February 2020, when the CDC was recommending 'no additional precautions . . . beyond the simple daily precautions that everyone should always take.'" *Id.* at 17 (quoting Ex. 4 at 3). In a separate example of purported regulatory failures, Defendants identify that Lead Plaintiffs' rely on guidance that was in effect in July 2020—not guidance in effect at the time of the alleged failure in March 2020—and thus, "Defendants cannot be faulted for failing to abide by regulatory guidance that did not exist." *Id.* at 18. Finally, Defendants argue that they are subject to numerous and frequently changing international laws, regulations, treaties, and other requirements, and "[n]o reasonable investor would have interpreted Carnival's commitments as a guarantee that the Company would always comply with every one of the myriad of potentially applicable rules and regulations." *Id.* at 19.

Lead Plaintiffs argue that "Defendants represented that Carnival complied with public health standards when in fact they did not or were not able to." Resp. at 14. Further, "beginning in January 2020, Defendants told investors that they were coordinating with governmental and supervisory agencies 'to implement recommended screening, prevention and control measures for [Carnival's] ships.'" *Id.* Lead Plaintiffs argue that they plead with particularity how these statements were materially false and misleading. *Id.* Specifically, Lead Plaintiffs cite to the "the

standards Carnival claimed to comply with (or exceed) on its ships, including the CDC's ILI guidelines," which "referenced steps Carnival should have taken to address disease outbreaks on its ships, including: (1) isolating sick passengers and crew; (2) social distancing; (3) wearing face masks; (4) sanitizing; and (5) using PPE." *Id.* Lead Plaintiffs cite to the HESS Policy, and the IAG, "which allegedly provided a compliance framework." *Id.* at 14–15. Ultimately, Lead Plaintiffs argue that the Consolidated Complaint "details how the COVID-19 outbreak aboard Carnival's ships exposed Carnival's failure to comply with (or exceed) these standards." *Id.* at 15. "Specifically, Carnival failed to: (1) screen passengers before boarding"; "(2) require passengers and crew to use masks and remain socially distant"; "(3) temperature check passengers and crew"; "(4) provide PPE"; "(5) quickly identify, evaluate, and isolate passengers and crew"; "(6) sufficiently communicate with passengers and crew . . . and with local health officials"; "(7) suspend onboard events"; "(8) sanitize"; and "(9) follow clear directives from local health authorities." *Id.* Lead Plaintiffs argue that "Carnival's health and safety failures demonstrated that its stated efforts to comply with (or exceed) [heath and safety] standards were, at best, inadequate, and, at worst, nonexistent." *Id.* at 16.

Lead Plaintiffs' arguments require the Court to infer that, because passengers would ultimately fall ill aboard Carnival's ships—just as people did in other venues across the globe—Carnival was non-compliant with health and safety standards, and thus Carnival's statements affirming its compliance with such standards were false or misleading. That inference is too tenuous to meet the heightened pleading standard applicable in the securities fraud context. Plaintiffs effectively acknowledge their uncertainty as to exactly what Defendants' regulatory failures were when they argue that Carnival's "stated efforts to comply with (or exceed) [health and safety] standards were, at best, inadequate." Resp. at 16. Further, taken in greater context,

the steps noted above that Carnival *should* have taken did not have broad application at the time and were related to handling a passenger suspected of having an ILI, or crew members who may have come in contact with such a passenger. *See* Consolidated Compl. ¶¶ 49–50 (quoting the CDC ILI Guidance).

The Consolidated Complaint suggests that far more stringent requirements should have been in effect ship-wide than existed in real time. For example, referencing the identification of a former cruise passenger who would become hospitalized, the Consolidated Complaint alleges that "[d]espite being under clear guidance to impose distancing and isolation measures, and to provide adequate [PPE] when a case of ILI was discovered on board, passengers were not given masks or other PPE when Carnival learned of the confirmed coronavirus case (or, ideally, even earlier)—a clear failure of protocol." Consolidated Compl. ¶ 103. But the guidance in place at the time only instructed Carnival on how to handle that passenger and crewmembers who came in contact with the passenger, not ship-wide distribution of masks and PPE. While more updated guidance instructs that such measures may have been effective, the guidance simply did not so instruct at the time. Even the CDC COVID-19 Guidance issued on February 12, 2020 only suggested the use of a mask for patients suspected of having COVID-19. *See* Consolidated Compl. ¶¶ 120–121.

Accordingly, the Court does not find that, as pled, the statements affirming compliance with then-existing regulatory requirements are materially false or misleading.

4. <u>Statements Confirming Commitment to Health and Safety</u>

Defendants argue that the Consolidated Complaint fails to identify which of Carnival's health and safety protocols were inadequate or how Carnival failed to follow them. Mot. at 20–21. Defendants argue that Lead Plaintiffs' allegations—that Carnival lacked proper protocols to protect its passengers and crew—are vague and insufficient. *Id.* at 21. Specifically, the

Consolidated Complaint acknowledges Carnival's publicly available HESS Policy, Carnival's efforts to create and fill a new chief ethics and compliance officer position, and Carnival's efforts to create the IAG group in September 2019 to review and recommend enhancements to the HESS Policy. *Id.* Defendants argue that the Consolidated Complaint is "replete with examples of Carnival's conduct that reflects its commitment to health and safety—often at the expense of its bottom line." *Id.* Defendants identify that "as the scope of the COVID-19 pandemic came into focus, Carnival *voluntarily* suspended its global operations to 'mitigate the spread' of the virus—*prior* to the CDC's No Sail Order," an action that garnered praise from the CDC. *Id.* at 22. Defendants reference several actions taken by Carnival aboard the *Diamond Princess* and the *Grand Princess* after learning of passenger illnesses, and argue that those "affirmative steps [taken] to limit the spread of COVID-19 were not even contemplated by the ILI or the [CDC] Interim Guidance." *Id.* at 22–23. "The mere fact that health care experts and government officials later changed their advice concerning how best to protect people from COVID-19, or that, in hindsight, the risks were greater than Carnival, the WHO, and the CDC believed them to be is not a basis for a securities fraud claim." *Id.* at 25.

Lead Plaintiffs argue that "Carnival's response to COVID-19—including its failure to comply with both applicable standards and its own HESS Policy—demonstrated that Defendants had not, in fact, been committed to compliance or health and safety," which ultimately "harmed Carnival's business and forced it to seek a massive capital infusion to shore up its long-term balance sheet." Resp. at 18. Lead Plaintiffs argue that "these were not 'isolated incidents' of corporate mismanagement but rather a complete failure to comply with even basic, pre-COVID-19 standards for controlling disease outbreaks." *Id.* Further, Lead Plaintiffs argue that "Carnival did nothing to lower its guest-to-space ratio, allowing thousands of people to crowd onto ships in late

February and early March to partake in onboard activities without limitation and . . . made it difficult for guests to cancel their tickets." *Id.*

As the Court has previously explained, Lead Plaintiffs fail to show with the required specificity how Defendants were non-compliant with applicable guidelines and regulations. Thus, Lead Plaintiffs' reliance on any such non-compliance fails to show that Defendants' stated commitments to health and safety were false or misleading. Moreover, many of Defendants' statements described Carnival's ongoing efforts and initiatives in furtherance of its health and safety goals. For example, in the September 26, 2019 earnings call statement, Carnival announced that it had filled a key position described as "a new role that is bringing together functions and people that were previously distributed across the corporation and complementing that with new talents, roles and processes *to help take [Carnival] to best-in-class and broad-based compliance*." Consolidated Compl. ¶ 216 (emphasis added). Through that statement, Carnival in essence acknowledged that it had not quite reached broad-based compliance, but nonetheless affirmed its commitment to getting there. Certainly, any reasonable investor could appreciate that it would take time for the incumbent of this new position to make meaningful progress. That Carnival was not able to do so before the pandemic began to materialize does not persuade the Court that Carnival's stated commitments to health and safety were materially false or misleading.

**B. Scienter**

Defendants argue that the Consolidated Complaint fails to allege severe recklessness with respect to Defendants' statements about the risks of COVID-19 and Carnival's commitment to regulatory compliance and passenger health and safety. Mot. at 27–33. Specifically, Defendants argue that the Consolidated Complaint "alleges no facts raising a strong inference that Defendants had actual, contemporaneous knowledge of material risks to the Company's operations and

finances in early 2020 that they intentionally failed to disclose." *Id.* at 27. Nor are there any "well-pleaded facts demonstrating that Carnival's conduct during the class period failed to adhere to any governing rule or regulation." *Id.* at 30. Moreover, even if certain Carnival ships did fail to comply with any regulatory requirements, "the Complaint lacks any particularized facts showing that *any* such incidents were communicated to Carnival's senior executives." *Id.* Regarding Carnival's commitment to health and safety, while Plaintiffs "rely on anonymously-sourced statements from news reports that post-date the class period to suggest that certain ships could have taken additional steps to protect passenger health and safety," there are no allegations "that *any* such incident was ever reported to Carnival's senior management." *Id.* at 32–33. Further, Defendants argue that Carnival's actions throughout the class period—*e.g.*, disclosing the risks of COVID-19, canceling certain cruises during the class period, and Carnival plc repurchasing more than 3 million of its own shares during the class period—are inconsistent with scienter. *Id.* at 34–36.

Lead Plaintiffs argue that Defendant Donald, "as Carnival's CEO, had access to information regarding Carnival's purported compliance with health and safety standards and related protocols." Resp. at 30. Further, the incumbent of the newly created chief ethics and compliance officer position reported directly to Defendant Donald and sat on the executive leadership team, which together with creating the IAG "to significantly enhance Carnival's efforts to address health and safety issues . . . supports a strong inference of scienter." *Id.* at 31. Lead Plaintiffs argue that, based on Padgett's conversation with a battery manufacturer in Wuhan, China, "Defendants knew or were severely reckless in not knowing that COVID-19 posed far more than a 'low' or 'very low' risk to Carnival by no later than January 25, 2020." *Id.* Lead Plaintiffs argue that Defendant Donald was directly involved in Carnival's COVID-19 crisis response, and

that he "was aware of Carnival's 'long history' in dealing with disease outbreaks on its ships." *Id.* at 32. Lead Plaintiffs argue that the "core operations" doctrine supports scienter because "[c]ruising safely and in compliance with health and safety standards is *the* core operation of the Company" and thus "it is appropriate to infer, particularly in light of Donald's admitted leading role in managing Carnival's health and safety efforts, that Donald and other senior Carnival executives knew of or were severely reckless in disregarding Carnival's failure (or inability) to comply with health and safety standards or its own protocols." *Id.* at 34–35.

"Under the PSLRA, a plaintiff cannot 'plead the requisite scienter element generally . . . .'" *Brophy v. Jiangbo Pharms., Inc.*, 781 F.3d 1296, 1302 (11th Cir. 2015) (quoting *Mizzaro*, 544 F.3d at 1238). In the Eleventh Circuit, "§ 10(b) and Rule 10b-5 require a showing of either an 'intent to deceive, manipulate, or defraud,' or 'severe recklessness.'" *Id.* (quoting *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 634 (11th Cir. 2010)) (internal citation and quotation marks omitted). The PSLRA "requires, 'with respect to each act or omission alleged,' that a complaint 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Carvelli*, 934 F.3d at 1318 (quoting § 78u-4(b)(2)(A)). "To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 323–24. "A complaint will survive [a motion to dismiss] only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

As an initial matter the Court has not found any of Defendants' statements to be materially false or misleading to sustain a securities fraud claim. Even if the statements were materially false

or misleading, the Court finds that Lead Plaintiffs have not sufficiently alleged a strong inference that Carnival acted with (1) the intent to deceive, manipulate, or defraud its investors; or (2) severe recklessness. Carnival's January 2020 statements reflect its commitment to and prioritization of health and safety, and its belief that the risk of COVID-19 was "low." *See* Consolidated Compl. ¶¶ 218, 221–223, 227, 229, 232. It is plausible that Carnival *is* committed to and prioritizes health and safety aboard its ships, notwithstanding the impact that COVID-19 would ultimately have. And, it is plausible that Defendants did indeed believe the risk to Carnival's business and passengers to be relatively low, as cases outside of China were only then starting to surface.

In January 2020, pre-pandemic life was mostly unchanged with no travel restrictions, other than perhaps travel to and from China. No mask mandates were in effect—nor were masks even recommended. While it is *possible* that in January 2020 Defendants possessed some greater knowledge than the CDC or the WHO as to the devastation COVID-19 would ultimately cause, that argument does not give rise to the requisite strong inference of scienter to support a claim for securities fraud. Lead Plaintiffs' reliance on Carnival's February 2020 statements reiterating its commitment to and prioritization of health and safety fare no better. As to the March 2020 statements, Lead Plaintiffs fail to reconcile the conflict between the false statement regarding a COVID-positive case and Defendants' contemporaneous actions of halting its voyages. This conflict, and Carnival's action to pause operations, cut against Lead Plaintiffs' argument that Carnival's March 2020 statements were made with scienter. And, Defendants did indeed take measures to further their health and safety goals, even if those efforts would ultimately prove to be unsuccessful in the face of a global pandemic. On balance, the Court does not find the inference of scienter to be *as compelling* as the opposing inferences that one could draw from the facts alleged here. *See Tellabs*, 551 U.S. at 324.

## IV. CONCLUSION

UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that Defendants' Motion to Dismiss the Amended Complaint (ECF No. 61) is GRANTED IN PART and DENIED IN PART, and the Amended Complaint is DISMISSED WITHOUT PREJUDICE. The Clerk of Court is INSTRUCTED to administratively CLOSE THIS CASE. All pending motions, if any, are DENIED AS MOOT. Should Lead Plaintiffs choose to file a second amended complaint, they may do so within twenty-one (21) days of the date of this Order.

DONE AND ORDERED in Chambers at Miami, Florida, this 27th day of May, 2021.

K. MICHAEL MOORE
CHIEF UNITED STATES DISTRICT JUDGE

c: All counsel of record