**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

IN RE CARNIVAL CORP.
SECURITIES LITIGATION

Case No. 1:20-cv-22202-KMM

**DEFENDANTS' MOTION TO DISMISS THE
SECOND AMENDED COMPLAINT AND
INCORPORATED MEMORANDUM OF LAW**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................................1

ARGUMENT .................................................................................................................................3

I.   The SAC Fails to Allege Any Actionable Misrepresentations or Omissions......................3

   A.   The SAC Does Not Adequately Allege That Defendants' Statements
        Affirming Carnival's Compliance with Regulatory Requirements or
        Implementation of Safety Protocols Were False or Misleading .............................3

        1.   The SAC Fails to Allege That Carnival Violated CDC
             Requirements .................................................................................................3

        2.   The SAC Fails to Allege That Carnival Violated Its Internal
             Policies.........................................................................................................10

        3.   Carnival's Statements Affirming Regulatory Compliance Are Not
             Actionable ....................................................................................................12

   B.   The SAC Does Not Adequately Allege That Defendants Had Unique or
        Special Access to Information about the Risks to Carnival's Business of
        COVID-19 But Failed to Issue Warnings Based on Such Information .................13

        1.   January 2020 Statements.............................................................................14

        2.   February 2020 Statements...........................................................................15

        3.   March 2020 Statements...............................................................................16

   C.   Plaintiffs Have Abandoned Their Theory That Defendants Misled
        Investors about Carnival's Commitment to Passenger Health and Safety ...........17

II.  The SAC Fails to Allege Scienter ......................................................................................17

   A.   The SAC Fails to Allege That Defendants Had Contemporaneous
        Knowledge of Facts Contradicting Their Statements about the Risks of
        COVID-19.............................................................................................................18

   B.   The SAC Fails to Allege That Defendants Had Contemporaneous
        Knowledge of Facts Contradicting Their Statements about Regulatory
        Compliance ...........................................................................................................19

   C.   Defendants' Conduct During the Class Period Was Fundamentally
        Inconsistent with Scienter ....................................................................................22

III. The SAC Fails to Allege Loss Causation ...........................................................................23

IV.  If Plaintiffs' Claims Are Not Dismissed, the Class Period Should Be Shortened............25

CONCLUSION............................................................................................................................25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Altisource Portfolio Sols., S.A. Sec. Litig*.,
  2015 WL 12001262 (S.D. Fla. Sept. 4, 2015) ........................................................23

*Berg* v. *Velocity Fin., Inc.*,
  2021 WL 268250 (C.D. Cal. Jan. 25, 2021) ..........................................................14

*Brophy* v. *Jiangbo Pharm., Inc*.,
  781 F.3d 1296 (11th Cir. 2015) .............................................................................19

*Carvelli* v. *Ocwen Fin. Corp.*,
  934 F.3d 1307 (11th Cir. 2019) .............................................................................13

*Chiarenza* v. *IBSG Int'l, Inc.*,
  2010 WL 3463304 (S.D. Fla. Sept. 2, 2010) .........................................................19

*Douglas* v. *Norwegian Cruise Lines*,
  2021 WL 1378296 (S.D. Fla. Apr. 12, 2021) ............................................... *passim*

*Druskin* v. *Answerthink, Inc.*,
  299 F. Supp. 2d 1307 (S.D. Fla. 2004) ..................................................................20

*Durham* v. *Whitney Info. Network, Inc.*,
  2009 WL 3783375 (M.D. Fla. Nov. 10, 2009) .......................................................21

*Fidel* v. *Rampell*,
  2005 WL 5587454 (S.D. Fla. Mar. 29, 2005) ........................................................20

*FindWhat Inv'r. Grp*. v. *FindWhat.com*,
  658 F.3d 1282 (11th Cir. 2011) .............................................................................22

*Garfield* v. *NDC Health Corp.*,
  466 F.3d 1255 (11th Cir. 2006) .............................................................................20

*Goldman Sachs Group, Inc.* v. *Arkansas Teacher Retirement System*,
  141 S. Ct. 1951 (June 21, 2021)............................................................................23

*Henningsen* v. *ADT Corp.*,
  161 F. Supp. 3d 1161 (S.D. Fla. 2015) ....................................................21, 22, 23

*In re HomeBanc Corp. Sec. Litig.*,
  706 F. Supp. 2d 1336 (N.D. Ga. 2010) ..................................................................24

*Howard* v. *Arconic Inc.*,
 395 F. Supp. 3d 516 (W.D. Pa. 2019) ..................................................................17

*Hubbard* v. *BankAtlantic Bancorp, Inc.*,
 688 F.3d 713 (11th Cir. 2012) ...........................................................................24

In re *KLX, Inc. Sec. Litig.*,
 232 F. Supp. 3d 1269 (S.D. Fla. 2017) .........................................................19, 22

*Luczak* v. *Nat'l Beverage Corp.*,
 812 F. App'x 915 (11th Cir. 2020) ....................................................................25

*McClain* v. *Iradimed Corp.*,
 111 F. Supp. 3d 1293 (S.D. Fla. 2015) ..............................................................25

*Meyer* v. *Greene*,
 710 F.3d 1189 (11th Cir. 2013) .........................................................................23

In re *Miva, Inc., Sec. Litig.*,
 2008 WL 681755 (M.D. Fla. Mar. 12, 2008) .....................................................25

*Miyahira* v. *Vitacost.com, Inc.*,
 2011 WL 13136262 (S.D. Fla. Dec. 8, 2011) .....................................................11

*Mizzaro* v. *Home Depot, Inc.*,
 544 F.3d 1230 (11th Cir. 2008) ...........................................................19, 20, 21, 23

*Mogensen* v. *Body Cent. Corp.*,
 15 F. Supp. 3d 1191 (M.D. Fla. 2014)............................................................20, 21

*Mulvaney* v. *GEO Grp., Inc.*,
 237 F. Supp. 3d 1308 (S.D. Fla. 2017) ..............................................................11

In re *NDCHealth Corp., Inc., Sec. Litig.*,
 2005 WL 6074918 (N.D. Ga. July 27, 2005)......................................................22

*Nguyen* v. *Endologix, Inc.*,
 962 F.3d 405 (9th Cir. 2020) .............................................................................23

In re *Ocwen Fin. Corp. Sec. Litig.*,
 2015 WL 12780960 (S.D. Fla. Sept. 4, 2015) .....................................................23

*Ong* v. *Chipotle Mexican Grill, Inc.*,
 294 F. Supp. 3d 199 (S.D.N.Y. 2018)................................................................17

*Plymouth Cty. Ret. Sys.* v. *Carter's Inc.*,
 2011 WL 13124501 (N.D. Ga. Mar. 17, 2011).....................................................22

*City of Roseville Emps.' Ret. Sys.* v. *EnergySolutions, Inc.*,
    814 F. Supp. 2d 395 (S.D.N.Y. 2011)......................................................................14

*Singh* v. *Cigna Corporation*,
    918 F.3d 57 (2d Cir. 2019)......................................................................................13

*In re Sunterra Corp. Sec. Litig.*,
    199 F. Supp. 2d 1308 (M.D. Fla. 2002)..................................................................22

*Thomas* v. *Shiloh Indus., Inc.*,
    2017 WL 1102664 (S.D.N.Y. Mar. 23, 2017) .......................................................22

*United States* v. *US Stem Cell Clinic, LLC*,
    403 F. Supp. 3d 1279 (S.D. Fla. 2019) ....................................................................4

*Waterford Twp. Gen. Emps. Ret. Sys.* v. *SunTrust Banks Inc.*,
    2010 WL 3368922 (N.D. Ga. Aug. 19, 2010) .......................................................24

**Statutes**

Private Securities Litigation Reform Act of 1995 ("PSLRA").......................................1, 6, 21, 22

**Other Authorities**

Fed. R. Civ. P. 9(b) ..................................................................................................1, 6

Fed. R. Civ. P. 12(b)(6)...............................................................................................1

Pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b), upon the incorporated memorandum of law, the accompanying Declaration of Daniel S. Sinnreich dated August 6, 2021 and its exhibits, and all other papers herein, Defendants Carnival Corp., Carnival plc (collectively, "Carnival" or the "Company"), and Arnold Donald (together with Carnival, the "Defendants") hereby move this Court to dismiss the Second Amended Class Action Complaint filed on July 2, 2021, Dkt. 74, in its entirety and with prejudice.

## PRELIMINARY STATEMENT

Plaintiffs' Second Amended Complaint ("SAC") addresses none of the fundamental defects in the Amended Complaint ("AC") identified in the Court's May 28 Order, Dkt. 71 (the "Order").  It should be dismissed, with prejudice, for the same reasons.

The AC alleged that Defendants fraudulently misled investors in early 2020 about Carnival's regulatory compliance, commitment to health and safety, and the risks of coronavirus, based on purported regulatory violations and the fact that passengers and crew contracted COVID-19 aboard certain vessels in February and March 2020.  *See* Dkt. 51.  The Court held, principally, that Carnival's alleged regulatory violations—such as failing to implement temperature checks and require social distancing and masks on certain vessels—"suggest[ed] that far more stringent requirements should have been in effect ship-wide than existed in real time."  Order 28.  Plaintiffs' arguments improperly "require[d] the Court to infer that, because passengers would ultimately fall ill aboard Carnival's ships—just as people did in other venues across the globe—Carnival was non-compliant with health and safety standards."  Order 27.

The SAC fails to identify any new categories of violations or any additional regulations or safety protocols.  Nor does it identify any additional ships on which alleged problems occurred.  The principal change Plaintiffs have effected in response to the Court's Order is to add approximately 50 paragraphs providing additional *examples* of alleged failures to implement adequate screening and sanitation protocols or require masks or social distancing in exactly the same ten-week time period from January 20, 2020 to March 30, 2020.  But the SAC is still describing the *same* alleged violations of the *same* regulations aboard the exact *same* eight Carnival ships already alleged in approximately 50 paragraphs of the AC.  The Court did not dismiss the prior complaint because it found that it contained an insufficient number of alleged examples of regulatory violations.  Rather, the Court dismissed the complaint because it failed to

allege that Carnival committed fraud by failing to anticipate the course of the pandemic or by violating "regulations" that simply did not exist at the time. The SAC doubles down on this fundamentally flawed theory and the Court should reject it again.

The SAC does virtually nothing to attempt to cure the other deficiencies in the AC identified in the Court's Order. The Court previously rejected Plaintiffs' argument that Defendants failed to adequately disclose the risks of COVID-19, holding that Plaintiffs pleaded no facts showing that Defendants had "any more insight as to the impact of COVID-19 than the average person." Order 19. Plaintiffs continue to pursue this theory, but the SAC adds only two new sentences describing a former employee who recalls that a single unspecified and undated fulfillment order from Italy did not arrive because of a COVID-19 shutdown. This new allegation does not overcome the Court's conclusion that the AC failed to allege that Defendants somehow knew and failed to disclose the scope and impact of the virus in early 2020. As for the theory that Defendants misled investors about their commitment to health and safety, the SAC abandons it altogether.

The Court also dismissed the prior complaint because it failed to raise a strong inference that "Defendants possessed some greater knowledge than the CDC or the WHO as to the devastation COVID-19 would ultimately cause." Order 33. The Court further held that Defendants' conduct, such as voluntarily suspending Carnival's global voyages, "cut against" scienter and rendered Plaintiffs' theory not "as compelling as the opposing inferences that one could draw from the facts alleged." Order 33. The SAC adds only a single new scienter allegation: a vague recollection by an anonymous "former employee" that Carnival executives met in late January and early February 2020 to discuss COVID-19. But Plaintiffs do not allege that there was any discussion of Carnival's safety protocols and compliance, or that Carnival executives were apprised during these meetings of developments on any of the ships; indeed, the SAC fails to identify—even in conclusory fashion—any fact made known to the Defendants during these meetings that contradicted any public statement by the Company.

In short, the SAC continues to fault Defendants for failing to anticipate the course of a global pandemic and failing to implement safety protocols that were not recommended, much less required, in early 2020. The SAC fails to identify any material misleading statement or omission, fails to adequately allege scienter or loss causation, and should be dismissed again, this time with prejudice.

**ARGUMENT**

I.    **The SAC Fails to Allege Any Actionable Misrepresentations or Omissions**

    A.    **The SAC Does Not Adequately Allege That Defendants' Statements Affirming Carnival's Compliance with Regulatory Requirements or Implementation of Safety Protocols Were False or Misleading**

Plaintiffs allege that Defendants' statements throughout the Class Period affirming Carnival's compliance with health and safety regulations were materially misleading because Carnival purportedly violated certain agency rules and internal protocols in February and March 2020. *See* SAC pp. 88-90 ("SAC Chart") & ¶¶ 16-17, 78, 229, 305, 316, 324. The Court previously rejected this argument because the complaint "suggest[ed] that far more stringent requirements should have been in effect ship-wide than existed in real time." Order 28. Rather than specify actual regulatory infractions, "Plaintiffs' arguments require[d] the Court to infer that, because passengers would ultimately fall ill aboard Carnival's ships—just as people did in other venues across the globe—Carnival was non-compliant with health and safety standards." Order 27. But "[t]hat inference is too tenuous to meet the heightened pleading standard applicable in the securities fraud context." *Id.*

The SAC adds *no* allegations describing new safety regulations or internal protocols during the Class Period. Instead, the SAC adds many paragraphs elaborating on the *same* supposed violations of the *same* supposed regulations aboard the *same* vessels discussed in the prior complaint. These "new" allegations are incrementally insignificant and fail to demonstrate that Defendants' conduct violated a single contemporaneous safety regulation, much less rose to the level of fleet-wide noncompliance that would render Defendants' statements misleading.

    1.    **The SAC Fails to Allege That Carnival Violated CDC Requirements**

The SAC cites only two regulations that Carnival vessels allegedly violated: (i) the CDC's Guidance for Cruise Ships on Influenza-Like Illness Management (the "ILI Guidance"), issued in 2016, and (ii) the CDC's Interim Guidance for Ships on Managing 2019 Novel Coronavirus, issued on February 12, 2020 (the "Interim Guidance"). *See* SAC Chart & ¶¶ 17, 305, 316, 324. But these are the same two sets of CDC guidance that Plaintiffs alleged were violated in the prior complaint. *See* AC ¶¶ 140, 225, 247, 250. The Court closely examined these Guidelines and found no violations alleged. Although the SAC adds some citations to additional provisions of the same Guidelines, these citations do not change the analysis or result.

As a threshold matter, the ILI and Interim Guidance were not binding regulations that

could be "violated."  Both documents were "guidance" that provided only "recommendations" and "requests" to cruise ship operators.  Exs. 1-2.[1]  *See United States* v. *US Stem Cell Clinic, LLC*, 403 F. Supp. 3d 1279, 1295 (S.D. Fla. 2019) (finding agency guidance did not have a "binding legal effect" given that its language "d[id] not command the parties or impose any obligations").  Moreover, the ILI and Interim Guidance applied only to cruise ships "originating from, or stopping in, the United States."  Ex. 1 at 2; Ex. 2 at 2.  Thus, the conduct aboard *five* vessels detailed in the SAC—the Diamond Princess, Westerdam, Coral Princess, Zaandam, and Ruby Princess—could not have "violated" either set of guidance because those ships had no contact with the United States.  In any event, the SAC—like its predecessor—alleges that Carnival vessels violated rules and recommendations that simply weren't in effect in early 2020.

    <u>Distancing and Masks Aboard Cruises or When Disembarking</u>.  The prior complaint faulted Carnival for failing to distribute masks to all passengers and implement social distancing protocols on its ships in early 2020.  For example, the AC alleged that "passengers were not given masks or other PPE" after the Diamond Princess learned that a former passenger tested positive for COVID-19, and that the vessel "did not impose adequate distancing measures in common areas."  AC ¶¶ 103, 106.  The AC similarly alleged that the Carnival Ecstasy and Coral Princess sailed with "no modifications imposed to accommodate social distancing guidelines[.]"  AC ¶ 141.  The Court rejected these allegations because the CDC's Guidance "only instructed Carnival on how to handle [a symptomatic] passenger and crewmembers who came in contact with the passenger," and the AC contained no allegations about Carnival's handling of symptomatic passengers.  Order 28.  The Court similarly held that the CDC did not recommend "ship-wide distribution of masks and PPE," and that even the Interim Guidance "only suggested the use of a mask for patients suspected of having COVID-19."  Order 28.

    The SAC repeats these allegations, *see* SAC ¶¶ 123, 215, 305, and alleges substantially similar conduct aboard other ships.  For example, Plaintiffs now allege that the Grand Princess failed to implement "social distancing protocols" after two passengers developed COVID-19 symptoms.  SAC ¶ 157.  Plaintiffs also allege that when passengers disembarked the Costa Luminosa, Ruby Princess, and Coral Princess, they were "not instructed to maintain any distance between themselves and other passengers and were not provided masks or gloves."  SAC ¶ 193;

---

[1]   References to "Ex. __" refer to exhibits to the attached Declaration of Daniel S. Sinnreich.  Page citations refer to the PDF pagination of exhibits, inclusive of exhibit cover page.

*accord id.* ¶¶ 182, 201.  Plaintiffs allege that the failure to implement these measures violated the CDC's recommendations that passengers with ILI or who are "suspected of having [COVID-19]" practice social distancing and isolate in their cabins.  SAC ¶ 142; *see* SAC Chart 88-89 & ¶¶ 16-17, 126, 215, 229, 305; Ex. 1 at 2-4; Ex. 2 at 3-4.  Again, however, Plaintiffs do not allege that Carnival failed to take appropriate precautions with passengers and crew who were ill or were exhibiting COVID-19 symptoms.  The Court should reject Plaintiffs' new allegations for the same reason it rejected the previous allegations:  the CDC simply did not recommend in early 2020 that ships impose social distancing or mask requirements for non-sick passengers.

      <u>Proper Use of PPE</u>.  The prior complaint alleged that crewmembers on certain vessels "did not wear masks or gloves to deliver food to passengers' cabins" despite a "coronavirus outbreak" on board.  AC ¶ 162 (Zaandam); *see also* AC ¶ 110 (after Diamond Princess imposed ship-wide quarantine, crew members reused gloves for food delivery, "stood face-to-face with passengers while delivering food," and "collected dirty dishes and used linens without full protective gear").  The Court previously rejected these allegations, holding that "Defendants did not state that crew members would be required to wear masks or gloves, or that any PPE would be provided to them by Carnival, nor do Lead Plaintiffs show with any specificity that such broad, general measures were recommended by the CDC in February 2020."  Order 23.

      The SAC repeats these allegations, *see* SAC ¶¶ 129, 223, and adds new allegations of similar conduct on other vessels.  For example, Plaintiffs have added allegations that after the Grand Princess imposed a ship-wide quarantine it was "running low on surgical masks" and "not all of the crew were wearing masks and gloves."  SAC ¶ 167; *see also* SAC Chart 88, 90.  Similarly, Plaintiffs now allege that after the Costa Luminosa disembarked three passengers with COVID-19 symptoms, its crew "began wearing napkins over their mouths and using napkins to grab plates to deliver food to passengers' cabins."  SAC ¶ 181.

      Plaintiffs do not allege that Carnival thereby violated a requirement that all crew members use masks and gloves on vessels.  That is because there was no such requirement.  Both the ILI and Interim Guidance stated that masks were "*not* generally recommended . . . for general work activities," although they "can be *considered* for cruise ship workers who can't avoid close contact with people" exhibiting symptoms.  Ex. 2 at 6 (emphases added).  And although the Interim Guidance recommended that crew wear gloves if they "need to have direct contact with sick people" or rooms "used by sick [people]," Ex. 2 at 6, Plaintiffs do not allege that gloves

were not worn in such situations.  To be sure, Plaintiffs do allege that these new allegations show that Carnival violated recommendations in both sets of Guidance that cruise ship operators "*[i]nstruct* crew members on the proper use, storage, and disposal of PPE."  SAC Chart 90 (emphasis added); Ex. 1 at 6; Ex. 2 at 6.  But, having failed to allege that any use of PPE was improper at the time, there is no factual allegation in the SAC to support a claim that Carnival failed to instruct crew members in proper PPE use.

Enhanced Cleaning Measures.  Plaintiffs previously alleged that Defendants failed to implement "enhanced" cleaning protocols on certain vessels.  *E.g.*, AC ¶ 108 (alleging Diamond Princess "ignored" recommendation of "Hong Kong health officials" to perform "thorough environmental cleansing and disinfection," and that the vessel's procedures were "low-level and minimal at best"); *id.* ¶ 162 (alleging that Zaandam did not take "additional cleaning measures" until two weeks into voyage).  But as the Court previously held, "Plaintiffs fail to show *with any specificity* that enhanced cleaning measures were not conducted."  Order 23 (emphasis added).

Once again, the SAC repeats these allegations, *see* SAC ¶¶ 127, 244, and tacks on similar allegations aboard other vessels.  For example, Plaintiffs allege that Carnival "did not take measures to disinfect, sanitize, or otherwise decontaminate" the Coral Princess prior to boarding, SAC ¶ 196, and certain passengers allegedly recalled that the Carnival Ecstasy "was not cleaned or sanitized," SAC ¶ 213; *see also* SAC Chart 88, 90.  The bare allegation that a vessel "did not" sanitize or "was not" cleaned does not meet the heightened pleading standard under Rule 9(b) and the PSLRA.  Nor do Plaintiffs explain how an unspecified number of "passengers" would have knowledge of the ship-wide sanitation protocols aboard the Carnival Ecstasy, which carries "over 2,000 passengers."  *See* SAC ¶ 212.[2]  In any event, the CDC *never recommended* that ships implement enhanced cleaning measures, either prior to boarding or during voyages.  The Interim Guidance states that "in addition to routine cleaning and disinfection strategies, ships may *consider* more frequent cleaning of commonly touched surfaces," but that "widespread disinfection is unlikely to be effective."  Ex. 2 at 8 (emphasis added).  That Plaintiffs now view Carnival's cleaning procedures as "low-level" and inadequate—with the benefit of hindsight— does not transform Defendants' statements about regulatory compliance into securities fraud.

---

[2]    To the extent Plaintiffs are implying that these vessels were not cleaned *at all*, such an allegation would be inconsistent with the several examples of cleaning and sanitizing aboard Carnival vessels described in the SAC. *E.g.,* SAC ¶¶ 163-64 (Grand Princess "increased its sanitary precautions" and conducted "enhanced environmental disinfection" the day after learning that a former passenger tested positive for COVID-19).

<u>Continuation of On-Board Activities and Shore Excursions</u>.  The prior complaint alleged that several Carnival vessels permitted on-board activities and shore excursion to continue despite individuals on board exhibiting "suspicious symptoms."  *See, e.g.*, AC ¶ 103 (alleging that the Diamond Princess "discontinu[ed] only some scheduled activities" after learning a former passenger tested positive for COVID-19); ¶ 140 (alleging that passengers on the Carnival Ecstasy "engage[d] in group activities" and ate and drank at buffets and bars); ¶ 144 (alleging that passengers on the Costa Luminosa disembarked for an excursion in Puerto Rico despite a passenger having flu-like symptoms and difficulty breathing).  The Court discussed these allegations several times in its prior decision, *see* Order 21, 27, 29-30, and rejected them along with several other steps Carnival supposedly "should have taken" because the steps "did not have broad application at the time and were related to handling a passenger suspected of having an ILI, or crew members who may have come in contact with such a passenger."  Order 27-28.

The SAC repeats these allegations, *see* SAC ¶¶ 123, 177, 213, and adds new allegations about similar conduct aboard other vessels.  For example, the SAC adds allegations that the Ruby Princess allowed passengers to access "the pools, gym, and buffets aboard the ship" after learning that a former passenger tested positive for COVID-19 and despite passengers "showing suspicious symptoms."  SAC Chart 89 & ¶ 190.  The SAC also adds allegations that passengers aboard the Zaandam continued to dine at buffets and "attend nightly entertainment" even after some "passengers and crew were exhibiting COVID-19 symptoms."  SAC Chart 89 & ¶ 223.[3]

The alleged conduct did not violate any CDC guidelines.  Plaintiffs argue that the alleged conduct violated the Interim Guidance's recommendation to "isolat[e] passengers and crew in their cabins or quarters with the door closed until symptoms are improved."  SAC Chart 88-89 & ¶¶ 16-17, 143, 229.  Plaintiffs deliberately omit that this guidance applied only to passengers and crew "who are suspected of having [COVID-19]" and those who had "high-risk exposures" to such individuals.  Ex. 2 at 4.  Neither the ILI nor Interim Guidance recommended canceling any

---

[3]   *See also* SAC ¶ 107 (alleging that, even after Defendants learned that a former passenger tested positive for COVID-19 on February 1, the Diamond Princess continued to offer onboard activities such as "opera performances," a "Zumba class," and "the ship's buffets"); *id.* ¶¶ 160-66 (alleging that formal dinners and poker nights continued aboard the Grand Princess despite passengers on its prior voyage exhibiting COVID-19 symptoms); *id.* ¶ 180 (alleging that the Costa Luminosa continued to provide access to the ship's "casino, pools, gym, spa, bars, and buffets," and "did not instruct passengers to quarantine or otherwise isolate themselves[,]" after learning on March 13 that a former passenger had tested positive for COVID-19); *id.* ¶¶ 199-205 (alleging that the Coral Princess allowed passengers "to continue exercising, eating, drinking, and dancing in communal areas" around the same time that a "number of passengers" were ill "in the sick bay").

activities—including shows, indoor dining, or shore excursions—just because certain passengers or crew developed COVID-19 symptoms.  *See* Exs. 1-2.  Neither set of guidance recommended these measures even if there were a *confirmed case* of COVID-19 on board.  *See id.*

Moreover, as the SAC's new allegations demonstrate, Carnival ships frequently *exceeded* CDC recommendations.  For example, the vessels described in the SAC implemented full, ship-wide quarantines shortly after learning that a current or former passenger tested positive for COVID-19.  *See, e.g.*, SAC ¶¶ 163-64 (Grand Princess implements ship-wide quarantine and cancels turn-down service and communal activities after learning that a *former* passenger tested positive for COVID-19).[4]  Neither the ILI Guidance nor the Interim Guidance recommended canceling *any* activities, much less instituting a ship-wide lockdown, in these situations.  *See* Exs. 1-2.  These actions, much like Carnival's decision to affirmatively suspend its global cruising operations *prior to* the CDC's No Sail Order, *see* SAC ¶ 216, are fundamentally at odds with Plaintiffs' theory of securities fraud.  *See* Order 33.

<u>Pre-Boarding Temperature Checks and Screenings</u>.  The prior complaint alleged that Carnival's pre-boarding screening protocols were inadequate on certain vessels.  *See, e.g.*, AC ¶ 140 (alleging that Carnival Ecstasy personnel "had not conducted pre-boarding screening or evaluation" for COVID-19 symptoms); *id.* ¶ 162 (alleging that the Zaandam failed to "take all boarding guests' temperatures, give out hand sanitizer, and closely check guests' passports for any suspicious recent travel").  The Court discussed these allegations throughout its Order, *see* Order 7, 22-23, 27, and rejected them because, like many of Carnival's supposed violations, these were based on protocols that "did not have broad application at the time."  Order 27-28.

The SAC repeats these allegations, *e.g.*, SAC ¶¶ 212, 244, and adds new allegations describing substantially similar "failures" aboard other vessels.  For example, the SAC alleges that there were no "effective procedures" for screening crewmembers, and that passengers reported no "additional or enhanced" screening procedures, prior to boarding the Coral Princess. SAC Chart 89 & ¶¶ 194-95.  Plaintiffs also allege that passengers were not "temperature checked" or "medically examined" prior to boarding Ruby Princess.  SAC ¶ 189.  The SAC's

---

[4]  *See also* SAC ¶¶ 104-06, 108, 121 (Diamond Princess screens passengers and imposes ship-wide quarantine after learning that one *former passenger* tested positive for COVID-19); *id.* ¶ 181 (Costa Luminosa informs passengers that two *former passengers* tested positive for COVID-19 and imposes ship-wide quarantine within two days of learning of diagnosis); *id.* ¶ 207 (Coral Princess instructs passengers to isolate in cabins due to high number of sick passengers *before* any confirmed case of COVID-19); *id.* ¶¶ 225-27, 244 (Zaandam distributes masks to passengers and instructs passengers to isolate in cabins due to confirmed case of COVID-19 on board).

new allegations fail to demonstrate any regulatory violation.

Plaintiffs concede, as they must, that neither the ILI nor Interim Guidance recommended that cruise ships conduct "verbal or written screenings" or "temperature checks" during the Class Period. *See* Ex. 3 ¶ 144. In fact, the CDC did not begin recommending these measures until *July 2020*. *See* Ex. 4 at 3-4. Plaintiffs allege that Defendants nonetheless violated the Interim Guidance's recommendation that vessels "[d]eny boarding of a passenger or crew member who is suspected to have [COVID-19] based on signs and symptoms plus travel history in China or other known exposure." Ex. 2 at 4; SAC Chart 89 & ¶ 143. But the Interim Guidance did not recommend any particular method for determining whether a boarding passenger had COVID-19 "signs or symptoms," and Plaintiffs plead no facts suggesting that Carnival permitted *any* passenger with suspicious symptoms and travel history in China to board *any* vessel. The SAC also concedes that Carnival vessels did conduct various pre-boarding screening protocols. *See, e.g.*, SAC ¶¶ 95 (pre-boarding questionnaire), 155 (affirmation that not ill), 159 (passengers with certain travel history denied entry); 188 (boarding and departure "delayed by the screening for passengers"), 194 (passengers with certain passports denied entry). Plaintiffs' belief—with the benefit of hindsight—that Carnival should have implemented additional screening protocols before they were recommended by any regulator cannot support a securities fraud claim.

<u>Failure to Offer Customers Refunds</u>. Plaintiffs previously alleged that a former employee was instructed to discourage customer cancellations during the Class Period by offering customers "incentives" such as "a double cruise in the future." AC ¶¶ 114-17. The Court discussed these allegations in the May 28 Order, *see* Order 5-6, 29-30, and implicitly rejected them when it concluded that Plaintiffs failed to plead any material misrepresentations.

The SAC repeats these allegations, *see* SAC ¶¶ 134-38, and adds several new allegations that, before March 6, 2020, certain passengers were told that they would not receive a full refund if they canceled their scheduled cruise travel. *See* SAC ¶¶ 161, 174, 194, 219. But Plaintiffs do not allege that this purported policy violated *any* rule or regulation, or contradicted *any* public statement by any Defendant. Rather, Plaintiffs' allegations suggest that Carnival began to offer full refunds to customers before any government agency even advised against cruise travel. *See* SAC ¶ 179 (CDC warns U.S. citizens about cruise ship travel on March 8, 2020). Plaintiffs' belief that Carnival should, as a business matter, have begun offering refunds at an earlier date does not demonstrate regulatory noncompliance and does not support a securities fraud claim.

*See Douglas* v. *Norwegian Cruise Lines*, 2021 WL 1378296, at \*5-6 (S.D. Fla. Apr. 12, 2021) (dismissing claim that cruise company misled investors by promoting aggressive sales practices during February and March 2020 notwithstanding the coronavirus).

<u>Insufficient Medical Supplies</u>.  The AC alleged that, several weeks into the Zaandam's voyage, Carnival deployed another one of its ships to "provide it with supplies, staff, and COVID-19 testing kits."  AC ¶ 161.  The Court did not have occasion to address this allegation.

The SAC elaborates, alleging that the need to restock indicates that the Zaandam initially had insufficient "oxygen cylinders" and "masks."  SAC ¶ 225.  Similarly, the SAC alleges that Carnival deployed another vessel to meet up with the Coral Princess *nearly a month* into its voyage to provide it with additional "medical personnel, oxygen tanks, and . . . medical supplies, demonstrating that the Coral Princess had not been sufficiently stocked pursuant to the [Interim Guidance]."  *Id.* ¶ 209; *see also id.* ¶ 185 (alleging that the Ruby Princess had insufficient viral swabs onboard the vessel).  Again, Plaintiffs misrepresent the CDC's recommendation.  The Interim Guidance recommends that vessels carry sufficient "medical supplies *to meet day-to-day needs*[,]" and have "contingency plans for rapid resupply during outbreaks."  Ex. 2 at 8 (emphasis added).  The allegation that Carnival deployed its own ships to resupply cruises with medical supplies is fully consistent with the Interim Guidance.  Further, the Zaandam restocked masks to distribute them *to passengers*, SAC ¶ 225, which, as described above, was not even recommended during the Class Period and does not demonstrate an insufficient supply.

      2.      <u>**The SAC Fails to Allege That Carnival Violated Its Internal Policies**</u>

The SAC, like the AC, alleges that the same conduct described above also violated various internal policies during the Class Period.  But the SAC identifies *no* new internal policies, and Plaintiffs' allegations should be rejected for the reasons articulated in the Order.

Plaintiffs allege that Defendants misled investors when they stated in February and March 2020 that Carnival had implemented "enhanced" screening and sanitation protocols, citing the exact same statements they identified in the prior complaint.  *See, e.g.*, SAC ¶ 315 ("[w]e have protocols, standards and practices for . . . coronavirus"); *id.* ¶ 322 ("[we have] enhanced our pre-boarding and onboard health protocols"); *id.* ¶ 323 ("[w]e have enhanced sanitation protocols"); *id.* ¶ 325 ("[w]e have implemented higher and higher levels of screening, monitoring and sanitation protocols"); *compare* AC ¶¶ 237, 245-46, 248.  The Court previously rejected a substantially similar argument, explaining that the fact that Defendants' safety

protocols "would not ultimately prove to be effective to combat the coronavirus" is "hindsight knowledge [that] cannot be used to assert securities fraud."  Order 22.

In any event, the SAC's references to unspecified "enhanced . . . protocols" are vague and not actionable.  Another court in this district recently dismissed securities fraud allegations against a cruise line based on substantially similar statements that it had taken "several proactive measures" to protect the health and safety of its passengers and crew during COVID-19. *Norwegian Cruise Lines*, 2021 WL 1378296, at *6.  The court explained that it was "unclear . . . what the proactive safety measure entailed" and therefore that the statements were "extremely vague" and "not actionable."  *Id.*  So too here.

The SAC's principal new allegation is attributed to a former "Program Manager" for Princess Cruise Line ("FE3"), who was allegedly involved in the Diamond Princess response in "early February" 2020.  SAC ¶ 125.  Plaintiffs allege that FE3 "did not believe that Carnival had an outline that it could follow to address specific [*sic*] during a pandemic[,]" and that Carnival lacked protocols "'to deal with COVID,' particularly shore-side."  SAC ¶ 132.  But the SAC does not allege that FE3 conveyed his criticisms to senior management, or even that he told anyone about his views at the relevant time.

Moreover, the mere fact that a single midlevel employee now expresses criticisms of Carnival's practices does not mean that the Company's actions were inadequate.  *See Mulvaney* v. *GEO Grp., Inc.*, 237 F. Supp. 3d 1308, 1313, 1321–22 (S.D. Fla. 2017) (rejecting allegations that defendant's statements about its quality of services were false when plaintiffs relied on subjective opinions from former employees that defendant's business had "low staffing levels, disciplinary issues, security issues, and poor working conditions," but failed to provide facts to support these criticisms).[5]  The SAC contains no allegations describing what FE3 observed about Carnival's protocols nor why they were inadequate.  *See* SAC ¶ 132.  In fact, FE3's recollection is not even attributed to first-hand observations, but rather to his personal belief—in hindsight— that Carnival's protocols *must* have been inadequate because, were it otherwise, "'we wouldn't have had to go through what we did.'"  *Id.*

The remaining allegations concerning Carnival's internal policies are *all* recycled from

---

[5]    *See also Miyahira* v. *Vitacost.com, Inc.*, 2011 WL 13136262, at *5 (S.D. Fla. Dec. 8, 2011) (dismissing securities fraud claims because "[a] pleading is insufficient when the allegations are based on 'subjective generalizations' or 'tales from the trenches' by confidential witnesses.").

the prior complaint. The SAC alleges that Defendants misled investors merely by mentioning the existence of Carnival's HESS Committee, which was charged generally with supervising and monitoring health, environmental, safety, security, and sustainability initiatives. SAC ¶¶ 317-19; *compare* AC ¶¶ 239-44. But, as the Court previously held, these statements are not misleading because "Plaintiffs do not argue that those committees *did not exist*; rather, Lead Plaintiffs infer that the Committees *were not effective* because Carnival would ultimately suffer financial loss as a result of the pandemic." Order 21.[6]

The SAC also recycles the allegation that several statements describing Carnival's goals and initiatives were misleading, including the statement that Carnival's medical experts were coordinating with the CDC and WHO "*to implement* recommended screening, prevention and control measures for our ships." SAC ¶ 298 (emphasis added); *see id.* ¶ 312 (same); *id.* ¶ 314 (same); *id.* ¶ 318 (Carnival's HESS Policy promotes an organization "*that strives* to be free of injuries, illness and loss") (emphasis added); *compare* AC ¶¶ 209, 218, 232, 236. The Court previously found that these precise statements were not misleading because they described "incomplete actions, ongoing initiatives, or aspirational goals," which "cannot be objectively measured in the face of a rapidly evolving global pandemic such as coronavirus." Order 21-22.[7]

### 3. Carnival's Statements Affirming Regulatory Compliance Are Not Actionable

Even if the new allegations did describe conduct that violated a regulatory requirement (or a CDC "recommendation"), they would not render Carnival's statements about regulatory compliance actionable, as this Court has already held. In addition to its own health and safety policies, Carnival operates in over 700 ports around the world and is "subject to numerous international, national, state and local laws, regulations, treaties and other legal requirements" that "change regularly, sometimes on a daily basis." *See* Ex. 6 at 21. No reasonable investor

---

[6]   Plaintiffs argue again that Carnival's conduct violated the company's HESS Policy. SAC ¶¶ 291-93; *compare* AC ¶¶ 209-11. But the HESS Policy is a short corporate document affirming Carnival's commitment to health and safety; it does not contain any specific protocols or measures required on Carnival vessels. *See* Ex. 5. The Court previously rejected Plaintiffs' arguments that the HESS Policy itself was a misleading statement, *see* Order 11-12, and that the HESS Policy "provided a compliance framework" that Carnival violated by failing to require social distancing, mask use, and enhanced sanitation aboard vessels, *see* Order 27.

[7]   Plaintiffs have also retained the allegation in the AC that Carnival failed to use pre-boarding temperature checks on three of Carnival's 104 vessels and that this contradicts Defendants' statements that guests would be temperature checked in "many of our embarkation ports." SAC Chart 89 & ¶ 322. As the Court previously held, this statement was not misleading because "Defendants did not state that temperature checks would be conducted at *all* embarkation points, but rather '*many*.'" Order 23 (emphases in original).

would have interpreted Carnival's comments as a guarantee that the Company would always comply with every one of the myriad of potentially applicable rules and regulations.  *See* Order 22 (dismissing claims based on statements describing "aspirational goals").

The Second Circuit's decision in *Singh* v. *Cigna Corporation*, 918 F.3d 57 (2d Cir. 2019) is instructive.  In *Singh*, plaintiffs alleged that defendants' statements that they had "established policies and procedures to comply with applicable [regulatory] requirements" were materially misleading because a regulator later found that the company had committed several violations. *Id.* at 60–61.  The appellate court affirmed dismissal of these claims.  The court rejected plaintiffs' "creative attempt to recast" regulatory violations as securities fraud and explained that "such generic statements [regarding compliance] do not invite reasonable reliance . . . and so cannot form the basis of a fraud case."  *Id.* at 59–60.  The court also emphasized that defendants' statements about regulatory compliance were, like Carnival's disclosure, "framed by acknowledgements of the complexity and numerosity of applicable regulations," which "suggests caution (rather than confidence) regarding the extent of [defendant's] compliance."  *Id.* at 64.  Recent decisions from the Eleventh Circuit and this district are in accord.  *See, e.g.*, *Carvelli* v. *Ocwen Fin. Corp.*, 934 F.3d 1307, 1320–22 (11th Cir. 2019) (explicitly adopting the reasoning in *Singh* and affirming dismissal of statements about "regulatory compliance and risk management efforts" as "quintessential puffery"); *Norwegian Cruise Lines*, 2021 WL 1378296, at *6-7 (cruise line's statements during COVID-19 pandemic that employees "comply with all applicable laws and regulations," and that company had "taken several proactive measures to protect the health and safety of its guests and crew," were vague and inactionable puffery).

### B.   The SAC Does Not Adequately Allege That Defendants Had Unique or Special Access to Information about the Risks to Carnival's Business of COVID-19 But Failed to Issue Warnings Based on Such Information

The Court previously rejected Plaintiffs' allegations that Defendants misled investors about the risks of COVID-19 in early 2020, citing both Defendants' robust disclosures and Plaintiffs' failure to allege that Defendants had "any more insight as to the impact of COVID-19 than the average person . . . could readily ascertain."  Order 19-25.  The SAC does not even try to cure these deficiencies.  Plaintiffs identify *no* new misleading statements or omissions.  Nor are there *any* additional allegations describing risks of COVID-19 that were discussed in contemporaneous medical advisories or regulatory guidance, or imputing nonpublic knowledge of the risks of COVID-19 to Defendants.  Plaintiffs' allegations should be rejected for the

13

reasons stated in the Court's May 28 Order.

1. **January 2020 Statements**

The SAC identifies no new misleading statements or omissions in January 2020.
Plaintiffs repeat their allegation that Carnival's Form 10-K for 2019, filed on January 28, 2020,
was misleading because it failed to disclose the likely impact of COVID-19 on the Company's
business and passengers.  SAC ¶¶ 301-11; *compare* AC ¶¶ 221-31.  But the Court already
rejected this argument, citing "the COVID-19 specific warnings provided in Carnival's 2019 10-
K."  Order 19-20; *see* Ex. 6 at 21, 26.  Plaintiffs add a redundant allegation that Defendants'
"failure to include a COVID-19 risk factor" in the 10-K violated Item 105 (formerly Item 503) of
Regulation S-K, which requires disclosure of material factors that make an investment
"speculative or risky."  SAC ¶ 311.  This argument fails for the same reason as Plaintiffs'
Section 10(b) argument—Carnival's risk disclosures were adequate given how little was known
about the virus in January 2020.  *See City of Roseville Emps.' Ret. Sys.* v. *EnergySolutions, Inc.*,
814 F. Supp. 2d 395, 426 (S.D.N.Y. 2011) ("Item [105] violations . . . track Rule 10b-5
violations.").  Another court recently dismissed allegations that a company violated Item 105 by
failing to disclose the risk posed by COVID-19 in its January 2020 SEC filings because plaintiffs
failed to show "how Defendants would have known about the coronavirus risks" at that time.
*Berg* v. *Velocity Fin., Inc.*, 2021 WL 268250, at *10 (C.D. Cal. Jan. 25, 2021).

Plaintiffs also repeat their allegation that Carnival misled investors when it purportedly
told the press in January 2020 that the risks of COVID-19 to its guests, crew, and global business
were "low."  SAC ¶¶ 298-99; *compare* AC ¶¶ 218-19.  But the assessment of health authorities at
the time was that the risk from COVID-19 *was* "low."  *See, e.g.*, Ex. 7 at 2 (CDC describes the
"risk to the American public" as "low" on January 30, 2020).  As the Court previously explained,
"it is plausible that Defendants did indeed believe the risk to Carnival's business and passengers
to be relatively low, as cases outside China were only then starting to surface," and "pre-
pandemic life was mostly unchanged."  Order 33.  Indeed, as of January 30, 2020, there were
only *83 confirmed cases* of coronavirus and no confirmed deaths outside of mainland China.
SAC ¶ 91.  And Plaintiffs do not identify a *single* known case of COVID-19 aboard any cruise
ship, much less a Carnival ship, in January 2020.

In an effort to show that Defendants knew more than they disclosed about coronavirus,
the SAC repeats the allegation that a former Carnival employee ("FE1") had to find new

suppliers as plants and factories began shutting down in China due to the spread of COVID-19. SAC ¶ 89; *compare* AC ¶ 81.  The Court previously rejected this allegation as "insignificant." Order 19.  The SAC adds a new allegation that FE1 recalls that a single unspecified and undated fulfillment order from Italy did not arrive because of a COVID-19 shutdown.  SAC ¶ 89.  This one-off incident is just as "insignificant" as the employee's prior recollection, and does not suggest that Carnival somehow gained special insight into the scope or course of the pandemic. As the Court previously held, Plaintiffs fail to allege how this "amounts to Carnival having any more insight as to the impact of COVID-19 than the average person, whether in the United States or abroad, could readily ascertain."  Order 19.[8]

Plaintiffs repeat their allegation—nearly verbatim—that Defendants "uniquely underst[ood] the gravity of COVID-19 even before the WHO and United States government declared the outbreak a public health emergency," because a Carnival officer spoke to a battery manufacturer in Wuhan and gained "insight" into the "global situation" on January 25, 2020. SAC ¶ 87; compare AC ¶ 80.  The Court already rejected this argument as "vague" and "unpersuasive," and noted that there was no allegation that the "battery manufacturer had and shared medically or scientifically based knowledge regarding the spread of coronavirus such that Carnival had an obligation to forewarn its investors of potential risks that were then unknown." Order 19.  Plaintiffs also allege that various travel bulletins and guidance issued in January 2020 undermine Defendants' contemporaneous statements about the risks of COVID-19.  SAC ¶¶ 84-86, 300.  But these allegations are repeated nearly verbatim from the prior complaint, cite precisely the same documents, and should be rejected again.  *Compare* AC ¶¶ 94-96, 220.

## 2. February 2020 Statements

The SAC contains no allegations describing new misleading statements or omissions in February 2020, and there are no new allegations suggesting that Defendants gained unique insight into the scope of the pandemic that they failed to disclose.  The SAC, like the AC, simply ignores the undisputed facts that the CDC did not recommend against cruise travel until March 8, 2020.  SAC ¶ 211.  The U.S. Department of State also did not warn travelers of the dangers associated with COVID-19 on cruise ships generally until March 8, 2020.  *See id.*; Ex. 8.  The WHO did not issue guidance for handling COVID-19 on cruise ships until February 24, 2020—

---

[8]   Even if this employee did gain special insight into the impact of the virus, Plaintiffs do not allege that he ever communicated any of his observations to anyone, much less senior management.  *See infra* 19-21.

and even then, the WHO did not recommend that operators cancel cruises. *See* Ex. 9. The SAC therefore does not plausibly allege that Carnival's management had better insight than these public health experts regarding the geographic extent and rapidity of the pandemic's spread.[9] In *Norwegian Cruise Lines*, Judge Scola recently dismissed claims accusing a cruise company of *actively downplaying* the risks of COVID-19 aboard cruise ships in February and March 2020 because the company's statements—including that there was "[no] need to worry" and that coronavirus could not survive on vessels in "tropical temperatures"—"aligned with contemporaneous pronouncements" of the U.S. government. 2021 WL 1378296, at *5.

### 3.   March 2020 Statements

The SAC identifies exactly the same allegedly misleading statements in March 2020 included in the AC, including Donald's opinion that "a cruise ship is not a riskier environment" than other crowded venues because it provides guests with "space and social distancing" and medical clinics. SAC ¶¶ 328-32; *compare* AC ¶¶ 251-55. The Court previously rejected these allegations because the alleged misstatements were made on or after the date that "Carnival announced a voluntary suspension of voyages in response to the pandemic," and no statement "could reasonably mislead investors at that stage of the pandemic." Order 25. The alleged misstatements were also made after Carnival issued an SEC filing on March 16, 2020, which warned investors that "the ongoing effects of COVID-19 on [Carnival's] operations and global bookings will have a material negative impact on its financial results and liquidity," and "we expect results of operations for the fiscal year ending November 30, 2020 to result in a net loss." SAC ¶ 231. Just as before, Plaintiffs' failure to "reconcile the conflict" between the alleged misstatements and this robust disclosure fatally undermines their allegations. Order 25.[10]

---

[9]   The SAC repeats the allegations in the AC that Carnival's February 12, 2020 press release and 2019 annual report were misleading. *See* SAC ¶¶ 314, 320; *compare* AC ¶¶ 132, 236. But repeating these allegations does not improve them; the SAC once again omits the fact that these documents disclosed that the coronavirus caused the Company to suspend cruise operations and impose travel restrictions in Asia, and that, as a result, the coronavirus would "have a material impact" on its financial performance. Ex. 10 at 12; Ex. 11.

[10]   The Court previously found that Carnival Cruise Line's statement that it "had not had a diagnosed case linked to [its] operation" was false because it "connected to Carnival cruises generally" and not only to the Carnival Cruise Line brand. Order 23-25. Defendants respectfully ask the Court to reconsider. Carnival Cruise Line is one of the many brands operated by Carnival Corp. & plc, the parent company. The statement at issue was a one-page document titled "Carnival Cruise Line Announces Pause In Service." Ex. 12. The document indicated that the report was "provided by Carnival Cruise Line," described the "source" as "Carnival Cruise Line," and began: "Carnival Cruise Line announced today that it is pausing operations immediately across its fleet of ships based in North America." *Id.* The entire document unambiguously referred to Carnival Cruise Line (the brand), including the statement that "Carnival has not had a diagnosed case linked to *our* operation."

C.      **Plaintiffs Have Abandoned Their Theory That Defendants Misled Investors about Carnival's Commitment to Passenger Health and Safety**

The SAC appears to have abandoned the claim that Defendants' statements affirming Carnival's commitment to the health and safety of its guests and crew were materially misleading.  *See, e.g.*, SAC ¶ 290; *see also, e.g.*, Ex. 3 ¶¶ 1, 69-71, 90, 109, 126, 148, 245, 281, 290 (striking references to Defendants' "commitment" to health and safety).

To the extent the SAC continues to pursue this theory, it should be rejected for the reasons stated in the Court's May 28 Order.  As explained above, the SAC fails to show "how Defendants were non-compliant with applicable guidelines and recommendations."  Order 30; *supra* Section I.A.1.  And "many of Defendants' statements described Carnival's ongoing efforts and initiatives in furtherance of its health and safety goals."  Order 30 (citing Carnival's creation of a new compliance position); *accord* Order 33 ("Defendants did indeed take measures to further their health and safety goals, even if those efforts would ultimately prove to be unsuccessful in the face of a global pandemic.").  If anything, the SAC adds *additional* examples of Carnival's health and safety efforts, including allegations that Carnival deployed additional ships to deliver medical supplies and personnel to assist passengers in need.  *See* SAC ¶¶ 209, 226-27.

In any event, statements from cruise lines affirming their commitment to "the safety of our guests and crew" are "extremely vague and constitute corporate puffery and thus, are not actionable."  *Norwegian Cruise Lines*, 2021 WL 1378296, at *6 (citing *In re Royal Caribbean Cruises Ltd. Sec. Litig.*, 2013 WL 3295951, at *12 (S.D. Fla. Apr. 19, 2013)).[11]

II.      **The SAC Fails to Allege Scienter**

The Court previously held that even if the statements alleged in the complaint were materially false or misleading, Plaintiffs "have not sufficiently alleged a strong inference" of

---

*Id.* (emphasis added).  By contrast, Carnival Corp. & plc (the parent company) issued a separate press release the same day announcing that four "brands includ[ing] Carnival Cruise Line" were suspending operations.  Ex. 13; *see* SAC ¶ 216.  That document indicated that the report was "provided by Carnival Corporation & plc," described the "source" as "Carnival Corporation & plc," and began: "Carnival Corporation & plc . . . today announced that four additional North American cruise line brands" would suspend voyages.  Ex. 13.  Plaintiffs do not allege that any diagnosed cases were linked to the Carnival Cruise Line brand.  Even if the statement was false, however, it could not "reasonably mislead investors" because it was made on the same day that Carnival voluntarily suspended its voyages in response to the pandemic, as the Court previously held.  Order 25.

[11]   *See also Howard* v. *Arconic Inc.*, 395 F. Supp. 3d 516, 546–49 (W.D. Pa. 2019) (commitments to "product safety" and "[Environment, Health and Safety] Value[s]" are not actionable); *Ong* v. *Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 219, 232 (S.D.N.Y. 2018) (commitments to "food safety" are not actionable).

scienter.  Order 32-33.  *First*, Plaintiffs failed to show that "Defendants possessed some greater knowledge than the CDC or the WHO as to the devastation COVID-19 would ultimately cause." *Id.* 33.  *Second*, Defendants' efforts to further health and safety goals, such as voluntarily pausing Carnival's voyages, "cut against" scienter and rendered Plaintiffs' theory not "*as compelling* as the opposing inferences that one could draw from the facts alleged here." *Id.* 33 (emphasis in original).  We address these two issues in turn.

A.    <u>The SAC Fails to Allege That Defendants Had Contemporaneous Knowledge of Facts Contradicting Their Statements about the Risks of COVID-19</u>

The consensus among public health authorities in early 2020 was that the risks of COVID-19 were limited, and that certain preventative measures we take for granted today would not prevent the spread of the virus.  *See* Order 33; *supra* Section I.B.[12]  Plaintiffs nonetheless ask the Court to infer that Defendants somehow had greater knowledge than the CDC or the WHO of the scale, severity, and eventual impact of COVID-19 in early 2020.  *See* SAC ¶ 284.  Plaintiffs rely on the *exact* same allegations as in the AC, and plead no facts to support this inference.

The Court's Order fully disposes of this contention.  Nothing in the SAC undermines or calls into doubt the Court's prior conclusion that "it is plausible that Defendants did indeed believe the risk to Carnival's business and passengers to be relatively low" in early 2020.  Order 33.  As the Court explained: "In January 2020, pre-pandemic life was mostly unchanged with no travel restrictions, other than perhaps travel to and from China.  No mask mandates were in effect—nor were masks even recommended.  While it is *possible* that in January 2020 Defendants possessed some greater knowledge than the CDC or the WHO as to the devastation COVID-19 would ultimately cause, that argument does not give rise to the requisite strong inference of scienter to support a claim for securities fraud." *Id.* (emphasis in original).

Plaintiffs recycle the allegation that John Padgett learned about the "scale" and "severity" of the COVID-19 pandemic from a battery manufacturer in Wuhan on January 25, 2020, and, at some point, "shared [the information] with [Defendant] Donald."  SAC ¶¶ 87, 284; *compare* AC ¶¶ 80, 202.  As explained above, *supra* 15, the Court already rejected this precise allegation as "vague" and "unpersuasive," explaining that, "at best," it imputes "knowledge of the conditions

---

[12]    *See, e.g.*, Ex. 14 (February 3, 2020: WHO chief calls on countries not to impose restrictions "that 'unnecessarily interfere with international travel and trade'"); Ex. 15 at 8 (February 12, 2020: WHO does "not recommend any specific health measures for travellers"); Ex. 16 (March 1, 2020: WHO states "If you are healthy, you only need to wear a mask if you are taking care of a person with suspected #coronavirus infection").

in Wuhan, China, based on the battery manufacturer's personal observations."  Order 19.

Plaintiffs also repeat—verbatim—their allegation that scienter can be inferred because Carnival "conducted extensive operations in Asia."  SAC ¶ 287; *compare* AC ¶ 205.  But the wholly innocuous facts that Carnival launched a cruise ship "designed and built for the Chinese market" in 2017 and "described itself as 'the leading cruise operator in Asia'" in 2018 do not raise a strong inference that the Company lied to investors about the risks of COVID-19.  *Id.*

Similarly, the (verbatim) recycled allegation that Carnival had previously experienced "outbreaks of infectious disease on board its cruise ships," SAC ¶ 285, *compare* AC ¶ 203, does not suggest that the Company concealed information about COVID-19 outbreaks from investors. *See Chiarenza* v. *IBSG Int'l, Inc.*, 2010 WL 3463304, at *5 (S.D. Fla. Sept. 2, 2010) ("Knowledge of this past problem, on its own . . . is not enough to establish scienter.").  Plaintiffs do not allege Carnival made any attempt to conceal this information from investors.  *See In re KLX, Inc. Sec. Litig*., 232 F. Supp. 3d 1269, 1282–83 (S.D. Fla. 2017) (finding that prior disclosure of related negative information contradicts an inference of scienter).  Nor does the severity of outbreaks aboard certain Carnival ships evince scienter.  *See Brophy* v. *Jiangbo Pharm., Inc*., 781 F.3d 1296, 1304 (11th Cir. 2015) (affirming dismissal because plaintiffs "cannot persuasively allude to the magnitude of the [reporting errors] as a basis for a strong inference that [defendant executive] must have known of the errors as CFO").  The Court considered and implicitly rejected this allegation in its dismissal Order.  *See* Order 31-32.

### B.   The SAC Fails to Allege That Defendants Had Contemporaneous Knowledge of Facts Contradicting Their Statements about Regulatory Compliance

As detailed above, the SAC does not identify a single regulation violated by a single Carnival vessel during the Class Period.  *Supra* Section I.A.1.  Yet even if Plaintiffs' new allegations described isolated incidents of regulatory violations, Plaintiffs fail to plead—even in conclusory fashion—that information about *any* violation was ever communicated to Donald or any other member of senior management during the Class Period.  The SAC thus fails to plead a strong inference of scienter.  *See Mizzaro* v. *Home Depot, Inc.,* 544 F.3d 1230, 1253 (11th Cir. 2008) (finding scienter allegations inadequate where complaint lacked particularized allegations that facts contradicting public statements were reported to senior management during the class period); *Norwegian Cruise Lines*, 2021 WL 1378296, at *9 (finding plaintiff failed to plead a strong inference that cruise line's statements concerning COVID-19 were made with scienter because the complaint failed to identify any evidence connecting the individual defendants to the

19

alleged fraud, or imputing other employees' knowledge of the fraud to senior executives).[13]

Plaintiffs nonetheless ask the Court to infer that Donald *must have* known about isolated regulatory infractions because of his position as CEO and "access to" such information.  SAC ¶ 36.  The SAC's only new scienter allegation is attributed to FE3, who recalls that, "as early as late January," the Company held daily meetings to discuss "illness rates and all progress reports."  SAC ¶ 279.  Plaintiffs allege that "the entire C-suite" attended these meetings, and FE3 was "first pulled into" the meetings "around February 5, 2020."  *Id.*  FE3 does not allege that there was any discussion during these meetings of Carnival's health protocols or regulatory compliance, nor does he assert that there was any discussion of the way health protocols were actually being implemented aboard any vessel.  The SAC thus fails to allege that management was made aware that any of its contemporaneous statements were inaccurate.  In fact, FE3 does not describe *any* specific meeting he attended, and fails to identify (even in conclusory fashion) *any* information contradicting Defendants' public statements that was discussed at any meeting.  These vague allegations do not support an inference of scienter.  *See Garfield* v. *NDC Health Corp.*, 466 F.3d 1255, 1265 (11th Cir. 2006) (holding that allegations about a meeting involving senior executives were insufficiently particularized where the complaint "failed to allege what was said at the meeting, to whom it was said, or in what context").

To the extent Plaintiffs rely on FE3's subjective but unexpressed "belief" that Carnival's safety protocols were inadequate, *supra* 11, those allegations also do not raise a strong inference of scienter.  There are no allegations—even conclusory ones—that FE3 shared his observations or belief with *anyone*, much less a member of senior management.  *See* SAC ¶ 132; *Mizzaro,* 544 F.3d at 1253; *Norwegian Cruise Lines*, 2021 WL 1378296, at *9.  In any event, the criticism of a single midlevel employee does not give rise to an inference of scienter.  *See Druskin* v. *Answerthink, Inc.*, 299 F. Supp. 2d 1307, 1334 (S.D. Fla. 2004) (allegations of confidential witnesses insufficient to support inference of scienter where they "amount[ed] to no more [than] former employees who either disagreed with management's decisions or held personal beliefs unsupported by particularized factual allegations").

---

[13]   *Accord Mogensen* v. *Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1220 (M.D. Fla. 2014) (adequately pleading scienter requires particularized allegations such as "specific details of first-hand interactions with a defendant in which they advised him that existing facts contradicted his public disclosures"); *Fidel* v. *Rampell*, 2005 WL 5587454, at *7 (S.D. Fla. Mar. 29, 2005) (scienter allegations inadequate when complaint failed to allege that defendants were directly told specific information that contradicted their public disclosures).

Every one of the SAC's remaining scienter allegations is repeated—often verbatim—from the prior complaint.  Plaintiffs once again allege that Donald must have known of specific regulatory violations throughout the Class Period because in early February 2020 he was "dialing into the situation updates" and participating in unspecified "crisis-response meetings."  SAC ¶ 278; *compare* AC ¶ 197.  But the SAC provides no details about who attended these meetings and what was said, much less that Donald learned facts contradicting Defendants' public statements about the virus.  *See Mizzaro*, 544 F.3d at 1253; *Norwegian Cruise Lines*, 2021 WL 1378296, at *9.  The Court previously dismissed the AC notwithstanding the allegation that "Donald was directly involved in Carnival's COVID-19 crisis response."  *See* Order 31.[14]

Plaintiffs also re-allege that Defendants must have known about supposed regulatory violations because Carnival's Board maintains a HESS Committee which "interact[s] frequently with Company management and the rest of the Board of Directors."  SAC ¶ 283; *compare* AC ¶ 201.  Plaintiffs add the unremarkable allegation that Carnival's Chief Ethics and Compliance Officer reported to the Company's CEO.  *See* SAC ¶ 278.  Fatally, however, the SAC once again contains no allegations describing any meeting of the HESS Committee, much less a particular meeting at which Donald or any senior executive, including the Chief Ethics and Compliance Officer, was in attendance and briefed on any allegedly contrary fact identified in the SAC.  *See Henningsen* v. *ADT Corp.*, 161 F. Supp. 3d 1161, 1200 (S.D. Fla. 2015) (finding allegation that CEO would "always" attend meetings where attrition and competition were discussed insufficient to demonstrate scienter with respect to alleged misrepresentations regarding the effect of competition on customer attrition).  The allegation that scienter can be inferred from "the mere existence of an internal reporting system, and the mere active engagement of management," is "precisely the type[] of vague allegation[] that the PSLRA was meant to curtail."  *Mogensen*, 15 F. Supp. 3d at 1220–21 (citations omitted).[15]

---

[14]   The SAC repeats the allegation that Donald was copied on an email from the CDC on April 5, 2020, where the CDC voiced concern about Carnival's plan for repatriating passengers.  SAC ¶ 280; *compare* AC ¶ 198.  But the email contains no suggestion of any wrongdoing by Carnival, and, in any event, post-dates the Class Period and cannot show Donald's knowledge of contrary facts during the Class Period.  *See Durham* v. *Whitney Info. Network, Inc.*, 2009 WL 3783375, at *19 (M.D. Fla. Nov. 10, 2009) (absent a link to knowledge or theory of fraud during the class period "any post class [period] developments are not relevant or indicative of scienter").

[15]   Although the SAC does not explicitly mention the "core operations" doctrine, Plaintiffs previously argued that it supported scienter in their brief opposing Defendants' motion to dismiss.  *See* Dkt. 64 at 34-35.  The Court considered this argument, *see* Order 32, and implicitly rejected it.  To the extent Plaintiffs rely on this doctrine, the Court should reject it again because the "Eleventh Circuit has never adopted the core operations doctrine,"

**C.**    **Defendants' Conduct During the Class Period Was Fundamentally Inconsistent with Scienter**

Because the "scienter analysis is comparative," courts must consider "alternative inferences that arise from the Complaint's allegations (and apparent omissions)." *FindWhat Inv'r. Grp.* v. *FindWhat.com*, 658 F.3d 1282, 1303 (11th Cir. 2011).  The Court previously held that Plaintiffs' theory of scienter is not "*as compelling* as the opposing inferences that one could draw from the facts alleged here."  Order 33.  Nothing in the SAC changes the Court's analysis.

For example, the Court determined that Carnival's affirmative decision to suspend its cruises worldwide *in advance* of the CDC's No Sail Order—which had an immediate and substantial negative effect on the company's bottom line—"cut against" Plaintiffs' theory of scienter.  *Id.*; *see In re NDCHealth Corp., Inc., Sec. Litig.*, 2005 WL 6074918, at *9 (N.D. Ga. July 27, 2005) (finding that immediate disclosure of information that would have a negative impact on the company "weighs *against* a finding of scienter").

Several other allegations in the SAC similarly "cut against" Plaintiffs' theory of scienter. Carnival's voluntary, affirmative disclosures throughout the Class Period that COVID-19 could have a material negative impact on the business strongly suggest that the Company did not intend to deceive the public about the risks of COVID-19.  *E.g.*, Ex. 6 at 26; Ex. 11.  Carnival also provided regular updates regarding the situations aboard several vessels described in the SAC, often on a daily basis.  *See, e.g.*, Exs. 17-18.  "Defendants' repeated public cautionary statements and disclosures would make little sense if Defendants had a plan to deceive the public on these very issues."  *See Henningsen*, 161 F. Supp. 3d at 1204.

Although the Court did not have occasion to reach the issue, Plaintiffs' theory of scienter is also implausible because they fail to identify any motive for any Defendant to defraud investors in early 2020.  *See In re KLX*, 232 F. Supp. 3d at 1282 (finding that failure to allege "any personal motive" weighed against scienter).[16]  Plaintiffs have not alleged that any Carnival executives or directors sold any of their Carnival shares during the class period, "an omission that weighs against inferring scienter."  *Mizzaro*, 544 F.3d at 1253; *accord In re Altisource*

---

and "the core operations doctrine alone" could not satisfy "the PSLRA's requirement that scienter be pled with particularity[.]" *Plymouth Cty. Ret. Sys.* v. *Carter's Inc.*, 2011 WL 13124501, at *17 (N.D. Ga. Mar. 17, 2011). The core operations doctrine also fails because Carnival's compliance practices do not "constitute nearly all of [the] company's business." *Thomas* v. *Shiloh Indus., Inc.*, 2017 WL 1102664, at *4 (S.D.N.Y. Mar. 23, 2017).

[16]   *See In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1337 (M.D. Fla. 2002) ("It is also significant that the Amended Complaint contains no allegations as to [defendant's] motive to commit or participate in fraud.").

*Portfolio Sols., S.A. Sec. Litig.*, 2015 WL 12001262, at *14 (S.D. Fla. Sept. 4, 2015).  To the contrary, Carnival plc *repurchased* more than 3 million of its own shares during the class period. *See* Ex. 19 at 7; SAC ¶ 22 (alleging that Carnival did not suspend share repurchases until the end of the class period).  This fact is wholly inconsistent with scienter because no Company would purchase its own shares at a price it knows to be inflated.  *See In re Ocwen Fin. Corp. Sec. Litig.*, 2015 WL 12780960, at *10 (S.D. Fla. Sept. 4, 2015); *Henningsen*, 161 F. Supp. 3d at 1204.

In essence, Plaintiffs are alleging that Carnival engaged in irrational and self-destructive behavior by continuing to operate cruises and make optimistic statements about its business, despite knowing that COVID-19 would inevitably cause passengers and crew to become sick or even die and its business to grind to a halt.  The far more plausible inference is that Carnival, like the rest of world, was taken by surprise by the development of the pandemic and updated its disclosures as the situation unfolded.  *See Nguyen* v. *Endologix, Inc.*, 962 F.3d 405, 416–19 (9th Cir. 2020) (finding it more plausible that defendants modulated their public optimism over time regarding their clinical trials as more information became available than that they intentionally pursued a hopeless FDA approval process).

### III.    The SAC Fails to Allege Loss Causation

Plaintiffs point to three SEC filings as purported "corrective disclosures" that revealed the truth of Defendants' fraud: (i) a filing on March 16, 2020, disclosing that Carnival believed COVID-19 "will have a material negative impact on its financial results and liquidity" and that the Company expected a "net loss" for the fiscal year, SAC ¶ 231, and (ii) two filings on March 31, 2020, that disclosed substantially similar information in connection with Carnival's public and private offerings of new shares, *see id.* ¶ 248.  Although the Court did not reach this issue in the dismissal Order, *see* Order 10 n.2, these filings—the same identified in the prior complaint, *see* AC ¶¶ 150 & 167—do not satisfy Plaintiffs' burden for pleading loss causation.

*First*, the SAC does not adequately allege loss causation because the March disclosures did not reveal the alleged falsity of the statements identified in the SAC.  *See Meyer* v. *Greene*, 710 F.3d 1189, 1200 (11th Cir. 2013).  The Supreme Court's recent decision in *Goldman Sachs Group, Inc.* v. *Arkansas Teacher Retirement System*, 141 S. Ct. 1951 (June 21, 2021)—which postdates the dismissal Order—is on point.  There, the Court explained that the inference that a later disclosure corrects an earlier misrepresentation—and therefore causes an investor's loss— "starts to break down when there is a mismatch between the contents of the misrepresentation

23

and the corrective disclosure." *Id.* at 1961.  Such a mismatch "may occur when the earlier misrepresentation is generic (*e.g.*, 'we have faith in our business model') and the later corrective disclosure is specific (*e.g.*, 'our fourth quarter earnings did not meet expectations')." *Id.*  The SAC contains precisely such a "mismatch."  The "generic" alleged misrepresentations in the SAC (*e.g.*, "[w]e are dedicated to fully complying with, or exceeding, all legal and statutory requirements," SAC ¶ 301), stand in sharp contrast to the "specific" corrective disclosures that allegedly later caused Carnival's stock to decline (*e.g.*, "we expect results of operations for the fiscal year ending November 30, 2020 to result in a net loss," SAC ¶ 231).  This "mismatch" is almost identical to the example identified as insufficient by the Supreme Court.

*Second*, Plaintiffs indulge in a fiction that it was Carnival's conduct aboard certain vessels that caused the Company's stock to drop.  But the obvious reason that the Company's stock dropped in March 2020 was the suspension of Carnival's global business.  The March disclosures specifically cite the fact that Carnival implemented a "pause" of its "global fleet cruise operations across all brands" as a reason for its negative financial outlook.  *See* Ex. 20 at 4; Ex. 21 at 10.  Even if Carnival had done a better job responding to the pandemic, the Company's stock still would have plummeted after it was forced to abruptly cancel its worldwide business operations in March 2020.  Plaintiffs' failure to "allege facts sufficient to apportion the losses between the [factors] that ultimately destroyed [their] investment" renders their loss causation allegations inadequate.  *Waterford Twp. Gen. Emps. Ret. Sys.* v. *SunTrust Banks Inc*., 2010 WL 3368922, at \*4 (N.D. Ga. Aug. 19, 2010) (quotation and citation omitted).[17]

*Finally*, neither disclosure could have caused investors' losses because Carnival warned of the risks that materialized and the information "revealed" in the disclosures was already public.  As described above, Defendants repeatedly disclosed prior to March 16, 2020 that COVID-19 would have a material negative impact on the Company's finances.  *See* Ex. 6 at 26; Ex. 11.  Under clear Eleventh Circuit law, investors cannot establish loss causation when they seek to recover losses attributable to "market forces that [defendant] warned of."  *Hubbard* v. *BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 729–30 (11th Cir. 2012).  Moreover, Carnival and the press reported the events aboard Carnival vessels described in the SAC long before the March

---

[17] *See also In re HomeBanc Corp. Sec. Litig.*, 706 F. Supp. 2d 1336, 1361 (N.D. Ga. 2010) (loss causation not pleaded where complaint "fails to make any allegations that would allow the Court to distinguish between any losses caused by the Defendants' alleged misrepresentations and the collapse of the [] industry as a whole").

disclosures.  *See, e.g.*, Exs. 17-18, 22; *accord* SAC ¶ 315 (quoting *New York Times* article, Ex. 22, with sub-headline: "Carnival could be hurt financially after passengers on two of its ships [Diamond Princess and Westerdam] were found to be infected").  Because the purported corrective disclosures merely confirmed negative information already known to the market, they did not cause Plaintiffs' loss.  *See Luczak* v. *Nat'l Beverage Corp.*, 812 F. App'x 915, 926 (11th Cir. 2020) ("If a document discusses only information of which the market is already aware . . . it is simply insufficient to constitute a corrective disclosure.") (quotation omitted).

**IV.**    **If Plaintiffs' Claims Are Not Dismissed, the Class Period Should Be Shortened**

The alleged Class Period begins on September 16, 2019, the date on which Carnival announced the creation of the IAG, a team "focused on investigating and analyzing so-called 'HESS issues.'"  SAC ¶ 67.  But the SAC provides no explanation for why the Class Period should begin on that date.  Plaintiffs do not allege that the IAG did or failed to do anything, or that the Company concealed anything from investors about the IAG.  The SAC does not allege that Defendants misled investors about the risks of COVID-19 until January 28, 2020, when Carnival allegedly described the risk of coronavirus as "low" despite its supposed knowledge to the contrary.  *See* SAC ¶ 90.  And the SAC does not allege that Carnival violated any regulations until the events aboard the Diamond Princess in February 2020.  *See* SAC ¶ 95.

Plaintiffs make the wholly conclusory argument that "[t]he failings associated with the coronavirus outbreaks on Carnival's ships" reflected inadequate health and safety protocols "that existed at the beginning of the Class Period."  SAC ¶ 79.  But there are no well-pleaded facts that support this allegation.  To the contrary, the section of the SAC alleging supposed misstatements in 2019, *id*. ¶¶ 67-79, points exclusively to events occurring in 2020 for support, *id*. ¶¶ 75-76, 78.  Although the Court declined to reach this issue in the dismissal Order, *see* Order 10 n.2, the Class Period should begin no earlier than the date on which Defendants are actually alleged to have misled investors—January 28, 2020.  *See In re Miva, Inc., Sec. Litig.*, 2008 WL 681755, at *2 (M.D. Fla. Mar. 12, 2008) (excising 17 months from the beginning of a class period because the alleged misstatements during that period "were not actionable").[18]

## CONCLUSION

The Court should dismiss the SAC with prejudice.

---

[18]    The Section 20(a) claim should be dismissed because Plaintiffs fail to plead a predicate violation of Section 10(b).  *See McClain* v. *Iradimed Corp.*, 111 F. Supp. 3d 1293, 1307 (S.D. Fla. 2015).

## **REQUEST FOR HEARING**

Pursuant to L. R. 7.1(b)(2), Defendants respectfully request a hearing on the Motion. Defendants believe a hearing would be helpful given the complexity of the underlying issues, allegations, and factual timeline involved in this matter and will assist the Court in adjudicating the Motion.  Defendants estimate that sixty (60) minutes will be sufficient.


Dated: August 6, 2021
       Miami, Florida

                                      Respectfully submitted,

                                       NELSON MULLINS BROAD AND
                                           CASSEL

                                       */s/ Mark F. Raymond*
                                       Mark F. Raymond
                                       Florida Bar No. 373397
                                       Erin K. Kolmansberger
                                       Florida Bar No. 94104
                                       2 South Biscayne Blvd. 21st Floor
                                       Miami, FL 33131
                                       Tel: 305-373-9425
                                       Fax: 305-995-6384
                                       Email:  mark.raymond@nelsonmullins.com
                                                  erin.kolmansberger@nelsonmullins.com

                                       PAUL, WEISS, RIFKIND,
                                           WHARTON & GARRISON LLP
                                       Theodore V. Wells Jr.
                                       (*admitted pro hac vice*)
                                       Richard A. Rosen
                                       (*admitted pro hac vice*)
                                       Daniel S. Sinnreich
                                       (*admitted pro hac vice*)
                                       1285 Avenue of the Americas
                                       New York, New York  10019
                                       Tel:  212-373-3000
                                       Fax:  212-757-3990
                                       Email:  twells@paulweiss.com
                                                  rrosen@paulweiss.com
                                                  dsinnreich@paulweiss.com


                                       ***Counsel for Defendants***

26

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that, on August 6, 2021, a copy of the foregoing **Defendants'**
**Motion to Dismiss the Second Amended Class Action Complaint** was filed electronically.
Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic
filing system.  Parties may access this filing through the Court's CM/ECF System.


<u>*/s/ Mark F. Raymond*</u>
Mark F. Raymond
Florida Bar No. 373397
Erin K. Kolmansberger
Florida Bar No. 94104
2 South Biscayne Blvd. 21st Floor
Miami, FL 33131
Tel: (305) 373-9425
Fax: (305) 995-6384
E-mail:  mark.raymond@nelsonmullins.com
         erin.kolmansberger@nelsonmullins.com


*Attorney for Defendants*