**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:20-cv-22202-KMM

IN RE CARNIVAL CORP. SECURITIES
LITIGATION.
_____/

## ORDER

THIS CAUSE came before the Court upon Defendants Carnival Corp., Carnival plc, and Arnold Donald's (collectively, "Carnival" or "Defendants") Motion to Dismiss the Second Amended Complaint and Incorporated Memorandum of Law. ("Mot.") (ECF No. 79). Lead Plaintiffs New England Carpenters Pension and Guaranteed Annuity Funds ("New England Carpenters") and Massachusetts Laborers' Pension and Annuity Funds ("Massachusetts Laborers") (collectively, "Lead Plaintiffs") and Named Plaintiff Michael W. Slaunwhite ("Slaunwhite" and together with Lead Plaintiffs, "Plaintiffs") filed a Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Second Class Action Complaint. ("Resp.") (ECF No. 82). Defendants filed a Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss the Second Amended Complaint. ("Reply") (ECF No. 85). The Motion is now ripe for review.

## I.   BACKGROUND[1]

This case arises under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Securities Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. SAC ¶ 24. Defendant Carnival Corp.

---

[1] The following background facts are taken from the Second Amended Class Action Complaint ("SAC") (ECF No. 74) and are accepted as true for purposes of ruling on this Motion to Dismiss. *Fernandez v. Tricam Indus., Inc.*, No. 09-22089-CIV-MOORE/SIMONTON, 2009 WL 10668267, at *1 (S.D. Fla. Oct. 21, 2009).

operates the world's largest cruise company, and its common stock is listed and traded on the New York Stock Exchange ("NYSE").  *Id.* ¶ 31. Defendant Carnival Corp.'s "three largest global segments, Carnival Cruise Line, Princess Cruises, and Holland America, sail itineraries throughout the world with a collective fleet of fifty ships." *Id.* ¶ 38.  Defendant Carnival plc, together with Carnival Corp. "formed a dual-listed company called Carnival, operate[d] as a single economic enterprise with a single senior executive management team and identical Board of Directors." *Id.* ¶ 33.  Carnival plc's American Depositary Shares ("ADS") are listed and traded on the NYSE. *Id.* ¶ 32.  Defendant Donald is the president and chief executive officer ("CEO") of Carnival and a Director of both Carnival Corp. and Carnival plc.  *Id.* ¶ 34.  Plaintiffs in this consolidated class action lawsuit purchased Carnival common stock between September 16, 2019 and March 31, 2020 (the "Class Period").  *Id.* at 5, ¶¶ 28–30.

"[P]rior to the Class Period, Carnival routinely touted its commitment to health and safety." *Id.* ¶ 49.  During the Class Period, Carnival's website advertised that its ships "operate[d] in full compliance with—and in many cases exceed[ed]—all U.S. and international safety regulations." *Id.* ¶ 54.  Carnival's commitment to health and safety was also documented on its Form 10-K filed January 28, 2020 ("2019 10-K"), wherein it stated:

> We are committed to providing a healthy environment for all of our guests and crew.  ***We collaborate with public health inspection programs throughout the world, such as the Centers for Disease Control and Prevention ("CDC") in the U.S. and the SHIPSAN Project in the EU to ensure that development of these programs leads to enhanced health and hygiene onboard our ships***.  Through our collaborate efforts, ***we work with the authorities to develop and revise guidelines, review plans and conduct on-site inspections for all newbuilds and significant ship renovations.  In addition, we continue to maintain our ships by meeting, and often exceeding, appliable public health guidelines and requirements,*** complying with inspections, reporting communicable illnesses and conducting regular crew training and guest education programs.

*Id.* ¶ 303 (emphasis in original).  In the years leading up to the Class Period, "and before the outbreak of COVID-19[,]" the CDC published best practices to advise cruise operators facing outbreaks of infectious diseases: Guidance for Cruise Ships on Influenza-Like Illness ("ILI") Management ("ILI Guidance").  *Id.* ¶ 52.  However, despite its "purported compliance" with applicable health and safety guidelines, "Carnival has routinely failed to adequately contain outbreaks of ILI and other infectious diseases on its ships."  *Id.* ¶¶ 14, 55.

Further, in the decade preceding the Class Period, "Carnival has been embroiled in environmental and safety scandals that have tarnished its reputation for maintaining stringent health, safety, and sustainability practices."  *Id.* ¶ 58.  These scandals resulted in Carnival making "repeated efforts to shore up its safety and security protocols," including the formation of a Health, Environmental, Safety & Security Committee (the "HESS Committee"), which "is comprised of at least three independent directors and meets at least four times annually."  *Id.* ¶ 59.

The HESS Committee is governed by Carnival's HESS Policy, which imposes several requirements upon Carnival's management team in furtherance of Carnival's commitment to "protecting the health, safety and security of [its] passengers, guests, employees and all others working on [its] behalf, thereby promoting an organization that strives to be free of injuries, illness and loss."  *Id.* ¶¶ 60–62, 150.  "These specific principles and implementation tasks presented to investors what appeared to be a robust management infrastructure around health and safety issues." *Id.* ¶ 63.  Carnival took other actions to publicly demonstrate its commitment to health and safety, such as filing a report on June 18, 2019 discussing its commitment to health and safety and creating a chief ethics and compliance officer position in August 2019.  *Id.* ¶¶ 64–65.  "As the outbreak of COVID-19 would eventually demonstrate, however, Carnival's purported policies and protocols concerning health and safety were far different than its public statements."  *Id.* ¶ 66.

At the outset of the Class Period, on September 16, 2019, "Carnival represented that it had made significant enhancements to its purported health and safety protocols." *Id.* ¶ 67. One such enhancement was the creation of the Incident Analysis Group ("IAG"), which "would make recommendations to enhance Carnival's HESS policies, procedures, and training; recommend corrective action and preventative plans; and share lessons to prevent recurrence of issues." *Id.* Carnival appointed "a career professional in transportation management and safety" to lead the IAG. *Id.* ¶ 68. Carnival represented that these efforts "constituted a significant enhancement to Carnival's HESS infrastructure in response to the outbreaks of infectious disease and other HESS incidents [Carnival] faced in prior years." *Id.* ¶ 69.

Defendants "further touted [their] health and safety capabilities" during a conference call on September 26, 2019, when Carnival announced its financial results for the third quarter of 2019. *Id.* ¶ 72. According to Plaintiffs, "Defendants' statements were untrue and created the misleading impression for investors that Carnival had proper protocols in place to ensure compliance with applicable health and safety guidelines and minimize the financial impact of infectious disease outbreaks on its cruise ships." *Id.* ¶ 73. "The true financial impact of Carnival's misrepresentations became critically apparent to investors as [Carnival] was forced to materially augment its risk factors to address the impact of the COVID-19 outbreaks on its ships, reputation, and financial outlook, and to seek to raise over $9 billion in cash during March of 2020." *Id.*

Plaintiffs contend that the COVID-19 pandemic revealed that Carnival "lacked proper policies, procedures, controls, or processes to prevent cruise ships from embarking on new voyages after it learned that passengers and crew were exposed to COVID-19" and "lacked proper health and safety policies and procedures to prevent passengers from embarking on cruises on ships where infection had already been detected." *Id.* ¶¶ 75–76. Additionally, Carnival "failed to follow

existing internal and CDC protocols, notwithstanding its public statements to the contrary." *Id.* ¶ 78. These failures "were not the result of an internal change in Company policy or infrastructure that occurred in January, February, or March 2020," as there were no changes to those policies or the Company's infrastructure during that period. *Id.* ¶ 79. "Rather, Carnival's failures reflected a lack of effectively functioning health and safety protocols, procedures, and operational capabilities that existed at the beginning of the Class Period." *Id.*

Carnival publicly downplayed the risk of COVID-19 in a January 2020 news article and continued to tout its dedication to health and safety in its 2019 10-K. *Id.* ¶¶ 83, 88. However, just days before filing its 2019 10-K and unknown to investors, Carnival "came into possession of information that allowed Defendants to uniquely understand the gravity of COVID-19 even before the [World Health Organization ("WHO")] and United States government declared the outbreak a public health emergency." *Id.* ¶ 87. Carnival was in such a unique position because one of Carnival's vendors—based in Wuhan, China—alerted Carnival's chief experience and innovation officer John Padgett ("Padgett") of "the scale and severity of COVID-19" and Padgett, in turn, shared that information with Defendant Donald. *Id.* Additionally, a former employee ("FE1") of Carnival "confirmed that Carnival had early access to information about the effects of the coronavirus on Carnival's business." *Id.* ¶ 89. Carnival continued to publicly downplay the risk of coronavirus on its ships in the days that followed. *Id.* ¶¶ 93–94.

Thereafter, passengers and crewmembers would indeed become ill aboard Carnival's ships. *Id.* ¶¶ 95–96, 103. "On Saturday, February 1, 2020, Hong Kong's government informed Carnival that a *Diamond Princess* passenger [who disembarked on January 25, 2020] had tested positive for COVID-19 at a hospital in Hong Kong." *Id.* ¶ 102. The next day, *Diamond Princess* crew members began exhibiting COVID-19 symptoms. *Id.* ¶ 103. Despite these developments,

5

*Diamond Princess* passengers were encouraged to "enjoy themselves" and partake in normal ship activities. *Id.* ¶ 107.

"Because there was insufficient [personal protective equipment ("PPE")] aboard the *Diamond Princess*, crewmembers often wore the same pair of gloves to deliver food to dozens of cabins at a time. Crewmembers collected dirty dishes and used linen without PPE." *Id.* ¶ 111. Passengers aboard the *Diamond Princess* were not given masks or PPE after Carnival learned of the confirmed case. *Id.* ¶ 123. News outlets began publishing articles criticizing Carnival's actions, or lack thereof. *Id.* ¶¶ 118–19, 125, 129–30. As ultimately reported by *Bloomberg Businessweek* on May 21, 2020, 712 people on the *Diamond Princess* tested positive for COVID-19; 40 of those passengers were eventually admitted to intensive care, and 12 died. *Id.* ¶ 125.

As COVID-19 began to spread on the *Diamond Princess* and other Carnival ships, Defendant Donald personally directed Carnival's response. *Id.* ¶¶ 124–26. A former employee ("FE3")—who "was integrally involved in mediating the COVID-19 outbreaks on board the *Diamond Princess* and other Carnival ships in early February"—explained that, as early as late January 2020, Carnival "held daily meetings, which included everyone from the C-suite (including Donald) to active crew members working on board the ships." *Id.* ¶ 125. "FE3 stated that 'no protocols or policies were in place to deal with COVID,' particularly shore-side, and any protocols that existed on board Carnival's ships were 'not sufficient enough to deal with a pandemic, otherwise we wouldn't have had to go through what we did.'" *Id.* ¶ 132.

Meanwhile, "Carnival encouraged its sales staff to continue ***selling*** cruises in order to maximize profits in the face of a clear danger to its passengers and crew." *Id.* ¶ 134 (emphasis in original). When customers inquired with Carnival about canceling their cruise tickets, "sales staff

were told to offer them incentives, such as a double cruise in the future, to keep them on the hook if they did not cancel." *Id.* ¶ 138. "Sales staff were also instructed to tell cancelling customers that, due to administrative issues, their refunds would take an increasingly long time to process." *Id.*

On February 12, 2020, the CDC published its Interim Guidance for Ships on Managing 2019 Novel Coronavirus ("COVID-19 Guidance"). *Id.* ¶ 141. The CDC COVID-19 Guidance included recommendations for treating passengers suspected of having COVID-19; managing passenger care when an infection was confirmed; imposing symptom, temperature, and potential exposure checks before passengers boarded ships; and crew management. *Id.*

On February 24, 2020, Carnival announced the cancellation of all its cruises to mainland China through mid-March 2020, and the suspension of its *Diamond Princess* cruises to mainland China through mid-April 2020, which Carnival downplayed as "merely due to the spread of COVID-19 and increasing restrictions related to China alone, not to the clear danger posed by cruising in the midst of a rapidly spreading pandemic." *Id.* ¶ 147.

On February 26, 2020, Carnival issued its Schedule 14A Proxy Statement, which omitted any reference to the risks of COVID-19 but continued to tout Carnival's commitments to health and safety. *Id.* ¶¶ 148–51. On February 27, 2020, Carnival filed its 2019 Annual Report, which included a short section discussing the risks of COVID-19 but did not disclose that Carnival's lack of a comprehensive plan to contain outbreaks of the coronavirus on its ships posed a severe long-term risk to its business. *Id.* ¶¶ 152–53.

On March 4, 2020, "Carnival told passengers on the *Grand Princess* ship, which was then sailing from San Francisco to Hawaii, that the CDC was investigating a cluster of COVID-19 cases in Northern California—including the death of one man—that was linked to [its] previous *Grand*

*Princess* cruise[.]" *Id.* ¶ 154.  "[P]rior to boarding the *Grand Princess* on February 11, 2020, passengers were merely asked to sign a form stating that they were not sick; passengers were not questioned further about their travel history or potential exposure to the coronavirus, and none was examined." *Id.* ¶ 155.  "*[N]one* of the passengers or crew members who transitioned from the first *Grand Princess* voyage to the second were examined in any capacity until March 5, 2020—nearly two weeks after the second voyage began." *Id.* ¶ 160 (emphasis in original).  Passengers who had sailed on the first *Grand Princess* voyage were instructed to remain in their cabins until they could be medically cleared, and Carnival advised its passengers that more cleaning and sanitation would be done. *Id.* ¶ 164.  Even still, on March 5, 2020, passengers continued to utilize the ship's various amenities and participate in activities without restriction.  *Id.* ¶ 165.

"By March 6, 2020, the onboard medical center was overwhelmed with calls and visits. The *Grand Princess* was running low on surgical masks and its crew was not isolated, with many sharing cabins and bathrooms." *Id.* ¶ 167.  The next day, Carnival decided to hold the ship at sea "approximately 50 miles off the coast of San Francisco.  That same day, a critically ill passenger was evacuated from the ship." *Id.* ¶ 168.  The *Grand Princess* was eventually allowed to dock at the Port of Oakland on March 9, 2020.[2] *Id.* ¶ 169.

On March 8, 2020, the U.S. State Department and the CDC issued guidance stating "U.S. citizens, particularly travelers with underlying health conditions, should not travel by cruise ship. CDC notes increased risk of infection of COVID-19 in a cruise ship environment." *Id.* ¶ 211.

---

[2] Similar events unfolded on the *Costa Luminosa*, *id.* ¶¶ 171–82, the *Ruby Princess*, *id.* ¶¶ 183–93, the *Coral Princess*, *id.* ¶¶ 194–210, and the *Zaandam*, *id.* ¶¶ 218–228.  For instance, on the *Coral Princess*, passengers reported no additional or enhanced medical or health screening procedures. *Id.* ¶ 195.  And, on the *Ruby Princess*, "[a]t all times during the cruise . . . passengers were allowed access to the pools, gym, and buffets aboard the ship." *Id.* ¶ 190.

On March 13, 2020, Carnival announced that it was pausing its operations. *Id.* ¶ 216. On March 16, 2020, Carnival issued a Form 8-K "disclosing that Carnival had notified its lenders under a revolving credit agreement . . . that it intended to borrow approximately $3 billion 'in order to increase its cash position and preserve financial flexibility.'" *Id.* ¶ 230. After the market closed that same day, Carnival filed an amendment to its Form 8-K stating that it "could no longer provide an earnings forecast and that it expected the fiscal year to end in a net loss." *Id.* ¶ 231.

Shares of Carnival common stock declined by over 12 percent, from a closing price of $14.57 on March 16, 2020 to a closing price of $12.71 on March 17, 2020. Carnival ADS also declined by over 12 percent, from a closing price of $12.91 on March 16, 2020 to a closing price of $11.33 on March 17, 2020. "Market commentators clearly linked Carnival's precipitous stock decline to its March 16 disclosures." *Id.* ¶ 233. Yet, "Defendants continued to misrepresent the effectiveness of their health and safety protocols in response to the COVID-19 outbreak." *Id.* ¶ 234. Subsequent Carnival SEC filings and disclosures, coupled with further negative publicity, resulted in further significant stock decreases. *Id.* ¶¶ 246–58. "From the first day of the Class Period to the last day of the Class Period, after investors learned the truth about Carnival's false statements, the price of Carnival's common stock declined by more than 73%, and the price of Carnival's ADS had declined by more than 74%, wiping out approximately $27 billion in shareholder value." *Id.* ¶ 259.

On December 17, 2020, Plaintiffs filed the Consolidated Class Action Complaint alleging violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 thereunder (Count I); and Section 20(a) of the Exchange Act (Count II). *See generally* ("Consolidated Compl.") (ECF No. 52). Defendants filed a Motion to Dismiss on January 18, 2021. (ECF No. 61). The Court granted Defendants' Motion to Dismiss in part on May 28, 2021, dismissing Plaintiffs' Consolidated Class

Action Complaint without prejudice.  ("Order") (ECF No. 71).  On July 2, 2021, Plaintiffs filed their Second Amended Class Action Complaint alleging the same two counts.  *See generally* SAC.

Now, Defendants move to dismiss the Second Amended Class Action Complaint—again with prejudice—for failure to state a claim.  *See generally* Mot.

## II.    LEGAL STANDARDS

### A.    Securities Fraud

"To state a claim for securities fraud under Rule 10b-5, a plaintiff must allege the following elements: (1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss; and (6) a causal connection between the misrepresentation or omission and the loss, commonly called loss causation."  *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1317 (11th Cir. 2019) (quoting *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1236–37 (11th Cir. 2008) (internal quotation marks omitted)).

"Additionally, to state a claim under Section 20(a), the Plaintiff must allege that: (1) [Carnival] committed a primary violation of the securities laws; (2) [Defendant Donald] had the power to control the general business affairs of [Carnival]; and (3) [Defendant Donald] 'had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in primary liability.'"  *Douglas v. Norwegian Cruise Lines*, No. 20-21107-CIV, 2021 WL 1378296, at *3 (S.D. Fla. Apr. 12, 2021) (citing *In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d 1269, 1274 (S.D. Fla. 2017)).  If a plaintiff fails to plead a violation of Section 10(b), a claim under Section 20(a) necessarily fails as well.  *See id.*

### B.      Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a complaint for failing to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted).  This requirement "give[s] the defendant fair notice of what the claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citation and alterations omitted).  The court takes the plaintiff's factual allegations as true and construes them in the light most favorable to the plaintiff.  *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).

A complaint must contain enough facts to plausibly allege the required elements.  *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295–96 (11th Cir. 2007).  A pleading that offers "a formulaic recitation of the elements of a cause of action will not do."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  "[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal."  *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).

### C.      Rule 9(b) and Private Securities Litigation Reform Act

A claim of securities fraud is subject to a "triple-layered pleading standard."  *Carvelli*, 934 F.3d at 1317.  To survive a motion to dismiss, a securities fraud claim brought under Rule 10b-5 must satisfy "not only the run-of-the-mill federal notice-pleading requirements, *see* Federal Rule of Civil Procedure 8(a)(2), but also the heightened pleading standards found in Federal Rule of Civil Procedure 9(b) and the special fraud pleading requirements imposed by the Private Securities Litigation Reform Act of 1995 [("PSLRA")], 15 U.S.C. § 78u-4."  *Id.* at 1317–18.  Failure to meet

11

any of the three standards will result in a complaint's dismissal. *Id.* at 1318 (citing *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005)).

The Eleventh Circuit has explained that Rule 9(b), in the securities fraud context, "requires a plaintiff to allege specifically (1) which statements or omissions were made in which documents or oral representations; (2) when, where, and by whom the statements were made (or, in the case of omissions, not made); (3) the content of the statements or omissions and how they were misleading; and (4) what the defendant received as a result of the fraud." *Id.* at 1318 (citing *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011)).

"The PSLRA—with some overlap—requires a complaint to 'specify each statement alleged to have been misleading' and the 'reason or reasons why the statement is misleading.'" *Id.* (quoting 15 U.S.C. § 78u-4(b)(1)(B)). The PSLRA "also requires, 'with respect to each act or omission alleged,' that a complaint 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id.* (quoting § 78u-4(b)(2)(A)). The Eleventh Circuit has explained that the required state of mind "is an 'intent to defraud or severe recklessness on the part of the defendant.'" *Id.* (quoting *FindWhat*, 658 F.3d at 1299)). "[A] 'strong inference' is one that is 'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007)). "Although scienter may be inferred from an aggregate of factual allegations, it must be alleged with respect to each alleged violation of the statute." *Id.* (citing *FindWhat*, 658 F.3d at 1296).

### D.     Judicial Notice

In analyzing a motion to dismiss in a securities fraud case, the Court may consider the full text of documents incorporated by reference into the complaint and other documents as to which

the Court may take judicial notice. *In re KLX, Inc. Sec. Litig.*, 232 F. Supp. 3d 1269, 1275 (S.D. Fla. 2017) (citing *Tellabs, Inc.*, 551 U.S. at 308). Specifically, a district court may consider the full text of securities filings alleged to contain misstatements. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276–81 (11th Cir. 1999) ("After a thorough review of the relevant case law, we approve of the Second Circuit's practice of judicially noticing relevant documents legally required by and publicly filed with the SEC at the motion to dismiss stage."). Documents incorporated by reference may be considered—without necessitating the conversion of a motion to dismiss into a motion for summary judgment—if they are both central to a plaintiff's claim and undisputed. *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005); *see also Harris v. Ivax Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999) (noting that the PSLRA contains a provision that directs a district court to consider not only "'any statement cited in the complaint' but also 'any cautionary statement accompanying the forward-looking statement, which are [*sic*] not subject to material dispute, cited by the defendant.' The usual rules for considering 12(b)(6) motions are thus bent to permit consideration of an allegedly fraudulent statement in its context" (citing PSLRA § 102(b), 15 U.S.C. § 78u–5(e))). Here the Court considers the full contents of Carnival's securities filings, press releases, and other items referenced in the Second Amended Class Action Complaint.

## III.   DISCUSSION

Defendants argue that the Second Amended Class Action Complaint should be dismissed because it (1) fails to allege any actionable misrepresentations or omissions, Mot. at 8–22; and (2) fails to allege scienter, *id.* at 22–28.[3] These arguments are addressed in turn below.

---

[3] Defendants also challenge loss causation, Mot. at 28–30, and argue that if the Second Amended Class Action Complaint is not dismissed, the Class Period should be shortened, *id.* at 30. However, again finding that the Second Amended Class Action Complaint fails to allege actionable misrepresentations or omissions made with scienter, the Court does not reach these arguments.

A.      **Misrepresentations and/or Omissions.**

Defendants argue that the Second Amended Class Action Complaint "adds no allegations describing new safety regulations or internal protocols during the Class Period.  Instead, the SAC adds many paragraphs elaborating on the *same* supposed violations of the *same* supposed regulations aboard the *same* vessels discussed in the prior complaint."  *Id.* at 8.  For these reasons, Defendants contend that (1) the Second Amended Class Action Complaint does not adequately allege that Defendants' statements affirming Carnival's compliance with regulatory requirements or implementation of safety protocols were false or misleading; (2) the Second Amended Class Action Complaint does not adequately allege that Defendants had unique or special access to information regarding the risks COVID-19 posed to Carnival's business and that Defendants failed to issue warnings based on such information; and (3) Plaintiffs have abandoned their theory that Defendants misled investors about Carnival's commitment to passenger health and safety.  *Id.* at 8–22.  Plaintiffs oppose each of Defendants' arguments; maintaining that the Second Amended Class Action Complaint sufficiently alleges that Defendants' statements were false.  Resp. at 15–24.

"A misrepresentation or omission is material if, 'in the light of the facts existing at the time,' a 'reasonable investor, in the exercise of due care, would have been misled by it.'"  *Carvelli*, 934 F.3d at 1317 (quoting *FindWhat*, 658 F.3d at 1305).  "In other words, materiality depends on whether a 'substantial likelihood' exists that a 'reasonable investor' would have viewed a misrepresentation or omission as 'significantly alter[ing] the total mix of information made available.'"  *Id.* (quoting *S.E.C. v. Morgan Keegan & Co.*, 678 F.3d 1233, 1245 (11th Cir. 2012) (per curiam)) (internal citation and quotation marks omitted).  "The question of materiality is not subject to a bright-line test, but instead depends on the specific circumstances of each case,

including the totality of information available to investors." *Id.* (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 30, 37–45 (2011)). "The materiality requirement aims to strike a balance between protecting investors and allowing companies to distribute information without perpetual fear of liability—in essence, to ensure that not every minor misstatement provides litigation fodder for disgruntled investors." *Id.*

1.      Alleged False and Misleading Statements[4]

Plaintiffs allege Carnival made the following material misrepresentations.  *See generally* SAC.

> Statements from Carnival's Website: Carnival Corporation & plc's values are found in our Health, Environmental, Safety and Security Policy, which describes our commitments to: 1. Protecting the health, safety and security of our passengers, guests, employees and all others working on our behalf, thereby promoting an organization that always strives to be free of injuries, illness and loss. 2. Protecting the environment, including the marine environment in which our vessels sail and the communities in which we operate, striving to prevent adverse environmental consequences and using resources efficiently and sustainably.  3. ***Complying with or exceeding all legal and statutory requirements related to health, environment, safety, security*** and sustainability throughout our business activities.  4. Assigning health, environment, safety, security (HESS) and sustainability matters the same priority as other critical business matters. . . .   Management . . . will: ***Ensure compliance with this Policy within each of Carnival's Corporate and Operating Line organizations***.  Identify managers who are responsible for HESS and sustainability performance and ***ensure that there are clear lines of accountability. Develop, implement and monitor effective and verifiable management systems*** to realize our HESS and sustainability commitments.  Identify, document, assess and conduct periodic reviews of the principal HESS and sustainability risks affecting our business and implement practical measures to manage the identified risks effectively.   Provide HESS and sustainability support, training, advice, and information, as appropriate, to passengers, guests, employees, and others working on behalf of the Company.  Promptly report and properly investigate all HESS incidents and take appropriate action to prevent recurrence.  The safety and security of our guests is our top priority.  ***Our ships operate in full compliance with—and in many cases exceed—all U.S. and international safety regulations***.

SAC ¶¶ 291–92, 294.

---

[4] Bold and italic text reflects Plaintiffs' emphasis in the Second Amended Class Action Complaint.

<u>September 16, 2019 Press Release</u>: With over 100 ships sailing to more than 700 ports around the world, ***it's imperative that we are thorough and diligent when it comes to the health, safety and security of our guests and crew***, and protecting the environments and destinations where we operate, which are ***top priorities for all of us***.

*Id.* ¶ 296.

<u>September 26, 2019 Earnings Call</u>: On the leadership front, we are excited to announce that Peter Anderson has joined us as Head of Ethics and Compliance. ***That's a new role that is bringing together functions and people that were previously distributed across the corporation and complementing that with new talents, roles and processes to help take us to best-in-class and broad-based compliance***. Peter, whose background is a former federal prosecutor along with a wide breadth of experience, including as a court-appointed monitor ***will report directly to me***.

*Id.* ¶ 72.

<u>January 28, 2020 2019 10-K</u>: Our commitments to the safety and comfort of our guests and crew and protecting the environment are paramount to the success of our business. We are committed to operating a safe and reliable fleet and protecting the health, safety and security of our guests, employees and all others working on our behalf. We continue to focus on further enhancing the safety measures onboard all of our ships. ***We are dedicated to fully complying with, or exceeding, all legal and statutory requirements related to health, environment, safety, security and sustainability throughout our business***. . . . [Carnival provides] regular health, environmental, safety and security support, training, guidance and information to guests, employees and others working on our behalf . . . . [Carnival has developed and implemented] ***effective and verifiable management systems to fulfill our health, environmental, safety, security and sustainability commitments***. . . . [The Company reports and investigates] health, environmental, safety and security incidents and ***take[s] appropriate action to prevent recurrence***. . . . We are committed to providing a healthy environment for all of our guests and crew. ***We collaborate with public health inspection programs throughout the world, such as the [CDC] in the U.S. and the SHIPSAN Project in the EU to ensure that development of these programs leads to enhanced health and hygiene onboard our ships***. *Through our collaborative efforts,* ***we work with the authorities to develop and revise guidelines, review plans and conduct on-site inspections for all newbuilds and significant ship renovations***. ***In addition, we continue to maintain our ships by meeting, and often exceeding, applicable public health guidelines and requirements***, complying with inspections, reporting communicable illnesses and conducting regular crew training and guest education programs. . . . In response to the ongoing coronavirus outbreak, China has implemented travel restrictions. As a result, we have suspended cruise operations from Chinese ports between January 25th and February 4th, canceling nine

16

cruises. . . . ***World events impacting the ability or desire of people to travel may lead to a decline in demand for cruises***. We ***may*** be impacted by the public's concerns regarding the health, safety and security of travel, including government travel advisories and travel restrictions, political instability and civil unrest, and other general concerns. Additionally, we ***may*** be impacted by heightened regulations around customs and border control, travel bans to and from certain geographical areas, government policies increasing the difficulty of travel and limitations on issuing international travel visas[.]

*Id.* ¶¶ 301–03, 307, 309.

January 28, 2020 Press Statement: ***Although the risks to our guests, crew, and business around the world is very low***, we are closely monitoring the situation . . . . Our medical experts are ***coordinating closely with the [CDC] and the [WHO] to implement recommended screening, prevention and control measures for our ships***.

*Id.* ¶ 298.

January 31, 2020 Press Statement: Although ***the risk to our guests and crew is low***, we are closely monitoring the evolving situation with respect to Coronavirus. Our medical experts are coordinating closely with the [CDC] and the [WHO] to ***implement enhanced screening, prevention and control measures for our ships, guests and crew***.

*Id.* ¶ 312.

February 4, 2020 Press Statement: ***The safety, security, and well-being of all guests and crew is our absolute priority***. The review of the arriving guests and crew, by Japanese health authorities, is standard practice after a guest tested positive for coronavirus and ***we are working closely with the local authorities to provide detailed records to facilitate their review***.

*Id.* ¶ 108.

February 12, 2020 Press Statement: Carnival Corporation & plc is closely monitoring the evolving situation with respect to Coronavirus. The safety of guests and employees, compliance and protecting the environment are top priorities for the company. The company's medical experts are coordinating closely with the [CDC] and the [WHO] to implement ***enhanced screening, prevention and control measures*** for its guests, crew and ships. The company's global team is working tirelessly to support guests impacted by voyage disruptions during this unprecedented time.

*Id.* ¶ 314.

February 18, 2020 Press Statement: *We have protocols, standards and practices for every possible issue you might imagine, including coronavirus*.

*Id.* ¶ 315.

February 26, 2020 Definitive Proxy Statement on Schedule 14A (the "February 2020 Proxy Statement"): The HESS Committees review and recommend policies relative to the protection of the environment and the health, safety and security of employees, contractors, guests and the public.  The HESS Committees also supervise and monitor health, environmental, safety, security and sustainability policies and programs and review with management significant risks or exposures and actions required to minimize such risks. . . .  Our HESS Committees are *responsible for oversight of risk associated with the health, environment, safety and security of employees, contractors, guests and the public*. . . . *The HESS Committees and our management team review all significant risks or exposures and associated mitigation actions*.  *Each of the Group Chief Executive Officers, each brands' President, the Chief Maritime Officer and senior maritime representatives attend the meetings of the HESS Committees*.  In addition, Carnival Corporation & plc's HESS Policy describes our commitments to: protecting the health, safety and security of our passengers, guests, employees and all others working on our behalf, thereby promoting an organization that strives to be free of injuries, illness and loss; . . . complying with or exceeding all legal and statutory requirements related to health, environment, safety, security and sustainability throughout our business activities; and assigning health, environment, safety, security and sustainability matters the same priority as other critical business matters.

*Id.* ¶¶ 317–18.

February 27, 2020 Annual Report ("2019 Annual Report"): In response to the ongoing coronavirus outbreak, China has implemented travel restrictions.  As a result, we have suspended cruise operations from Chinese ports between January 25th and February 4th, canceling nine cruises.  We also expect that travel restrictions will result in cancellations from Chinese fly-cruise guests booked on cruises embarking in ports outside China.  We estimate that this will impact our financial performance by $0.03 to $0.04 per share.  If the travel restrictions in China continue until the end of February, we estimate that this will further impact our financial performance by an additional $0.05 to $0.06 per share.  Five percent of our capacity was scheduled to be deployed in China in fiscal year 2020.  If these travel restrictions continue for an extended period of time, they could have a material impact on our financial performance.

*Id.* ¶ 320.

February 28, 2020 Publicly Disseminated Video Featuring Chief Medical Officer: [We have] *enhanced our pre-boarding and onboard health protocols*.  Our

advanced sanitation response protocols serve as our foundational basis and comprehensive practice, ***developed in conjunction with the U.S. CDC, and several other health authorities***. . . .   In light of the global spread of coronavirus or COVID-19, we are also taking extra precautions. . . .  ***[A]ll guests will be required to go through thermal screening and/or be checked with non-contact thermometers in many of our embarkation ports to detect signs of fever***.  Our crew members are also being screened and providing us a clean bill of health before they are permitted to embark the ship. . . .  [G]iven the global spread of COVID-19, ***we have implemented even more measures to prevent the spread of disease onboard***.  These include distribution of personal hand sanitizer to each guest onboard. . . .  ***We have enhanced sanitation protocols*** for all staterooms and high-traffic public areas, with more frequent disinfection being applied.  As part of our standard cleaning protocols, ***we routinely use a disinfectant that kills coronavirus within 30 seconds***.

*Id.* ¶¶ 322–23.

March 13, 2020 Press Statement: [W]e have implemented ***higher and higher levels of screening, monitoring and sanitation protocols*** to protect the health and safety of our guests, crew and the communities we serve. . . .  ***Carnival has not had a diagnosed case linked to our operation***.

*Id.* ¶ 325.

March 18, 2020 Press Statement: [N]umber one, our highest responsibility and our top priorities are compliance, environmental protection, and the health, safety, and well-being of our guests. . . .  ***[N]o ship inherently has any virus or illness on it, it's obviously people and so whatever happened on the ships originally came in from people coming on the ship and so what we've done is we have great protocols already***.  ***We've enhanced those protocols***, we're working very closely with the [CDC] and the [WHO] and other global medical experts to make certain.  ***We have a long history of effectively managing and containing spreads of illnesses on the ships themselves***, we've been set up for that, we have medical facilities on the ships who identify early, we pre-screen before people come on the ships, and then we can show the facts on the actual number of cases of confirmed COVID, and ***there's no evidence whatsoever that community spread was dramatically enhanced by people going on cruise ships***. . . .  In fact, if you think about a cruise ship, just for a second, if you think about a cruise ship and you compare it to other forms of travel, we do temperature screenings, we do medical records, you don't do that when you go to a movie theater or get on a train or you're in an airport terminal or subway terminal.  ***We have much more natural social distancing, often people who haven't cruised think of cruises as these congested places***.  ***You know that there's much more space and social distancing than normally happens on a cruise***.

*Id.* ¶ 328.

March 22, 2020 Press Statement: ***If you look at the actual number of cases, you know cruise ships are not a source for coronavirus. We have hundreds of cruise ships out there, very few had cases on them***. The one that had the most cases was very early on when no one understood hardly anything. . . . But ***a cruise ship is not a theater. It is not an arena. It's more like Central Park. There's lots of natural social distancing, the ships are large. People are not always gathered and clumped together***. . . . We identify, people get sick, there's a medical clinic onboard, we isolate, OK, and so in effect, you control the spread, whereas when you're in a restaurant or you're in a public library, in a school, that does not happen. So all I'm suggesting is ***a cruise ship is not a riskier environment, people perceive it that way, but the reality is it's not***.

*Id.* ¶ 329.

March 24, 2020 Website Statement: Carnival Cruise Line's highest responsibilities include the health and safety of our guests and crew. Coronavirus is a fluid situation, and we continue to work closely with public health experts and the Cruise Lines International Association (CLIA), ***to monitor, screen and implement best practices to protect the health of our guests and crew as it relates to COVID-19 (coronavirus)***. Our monitoring, screening and operational protocols are designed to be flexible so that we can effectively adapt to changes as they occur.

*Id.* ¶ 331.

2.  Carnival's Statements Affirming Compliance with Regulatory Requirements and/or Implementation of Safety Protocols Were Not False or Misleading.

Defendants argue that the Second Amended Class Action Complaint again fails to adequately allege Defendants' statements affirming Carnival's compliance with relevant regulatory requirements or implementation of safety protocols were false or misleading. Mot. at 8. Specifically, Defendants contend that (1) Plaintiffs fail to allege that Carnival violated CDC requirements; (2) Plaintiffs fail to allege that Carnival violated its own internal policies; and (3) Carnival's statements affirming regulatory compliance are not actionable. *Id.* at 8–18.

Plaintiffs argue that the Second Amended Class Action Complaint (1) "identifies the guidelines Carnival claimed to comply with (or exceed) on its ships, including its own internal protocols and the ILI and COVID-19 Guidance"; (2) alleges with particularity Defendants' non-compliance with the stated guidelines; (3) demonstrates Carnival's non-compliance with its

own health and safety protocols, "including the purportedly 'enhanced' measures it implemented in response to COVID-19[, which also demonstrates] Carnival's failure to comply with these standards even before the COVID-19 pandemic"; and (4) cures any deficiencies in the Consolidated Complaint regarding the actionability of Carnival's misrepresentations about its "commitments" to passenger health and safety.  Resp. at 15–18.

a.   *Plaintiffs Fail to Adequately Allege Violations of CDC Guidance.*

Defendants argue that, as an initial matter, the COVID-19 and ILI Guidance cited by Plaintiffs "were not binding regulations that could be 'violated.'"[5]  Mot. at 8–9.  Next, Defendants assert that Plaintiffs' arguments regarding Carnival's failure to (1) require social distancing aboard cruises or when disembarking, (2) provide and require the proper use of PPE by its passengers and crew aboard cruises or when disembarking, (3) implement "enhanced" cleaning measures, (4) cease onboard activities and shore excursions, (5) perform adequate pre-boarding temperature checks and screenings, (6) offer refunds to customers, and (7) carry sufficient medical supplies onboard its ships were previously raised in the Consolidated Complaint and rejected by the Court in its May 28, 2021 Order, and that the Second Amended Class Action Complaint fails to cure any of the prior complaint's deficiencies.  *Id.* at 8–15.

Plaintiffs argue in response that (1) "Defendants' contention that the ILI and COVID-19 Guidance did not apply to 5 of the 8 ships alleged in the SAC" is inapposite because Carnival "assured investors that [its] ships complied with 'all U.S. and international safety regulations,'"

---

[5]  Federal Rule of Evidence 201 provides that "[t]he court may judicially notice a fact that is not subject to reasonable dispute because . . . it can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned."  Fed. R. Evid. 201(b)(2).  Here, the Court finds it prudent to judicially notice guidance—specifically, the CDC's ILI and COVID-19 Guidance—that Plaintiffs reference and excerpt in the Second Amended Class Action Complaint, and that Defendants attach to their Motion.  *See* (ECF Nos. 79-2, 79-3); *see also McClain v. Iradimed Corp.*, 111 F. Supp. 3d 1293, 1299–30 & n.6 (S.D. Fla. 2015).

*see* Resp. at 16 n.4; and (2) the Second Amended Class Action Complaint (a) identifies the guidelines Carnival claimed to comply with or exceed with particularity, (b) identifies the specific actions Carnival did not take pursuant to the guidelines, and (c) alleges with particularity Carnival's non-compliance with the guidelines, *id.* at 16–17.

To begin, the Second Amended Class Action Complaint alleges violations of the same two non-binding regulations as Plaintiffs' previous complaint: the ILI Guidance and the COVID-19 Guidance. *Compare* SAC ¶¶ 17, 123, 229, 305, 316, 324 (alleging various violations of the CDC's ILI and COVID-19 Guidance, *with* Consolidated Compl. ¶¶ 140, 225, 247, 250 (same). Plaintiffs' argument that the binding effect of the CDC's Guidance on the *Diamond Princess*, *Westerdam*, *Coral Princess*, *Zaandam*, and *Ruby Princess* is irrelevant because Carnival "assured investors that [its] ships complied with 'all U.S. and international safety regulations'" is not a compelling one.[6] Resp. at 16 n.4; *but see* (ECF No. 79-3) at 2 ("This document provides guidance for ships ***originating from, or stopping in***, the United States[.]") (emphasis added). Such an argument requires the Court to read Defendants' statements to mean that all of Carnival's ships comply with "every single jurisdiction's unique (and sometimes conflicting) rules." Reply at 6. That is not a practical reading of Defendants' statements. A more reasonable interpretation is that Carnival's ships comply with the relevant regulations of the jurisdictions in which they operate. Nor do Plaintiffs specifically allege in the Second Amended Class Action Complaint that Defendants assured investors that ***all*** of its ships worldwide complied with the CDC's non-binding Guidance. *Id.*; *see generally* SAC.

---

[6] The actionability of such general statements is discussed in further detail below. *See infra* III.A.2.c.

Additionally, despite Plaintiffs' arguments to the contrary, the Second Amended Class Action Complaint does not adequately plead violations of the then-existing CDC regulations—even if those regulations had applied to all eight of the ships specified.  For example, Plaintiffs state that Carnival violated the CDC's Guidance by failing to provide PPE to all passengers and crew or to require social distancing of those on board.  SAC ¶¶ 123, 215, 305; Resp. at 17.  But the guidance at that time did not require, or even recommend, the masking and distancing of healthy passengers.  (ECF No. 79-3) at 3–4 (recommending that "the **sick person** wear a facemask before leaving their cabin" and "passengers and crew who are **suspected of having 2019-nCOV infection** [isolate] in their cabins . . . until symptoms are improved") (emphasis added).

In their Response, Plaintiffs do not cite to any allegations from the Second Amended Class Action Complaint that sick or exposed passengers and crew failed to isolate or wear masks and socially distance when outside their cabins.  Resp. at 5,7 (citing SAC ¶¶ 106–07, 156, 166, 180, 190, 192, 205, 223–24).  Moreover, the Second Amended Class Action Complaint alleges that Carnival instituted a ship-wide quarantines on several ships, which actually exceeded the CDC Guidance in place in the Spring of 2020.  SAC ¶¶ 166, 181, 207, 225–27, 244 (noting the imposition of ship-wide quarantines on the *Grand Princess*, *Costa Luminosa*, *Coral Princess*, and *Zandaam*).

Plaintiffs also allege that Carnival violated CDC Guidance by failing to maintain an adequate stockpile of PPE and medical supplies.  SAC ¶¶ 185, 209, 225, 244; Resp. at 17.  But, again, the Guidance only recommended that ships maintain a "sufficient" stock of PPE and medical supplies for their "day-to-day needs," (ECF No. 79-2) at 6; (ECF No. 79-3) at 8, and the Second Amended Class Action Complaint alleges that Carnival acted to restock its ships when supplies

began running low.  SAC ¶¶ 209, 225, 244.  Therefore, Carnival's actions as alleged did in fact comply with the CDC's Guidance.  *See* (ECF No. 79-3) at 8 ("Have contingency plans for rapid resupply during outbreaks.").

The foregoing are just two (of several) examples of Plaintiffs' (1) conclusory allegations of regulatory violations where none exist and (2) contradicting themselves—as well as the judicially noticed CDC Guidance—within the Second Amended Class Action Complaint.  *See Campos v. INS*, 32 F. Supp. 2d 1337, 1343 (S.D. Fla. 1998) (concluding that a court reviewing a motion to dismiss "need not accept factual claims that are internally inconsistent, facts which run counter to facts of which the court can take judicial notice, conclusory allegations, unwarranted deductions, or mere legal conclusions asserted by a party").  Consequently, Plaintiffs' allegations related to Defendants' supposed noncompliance with the then-existing CDC Guidance do not meet the heightened pleading standard required for securities fraud claims.  *Carvelli*, 934 F.3d at 1317–18 (describing a triple-layered pleading standard for claims brought under Rule 10b-5 and noting that "[f]ailure to meet any of the three standards will result in a complaint's dismissal").

In sum, Plaintiffs' addition of seventy-seven (77) paragraphs' worth of "detailed allegations" purportedly "demonstrating that Carnival was not in compliance with the relevant public health guidelines" in the Second Amended Class Action Complaint do not solve the underlying and incurable issues with the previous complaint.  *See* Resp. at 8; *see also* Order at 28 ("The Consolidated Complaint suggests that far more stringent requirements should have been in effect ship-wide than existed in real time.").  Instead, Plaintiffs continue to (1) allege violations of regulations not binding on or applicable to five of the eight ships mentioned; (2) allege violations of rules and protocols that were not in place at the early stages of the COVID-19 pandemic; or (3) inadequately plead violations of the then-existing guidance.  *See generally* SAC.

Accordingly, for the foregoing reasons, as well as those previously stated in the Court's prior Order, Carnival's statements regarding its compliance with the CDC's Guidance were not false or misleading.  *See* Order at 27–28.

> b.   *Plaintiffs Fail to Adequately Allege Violations of Internal Protocols or Policies.*

Defendants next argue that Carnival's conduct in early 2020 did not violate any internal Carnival policies, and thus their statements regarding Carnival's implementation of enhanced screening and sanitation protocols in February and March of 2020 were not misrepresentations. Mot. at 15 (citing SAC ¶¶ 315, 322, 323, 325.  Defendants also maintain that the Second Amended Class Action Complaint's new allegations attributed to FE3 are similarly not actionable because they constitute his personal beliefs "in hindsight" and not first-hand observations.  *Id.* at 16. Additionally, Defendants argue that Plaintiffs' remaining allegations concerning Carnival's internal policies, goals, and initiatives are (1) recycled from the prior complaint and (2) not misleading.  *Id.* at 16–17.

Plaintiffs argue in their Response that the Second Amended Class Action Complaint sufficiently demonstrates Carnival's noncompliance with its own health and safety protocols, "including the purportedly 'enhanced' measures it implemented in response to COVID-19."[7]

---

[7]  Plaintiffs fail to specifically respond to Defendants' arguments that (1) Plaintiffs' allegations pertaining to Carnival's enhanced screening measures are inadequate, and (2) Defendants' statements regarding the existence of the HESS Committee and Carnival's medical experts coordinating with the CDC and WHO are not misleading.  *See* Resp. at 15–24; *see also* Mot. at 15–17.  As a result, the Court deems these points forfeited by Plaintiffs and only addresses Plaintiffs' arguments regarding enhanced sanitation measures.  *See Melford v. Kahane & Assocs.*, 371 F. Supp. 3d 1116, 1126 (S.D. Fla. 2019) ("[A] 'litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point.  The court will not do his research for him.'" (citing *Phillips v. Hillcrest Medical Center,* 244 F.3d 790, 800 n.10 (10th Cir. 2001)).

Resp. at 17.   Specifically, Plaintiffs assert that Carnival failed to (1) disinfect, sanitize, or decontaminate the *Coral Princess* before boarding began on March 5, 2020, (2) clean or sanitize the *Ecstasy*; (3) provide hand sanitizer to *Zaandam* passengers or undertake increased cleaning measures on that ship; and (4) sanitize *Costa Luminosa* before boarding passengers on March 5, 2020, despite a passenger from the previous voyage being evacuated with COVID-19 symptoms. *Id.* (citing SAC ¶¶ 196, 213, 215, 244, and 175).   Additionally, Plaintiffs argue that their new allegations regarding FE3 addresses the Court's earlier ruling by alleging that "Carnival had "no protocols or policies . . . in place to deal with COVID" despite its statements to the contrary.[8] *Id.* at 21 (citing SAC ¶ 132).

In reply, Defendants maintain that (1) as a threshold matter, Plaintiffs' allegations fail because they do not explain what, exactly, the 'enhanced' cleaning protocols entailed;[9] and (2) Plaintiffs' allegations that certain vessels were "not cleaned or sanitized" at all "strain credulity, cite no authority, and once again lack the 'specificity' required by Rule 9(b) and the PSLRA." Reply at 10.   Defendants also argue that Plaintiffs (1) do not describe what FE3's personal involvement in Carnival's COVID response entailed; (2) fail to allege what FE3 observed about Carnival's cleaning protocols and why they were inadequate; (3) rely on FE3's criticisms, which "reflect hindsight bias, and not firsthand knowledge." *Id.* at 13.

As an initial matter, the Court cannot and does not weigh the credibility of Plaintiffs' allegations—it must generally accept as true factual allegations contained in the Second Amended

---

[8]  Plaintiffs raise this argument in a section of their Response addressing Defendants' materially false and misleading statements about COVID-19's impact on Carnival.  Resp. 18–24.  However, the Court finds it is more appropriately addressed here given Defendants' arguments in their Motion.  *See* Mot. at 16.

[9]  The Court discusses the actionability of these statements below.  *See infra* III.A.2.c.

Class Action Complaint.  *See Fernandez*, 2009 WL 10668267, at *1.  However, as noted previously, a court reviewing a motion to dismiss "need not accept factual claims that are internally inconsistent, facts which run counter to facts of which the court can take judicial notice, conclusory allegations, unwarranted deductions, or mere legal conclusions asserted by a party."  *Campos*, 32 F. Supp. 2d at 1343.

With that in mind, the Court finds that Plaintiffs have failed to adequately allege violations of Carnival's internal safety protocols.  First, the Second Amended Class Action Complaint is internally inconsistent as to Carnival's enhanced sanitation measures.  For instance, Plaintiffs initially allege that the Carnival failed to "undertake additional cleaning measures on *Zaadam*," SAC ¶ 229, but later allege that a *Zaadam* "passenger reported that he did not notice crew members taking any additional cleaning measures ***until two weeks later***," *id.* ¶ 244 (emphasis added). Additionally, Plaintiffs allege elsewhere that Carnival did increase sanitation efforts.  *See id.* ¶¶ 163–64 ("The following day, Carnival increased its sanitary precautions on the *Grand Princess* . . . [and] noted 'As a precaution, we are also conducting additional enhanced environmental disinfection onboard in addition to our regular stringent cleaning and sanitation protocols.'").

Next, the allegations regarding enhanced cleaning protocols that are not contradictory lack the requisite specificity for securities fraud claims.  Plaintiffs' *Costa Luminosa* and *Coral Princess* allegations simply allege that Carnival failed to sanitize or "professionally clean" the two ships ***before*** passengers boarded.  *See id.* ¶ 175 (alleging that "no efforts were made to sanitize or otherwise professionally clean the [*Costa Luminosa*]" before Carnival allowed new passengers aboard); *id.* ¶ 196 ("Carnival also did not take measures to disinfect, sanitize, or otherwise decontaminate the *Coral Princess* ship before boarding began on March 5, 2020[.]").  However,

Carnival's statements regarding its "enhanced" sanitation protocols did not state (1) what those protocols entailed or (2) when they would occur. *Id.* ¶ 323 ("We have enhanced sanitation protocols for all staterooms and high-traffic public areas, with more frequent disinfection being applied. As part of our standard cleaning protocols, we routinely use a disinfectant that kills coronavirus within 30 seconds.").

Additionally, passengers aboard the *Ecstasy* "reporting" that the ship was not cleaned or sanitized is similarly unspecific. *Id.* ¶¶ 213, 215 (alleging that "passengers reported that the ship was not cleaned or sanitized[, which] flew in the face of the CDC's COVID-19 Guidance"). Plaintiffs' allegation that passengers aboard the *Zaandam* stated that Carnival's extra precautions, including giving out hand sanitizer, were not "evident" is also insufficient. *Id.* ¶ 244. Regardless of whether Carnival's vague statements are even actionable, which is discussed below, these allegations in the Second Amended Class Action Complaint fail to specifically allege that Carnival ***did not*** implement enhanced cleaning protocols. *See Carvelli*, 934 F.3d at 1317–18 (describing a triple-layered pleading standard for claims brought under Rule 10b-5 and noting that "[f]ailure to meet any of the three standards will result in a complaint's dismissal"); *see also Hartel v. GEO Group, Inc.*, Case No. 20-81063-CIV-SMITH, 2021 WL 4397841, at *11 (S.D. Fla. Sept. 23, 2021) (finding that the plaintiffs failed to allege facts demonstrating that the defendant's statements about "deploy[ing] specialized sanitation teams to sterilize high-contact areas of its facilities or develop intensive schedules and procedures for the cleaning and disinfecting of facility spaces" were false).

Further, the Second Amended Class Action Complaint's new allegations attributable to FE3, who was "involved in mediating the COVID-19 outbreaks on board the *Diamond Princess* and other Carnival ships in early February," do not cure the deficiencies of the prior complaint.

SAC ¶ 125; *see* Order at 23 ("Plaintiffs fail to show with any specificity that enhanced cleaning measures were not conducted"). Plaintiffs—through FE3—allege that Carnival had "no protocols or policies . . . in place to deal with COVID." *Id.* ¶ 132. However, as Defendants point out, the Second Amended Class Action Complaint does not (1) describe what role FE3 as a Program Manager actually played in Carnival's COVID response, other than that he was pulled into daily meetings in early February, or (2) "allege what (if anything) FE3 observed about Carnival's cleaning protocols, nor why they were purportedly inadequate." Reply at 13.

While Plaintiffs have generally described a basis for FE3's knowledge, the Court nonetheless finds FE3's allegations insufficient to establish the absence of COVID-19 protocols at Carnival. *See Miyahira v. Vitacost.com, Inc.*, Case No. 10-80644-CIV-RYSKAMP/VITUNAC, 2011 WL 13136262, at *5 (S.D. Fla. Dec. 8, 2011) ("The Eleventh Circuit requires a plaintiff to provide the basis of a confidential witness's knowledge, including (1) the position(s) held, (2) the proximity to the offending conduct, and (3) relevant time frame. The particularity of the allegations informs the Court of the weight to afford the allegations contained in confidential witness statements.") (citing *Mizarro v. Home Depot, Inc.*, 544 F.3d 1230, 1239–40 (11th Cir. 2008) (internal citations omitted)).

The Second Amended Class Action Complaint does not sufficiently allege facts that qualify FE3 to opine on the existence—or adequacy and effectiveness—of Carnival's sanitation protocols. *Id.* at *12 ("Because the amended complaint does not provide sufficient details to impart the necessary indicia of reliability to these confidential witnesses' accounts, these confidential witnesses' accounts are insufficient to establish [the existence of the alleged problems]."). For example, FE3 "**did not believe** that Carnival had an outline it could follow" during a pandemic. SAC ¶ 132 (emphasis added). This allegation states FE3's personal and unsubstantiated belief,

not a fact based on personal knowledge.  Furthermore, FE3's conclusory allegation—with the added benefit of hindsight—that "any protocols that existed on board Carnival's ships were 'not sufficient enough to deal with a pandemic, otherwise we wouldn't have had to go through what we did'" is nothing more than a subjective generalization.  *See Miyahira*, 2011 WL 13136262, at *5 ("A pleading is insufficient when the allegations are based on 'subjective generalizations' or 'tales from the trenches' by confidential witnesses.").  And, last, FE3's allegation that Carnival had "no protocols or policies . . . in place to deal with COVID," SAC ¶ 132, are contradicted by Plaintiffs' allegations elsewhere in the Second Amended Class Action Complaint, *id.* ¶¶ 163–64 (stating the *Grand Princess* "increased its sanitary precautions," conducted "enhanced environmental disinfection," "cancelled large gatherings," and instituted a ship-wide quarantine in response to a former passenger testing positive for COVID-19).

For the reasons above, Plaintiffs again fail to show with any specificity that enhanced cleaning measures were not conducted.  *See* Order at 23.  That Carnival's safety protocols "would not ultimately prove to be effective to combat the coronavirus" is "hindsight knowledge [that] cannot be used to assert securities fraud.").  *See id.* at 22.  Therefore, Plaintiffs' Second Amended Class Action Complaint fails to sufficiently allege that Defendants violated any internal protocols or policies, or that their statements regarding "enhanced" sanitation measures were false or misleading.  *See generally* SAC.

> c.  *Carnival's Statements Affirming Regulatory Compliance and Internal Protocols Are Not Actionable.*

Finally, Defendants argue that "[e]ven if the new allegations did describe conduct that violated a regulatory requirement (or a CDC 'recommendation'), they would not render Carnival's statements about regulatory compliance actionable" based on the Second Circuit's opinion in *Singh v. Cigna Corporation*, which was subsequently adopted by the Eleventh Circuit.  *Id.* at 17–18

(citing *Singh v. Cigna Corporation*, 918 F.3d 57 (2d Cir. 2019); *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1320–22 (11th Cir. 2019)).

Plaintiffs contend in their Response that "[s]tatements about a company's compliance with guidelines and protocols are actionable where defendants did not comply with those standards," regardless of whether the regulations are "binding." Resp. at 15–16 (citing *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1227–29 (N.D. Ga. 2019)). Plaintiffs also argue that Carnival's affirmation of its compliance with internal policies are actionable. *Id.* at 16.

In reply, Defendants argue that Plaintiffs appear to concede that Carnival's generic statements about regulatory compliance are not actionable under *Singh* and *Carvelli*. *See* Reply at 11. Similarly, Defendants assert that vague statements about enhanced sanitation protocols are inactionable. *Id.* at 10. Additionally, Defendants reiterate that "[e]ven if Plaintiffs did identify a few isolated instances of regulatory noncompliance—and they do not—it would not render any of Defendants' statements misleading. As Plaintiffs' own cases show, only allegations of systemic noncompliance, including regulatory determinations of noncompliance, are sufficient to state a claim." *Id.* at 6–11 (citing *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d at 1221).

Plaintiffs identify several of Defendants' statements in the Second Amended Class Action Complaint that they allege are false and misleading. SAC ¶¶ 290–332. Examples of these statements include: (1) "Carnival Corporation & plc's values are found in our Health, Environmental, Safety and Security Policy, which describes our commitments to . . . [c]omplying with or exceeding all legal and statutory requirements related to health, environment, safety, security[,]" *id.* ¶ 291; (2) "Our medical experts are coordinating closely with the U.S. Centers for Disease Control and Prevention (CDC) and the World Health Organization (WHO) to implement

enhanced screening, prevention and control measures for our ships, guests and crew[,]" *id.* ¶ 312;

and (3) "We have enhanced our pre-boarding and onboard health protocols[,]" *id.* ¶ 322.

However, Defendants' commitments to regulatory compliance and statements regarding "enhanced" safety measures fall squarely within the definition of "puffery" elucidated by the Eleventh Circuit in *Carvelli*: "generalized, vague, nonquantifiable statements of corporate optimism."  934 F.3d at 1318–20 (noting that other federal appellate courts have recently deemed puffery in the securities fraud context to include "proclamations that a company 'expects to continue to allocate significant resources' to regulatory compliance, 'generalized statements about a company's transparency, quality, and responsibility,' and a description of company products as being 'unmatched' in 'reliability, quality and connectivity'"); *Norwegian Cruise Lines*, 2021 WL 1378296, at *6–7 (finding that a cruise line defendant's statements that employees "comply with all applicable laws and regulations" and that company had "taken several proactive measures to protect the health and safety of its guests and crew" during the COVID-19 pandemic were vague, corporate puffery, and not actionable).

Further, the Court agrees with Defendants that this case is distinguishable from those cited by Plaintiffs because, here, the Second Amended Class Action Complaint does not adequately allege that such violations were "systemic."  *See* Reply at 11; *see also In re Equifax Inc. Securities Litigation*, 357 F. Supp. 3d at 1228–29.  Plaintiffs' argument that "the COVID-19 outbreaks on its ships, coupled with Carnival's widespread non-compliance with health and safety guidelines" demonstrate that it failed to comply with regulatory requirements even before the COVID-19 pandemic" is not compelling.  Resp. at 18 (citing SAC ¶¶ 55, 66, 244).

Only one of the paragraphs cited in Plaintiffs' Response attempts to lay out Carnival's purported widespread noncompliance with health regulations.  *See* SAC ¶ 55.  Therein, Plaintiffs

allege in a conclusory fashion that "Carnival has routinely failed to adequately contain outbreaks of ILI and other infectious diseases on its ships." *Id.*  In support, Plaintiffs state that (1) in the three years leading up to the Class Period, Carnival reported to the CDC sixteen (16) outbreaks of viral illnesses on its ships ranging from norovirus to *E. coli*; (2) "[i]n 2019, half of the CDC-identified outbreaks of ILI aboard cruise ships occurred on Carnival-owned ships"; and (3) in July 2019, the CDC gave Carnival's *Fantasy*—a ship not named anywhere else in the Second Amended Class Action Complaint—"one of the worst sanitation ratings in the Company's history—an 'unsatisfactory' 77 out of 100 possible points." *Id.*  None of these allegations is sufficient to support the widespread regulatory noncompliance Plaintiffs allege.

Here, the Second Amended Class Action Complaint fails to allege Carnival's "systemic organizational disregard for" health and safety guidelines with the requisite specificity. *Id.*; Resp. at 18; SAC ¶ 55.  Unlike the defendant in *In re Ocwen Fin. Corp. Sec. Litig.*, Plaintiffs do not allege any enforcement action taken by the CDC in response to Carnival's purported violations. No. 14-81057-CIV-WPD, 2015 WL 12780961, at *3 (S.D. Fla. Dec. 22, 2015) (referring to new allegations in the plaintiff's amended complaint regarding consent orders entered into by the defendants with regulators).

That Carnival had sixteen (16) "outbreaks" in a three-year period with a fleet of over 100 ships, does not suggest widespread regulatory noncompliance—particularly when the Second Amended Class Action Complaint does not provide the number of outbreaks Carnival's competitors had over the same time period for context.  SAC ¶ 55.  For instance, in *In re Equifax Inc. Securities Litigation*, upon which Plaintiffs rely in their Response, the court found that even if Equifax's statements conveyed that it made an effort to comply with data security laws, regulations, and standards, "they would still be false or misleading.  A reasonable investor would

understand these statements to assure that the company was making actual, good faith efforts to maintain a data security protocol that complied with these standards.  The state of Equifax's cybersecurity reflected a '***systemic organizational disregard for cybersecurity***.'" 357 F. Supp. 3d at 1228 (citing to allegations in the plaintiffs' amended complaint) (emphasis added).

The Second Amended Class Action Complaint does not adequately allege a "systemic organizational disregard for [compliance]." *Id.*  For similar reasons, Plaintiffs' allegations that in 2019 Carnival had half of the CDC-identified outbreaks in 2019 and the *Fantasy* received a sanitation rating of 77 out of 100 are also insufficient to allege widespread health and safety noncompliance.  *Id.*

And, to the extent Defendants' statements regarding the distribution of hand sanitizer to passengers as an enhanced sanitation measure were misleading, the Court finds them immaterial and inactionable because "the alleged [misrepresentations are] 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *Luczak v. Nat'l Beverage Corp.*, 812 F. App'x 915, 924 (11th Cir. 2020); *see also Carvelli*, 934 F.3d at 1317 ("A misrepresentation or omission is material if, 'in the light of the facts existing at the time,' a 'reasonable investor, in the exercise of due care, would have been misled by it.'" (quoting *FindWhat*, 658 F.3d at 1305)).  A reasonable investor would not view this "misrepresentation . . . as 'significantly alter[ing] the total mix of information made available.'" *Carvelli*, 934 F.3d at 1317 (quoting *Morgan Keegan & Co.*, 678 F.3d at 1245).  This finding "strike[s the] balance between protecting investors and allowing companies to distribute information without perpetual fear of liability" described by the Eleventh Circuit in *Carvelli*.  *See id.* ("The question of materiality is not subject to a bright-line test, but instead depends on the specific circumstances of each case, including the totality of information available to investors.").

Accordingly, Carnival's statements affirming its compliance with regulatory guidance and internal protocols and policies are not actionable.

3.    Carnival Did Not Fail to Warn of the Risks of COVID-19.

a.    *Defendants' January 2020 Statements*

Defendants argue that "[t]he SAC identifies no new misleading statements or omissions in January 2020."  Mot. at 19.  Specifically, Defendants contend that (1) Plaintiffs' recycled allegation that Carnival's 2019 10-K was misleading because it failed to disclose the likely impact of COVID-19 on the Company's business and passengers has already been rejected, and Plaintiffs' new allegation that the 2019 10-K violated Item 105[10] is redundant; (2) Plaintiffs repeat their allegation that Carnival misled investors when it purportedly told the press in January 2020 that the risks of COVID-19 to its guests, crew, and global business were "low," which the Court did not find persuasive in its prior Order; (3) Plaintiffs' repeated allegation regarding FE1's need to find new suppliers due to the situation in China was previously rejected as insignificant, and FE1's recollection "that a single unspecified and undated fulfillment order from Italy did not arrive because of a COVID-19 shutdown" is just as insignificant; (4) Plaintiffs reraise their previously rejected allegation—nearly verbatim—that Defendants "uniquely underst[ood] the gravity of COVID-19 even before the WHO and United States government declared the outbreak a public health emergency," because Padgett spoke to a battery manufacturer in Wuhan; and (5) Plaintiffs reallege that various travel bulletins and guidance undermine Carnival's January 2020 statements, but these documents should be rejected again.  Mot. at 19–20.

---

[10]  Regulation S-K provides that "[w]here appropriate, provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the registrant or offering speculative or risky."  17 C.F.R. § 229.105 ("Item 105 Risk Factors").

In their Response, Plaintiffs assert that the Second Amended Class Action Complaint (1) alleges that Defendants were in possession of material information in January 2020 that contradicted their public representations downplaying the risks of COVID-19, Resp. at 18–19 (citing SAC ¶¶ 40, 45, 87, 89); (2) adds allegations further corroborating that Carnival had unique, early insight into the scale and severity of the global COVID-19 crisis, especially the risks it posed to its business, *id.* at 19; and (3) expressly alleges a claim that the Court did not previously consider—namely, that Defendants failed to include a COVID-19 risk factor in Carnival's 2019 10-K in violation of Regulation S-K, Item 105, *id.* at 20 (citing SAC ¶ 311), the omission of which also made the "Risk Factors" section of Carnival's 2019 10-K misleading, *id.* at 20–21.

Defendants argue in reply that "Plaintiffs (once again) ignore the fact that the Court relied on 'the COVID-19 specific warnings provided in Carnival's 2019 10-K' in dismissing the prior complaint." Reply at 12. Defendants reiterate that Plaintiffs' allegations about passenger demographics and European Union guidance are recycled verbatim from the prior complaint and should again be rejected. *Id.* at 12–13.

As an initial matter, after a review of the Second Amended Class Action Complaint and determining the allegations to be exactly—or nearly—identical to those in the prior complaint, the Court does not find it a prudent or efficient use of judicial resources to reexamine in depth each allegation that has already been considered and found lacking. *Compare* SAC ¶¶ 40, 45, 84–87, 89, 298–311, *with* Consolidated Compl. ¶¶ 37, 42, 80–81, 94–96, 218–31; *see generally* (ECF No. 79-4) (showing the changes between the Second Amended Class Action Complaint and the Consolidated Class Action Complaint). Plaintiffs' added allegations related to the information Defendants supposedly possessed in January 2020 do not cure the deficiencies previously found in the Consolidated Class Action Complaint.

For instance, FE1's new recollection that one of Carnival's Singaporean brokers "specifically cited the spread of COVID-19 as the reason for manufacturing slowing down" across Asia does not now render Plaintiffs' allegation significant—especially since FE1 only worked for Carnival from *February 2020 to May 2020*.  SAC ¶ 89.  Nor does an undated non-delivery of an order from Italy.  *Id.*  Therefore, the Court adopts by reference the analysis and conclusions from its prior Order regarding Defendants' January 2020 statements.  *See* Order at 17–20.

Moreover, Plaintiffs' new argument that Carnival's failure to warn about the risks from COVID-19 in its 2019 10-K violated Item 105 and rendered its other risk disclosures misleading is not compelling.  Resp. at 20 (citing SAC ¶ 311).  As the Court previously found, "[i]n January 2020, pre-pandemic life was mostly unchanged with no travel restrictions, other than perhaps travel to and from China."  Order at 33.  Despite their new allegations, Plaintiffs have not adequately pled that Defendants had knowledge of material information in January 2020 such that a failure to include a "specific COVID-19 risk factor" violated Item 105 or made the 2019 10-K misleading.

Thus, the Court again finds that the COVID-19 specific warnings provided in Carnival's 2019 10-K were sufficient.  *See* SAC ¶¶ 301–03, 307, 309 (alerting investors of suspended cruise operations from Chinese ports which resulted in the cancellation of nine cruises, and cautioning that "[w]orld events impacting the ability or desire of people to travel may lead to a decline in demand for cruises"); *see also Carvelli*, 934 F.3d at 1317 ("[M]ateriality depends on whether a 'substantial likelihood' exists that a 'reasonable investor' would have viewed a misrepresentation or omission as 'significantly alter[ing] the total mix' of information made available." (quoting *Morgan Keegan & Co.*, 678 F.3d at 1245) (internal citation and quotation marks omitted)).

Accordingly, the Court still does not find that the January 2020 statements, as pled, are materially false or misleading.

      *b.*     *Defendants' February 2020 Statements.*

Defendants argue the Second Amended Class Action Complaint "contains no allegations describing new misleading statements or omissions in February 2020, and there are no new allegations suggesting that Defendants gained unique insight into the scope of the pandemic that they failed to disclose." Mot. at 20. Defendants contend that, just as in the prior complaint, Plaintiffs fail to acknowledge that (1) the CDC did not recommend against cruise travel until March 8, 2020, SAC ¶ 211; (2) the U.S. Department of State did not warn travelers of the dangers associated with COVID-19 on cruise ships generally until March 8, 2020, *see id.*; *see also* (ECF No. 79-9) at 1; (3) "[t]he WHO did not issue guidance for handling COVID-19 on cruise ships until February 24, 2020—and even then, the WHO did not recommend that operators cancel cruises[,]" *see generally* (ECF No. 79-10).[11] Mot. at 20–21.

Plaintiffs argue that "[t]hroughout February 2020, Defendants touted their response to—and minimized the risks posed by—COVID-19 to Carnival's business," which Plaintiffs contend was misleading. Resp. at 21. Plaintiffs state that they have addressed the Court's previous ruling finding that they failed to sufficiently allege that enhanced measures were not taken in three ways: (1) the Second Amended Class Action Complaint adds new allegations attributed to FE3

---

[11] Federal Rule of Evidence 201 provides that "[t]he court may judicially notice a fact that is not subject to reasonable dispute because . . . it can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201(b)(2). Here, the Court finds it prudent to judicially notice guidance—specifically, guidance issued by the WHO and the U.S. State Department—that Plaintiffs reference and excerpt in the Second Amended Class Action Complaint, and that Defendants attach to their Motion. *See* (ECF Nos. 79-9, 79-10); *see also McClain v. Iradimed Corp.*, 111 F. Supp. 3d 1293, 1299–30 & n.6 (S.D. Fla. 2015).

showing that Carnival had no COVID protocols or policies in place;[12] (2) the Second Amended

Class Action Complaint alleges that, "contrary to Defendants' suggestion that Carnival had taken

steps to prevent the spread of COVID-19 aboard its ships—Carnival's COVID-19-related risks

were compounding in February 2020"; and (3) the Second Amended Class Action Complaint

alleges that these risks were amplified by Carnival's failures to comply with existing guidance and

its own internal protocols. Resp. at 21–22.

Plaintiffs' first assertion that Defendants' February 2020 statements are false because

Carnival knew passengers were getting sick on its ships is recycled from its prior complaint and

was previously rejected. The Court found in its May 28, 2021 Order that

> Plaintiffs' arguments require the Court to infer that, because passengers would
> ultimately fall ill aboard Carnival's ships—just as people did in other venues across
> the globe—Carnival was non-compliant with health and safety standards, and thus
> Carnival's statements affirming its compliance with such standards were false or
> misleading. That inference is too tenuous to meet the heightened pleading standard
> applicable in the securities fraud context.

Order at 27; *see also id.* at 30 (concluding that Plaintiffs failed to show with the required specificity

how Defendants were noncompliant with applicable guidelines, regulations, and their internal

policies, including the HESS policy, "[t]hus, [] Plaintiffs' reliance on any such non-compliance

fails to show that Defendants' stated commitments to health and safety were false or misleading").

The Court declines to depart from its prior ruling now. And, the Court has already found that the

Second Amended Class Action Complaint fails to adequately allege Carnival's noncompliance

with existing guidance and its own internal protocol, and that Carnival's statements are nonetheless

inactionable. *Supra* III.A.2.a–c.

---

[12] The Court addresses—and rejects—Plaintiffs' first argument regarding FE3 above. *See supra* III.A.2.b.

Consequently, the Court does not find that, as pled, the February 2020 statements are materially false or misleading.

      c.     *Defendants' March 2020 Statements*

In their Motion, Defendants state that the Second Amended Class Action Complaint identifies the same allegedly misleading statements in March 2020 included in the Consolidated Class Action Complaint, including Defendant Donald's opinion that "'a cruise ship is not a riskier environment' than other crowded venues because it provides guests with 'space and social distancing' and medical clinics"—allegations the Court previously rejected.   Mot. at 21. Defendants argue that "[j]ust as before, Plaintiffs' failure to 'reconcile the conflict' between the alleged misstatements" and Defendants' March 16, 2020 SEC filing warning investors that Carnival expected the fiscal year to end in a net loss "fatally undermines their allegations." *Id.* Defendants also request that the Court reconsider its earlier finding that Carnival Cruise Line's March 13, 2020 statement was misleading. *See id.*, n.10 (citing Order at 23–25).

Plaintiffs' Response states that the issue of "whether the truth [of the risks posed by COVID-19] was made known to investors with sufficient intensity and credibility to render immaterial Defendants' concrete representations to the contrary" in Carnival's March 13, 2020 press release is not one that can be resolved at the pleading stage.  Resp. at 22–23.  Plaintiffs also argue that Defendants continued to mislead investors throughout March 2020, including with Carnival's March 18 and March 22 statements, which Plaintiffs assert are false.  *Id.* at 23.  Finally, Plaintiffs assert that Defendants provide no basis to revisit the Court's determination that the statement was made by Carnival at the parent-company level.  *Id.*, n.15.

To begin, Plaintiffs provide no basis for the Court ***not*** to consider Defendants' arguments in their Motion anew.  Resp. at 22 n15.  Accordingly, the Court reevaluates the March 13, 2020

statement—specifically that "Carnival has not had a diagnosed case linked to [its] operation"—and finds that it was not false.  *See* (ECF No. 79-13) at 2.  The press release states: "***Carnival Cruise Line*** announced today that it is pausing operations immediately across ***its fleet of ships based in North America***."  *Id.* (emphasis added).  It also identifies Carnival Cruise Line as the source of the statement.  *Id.* at 2–3.  The Second Amended Class Action Complaint does not allege that any ship in the Carnival Cruise Line business segment had any diagnosed cases of COVID-19.  *See generally* SAC.

And, just over an hour after Carnival Cruise Line's statement, Defendant Carnival Corporation & plc, the parent company, issued its own separate press release acknowledging that four of its brands, including Carnival Cruise Line, were suspending voyages.  *See generally* (ECF No. 79-14).  Defendant Carnival's release did not make similar claims regarding a lack of COVID-19 cases.  *Id.* at 2.

However, even if Carnival Cruise Line's statement was misleading, it was made on the ***same day*** that Carnival announced a voluntary suspension of voyages in response to the pandemic, as the Court previously observed.  *See* Order at 25; (ECF Nos. 79-13, 79-14).  Plaintiffs' initial argument that the Court improperly determined that Carnival's March 13, 2020 press release, although misleading, was not material because the market knew the relevant truth is not persuasive.  Resp. 22–23.  First, the case to which Plaintiffs cite addressed the issue in an order on class certification.  *See Aranaz v. Catalyst Pharm. Partners Inc.*, 302 F.R.D. 657 (S.D. Fla. 2014).

Second, another court in this District has previously found that "[t]he issuance of a warning . . . on the very issue that [the plaintiffs] allege was withheld from investors by [the defendants] during the class period vitiates the ability of [the plaintiffs] to maintain a securities fraud case on these alleged omissions."  *In re Republic Servs., Inc. Sec. Litig.*, 134 F. Supp. 2d

1355, 1363 (S.D. Fla. 2001) (citing *Saltzberg v. TM Sterling/Austin Assoc., Ltd.,* 45 F.3d 399, 400 (11th Cir. 1995)).   As the Court previously found, Carnival's 2019 10-K provided specific COVID-19 warnings to investors.   *Supra* III.A.3.a; *see also* SAC ¶¶ 301–03, 307, 309. Additionally, Plaintiffs include a new allegation in their Second Amended Class Action Complaint regarding Defendants' 2019 Annual Report published on February 27, 2020—almost three weeks before the March 13, 2020 press release.  SAC ¶ 320.  This statement provides further support that Carnival provided warnings that its business might be materially impacted by COVID-19.  *See id.* ("In response to the ongoing coronavirus outbreak, China has implemented travel restrictions. . . .  If these travel restrictions continue for an extended period of time, they could have a material impact on our financial performance.").

Thus, the Court again fails to see how the March 13, 2020 statement, or any of the statements made thereafter, could reasonably have misled investors at that stage of the pandemic. *Carvelli*, 934 F.3d at 1317 ("A misrepresentation or omission is material if, 'in the light of the facts existing at the time,' a 'reasonable investor, in the exercise of due care, would have been misled by it.'" (quoting *FindWhat*, 658 F.3d at 1305)); *see also In re Republic Servs., Inc. Sec. Litig.*, 134 F. Supp. 2d at 1363 ("Investors were on notice of the exact problem that caused [the defendant] to lower earnings estimates, providing an alternative basis to dismiss the Complaint.").

Finally, Plaintiffs still fail to reconcile the conflict between the later March 2020 statements—which generally assert Defendant Donald's view that cruise ships are safe places to be as compared to other crowded venues like movie theaters—and Carnival's March 16, 2020 Form 8-K/A, which stated:

> Significant events affecting travel, including COVID-19, typically have an impact on booking patterns, with the full extent of the impact generally determined by the length of time the event influences travel decisions.  The Corporation believes the ongoing effects of COVID-19 on its operations and global bookings will have a

> material negative impact on its financial results and liquidity.  The Corporation is taking additional actions to improve its liquidity, including capital expenditure and expense reductions, and pursuing additional financing.  Given the uncertainty of the situation, the Corporation is currently unable to provide an earnings forecast, however we expect results of operations for the fiscal year ending November 30, 2020 to result in a net loss.

SAC ¶ 231.  As a result, the Court finds no reason to depart from the conclusion of its prior Order on this issue.  Order at 25.

Therefore, the Court does not find that, as pled, the March 2020 statements are materially false or misleading.

4.      The Second Amended Class Action Complaint Does Not Adequately Allege That Defendants Misled Investors About Carnival's Commitment to Health and Safety.

Lastly, Defendants argue that "[t]he SAC appears to have abandoned the claim that Defendants' statements affirming Carnival's commitment to the health and safety of its guests and crew were materially misleading."  Mot. at 22 (citing SAC ¶ 290) (neglecting to specifically identify Defendants' "commitments" to health and safety as a category of false and misleading statements).  However, to the extent the Second Amended Class Action Complaint continues to pursue this theory, Defendants argue it should be rejected for the reasons stated in the Court's prior Order.  *Id.*  Additionally, Defendants contend that "statements from cruise lines affirming their commitment to 'the safety of our guests and crew' are 'extremely vague and constitute corporate puffery and thus, are not actionable.'"  *Id.* (citing *Norwegian Cruise Lines*, 2021 WL 1378296, at *6).

Plaintiffs respond to Defendants' arguments by simply stating that they "[have] cured any deficiencies identified in the [Court's] Order. . . .  Viewed in context, [Carnival's] statements are actionable because they left investors with the misleading impression 'that reasonably effective

steps were being taken to comply with applicable' standards when, in reality, Carnival was noncompliant."  Resp. at 18 (citing SAC ¶¶ 291, 296, 301, 306).

As the Court has previously explained, however, Plaintiffs fail to show with the required specificity how Defendants were noncompliant with applicable guidelines and regulations.  *Supra* III.A.2.  Thus, Plaintiffs' arguments that Defendants' stated commitments to health and safety were false or misleading which are predicated on such noncompliance necessarily fail.  SAC ¶¶ 291, 301, 306; *see, e.g.*, *id.* ¶ 296 ("With over 100 ships sailing to more than 700 ports around the world, it's imperative that we are thorough and diligent when it comes to the health, safety and security of our guests and crew . . . are top priorities for all of us.").  As the Court previously observed:

> [M]any of Defendants' statements described Carnival's ongoing efforts and initiatives in furtherance of its health and safety goals.  For example, in the September 26, 2019 earnings call statement, Carnival announced that it had filled a key position described as "a new role that is bringing together functions and people that were previously distributed across the corporation and complementing that with new talents, roles and processes ***to help take [Carnival] to best-in-class and broad-based compliance***."  Through that statement, Carnival in essence acknowledged that it had not quite reached broad-based compliance, but nonetheless affirmed its commitment to getting there.  Certainly, any reasonable investor could appreciate that it would take time for the incumbent of this new position to make meaningful progress.  That Carnival was not able to do so before the pandemic began to materialize does not persuade the Court that Carnival's stated commitments to health and safety were materially false or misleading.

Order at 30 (internal citation omitted).  Moreover, as described in further detail above, the Court agrees with Defendants that vague and general statements committing to passenger and crew safety are puffery and therefore not actionable.  Mot. at 22; *Norwegian Cruise Lines*, 2021 WL 1378296, at *6 ("[T]he challenged statements are extremely vague and constitute corporate puffery and thus, are not actionable.").

In sum, Plaintiffs have not satisfied the particularity requirements under Rule 9(b) or PSLRA.   The Second Amended Class Action Complaint, thus, fails to plead a material misrepresentation or omission.

### B.     Scienter

Defendants argue that (1) Plaintiffs fail to allege that Defendants had contemporaneous knowledge of facts contradicting their statements about the risks of COVID-19; (2) Plaintiffs fail to allege that Defendants had contemporaneous knowledge of facts contradicting their statements about regulatory compliance; and (3) Defendants' conduct during the Class Period was "fundamentally inconsistent with scienter."  Mot. at 23–28.

Plaintiffs argue in their Response that (1) they allege Defendants possessed contemporaneous information that directly contradicted their public statements; (2) Defendants' statements support a strong inference of scienter; (3) the Second Amended Class Action Complaint addresses the Court's Order as to scienter; and (4) "[t]he SAC alleges a number of additional facts that, taken holistically, support an inference of scienter."  Resp. at 24–29.

In reply, Defendants contend that "Plaintiffs' theory of scienter is not as compelling as opposing inferences."  Reply at 14–15.  Defendants also argue that the Second Amended Class Action Complaint fails to allege that Defendants had contemporaneous knowledge of facts contradicting their public statements.  *Id.* at 15–19.

"Under the PSLRA, a plaintiff cannot 'plead the requisite scienter element generally . . . .'" *Brophy v. Jiangbo Pharms., Inc.*, 781 F.3d 1296, 1302 (11th Cir. 2015) (quoting *Mizzaro*, 544 F.3d at 1238).  In the Eleventh Circuit, "§ 10(b) and Rule 10b-5 require a showing of either an 'intent to deceive, manipulate, or defraud,' or 'severe recklessness.'"  *Id.* (quoting *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 634 (11th Cir. 2010)) (internal citation and quotation

marks omitted).  The PSLRA "requires, 'with respect to each act or omission alleged,' that a complaint 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  *Carvelli*, 934 F.3d at 1318 (quoting § 78u-4(b)(2)(A)).

"To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff."  *Tellabs*, 551 U.S. at 323–24. "A complaint will survive [a motion to dismiss] only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* at 324 (emphasis added).

To begin, the Court has not found any of Defendants' statements to be actionable misrepresentations or omissions sufficient to sustain a claim for securities fraud.  *Carvelli*, 934 F.3d at 1317 (quoting *Mizzaro*, 544 F.3d at 1236–37).  And, even if the statements were materially false or misleading, the Court nonetheless finds that Plaintiffs have not sufficiently alleged a strong inference that Carnival acted with (1) the intent to deceive, manipulate, or defraud its investors; or (2) severe recklessness.  *Brophy*, 781 F.3d at 1302.

First, the Court again finds that Carnival's January 2020 statements reflect its commitment to and prioritization of health and safety, and its belief that the risk of COVID-19 was "low."  *See* SAC ¶¶ 298, 301–03, 307, 309, 312.  It remains plausible that Carnival is committed to and prioritizes health and safety aboard its ships, notwithstanding the impact that COVID-19 had—and continues to have—on its business and on the world economy.  It is similarly plausible that Defendants did indeed believe in the early days of the pandemic that the risk to Carnival's business and passengers was relatively low, as cases outside of China were only then beginning to rise.

As the Court observed in its May 28, 2021 Order:

> In January 2020, pre-pandemic life was mostly unchanged with no travel restrictions, other than perhaps travel to and from China. No mask mandates were in effect—nor were masks even recommended. While it is ***possible*** that in January 2020 Defendants possessed some greater knowledge than the CDC or the WHO as to the devastation COVID-19 would ultimately cause, that argument does not give rise to the requisite strong inference of scienter to support a claim for securities fraud.

Order at 33 (emphasis in original). Nothing in Plaintiffs' Second Amended Class Action Complaint warrants the Court's departure from its prior conclusion.

Second, Plaintiffs' reliance on Carnival's February 2020 statements reiterating its commitment to and prioritization of health and safety and warning of the potential impact COVID-19 might have on its business fare no better. These allegations contain the exact same statements from Plaintiffs' prior complaint—with the addition of a statement from Carnival's February 27, 2020 Annual Report that do not even raise in their Response. *See* SAC ¶¶ 314–15, 317–18, 320, 322–23; *see generally* Resp..

Third, as to the March 2020 statements, despite their efforts, Plaintiffs still fail to raise a plausible inference that Defendant Donald's statements in mid-to-late March regarding his view on the general safety of cruise ships were made with scienter, especially considering Defendants' actions of halting its voyages on March 13 and Carnival's filing its March 16, 2020 Form 8-K/A notifying investors of the expected year-end loss. *See* SAC ¶¶ 231, 325, 328–29, 331. Carnival's action to pause operations cuts against Plaintiffs' argument that any of Carnival's March 2020 statements were made with scienter. Further, Defendants did indeed take measures to advance their health and safety goals, even if those efforts would ultimately prove to be unsuccessful in the face of a global pandemic.

Finally, the Court agrees with Defendants' argument that their conduct is inconsistent with scienter. Mot. at 27–28. Carnival bought back more than three million of its shares during the

Class Period.  *See* (ECF No. 79-20) at 7; SAC ¶ 22 (alleging that Carnival did not suspend share repurchases until the end of the Class Period); *In re Ocwen Fin. Corp. Sec. Litig.*, 2015 WL 12780960, at *10 ("There is no evidence of suspicious stock sales or purchases by any of the Defendants in the Complaint.  To the contrary, Ocwen launched a buyback program to repurchase outstanding shares during the relevant period, cutting against an inference of scienter."); *Henningsen v. ADT Corp.*, 161 F. Supp. 3d 1161, 1204 (S.D. Fla. 2015), *aff'd sub nom. IBEW Loc. 595 Pension & Money Purchase Pension Plans v. ADT Corp.*, 660 F. App'x 850 (11th Cir. 2016) ("Instead of selling stock, ADT bought its own stock during the relevant period.  'Stock repurchase programs actually ***negate*** a finding of scienter.'") (emphasis in original).

Nor do Plaintiffs allege in the Second Amended Class Action Complaint that Carnival executives sold shares during the same time period.  *See generally* SAC; *see also Mizzaro*, 544 F.3d at 1253 ("In this case, the amended complaint says nothing about suspicious stock transactions by any of the individual defendants, an omission that weighs against inferring scienter.").  While "suspicious stock sales are not necessary to create a strong inference of scienter[,] . . . . [t]he presence or absence of such allegations must be assessed in light of all of the allegations found in the complaint."  *See id.* (citing *Tellabs*, 551 U.S. at 325).  Carnival's repurchasing shares and the absence of suspicious stock sales during the Class Period, combined with Carnival's suspending voyages in March, negate a finding of scienter.

On balance, the Court does not find the inference of scienter to be as compelling as the opposing inferences that one could draw from the facts alleged.  *See Tellabs*, 551 U.S. at 324.

## IV.  CONCLUSION

UPON CONSIDERATION of the Motion, the pertinent portions of the record, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED that

Defendants' Motion to Dismiss the Second Amended Complaint and Incorporated Memorandum of Law (ECF No. 79) is GRANTED, and the Second Amended Class Action Complaint (ECF No. 74) is DISMISSED WITH PREJUDICE.  The Clerk of Court is INSTRUCTED to CLOSE THIS CASE.  All pending motions, if any, are DENIED AS MOOT.

DONE AND ORDERED in Chambers at Miami, Florida, this *30th* day of March, 2022.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

c: All counsel of record

49